UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. ~~99-3458~~-CIV-LENARD
*02-20261*

MAZEN AL NAJJAR,

      Petitioner,

vs.

JOHN ASHCROFT, Attorney General, United
States Department of Justice, *et al.*,

      Respondents.

_____/

# EXHIBIT 1: TRANSCRIPT OF REMAND CUSTODY HEARING
## (VOLUME 2 OF 9)

### AUGUST 29, 2000

TO

SUPPLEMENTAL COMPLAINT AND RENEWED PETITION FOR HABEAS CORPUS

**U.S. Department of Justice**
Executive Office for Immigration Review
Immigration Court

Matter of                                                File A 26 599 077

|  |  |
|---|---|
| MAZEN AL NAJJAR | ) ) ) In BOND Proceedings ) ) ) |
| Respondent | ) Transcript of Hearing |

Before R. KEVIN MCHUGH, Immigration Judge

Date: August 29, 2000                    Place: Bradenton, Florida

Transcribed by FREE STATE REPORTING, INC., at Annapolis, Maryland

Official Interpreter:

Language:

Appearances:

For the Immigration and
Naturalization Service:                  For the Respondent:

Daniel Vera                              Martin B. Schwartz
George Perez                             David Cole
Karin M. Guttormsen                      Joseph Hohenstein
                                         Nancy Chang

JUDGE FOR THE RECORD

Okay.  We're back on the record on this 28th day of August, the year 2000 -- the 29th day of August, in Bradenton, Florida, in the matter of Mr. Mazen Al Najjar.  The A number is 26 599 077.  He is present in Court today with his counsel, Mr. David Cole, Joseph Hohenstein, Nancy Chang, Andrew Caton --

JUDGE TO MR. SCHWARTZ

And Andrew Caton is not here?

MR. SCHWARTZ TO JUDGE

No

JUDGE FOR THE RECORD

And Martin B. Schwartz.  And the Government is going to be represented by Mr. Daniel Vera, George J. Perez, and Karin M. Guttormsen.  And anything we need to take up, gentlemen?

MR. COLE TO JUDGE

We have a -- Judge, David Cole --

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

-- for the respondent.  We have a motion which we presented last week, Your Honor, requesting disclosure of exculpatory evidence pursuant to Brady.  The claim being that due process applies to these proceedings.  The Brady requirement is that due process requirement is based on the notion that the Government has no interest in not disclosing to the respondent any

A 26 599 077                    47                    August 29, 2000

information that would tend to undermine its case and be favorable to the respondent. It has been ordered to be disclosed in other Immigration cases, and we therefore seek an order that the Government disclose to us any exculpatory evidence. Additionally, particularly critical in a case like this where the Government has indicated that it intends to proceed on the basis of classified information which, as Your Honor is well aware and as Judge Leonard made clear, raises very serious questions in terms of our ability to fairly defend Dr. Al Najjar, our ability to cross-examine any sources any witnesses is fundamentally compromised. And in light of that, in particular, due process would require that the Government turn over any information which is favorable to the respondent. They have had for now five years everything in WISE and ICP's offices (phonetic sp.). They have been conducting an investigation for five years. Nothing has come of it. It is very likely, given that nothing has come of it, that they have evidence which is favorable to the respondent. That is to suggest that the respondent is not responsible for all of the criminal activities that they enumerated for you three years ago. And, therefore, as the Supreme has said the Government has no interest in detaining somebody improperly. And, therefore, if they have any evidence in their control that is favorable to the respondent, it ought to be turned over to us.

JUDGE TO MR. COLE

Okay. Now I do note that regarding the case that you cited

A 26 599 077                                48                    August 29, 2000

in your motion, it was submitted a little bit earlier in the proceedings. I got the motion on Monday, which is yesterday, and today is Tuesday. So I would have thought that if you wanted this, that you would have submitted it at an earlier date.

MR. COLE TO JUDGE

Yeah, I apologize for that, Your Honor. I think we submitted it, actually, on Thursday. I think it was filed on Thursday.

JUDGE TO MR. COLE

Um-hum, I was out of town.

MR. COLE TO JUDGE

You were out of town. So I think just the record should reflect that we filed it on Thursday. I apologize for the late notice. But I would also note that the Brady requirement is actually an ongoing obligation on the Government to disclose favorable evidence. So, in fact, whether we made the request or not, the Government should be turning this material over to us. But we have now formally made the request, I believe under the due process clause under Brady, that the Government is obligated to turn it over. And if they don't turn it over, that that fundamentally compromises our ability to have what Judge Leonard mandated, which is a fundamentally fair proceeding.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. VERA

Mr. Vera.

MR. VERA TO JUDGE

Yes, Your Honor.  First, the Government's position is that it's unsettled as to whether or not Brady actually applies to Immigration Court proceedings.  Nonetheless, the Government's position is that if it was in possession of exculpatory evidence as defined in Brady, that we of course would turn it over t counsel on just general notions of due process as counsel has argued.  The position of the Government, however, is that Brady and our requirements under due process are much more narrow than counsel has argued.  It's not any evidence that might be favorable to the respondent.  It's any evidence that might tend to exculpate the respondent from those allegations which the Government has levied against a particular person.  Our position is that of course in our investigation and in the information that we have obtained over the years, we don't have in our possession evidence that would indicate that Mr. Mazen Al Najjar is not a threat to national security as we have alleged to this Court and as was previously found by this Court for the purposes of whether or not he should be free from custody of the INS.  So therefore our position is that while we would certainly seek to turn over anything that might be exculpatory as that term is defined under the law, that we don't have in our possession and are not aware of any information that would tend to exculpate Mr. Al Najjar from the position that we have, and that's that he is a

A 26 599 077                    50                    August 29, 2000

threat to national security.  So at this time we have no evidence and we don't believe -- we understand the continuing obligation, but we don't, after five years, don't believe we're going to run into exculpatory evidence unless the other side turns it over to us.

JUDGE TO MR. VERA

Okay.

JUDGE TO MR. COLE

Mr. Cole.

MR. COLE TO JUDGE

Well, if I take the Government counsel to be asserting that they do understand that they are under the obligation to provide us with the evidence but there just isn't such evidence, then we'll take them at their word.  I think there may well be an issue as to what constitutes exculpatory, in <u>Brady</u> the Court said anything that is favorable to the defendant and material to the issues of the case.  And it is --

JUDGE TO MR. COLE

I think in the California cases the individuals came in, if I'm not mistaken, from Iraq.  And they were probably processed by the State Department and by the INS, and so many, many statements were taken through the entire procedure.  And in this particular case, I don't believe we have the -- I think the respondent came in as a student.  Is that right?

MR. COLE TO JUDGE

A 26 599 077                    51                    August 29, 2000

That's right.

JUDGE TO MR. COLE

At one time, and so we don't have the lengthy questioning that would ordinarily be the same type of case that if he came through Guantanamo or one of those cases.

MR. COLE TO JUDGE

Right.  I, just to clarify.  The case, the prior case which was cited, In re Hamini (phonetic sp.), is not the case involving the Iraqis.  The case --

JUDGE TO MR. COLE

Yeah, well you put Judge Einhorn's order --

MR. COLE TO JUDGE

Right, Judge Einhorn was the Judge on it.  But it's not the case involving the Iraqis which is the case that has gotten a lot of attention lately.  Jim Woolsey (phonetic sp.) represented the Iraqis.  And they were recently freed after being detained on the basis of the evidence.  Well the case that we have cited to Your Honor is a case that's now been pending for 13 years involving a group of eight aliens in Los Angeles, who I also represent, who are alleged to be associated with the Popular Front for the Liberation of Palestine, one of the, a part of the PLO.

JUDGE TO MR. COLE

Yeah, I almost set their bond hearing in that case --

MR. COLE TO JUDGE

I'm sorry?

A 26 599 077                    52                    August 29, 2000

JUDGE TO MR. COLE

I almost set the bond hearing in that case.

MR. COLE TO JUDGE

Okay.

JUDGE TO MR. COLE

I was out in California.

MR. COLE TO JUDGE

Okay. So then you know the case. That's the case.

JUDGE TO MR. COLE

That's just about all I know.

MR. COLE TO JUDGE

All right. Well what I'll say about that case is that it is essentially the same kind of allegation that's involved here, the allegation that these people were associated with the Popular Front for the Liberation of Palestine, that they supported it, that they fund raised for it, et cetera. And Judge Einhorn and Judge Hyrcenko before Judge Einhorn both ordered the Government to turn over any evidence favorable to Mr., to the respondents in the course of that proceeding. And not only did they order that they turn over all evidence favorable to the defendants, they ordered, Judge Einhorn ordered the Government, and it's reflected in the orders we submitted to Your Honor, that the Government search all CIA files, all State Department files, all Defense Department files, all FBI files to find out whether there was evidence in there that contradicted any of the assertions that

A 26 599 077                    53                    August 29, 2000

they were making in the proceeding. And it took them quite a --
as you might imagine it took them quite a long time, but they
ultimately turned over I'd say in the neighborhood of 100 to 150
pages of contradictory information which we then used to cross-
examine their witnesses. That I believe is, you know, the
appropriate step, particularly in a case like this where, as I
have said, classified information is being presented. In the
<u>Hamini</u> case no classified information was presented. It was all
on the record. And even though it was all on the record the
Court required as a matter of fundamental fairness, as a matter
of due process, what possible interest would the Government have
in keeping from the Court and from us evidence that is favorable
to the respondent. This is not a, you know, some kind of, you
know, civil litigation over money. This is about whether a
person should be locked up or not. And it's, due process
requires that in that, in that determination, the Government has
no interest in locking up the wrong people. It has every
interest in disclosing any evidence which is favorable to the
respondent. I, frankly, you know, it's hard for me to believe
that there is no evidence in the Government's possession which is
favorable to the respondent. They have made that indication to
Your Honor.

JUDGE TO MR. COLE

As officers of the Court, I might add.

MR. COLE TO JUDGE

A 26 599 077                    54                    August 29, 2000

Right, as officers of this Court. And I'm not sure where we can go with that, but I do think that they are under that obligation. And I think that you should make clear that they are under that obligation. Because I hear counsel saying we recognize due process, we recognize it as a matter of fairness, that we would provide this information. But we don't recognize that we are required to provide this information. Require and, well, we might do it because we're good guys are two very different things. And what the Constitution requires is that the Government be obligated, not that the Government, if it consists of, you know, good guys in its discretion can turn over favorable evidence, but that the Government is obligated. And so we ask Your Honor to just clarify and order the Government to turn over any favorable evidence. If their testimony is that there is no such favorable evidence, then we proceed.

JUDGE TO MR. COLE

Well, I think Mr. Vera's words were we will turn it over. We don't have it. It seems to me that that is exactly what you asked for.

MR. COLE TO JUDGE

Your Honor, well that is exactly what I asked for. I take him to be disagreeing with the definition of exculpatory evidence, which the Brady court says is favorable to the defendant and material to the case. So I would ask Your Honor to ask counsel whether they have any information that is favorable

A 26 599 077                    55                    August 29, 2000

to the respondent and material to the issue of national security, that's all.

MR. VERA TO JUDGE

Well, Your Honor, that's the whole point.  I believe that counsel is asking for way too much.  If we have information that Mr. Mazen Al Najjar is a good father, that's favorable to him.  But that's information that they have.  That's information that is not material to the issue of whether or not he otherwise poses a threat to national security.  We have information that Mr. Mazen Al Najjar was employed in the United States at some point, gainfully employed.  That might be favorable in terms of these Immigration Court proceedings.  But again, that's not relevant to the issue of whether or not he poses a threat to national security based on the evidence that we have presented to this Court before and will be presenting again.  So our position is that, again, even if we apply Brady in its pure context, Brady and notions of due process require us to turn over that which might tend to exculpate from that which we, the U.S. Government, have charged against an individual.  And the representation that we're making is that we understand our obligation.  We voluntarily accept an obligation to turn over anything that would tend to exculpate Mr. Mazen Al Najjar from that which we are alleging in this Court.  We are not in possession of any such information.  If it, in fact, comes into our possession at a later date, we are aware of our continuing obligation to do so

A 26 599 077                    56                  August 29, 2000

and will turn it over to counsel at the first available moment. But at this time and under those parameters, we have no such information.

JUDGE TO MR. COLE

Mr. Cole.

MR. COLE TO JUDGE

Counsel's response to your question I think avoided the question, because what he said is well we might have evidence that might be favorable to Mr. Al Najjar on, for example, his work history, et cetera, but that wouldn't be material to the issue of national security. Well what we asked Your Honor to ask him, and what you did ask him, was whether you have favorable evidence relating to the issue of national security. If there is any such evidence, in fact --

JUDGE TO MR. COLE

I think I asked, did he have exculpatory evidence.

MR. COLE TO JUDGE

Well, that's -- and I still haven't heard from counsel what they define as exculpatory evidence. Because if they're making a representation, it would be useful to know are they representing that they have no evidence that is favorable to the respondent --

JUDGE TO MR. COLE

Not favorable.

MR. COLE TO JUDGE

Well favorable and material is the definition of exculpatory

under Brady.  So exculpatory equals favorable.

JUDGE TO MR. COLE

Not all favorable --

MR. COLE TO JUDGE

Favorable and material.  It has to be material.

JUDGE TO MR. COLE

I think they've answered that.  I don't think we can do any better than what Mr. Vera, as a member of, officer of the Court has, you know -- I could give you an order, but, you know, I don't know how we can beat that.

MR. COLE TO JUDGE

Well --

JUDGE TO MR. COLE

And I'm not going to give one like Judge Einhorn.  If you wanted one like Judge Einhorn, you should have come in here when Judge Leonard issued the order.  And, you know, you come in now asking that I issue a search order for all the department of --

MR. COLE TO JUDGE

I'm not --

JUDGE TO MR. COLE

-- the whole, everything --

MR. COLE TO JUDGE

-- no, I'm not asking that, Judge.  I was just giving that as an example of what another Judge has done.  We are not asking you to ask the Government to do that.  We are asking the

A 26 599 077                    58                    August 29, 2000

Government, ask the Government, or the Government to turn over material that is favorable to Mr. Al Najjar on the material issue of national security.  That is all we're asking.

JUDGE TO MR. COLE

Okay.  I think it's been resolved.  Okay, next issue.

MR. COLE TO JUDGE

The next issue, Your Honor, is the declassified summary of the classified information.  The Government has known we've gone through, we've had a number of exchanges with respect to this issue.  Judge Leonard, in her decision, held that to consider classified information in the prior proceeding was a violation of due process in part because the summary which was provided was inadequate.  Therefore, a fortiori in this proceeding, in order to provide adequate procedures, there has to be a more detailed summary, particularly as Your Honor has declined to give us access, clear counsel access to the information behind closed doors.  The only possible way to even begin to get a sense of what the classified is is through the presentation of an unclassified summary.  Your Honor indicated that under the regulations, you didn't believe that you had the authority to order that.  We believe that under Judge Leonard's decision you do have the authority to order that, but that's sort of water under the bridge at this point.  We are now here on the day of hearing.  The Government has indicated that it intends to present classified information.  It has indicated to Your Honor that it

A 26 599 077                         59                    August 29, 2000

was preparing a declassified summary. We think we should have been provided earlier, at least we ought to be provided it now before any witness gets up. How are we supposed to conduct a cross if we don't know what the scope of the evidence the Government intends to present behind closed doors is, even a cross of Mr. West or any of the other witnesses? And so in order for us to have -- I, we, our position is that any consideration of -- you understand, our position is that any consideration of classified information violates Dr. Al Najjar's due process rights. And we do not believe that the classified information should be considered. But at a minimum, it is clear from Judge Leonard's order that a summary should be provided, and we still have not been provided with that summary. We have made three independent requests for that summary. The Government said it was working on it. They have yet to turn it over.

JUDGE TO MR. VERA

Mr. Vera.

MR. VERA TO JUDGE

Yes, Your Honor. Again, we have previously cited to the regulations that apply to these proceedings. And the position of the Government is when and if we do present classified evidence in this Court, in camera and ex parte, we will present an unclassified summary to this Court for the Court's review to make the determination as to whether or not that unclassified summary can be provided to the respondent without endangering national

A 26 599 077                    60                    August 29, 2000

security.  At that time counsel for the respondent, of course, was given access to that unclassified summary and can do it with that summary that which counsel wishes.  Our position of course is that there is no discovery.  There is no independent obligation.  Even Judge Leonard does not go as far as counsel argues.  Judge Leonard, in our view, simply states that when and if classified evidence is going to be used she suggested certain procedures might be utilized.  She suggests of course that in order to gain due process through the use of such proceedings, there are certain requirements that have to be met.  But as Your Honor has very precisely stated, in the prior ruling the Judge does not go so far as to order this Court to undertake any particular procedure in regards to that process but, in fact, merely suggests.  So our position is that pursuant to the regulations and pursuant to even the authority that is cited by counsel, there is no independent obligation for us to provide an unclassified summary at this time and we would not be doing so.  One last point we would make, of course, is that which we've already made in the motion and that's that Special Agent West will testify in the open court proceeding.  He will therefore not be testifying about the classified information.  And in order to cross-examine Special Agent West, there is no need for an unclassified summary or anything related to the classified evidence presentation since he is not the witness that the Government will present for that purpose.

A 26 599 077                      61                  August 29, 2000

MR. COLE TO JUDGE

Your Honor, the witness that the Government will present for that purpose we obviously can't cross-examine. The Government has made clear in its prior filings with Your Honor, that it intends to present classified information. There's no secret here that there is going to be an *in camera* proceeding, and we object to that proceeding. Judge Leonard held that the prior holding of an *in camera* proceeding was unconstitutional in a situation where they provided a summary. It was unconstitutional because the summary was on its face inadequate. By definition then, in order for this proceeding to be constitutional, and what Judge Leonard has ordered is not some, that you apply INS regulations. She has ordered that you provide Dr. Al Najjar a remedy. And the remedy is a fundamentally fair hearing in which the Court must, and I quote from page 62 of her ruling, "preserve the petitioner's rights to notice, an opportunity to confront the evidence and a fundamentally fair proceeding." Now if they are presenting classified information, there are, our position is that you can't, we can't have adequate notice, adequate opportunity to cross-examine if you've got a witness behind closed doors talking to Your Honor and we don't have any access to cross-examine that witness, to ask any questions of that witness, to find out his sources, et cetera. But at a minimum, Judge Leonard's decision says that even where a summary is provided it's unconstitutional unless that summary is adequate to

A 26 599 077                    62                    August 29, 2000

apprise the petitioner of notice of the evidence against him and an opportunity to confront the evidence. This is our opportunity to confront the evidence. Sergeant West is going to get on the stand. He's going to testify. We need to know what the charges are here. We need to know -- and, and from a fundamental fairness point of view, we need to know what the charges are and from an efficiency standpoint, from Your Honor's efficiency standpoint, we need to know what the evidence is here. What's the purpose of hiding the ball at this point in the proceeding. Let's get out on the table what the charges are, and then we can, we might have an opportunity to defend ourselves. But if we're going to hide the ball, put on one witness who -- and we have to cross-examine him not knowing what, whether Dr. Al Najjar is charged with blowing up a building or, you know, supporting some kind of terrorist activity, not knowing that, we don't know that because nothing has been alleged of that sort, then we are short circuited in our ability to cross-examine Mr. West. We're also short circuited in our ability to cross-examine the Government's other witness. So the -- I just don't see, I see no interest that the Government could possibly assert in hiding the ball at this point. If they're going to turn over the unclassified summary, they have an unclassified summary, why not turn it over? I have not heard a reason why it shouldn't be turned over now. And I'm giving you two reasons why it should. One is Judge Leonard's decision basically says that you have to provide notice

A 26 599 077                    63                    August 29, 2000

of the evidence and an opportunity to confront the evidence, and she's talking about the secret evidence. Your Honor has already said that one route to that clear counsel is out, is not permissible. The only other route, and I haven't heard counsel suggest another route, the only other route I can think of that the Government has ever suggested is that in any proceeding of this type is a declassified summary. In the other -- I have represented a number of aliens in Immigration proceedings where secret evidence has been used. In every one of those proceedings the Government provided the declassified summary at the opening of the case so that when they put their witnesses on in open court, we could ask questions that might go to the allegations that they're going to be presenting Your Honor with behind closed doors. What possible interest do they have in pining that off from us? Now we should be able to cross-examine Sergeant West to the fullest ability with respect to the charges in this case. And the charges have not been disclosed because they're presenting, they are going to present some of it in secret. And therefore, as a matter of due process and efficiency, they should be required to give us the summary at this point. And again, I have heard no argument from counsel as to what, how they would be harmed by providing Dr. Al Najjar with notice of the evidence that they are going to present to Your Honor in secret.

JUDGE TO MR. VERA

Mr. Vera.

A 26 599 077                    64                    August 29, 2000

MR. VERA TO JUDGE

Well, Your Honor, I think the argument is somewhat disingenuous. I'll use counsel's own arguments that he has posed before that there is certainly at least one argument that calls for us not to proceed that way at this time and that's the very notion that he says that the authority for this Court proceeding is limited to the four corners, in essence, to the four corners of the decision issued by Judge Leonard. And that decision tells this Court that if in fact our open court presentation indicates that Mazen Al Najjar is in fact a threat to national security as we have alleged, that perhaps this Court might determine that that inquiry is at an end. And we may end up, while we may or may not do so, we may end up in a scenario where, in fact, the unclassified summary is not necessary to these proceedings. But beyond that, our position is of course that the respondent himself is in the best position to know what he has done or not done in relation to the terrorist organization that we have already disclosed before in the prior proceeding, the Palestinian Islamic Jihad, what he has done in relation to that organization. There is no discovery in these proceedings for anyone, not for somebody who is in his position or somebody who is a criminal or somebody who has done something else. There is no discovery in these proceedings. Congress has not provided that for these proceedings and for people that are similarly situated. So the Government's position is simply this, we will be putting on our

A 26 599 077       65       August 29, 2000

case today as required by the decision of Judge Leonard.  We will be presenting open court evidence that goes with more specificity to those activities of the respondent in relation to the terrorist organization that we have mentioned.  Counsel, in preparation for this case, clearly had the opportunity that we don't have, and that's access to his client to advise about what it is that his client has or has not done in relationship to the Palestinian Islamic Jihad.  We have a problem beyond all that, and that's simply that the statute and the regulations and the executive order that are binding on this Court preclude the disclosure of classified evidence to the respondent.  And we have to balance here.  We have to determine in the country's best interests whether or not we allow somebody that we say is meaningfully associated with a terrorist organization to run free in the United States or whether or not we use evidence in these in camera proceedings to keep that person in custody and in a position where he cannot assist in potentially harming the citizens of this country or anywhere else.  So our position is simply that we do have the opportunity to present in camera classified evidence.  That Judge Leonard's decision does not in fact proscribe that.  That at most Judge Leonard says that there are certain things that she recommends that we ought to do when we do that, and there is no direction to this Court, neither by regulation or by law or even Judge Leonard's decision that somehow can be argued to require that we have to produce anything

A 26 599 077                      66                    August 29, 2000

at this time to include an unclassified summary of the classified evidence that we may in fact use before this whole proceeding is over.

JUDGE TO MR. COLE

Mr. Cole.

MR. COLE TO JUDGE

Your Honor, this is not a discovery request. This is evidence that they intend to present behind closed doors. And in ordinary proceeding all evidence is put on right there. We get to see it. We get to respond to it. The whole point of the summary is because this evidence is put on behind closed doors. We don't get to see it. We have a right to, at a minimum, we have a right to a summary of the evidence. We're not asking -- counsel says well we can't under the statutes and regulations and executive order, we can't disclose classified information. As Your Honor knows we are not asking for the disclosure of classified information. We are asking for, and what the Government has provided in every other secret evidence case at the outset of the case, is a declassified summary. That is what they indicated that they were working on. That means that they have presented the classified information to the classifying agency, which is probably the FBI. The FBI made a determination as to what could be revealed without undermining national security. They have made that determination. The summary exists. The summary ought to be provided. There is simply no

A 26 599 077                    67                    August 29, 2000

purpose served by not providing the summary at a time when Dr. Al Najjar is going to begin attempting to defend himself in a proceeding in which, as Judge Leonard ordered, the Court must preserve the petitioner's right to notice and an opportunity to confront the evidence.  With respect to -- Judge Leonard also states, on page 60 of her decision, that the Government should not be entirely precluded from relying unclassified information as Mr. Vera stated, but Mr. Vera left out the rest of her sentence, the rest of the sentence.  As the Government should not be entirely precluded from relying on classified information but must introduce it in a manner that affords petitioner access to the decisive evidence to the fullest extent possible without jeopardizing legitimately raised national security interests. Now the purpose of the declassification review is to identify that information in the evidence which, in fact, there is no national security concern with respect to.  They have done that. By necessity they had to do that.  They told this Court that they were doing that.  Now they ought to present it to us.  When, and when we had a telephonic conference two weeks ago, Your Honor, I argued we should be going with their public record of the case and our public record of the case, and only at the close of that case if you concluded that there was not a basis for a threat to national security should we go forward with classified information.  The Government said no.  We want to put on our case in the way that we want to put it on.  We want to put on our open

A 26 599 077                    68                    August 29, 2000

record evidence, then we want to put on our secret evidence. Then counsel for the respondent can put on their evidence. And Your Honor said that the Government is permitted to do that. They should be required to provide us the unclassified summary. If they, if they decide at the close of the hearing that in fact they don't need to present classified information, then what harm has come to them? They have presented us with a summary of information which is not secret regarding their allegations. They have said they are going to use this. In order for us to have a fair opportunity to respond -- I mean, we are fighting in the dark here, Your Honor. By definition anytime you go behind closed doors, and I'm sure that Your Honor is not comfortable with the kind of proceeding where one side gets to talk to a Judge outside of the other side's part. That's extremely unusual. At a minimum, Judge Leonard said the Government is obligated to disclose to the fullest extent possible, without undermining national security interests, that information and must provide notice of the evidence and an opportunity to confront it. There is no notice of the evidence and an opportunity to confront it if, in fact, they are not willing to even turn over the information which is declassified. And I will again reiterate in every prior classified information proceeding that I have been involved in, and I have been involved in a number over the years, this is the 13th case involving allegations of national security threats based on secret

A 26 599 077                    69                    August 29, 2000

evidence, in every proceeding we have gotten a summary.

JUDGE TO MR. COLE

Okay. I don't think they said they weren't going to give you the summary. It appears to be the, when we're going to get the summary. As I stated earlier, I'm not going to run your case. I'm not going to run the Government's case. You know, each of you are capable counsel, and I expect you all to present your case. And I'm not going to interfere with the presentation of it unless there is, you all step out of bounds. At this particular step, I'm not going to force the Government at this stage of the game to give the summary. They can give it at the appropriate time. I know if you need a continuance after that, you feel that you were prejudiced, then I will certainly give you a continuance to prepare.

MR. COLE TO JUDGE

Well, Your Honor, it's extremely likely that we will need a continuance to prepare. It's extremely prejudicial to the respondent not to be able to present a single defense at a single time. Counsel are from out of town, from way out of town. It's very -- I mean, the efficient way to proceed here would be to provide the information so that everybody knows what's at issue. Why do we go forward in a case without even knowing -- what possible interest does the Government have in keeping, hiding from us information which is not classified, which is not confidential, which does not threaten national security, and

A 26 599 077                    70                    August 29, 2000

which concerns their allegations regarding Mr. Al Najjar?  So our objection is noted for the record.

JUDGE FOR THE RECORD

So noted.

JUDGE TO MR. COLE

Okay.  As I remember there was also a request for Mr. Basheer Musa Nafi.

MR. COLE TO JUDGE

That's right.  We have requested that he be allowed to testify by telephone.  The reason he needs to testify by telephone is that he was in London.  He is also not permitted to enter the United States because he was deported, on a rather technical charge that we will go into, less than five years ago.  So he is barred from entry to the country.  Telephonic testimony, as I understand it, is not very unusual in Immigration proceedings.  The Government has alleged that one reason that Dr. Al Najjar is a threat to national security is because of his relationship to Basheer Musa Nafi, his relationship to Basheer Musa Nafi.  And the Government -- and well, why should his relationship to Basheer Musa Nafi matter?  Because the Government alleges that Basheer Musa Nafi is a terrorist.  He is a leading member of the Palestine Islamic Jihad.  They base that allegation, as far as we can tell in prior testimony, they based it on a single newspaper article.

JUDGE TO MR. COLE

A 26 599 077                    71                    August 29, 2000

Do you agree or disagree that he is a member of the
Palestinian --

MR. COLE TO JUDGE

We disagree.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

And in fact we are offering him here.  We are -- you know,
they have made an allegation based on hearsay that this person
with whom Dr. Al Najjar is associated is a member of the PIJ.  We
are offering to bring the person in so we can direct testimony as
to whether he is a member of the PIJ.  And we are quite confident
that when Your Honor hears from him, you will see that there is
no basis whatsoever for the allegation that he is member of the
PIJ.  That he was in fact opposed to the founding of the PIJ.
That he has never in his life in any way taken any activities or
any advocacy on behalf of the PIJ, despite the fact that he is a
very public man.  He is a professor, an esteemed professor.  He
has published books.  He has published reams of articles,
newspaper articles, some 400 opinion pieces, Arab and English
language papers throughout the world, never asserted any support
or any link or any connection whatsoever to the Palestine Islamic
Jihad.  If the Government is going to make a material part of its
case the identity of Basheer Musa Nafi and whether or not he is a
member of the PIJ, how could it possibly object to hearing from

A 26 599 077                    72                    August 29, 2000

Mr. Basheer Musa Nafi and asking him, are you a member of the PIJ.  Let's get it from the person who has the best information. Now they might argue that he's not credible.  That's a determination that you're entitled to make.  But the notion that the Government  opposes our request on the ground that Basheer Musa Nafi is a member of the PIJ is putting the cart before the horse.  They have alleged, based on hearsay, that he is.  We offer to prove based on direct testimony that he is not.  We certainly ought to have the right to present that evidence.

JUDGE TO MR. VERA

Mr. Vera.

MR. VERA TO JUDGE

Yes, Your Honor.  First of all, counsel is an experienced Immigration practitioner.  He knows that even a person who gets deported can, in fact, come back into the United States for the limited purpose of testifying in a proceeding under 8 C.F.R. 212(d).  And, in fact, no such request was made to allow him to come back into the United States for that limited purpose.  Our position, of course, is that Basheer Musa Nafi is in fact affiliated with the Palestinian Islamic Jihad Organization, and in fact our evidence will, we believe today, prove that.  If in fact such parole requests would have been made, we may perhaps have been able to grant that in sufficient time to allow Mr. Basheer Musa Nafi to testify.  Clearly, we would have brought him into the United States in custody --

A 26 599 077                    73                    August 29, 2000

JUDGE TO MR. VERA

Go ahead.

MR. VERA TO JUDGE

And --

(OFF THE RECORD)

(ON THE RECORD)

(TAPE 3)

JUDGE TO MR. VERA

Go ahead.

MR. VERA TO JUDGE

-- and yet counsel would have had ample opportunity to prepare him and to present him to this Court if, in fact, his testimony was necessary.  Clearly, counsel's argument that Basheer Musa Nafi can come here and tell you that he's not a terrorist or can do so by phone kind of avoids the obvious.  And that's that if you're a terrorist, you're not likely to get up on the stand and tell the Court that you in fact are a terrorist.  You're certainly not going to do that if you're not even within the confines of the United States where, in fact, you might be charged with perjury if you lie about your activities in regards to a terrorist organization.  So none of the safeguards that are inherent to determining that a witness in fact is testifying truthfully under oath would be present if Basheer Musa Nafi were allowed to testify by phone from London, England.  And certainly with an individual that, again, we believe our evidence will show

A 26 599 077                              74                    August 29, 2000

is a member of a terrorist organization, this Court cannot possibly assume that there is a sense of reliability in his testimony.  The Government's case would be severely prejudiced. We have no means of enforcing the laws of this land in regards to perjury, and we therefore would certainly object, especially in light of the fact that counsel made no request to have Basheer Musa Nafi come here in custody but paroled the United States Immigration and Naturalization Service.  The agency that in fact is prosecuting this case, who would have been potentially able to allow him to enter again in custody for these purposes.

JUDGE TO MR. COLE

Mr. Cole.

MR. COLE TO JUDGE

Your Honor, as Your Honor is aware and as Mr. Vera is aware, Government witnesses commonly testify by telephone in Immigration proceedings.  It is also common that the Court takes sworn testimony from people outside of the country.  In asylum proceedings it is probably the norm that information, declarations are offered from outside the country where the laws of, American laws of perjury don't apply and nonetheless the court takes those.  I have never heard the Government object to the admission of a declaration of any kind on the ground that it was made by someone outside of the country.  That's wholly unfounded.  As to credibility -- you know, all they have said here is we're going to prove, Judge, we're going to prove that he

A 26 599 077                    75                    August 29, 2000

is a PIJ member, therefore you shouldn't hear from him.  There is no evidence that he is a member of the PIJ.  Even if there were evidence that he is a member of the PIJ, I would think that Your Honor would want to hear from the person.  Again, you might find him to lack credibility, that's within your prerogative, but certainly you should hear him out.  If the Government determines and the Court determines at the close of his telephonic testimony that you can't make a sufficient determination as to whether or not he was credible because you didn't get to look him in the eye, then maybe a continuance would be appropriate at which we bring him in if it turns out that that is a, you know, a dispositive factor for yourself, for Your Honor.  But he should, you should at least hear from him.  We didn't -- I, I -- in fact, Your Honor, I was not aware of the regulation that Mr. Vera refers to.  We didn't make that request, but, frankly, we didn't understand the central significance of Mr. Nafi to the Government's case until they provided the subpoena with respect to Mr. Arian which indicates that Nafi, this petitioning for Nafi is a critical part of their case.  We, therefore, sought to have him testify.  He is a professor.  He is teaching.  He is not someone who can, you know, just -- it's totally unreasonable to expect that he is going to come to the United States, willingly get himself put in custody in order to testify in a proceeding where his interests are not at stake.  He has never --

JUDGE TO MR. COLE

A 26 599 077                       76                  August 29, 2000

Where does he teach?

MR. COLE TO JUDGE

Huh?

JUDGE TO MR. COLE

Where does he teach?

MR. COLE TO JUDGE

He teaches at the -- let me get his -- he teaches at the University of London. I'm not sure which college in the University of London. I have his CV and we will present that.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

But he's a professor at the University of London. He has never been charged with a criminal act. He has never been -- the only, the only legal violation that he has ever been found to have committed is he has been found to have worked for one month after why -- he was originally employed to work for WISE, came in on a H1B visa to work for WISE. WISE was closed down when the Government seized all of it's records, thousands of pages of documents, and everything out of its office. WISE was therefore defunct. Dr. Nafi was then working for WISE. He then for one month worked for an organization in Virginia and had not technically informed INS that he was transferring employment to IIIT, it's an organization that is called International --

MR. SCHWARTZ TO MR. COLE

A 26 599 077                      77                      August 29, 2000

Institute for Islamic --

MR. COLE TO JUDGE

-- Institute for Islamic Thought in Herndon, Virginia. That's the only -- and he agreed actually to, he stipulated that he had violated that he had violated that technical rule by failing to inform the INS that he was switching employers when the INS essentially closed down his employer, and he left the country. He was in fact, when the Government arrested him and put him into deportation proceedings, he was on the way out of the country. He was at a good-bye party. He was on his way out the door. The Government arrested him. The Government asked him about, actually about the respondent's brother-in-law in particular, and then they agreed to allow him to deport based on this technical violation. So this is not someone as to whom there has even been a criminal charge much less any kind of criminal conviction. This is someone who is a well respected, highly well respected expert on the Middle East and Islam whose very identity is a material and critical part of the Government's case. And they're saying we don't want Your Honor to hear from him. We want Your Honor to rely instead on our evidence. We don't want the other side to be able to present the best evidence. What could possibly be the best evidence? We simply see no reason why Dr. Nafi should not be permitted to testify.

JUDGE TO MR. COLE

Okay. I'm inclined to grant your request to have Dr. Nafi

A 26 599 077                          78                    August 29, 2000

testify by phone.

MR. COLE TO JUDGE

Thank you.

JUDGE TO MR. COLE

Okay.  Timothy Sprigdon (phonetic sp.) --

MR. COLE TO JUDGE

Oh, I'm sorry --

JUDGE TO MR. COLE

There's a request for a Timothy Sprigdon to talk, to also telephonic testimony.

MR. COLE TO JUDGE

Okay.  It has turned out that reason for our request with respect to Mr. Sprigdon was that he had a trip to England.  That trip has at the last moment been cancelled.  So if we need to call him we can call him in person.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

So that issue is now moot.

JUDGE TO MR. COLE

Okay.  And then as I understand, you do need an Arabic interpreter for Mr. Nafi and the respondent as well.

MR. COLE TO JUDGE

Right.

JUDGE TO MR. COLE

A 26 599 077                          79                     August 29, 2000

Okay. Does that take care of all the outstanding issues?

MR. COLE TO JUDGE

I think that, I think, Your Honor, that takes care of the outstanding issues. We would like the opportunity to present a very brief opening whenever you deem that appropriate. I don't know if the Government wants to present, go first since it's their burden or --

JUDGE TO MR. VERA

Does the Government want to go first?

MR. VERA TO JUDGE

We waive opening, Your Honor.

JUDGE TO MR. VERA

Okay.

JUDGE TO MR. COLE

You may proceed, Mr. Cole.

MR. COLE TO JUDGE

All right. Your Honor, we are here today under Judge Leonard's order of May 31, 2000 in which Judge Leonard determined that the INS violated Dr. Al Najjar's due process rights by detaining him on the basis of secret evidence, thereby, in her words, "denying him notice of evidence against him and a meaningful opportunity to defend against the charges." That's at page 50 of her decision. She also determined that the INS had violated its' own statute by detaining Dr. Al Najjar based on association with the Palestine Islamic Jihad without a finding

A 26 599 077                    80                    August 29, 2000

that he had in fact engaged, had engaged in a degree of participation in the activities of the organization that specifically pose a threat to national security.  In other words, under her reading of the Immigration statute association with the PIJ, even if proven, is not sufficient to establish that somebody is a threat to national security.  She therefore provided a remedy.  She found that Dr. Al Najjar had been detained for the last three and a half years unconstitutionally.  The remedy she provided was for Dr. Al Najjar to be given a fair hearing.  At that hearing the burden is on the Government to show that he is a threat to national security under <u>Matter of Patel</u>.  In a bond proceeding, of course, of this type the Government's burden is to show a change in circumstances which justifies his detention.  Since Your Honor's May 1997 decision was vacated, the last decision with respect to Dr. Al Najjar was to let him out in 1983 on a minimal bond, and he was out for some 14 years on a minimal bond without any untoward circumstances.  The Government has to illustrate changed circumstances, and they have the burden of demonstrating that he is a threat to national security.  As a matter of procedure, as a matter of procedure, Judge Leonard stated that the court may consider secret evidence but in doing so must preserve the petitioner's rights to notice, an opportunity to confront the evidence and a fundamentally fair proceeding.  She did not indicate precisely how Your Honor should do that.  We of course take the position that the use of secret

A 26 599 077                    81              August 29, 2000

evidence can never be consistent with preserving a petitioner's rights to notice and an opportunity to confront the evidence and a fundamentally fair proceeding, but nonetheless it is your obligation to fashion some way that Dr. Al Najjar will have the right to notice of the secret evidence and to an opportunity to confront the secret evidence. We obviously still haven't gotten anything close to that since we have gotten no procedural guarantees with respect to that secret evidence. Second, with respect to the substantive issues in the proceeding, Judge Leonard said at page 68 of her decision that it's not enough for the Government to show that Dr. Al Najjar is associated with the Palestine Islamic Jihad. Rather, they must show meaningful association or, in her words, a degree of participation in the activities of the organization that pose a threat to national security. In other words, the Government has to show -- it can't show that he knew some members of the PIJ. They can't even show that he supported PIJ lawful activities. They have to show that he participated in PIJ activities that pose a threat to national security. In all of the prior proceedings, the deportation proceeding, the bond proceeding, I see no evidence whatsoever, even of an allegation that he participated in any activities of the PIJ that pose a threat to United States national security. Now Dr. Al Najjar has now been detained for over three years and three months. Three years and three months ago in this very proceeding Special Agent West, the Government's principal

witness, testified that Dr. Al Najjar was a threat to national security because he was involved in illegal fund raising for terrorist groups, particularly the PIJ, and involved in visa fraud for bringing terrorists into the country. He stated three years and three months ago that Dr. Al Najjar was under investigation for a multitude of criminal charges: visa fraud, bank fraud, currency violations, voter law violations, and illegal provision of funds to terrorist organizations. He stated that there was a grand jury investigation under way with respect to the voter law violation. Three years and three months later no charges have been filed against Dr. Al Najjar. The grand jury proceeding obviously over. It's more than 18 months since the, Mr. West's testimony that was under way. No charges, exonerated. Now had Dr. Al Najjar been convicted, had he been convicted of any of the crimes that he was under investigation for, he would not likely have served three years and three months in prison. You don't serve three years and three months in prison for visa fraud, bank fraud, currency violations, voter law violations. And no one has ever served any time in prison for illegal provision of funds to a terrorist organization. Many violent criminals, many people who are convicted of violent assaults do not serve three years and three months. Yet Dr. Al Najjar has been in detention now for that long without a single criminal charge against him. And I think one of the central questions presented here is, why has there not been a single criminal

A 26 599 077                         83                         August 29, 2000

charge arising out of this investigation?  The investigation, according to Special Agent West, involved multiple agencies.  It involved INS.  It involved the FBI.  It involved Customs.  It involved the State Department.  Massive inquiry.  Five years ago they, the Government seized all of WISE and ICP's records.  For five years they have had all of ICP and WISE's records.  No charges have been brought.  That very fact raises, raises I think in itself very serious questions about whether Dr. Al Najjar in fact poses a threat to national security.  If he can't even be charged with a crime, how can he pose a threat to national security?  Three years and three months ago Special Agent West testified that he had evidence of illegal fund raising, of visa fraud, of bank fraud.  We'd like to see that evidence.  No such evidence was presented.  Special Agent West made allegations, hearsay allegations that he had such evidence.  No such evidence was presented.  Yet the Government continues to claim today that Mazen Al Najjar is a threat to national security.  And as best as we understand it, and of course our understanding is greatly limited by the fact that we have not seen the classified information and we have still not seen even a summary of the classified information.  As best as we can understand it from the public record and from what they have said in the pleadings to Your Honor subsequent to Judge Leonard's opinion, the claims are two.  There are really two claims, two issues here I think, just to focus the proceedings.  The first claim is that Dr. Al Najjar

A 26 599 077                          84                    August 29, 2000

raised money for the Palestine Islamic Jihad through two organizations: WISE, World and Islamic Research Institute Enterprise, Incorporated, and ICP, Islamic Concern Project, Incorporated. WISE we will show is a -- or was because it no longer -- neither of these organizations any longer exists. But WISE we will show was a legitimate highly regarded research institute. In its four years of existence, it published some 20 dense volumes of academic writings on Islamic issues. It sponsored academic round tables and talks. It published the transcripts of the academic round table and talks. Nothing in those 20 volumes, nothing in those academic round tables indicates any support for terrorism. There is no evidence whatsoever that WISE provided money to anybody, much less to the Palestine Islamic Jihad. WISE was trying to raise money to support the academic and scholarly work that it was doing, and it was not interested in and did not provide donations to anybody else. Dr. Al Najjar was Executive Director of WISE for a period of time. That's his association with WISE. His activities on behalf of WISE we will show consisted of editing and translating for the journal. They did not in any way consist of any kind of support for the Palestine Islamic Jihad. The Islamic Concern Project, the Islamic Concern Project our evidence will show is an educational and charitable institution with a somewhat broader focus than WISE. That is, WISE was a scholarly institute. Its' audience were scholars. Its' round tables were generally

A 26 599 077                          85                    August 29, 2000

attended by maybe 30, 40 professors. It was not for popular consumption. This was serious academic work, and we will offer evidence to that effect. ICP, or the Islamic Concern Project, it is also known as the Islamic Committee for Palestine, had a broader focus. It was an attempt to do education on issues of concern to Muslims in the United States, and particularly with a focus on Palestine. By no means an exclusive focus on Palestine, but the years of its' existence were 19 -- the end of 1988 to 1992, 1993, I believe, and this coincided with the Intifada, with the nonviolent opposition to the Israeli occupation in the West Bank. And there was great interest among many people in that struggle and in what was going on there and so one of the focus' was on Palestine, but they also had this broader focus. ICP was totally open to the public. What did ICP do? Essentially, it did two things. It sponsored conferences and it published materials. It sponsored an annual conference each year. The conferences were open to the public. They were attended by as many as a thousand people. Every minute of the proceedings was videotaped. The proceedings were then transcribed and made available in transcript form to the public. The purpose was to draw Muslims together, mostly Muslim students, and to discuss issues of concern. They discussed issues of concern in Palestine, in Bosnia, in Turkey, in a whole range of areas in which Muslims have some concern. They discussed issues like the condition of women in Islam. They discussed religious issues,

A 26 599 077                    86                    August 29, 2000

religion and the state. A broad range of topics presented in the form of panels, just like any conference. It's a three day conference. There were panel, after panel, after panel on different topics. All of that is public. All of that is public. And also, all of that was seized by the Government five years ago. Yet no evidence has ever been presented, and we believe there is no evidence, that anything untoward went on in those proceedings, including the one fund raising appeal which occurred at each conference. And our evidence will show that the conferences went from Friday until Sunday, Friday until Sunday, three days. That on Saturday night, the center of the conference, there was a dinner, much like virtually any conference that one goes to that goes over the weekend, there is a big dinner on Saturday night. At the close of that dinner there was an appeal. The appeal was to support the ICP in its' activities. It is not cheap to put on a conference for a thousand people, to bring in speakers, to publish and transcribe the proceedings, so they sought money to support ICP. They also sought money to support charitable projects related to the interests of the Islamic community here and the Islamic community in the Middle East. Principally, those appeals consisted of support for needy children in the West Bank, in Gaza and in various refugee camps. And that project which we'll go into in great detail included, basically consisted of identifying families here who would agree to sponsor a family in Palestine

A 26 599 077                    87                    August 29, 2000

that was in need. And at this time, because of the Intifada, there was a massive general strike, all of the schools were closed, lots of businesses were closed, lots of people were unemployed, and therefore there was a lot of need. There is no evidence, and we believe there will be no evidence, that any of the money that ICP raised was sent to the Palestine Islamic Jihad or any other terrorist organization. Again, the Government has all the counts, all the records, with respect to these and, indeed, has had them for five years and has never filed a single criminal charge. The second charge, the second charge -- oh, let me, one more word on that. Just as a legal matter, as a factual matter, we think that there will be no showing that any money went to the PIJ. As a legal matter, sending money to the PIJ does not render one a threat to national security. We will show that the PIJ engages in lawful activities, and that therefore providing support for the PIJ is not direct participation in those activities that threaten the national security of the United States. That is a legal point. It's a threshold legal question. I don't think Your Honor is ever going to have to reach it because I don't think there's even going to be any showing that any money went to the PIJ. But I think it's just important to keep in mind that the standard here is not did the, is the respondent associated with the PIJ or did he support the PIJ in some way, but did he directly participate in activities of the PIJ that threatened the national security. If the PIJ runs a

A 26 599 077                    88                  August 29, 2000

kindergarten and the respondent was alleged to have, shown to have supported such a kindergarten, that would not be a threat to national security. The second allegation is that the respondent procured visas illegally for three alleged terrorists: Ramadan Abdullah Shallah, Basheer Nafi and Abdel Aziz Odeh. The respondent, in fact, did not procure visas for anybody. The respondent's brother-in-law, Sami Al Arian, who has never been charged with any criminal activity, who is not under deportation proceedings, signed petitions, H1B petitions for two of these individuals, Ramadan Shallah and Basheer Nafi. Those H1B petitions asserted that Ramadan Abdullah Shallah was coming to the United States to work for WISE, and he did come to the United States and work for WISE. They asserted that Basheer Nafi was going to work for WISE, come to the United States and work for WISE, and he did come to the United States and work for WISE. There is not a single misrepresentation in the H1B visa petition. With respect to Abdel Aziz Odeh, no petition was filed. Neither the respondent, nor Sami Al Arian, nor WISE, nor ICP took any legal steps in connection with Abdel Aziz Odeh's entry into the United States. How did Abdel Aziz Odeh enter the United States? He applied for a visitor's visa. The State Department granted him a visitor's visa. The INS admitted him on repeated occasions. He has never been found to be excludable. He has never been held to be excludable. But the critical legal point here is that the respondent did nothing to seek a visa for Abdel

A 26 599 077                    89                    August 29, 2000

Aziz Odeh. You don't need to have someone seek to obtain a visa for you if you're coming here as a visitor, and so by definition he can't have committed any kind of crime with respect to Abdel Aziz Odeh coming into the country. The theory the Government seems to present is not that there was a false representation -- well, let's take Abdel Aziz Odeh. The Government's theory appears to be not that he, that they applied for a petition for him and it was false or anything like that, but that they invited him to come here. He came here on a visa procured by him, but he was excludable as a member of the Palestine Islamic Jihad. We don't believe that there is any evidence that he is a member of the PIJ. Moreover, and more importantly, members of the PIJ were not excludable until 1997. Under Immigration law, a member of the PIJ was permitted to enter the country until 1997. In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act. In that Act, for the first time, Congress made it excludable, made persons who are members or representatives of organizations identified by the Secretary of State as terrorist organizations excludable, for the first time. That provision didn't take effect until the Secretary of State actually designated anyone as a terrorist organization. The Secretary of State did not designate any group as a terrorist organization until 19, late 1997. Dr. Odeh, as far as we can tell, when he came to the United States it was the early 1990's. It was not illegal for Dr. Odeh to come, even if it were

A 26 599 077                    90                    August 29, 2000

established that he were a member of the Palestine Islamic Jihad. With respect to Ramadan Shallah and Basheer Nafi, the Government's allegation seems to be similar. They, even though they came on an H1B visa, they were actually excludable. And therefore it was somehow visa fraud to file an H1B visa petition. There is no case law to support that theory. There is no statement on an H1B visa petition that the person filing the petition knows whether the person is admissible or not. That is a determination that is separately made when the person seeks to enter the country. The ultimate question here, Your Honor, is does Dr. Al Najjar pose a threat to national security? Does he pose a threat to national security because, in Judge Leonard's words, he directly participated in activities of the PIJ which threatened the national security of the United States. We believe the evidence will show that Dr. Al Najjar is a peace loving, quiet man. That he is well respected in his community. That he is the president of a private school. That he is an imam in the local mosque. That he has never raised a finger at any one. That he has never engaged in violence against anyone. That he has never supported violence of any kind and has not associated with or in any way participated in activities of the Palestine Islamic Jihad. And therefore we believe Your Honor should, at the close of this hearing, order his release. Thank you.

JUDGE TO MR. COLE

A 26 599 077                    91                    August 29, 2000

Okay.

JUDGE TO MR. VERA

Mr. Vera, are you ready to proceed?

MR. VERA TO JUDGE

Yes, we are, Your Honor.

JUDGE TO MR. VERA

How do you wish to proceed?

MR. VERA TO JUDGE

We would call Sami Al Arian as our first witness.

JUDGE TO MR. CANNELLA

You can come up here.

MR. CANNELLA TO JUDGE

Good morning, Judge.

JUDGE TO MR. CANNELLA

Good morning, Mr. Cannella.

MR. CANNELLA TO JUDGE

Your Honor, may I address the Court --

JUDGE TO MR. CANNELLA

Yes.

MR. CANNELLA TO JUDGE

-- at this point?

JUDGE TO MR. CANNELLA

And go ahead and identify yourself.

MR. CANNELLA TO JUDGE

For the record, my name is Robert Cannella.  I'm an attorney

A 26 599 077                    92                  August 29, 2000

and I represent the interests of Sami Al Arian, a witness who has been subpoenaed before this Court.  Your Honor, in order to facilitate the processes of the Court and to, out of respect and consideration for the Court as well, I would like to give you advance notice before Mr. Al Arian is called to the stand that he intends to assert his 5th Amendment privileges when it's appropriate and necessary.  And I, instead of resisting the process at this point or anything, we again, out of due consideration and respect for the Court and the process here, I did want to inform the Court of that.

JUDGE TO MR. CANNELLA

Okay.

MR. CANNELLA TO JUDGE

I don't know what effect that would have with respect to the Immigration Service's position, but we want to let you know that he is going to assert his 5th Amendment privileges, Judge.

JUDGE TO MR. CANNELLA

Okay.  And go ahead and give me your address, sir, if you would.

MR. CANNELLA TO JUDGE

My address, Judge?

JUDGE TO MR. CANNELLA

Yes.

MR. CANNELLA TO JUDGE

It's 1949 West Martin Luther King Boulevard, Tampa, Florida,

A 26 599 077                    93                    August 29, 2000

33607.

JUDGE TO MR. CANNELLA

     Okay.

JUDGE FOR THE RECORD

     And let me state that Mr. Robert Cannella, C A N N E L L A, is representing Mr. Sami Al Arian.

JUDGE TO MR. CANNELLA

     And so do you want to take the stand, or what do you want to do?

MR. CANNELLA TO JUDGE

     Your Honor, I mean, he's under subpoena.  And --

JUDGE TO MR. CANNELLA

     Okay.  Let's go ahead and have him take the stand.  And you're going to be here, I assume.

MR. CANNELLA TO JUDGE

     Yes, sir, please.

JUDGE TO MR. CANNELLA

     Yeah, you can stand over there.  If you would have a seat there, sir.

JUDGE TO MR. AL ARIAN

     Q.   And if you would have a seat and raise your right hand. Mr. Al Arian, do you swear to or, to tell the truth, the whole truth, and nothing but the truth, so help you God?

     A.   I do.

     Q.   Okay.  And would you state your full name please?

A 26 599 077                    94                    August 29, 2000

A.   Yes.   In the name of God the merciful, my name is Sami Amin Al Arian.

Q.   And that's S U M I?

A.   S A --

Q.   S A M I.

A.   S A M I.

Q.   Okay.   And then capital A L, capital A R I A N?

A.   Correct.

Q.   Okay.   And can you give me your address.

A.   5207 East 127th Avenue, Tampa, 33617.

Q.   And do you know Mazen Al Najjar?

A.   Yes, I do.

Q.   And how so?

A.   We went to high school together --

Q.   I guess, are you related?

A.   Oh, yeah.   He is my brother-in-law.

JUDGE TO MR. VERA

Okay, Mr. Vera, you may proceed.

MR. VERA TO JUDGE

Before we begin, Your Honor, if the witness could be asked to speak a little bit louder.   He's speaking very low.

JUDGE TO MR. VERA

Okay.

JUDGE TO MR. AL ARIAN

Q.   If you would speak loud enough so that everybody in the

A 26 599 077                    95                    August 29, 2000

courtroom can hear you and the microphone will pick it up, and that way everything will be recorded.

A.    No problem.

Q.    Okay.

MR. VERA TO MR. AL ARIAN

Q.    Good morning, Mr. Al Arian.

A.    Good morning.

Q.    Sir, isn't it true that you support the freedom for Islam through violence?

A.    I'm sorry?

Q.    Do you support freedom through, for Islam through violence?

A.    No, I don't.

Q.    You do not?

A.    No.

Q.    Please speak up, sir.

A.    No, I don't.

Q.    Thank you.  Sir, do you denounce the Palestinian Islamic Jihad Organization?

A.    Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.    Well you do acknowledge that the Palestinian Islamic Jihad Organization is a terrorist organization, do you not?

A.    Based on the advice of my counsel, I assert my 5th Amendment privileges.

A 26 599 077                    96                    August 29, 2000

Q.   Sir, do you acknowledge that Hamas is a terrorist organization?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, do you agree that Hezbollah is a terrorist organization?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, do you support the Constitution of the United States?

A.   Absolutely.

Q.   Sir, would you bear arms on behalf of the United States?

A.   Absolutely.

Q.   Sir, what in fact is or was your role with the Islamic Committee for Palestine?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Well you acknowledge that you were, in fact, one of the founders of the Islamic Committee for Palestine, do you not?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that in your capacity as the Chief Executive for the Islamic Committee for Palestine you arranged conferences in the United States?

A 26 599 077                    97              August 29, 2000

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that you, in fact, in your capacity with, let me use the initials ICP, in your capacity with ICP, you in fact had interaction with a person by the name of Ramadan Shallah?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Based on your status with ICP, you had a relationship or interaction with a person by the name of Basheer Nafi.

A.   Based on the advice of my counsel, I invoke my 5th Amendment privileges.

Q.   Sir, based on your status with ICP, you had interaction with or a relationship with a person by the name of Ghannoushi.

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, based on your position with ICP, you had relations or a relationship or association with a person by the name of Omar Abdel Rahman.

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, have you ever engaged in fund raising for the Palestinian Islamic Jihad Organization?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

A 26 599 077                     98                     August 29, 2000

Q. Sir, in your capacity with ICP you in fact supervised the activities of the respondent, Mazen Al Najjar, did you not?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that Mazen Al Najjar, the respondent, was in fact also involved in arranging for the conferences that ICP held in the United States?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that from the period 1988 through the period 1992, you in fact attended conferences held by the Islamic Committee for Palestine?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't true that during that same period of time, 1988 through 1992, your brother-in-law Sami Al -- or Mazen Al Najjar also attended conferences held and sponsored by ICP?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that at those conferences Ramadan Shallah attended?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that at the ICP conferences a person by the name of Ghannoushi also attended?

A 26 599 077                    99                    August 29, 2000

A.    Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.    Isn't it true that at the conferences held by ICP in the United States a person by the name of Omar Abdel Rahman also attended?

A.    Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.    Sir, isn't it true that at the conferences held by ICP a person by the name of Basheer Nafi also attended?

A.    Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.    Sir, do you know a person by the name of Fawaz Damra?

A.    Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.    Sir, isn't it true that Fawaz Damra in fact engaged in fund raising at the ICP conferences?

A.    Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. VERA TO JUDGE

To correct the record, I'm sorry, it's Damra, not Amra.

JUDGE TO MR. VERA

Can you spell that?

MR. VERA TO JUDGE

D A M R A.

MR. VERA TO MR. AL ARIAN

A 26 599 077                    100                    August 29, 2000

Q. Sir, let me correct the question then. Are you familiar with a person by the name of Fawaz Damra?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. And, sir, isn't it true that Fawaz Damra was in fact soliciting funds at the ICP conferences for the Palestinian Islamic Jihad Organization?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that you in fact stood near or with Fawaz Damra while he engaged in fund raising for the Palestinian Islamic Jihad Organization?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that while Fawaz Damra was in fact fund raising for the PIJ, Palestinian Islamic Jihad Organization, your brother-in-law, Mazen Al Najjar, was also there?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't true that you in fact have known Ramadan Shallah since you lived in Egypt?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't true that you lived in Egypt between 1966 and 1975?

A 26 599 077                    101                    August 29, 2000

A.   Yes.

Q.   Isn't it true that you attended the university there?

A.   That's not true.

Q.   Sir, what did you do in Egypt between 1966 and 1975?

A.   I went through primary school.  I went through cabrether (phonetic sp.) school, which is middle school.  I went through high school.  I was hoping to get into college.  It didn't work out, and I came here in '75.

Q.   Isn't it true that you knew Basheer Nafi while you lived in Cairo, Egypt?

A.   That's not true.

Q.   When did you first meet Basheer Nafi?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, who is Fatin Chakaki (phonetic sp.)?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that Mr. Chakaki was in fact the founder of the Palestinian Islamic Jihad Organization?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that you in fact have known Mr. Chakaki for a significant period of time?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

A 26 599 077                    102                    August 29, 2000

Q.   Sir, have you in fact ever been associated with the Palestinian Islamic Jihad Organization?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that you are aware that your brother-in-law, Mazen Al Najjar, is in fact, or has in fact been associated with the Palestinian Islamic Jihad Organization?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, did you in fact in your capacity with either ICP or the World Islamic Studies Enterprise file visa applications on behalf of Basheer Nafi?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that in your capacity with either WISE, the World Islamic Studies Enterprise, or ICP, the Islamic Committee for Palestine, you filed visa applications for Ramadan Shallah?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, in your capacity with the Islamic Committee for Palestine you in fact oversaw a significant amount of money come through bank accounts held in your name?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

A 26 599 077                    103                    August 29, 2000

Q. Sir, isn't it true that in your capacity with ICP you also were aware of the fact that significant amounts of money were coming through the accounts held in the name of your brother-in-law, Mazen Al Najjar?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that in fact thousands of dollars came through the account in the name of Mazen Al Najjar as he was associated with the ICP?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that when the U.S. Government raided your residence two years back, that you were in possession of videotapes at which you were seen attending ICP conferences?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that when the Government seized evidence from your residence, they seized a computer from you?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that that computer that was seized by the U.S. Government from your residence contained a manifesto for the Palestinian Islamic Jihad?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

A 26 599 077                    104                    August 29, 2000

Q.   Sir, isn't it true that based on the raid of either your residence or the offices of the World Islamic Studies Enterprise by federal agents, the computers that were seized also contained a charter for an organization to be set up in the United States?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that that charter indicated that in fact an organization was going to be set up to conduct, among other things, to infiltrate the U.S. Government agencies?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that such a document existed either at your residence or at the offices of WISE and existed in handwritten fashion?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that among other things seized by the United States Government in a raid of your residence or your office that there was a fund raising letter that you sent to a person by the name of Dr. Ismael Alshari (phonetic sp.)?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that that fund raising letter indicates that you were asking for funds to be sent to ICP in

A 26 599 077                    105              August 29, 2000

Tampa, Florida?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that you sent, among the documents seized by the U.S. Government in a raid of your residence or the WISE office here in Florida, that you also had a letter from you to a person by the name of Jabbair Al Awani (phonetic sp.), again asking for money for WISE?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

(OFF THE RECORD)

(ON THE RECORD)

(TAPE 4)

JUDGE FOR THE RECORD

Pick up, tape no. 4.

JUDGE TO MR. VERA

You may proceed, Mr. Vera.

MR. VERA TO JUDGE

Thank you, Your Honor.

MR. VERA TO MR. AL ARIAN

Q.   Sir, isn't it true that in the raid conducted by federal agents of your residence in Tampa, Florida -- I'm sorry, of your office, the World Islamic Studies Enterprise office, that a document entitled a, "Hamas/PIJ Pact, an Agreement," was in fact seized from that office?

A 26 599 077                     106                     August 29, 2000

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that that pact in fact indicated that one of the conditions of the relationship was that no violence would be used to enforce the rules of that pact?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Isn't it true that that pact also contained a condition by omission that that pact of no violence was simply against others and not others?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. COLE TO JUDGE

Your Honor, I just --

JUDGE TO MR. COLE

Okay, Mr. Cole, go ahead.

MR. COLE TO JUDGE

We're going to object if we're going to continue in a line of questioning that is directed at Sami Al Arian and whether Sami Al Arian is on trial. Dr. Al Najjar is on trial. In addition, with respect to he is going through a list of documents, the Government has the documents. The documents are the best evidence. It serves no purpose for us to sit here and have Dr. Al Arian to continue to assert the 5th Amendment privileges. The Government has the evidence. They can put the evidence on. And

A 26 599 077                 107                 August 29, 2000

without any connection to Dr. Al Najjar shown it seems to me that it's outside the scope of this proceeding which is not whether Dr. Al Arian is a threat to national security, apparently, the Government doesn't think he is because he's sitting here, but rather whether Dr. Al Najjar is a threat to national security. So I would ask that the questions be limited to questions related to Dr. Al Najjar. And I would ask -- I'm not sure whether it makes sense to continue with this kind of questioning with respect to documents which the Government has which the Government can submit.

JUDGE TO MR. VERA

Mr. Vera.

MR. VERA TO JUDGE

I appreciate counsel offering advice on how the U.S. Government ought to try its case. However, we believe that we have the right to ask questions of this witness who the Court, sua sponte, is aware is not only a business associate of the respondent but is in fact the brother-in-law. Through his own testimony, he has known the respondent since a very early age, since some sort of secondary school. The respondent in fact worked at the very organizations that this witness is taking the 5th Amendment in terms of, or invoking the 5th Amendment in terms of whether he was even associated with. We believe that it's relevant to this Court's determination, especially after the public pronouncements made by this witness, and in fact counsel

A 26 599 077                    108                    August 29, 2000

and others on behalf of Mazen Al Najjar that he's totally innocent, that ICP and WISE are totally innocent of fund raising activities for a terrorist organization, that the person who controlled both WISE and ICP sit here before Your Honor and either answer questions or, if in fact he's going to invoke the 5th Amendment, that he do so.  Because they all relate to the activities of Mazen Al Najjar in the United States.  Because as I believe has come up in the prior proceeding, and has certainly came up in the regular proceeding, the merits hearing for the respondent, and I hope that when he gets up under oath he doesn't deny that he himself was associated with ICP and WISE.  But clearly the issues are relevant to what in fact those two organizations were doing and what in fact Mr. Mazen Al Najjar himself was doing and/or knew, or should have known, were the activities and the primary purposes of those two organizations.

JUDGE TO MR. COLE

Mr. Cole.

MR. COLE TO JUDGE

Your Honor, I'm not sure, I think the question of relevance is a very good question.  And the Government has asserted that Dr. Al Arian is, has been under investigation for, among other things, not indicating that he was associated with the ICP and with WISE on his naturalization petition.  Now his invocation of the 5th Amendment privilege against self incrimination with respect to all questions with respect to ICP and WISE leads to no

A 26 599 077                    109                    August 29, 2000

conclusion, no clear conclusion whatsoever, other than he might be concerned about what the Government has said they are investigating, which is having failed to disclose that on his naturalization application. That has no implication for Dr. Al Najjar whatsoever. And so it's not clear to me why we continue with this line of questioning without a tie in to Dr. Al Najjar and where, by the Government's own admission, Dr. Al Arian is under investigation and therefore has the right to assert the 5th Amendment privilege with respect to a crime that does not implicate Dr. Al Najjar in any way whatsoever. And so his refusal to answer these questions doesn't lead to any kind of evidence that's relevant to this proceeding. The most that it suggests is that he might be concerned about the fact that the Government is investigating him, and has been'for a long time, for having failed to list two organizations on his naturalization application. And so it seems to me that we're really wasting our time here.

JUDGE TO MR. VERA

Mr. Vera, a question of relevance?

MR. VERA TO JUDGE

Yes, Your Honor. Again, our position would be that we are going to tie it all in in regards to the evidence we're going to present today. What this witness is invoking the 5th Amendment for are the relationships that we say are evidence of the fact that WISE and ICP had a meaningful association, a fund raising

A 26 599 077                    110                    August 29, 2000

and support association with the Palestinian Islamic Jihad Organization. That in fact Sami Al Arian, the person sitting before you as a witness, was the one person who was in control of the daily activities of WISE and ICP in relation to everything they did, but certainly in relation to what they did in support of the Palestinian Islamic Jihad Organization, terrorist organization. That because Sami Al Arian in fact employed, hired, supervised, and directed and knew about the daily activities of Mazen Al Najjar in relation to WISE and ICP, that the tie is very clear. The relevance is very clear because if Sami Al Arian was aware that they were supporting the PIJ, then Mazen Al Najjar was also aware. We also will continue to show evidence as this case progresses that will tie in everyone of these questions. And I can state for the Court right now, very clearly we'll show that Sami Al Arian, Mazen Al Najjar and a variety of people that were known and suspected terrorists attended conferences that were put on by ICP in the United States. And that at those conferences there was in fact fund raising for the Palestinian Islamic Jihad Organization, conferences at which he was at and he was at. And we believe that this person sitting before you, Sami Al Arian, clearly has information that would tell this Court whether or not the assertions made by the Government are true or more like true than not. So they're clearly relevant.

MR. COLE TO JUDGE

A 26 599 077                         111                    August 29, 2000

The question, Your Honor, is --

JUDGE TO MR. COLE

Mr. Cole --

MR. COLE TO JUDGE

-- is the invocation of the 5th -- all we're getting -- we're not getting any evidence. We're getting a list of questions from Mr. Vera. All we're getting from Mr. Al Arian is an invocation of the 5th Amendment privilege. That isn't probative of anything for, as I've said before, that privilege is fully supported by the fact, on the record, that the Government is investigating him for having failed to disclose ICP and WISE on his naturalization petition. That's a crime. He has a right to invoke the 5th with respect to any question that might lead to evidence regarding his association with ICP and WISE. But that doesn't -- his invocation of the 5th, when he says that I'm not going to testify with respect to ICP and WISE, doesn't implicate Dr. Al Najjar because suppose, let's suppose he was guilty.  I mean, one inference might be Sami Al Arian is guilty.  He failed to identify ICP and WISE on his naturalization petition.  So what?  What does that prove?  It doesn't prove anything, and therefore the answers don't prove anything.  The questions obviously don't prove anything.  And therefore if Dr. Al Arian -- it appears to me that Dr. Al Arian is asserting the 5th with respect to all questions with respect to ICP and WISE.  If that's the case, I don't think there is any point in going further.  Dr.

A 26 599 077                    112                 August 29, 2000

Al Najjar is going to testify.  He's going to testify about WISE.
He's going to testify about ICP.  He's not under investigation
for having failed to list these organizations on his
naturalization application.  And whether or not Sami Al Arian is
guilty of failing to list those organizations on his application
is of no relevance to this proceeding.  It's not whether the
questions are relevant.  It's whether the answers are relevant.
And precisely because the Government is investigating him for a
crime which has no implication for the question of whether Dr. Al
Najjar is a threat to national security, precisely because when
he says I might be incriminating myself on the allegation that
you have made that I failed to list these organizations, that
doesn't implicate Dr. Al Najjar in the least.  He either did or
he didn't.  It's either a crime or it's not a crime.  And whether
it's a crime or it's not a crime has no relevance to whether Dr.
Al Najjar is a threat to national security.  Your Honor, I
believe that the Government is trying to put Sami Al Arian on
trial and to try to taint Dr. Al Najjar with guilt by
association, and I believe it is simply inappropriate.  The
question Your Honor has to ask is, does anything that Dr. Al
Arian -- when Dr. Al Arian says I invoke the 5th, does that prove
anything with respect to Dr. Al Najjar?  It proves nothing with
respect to Dr. Al Najjar.  And so if that's what we're going to
do is just go through a list of questions and he's going to keep
saying any question with respect to ICP and WISE I'm not going

A 26 599 077                   113                   August 29, 2000

to, I'm not going to -- that's like -- we would like Dr. Al Arian to testify. We want Dr. Al Arian to testify. We believe Dr. Al Arian could explain everything with respect to ICP and WISE that would establish the legality of every act that was undertaken. We want him to testify, but he's taken the 5th. He has the right to take the 5th because the Government has alleged that he has engaged in criminal activity for failing to identify ICP and WISE on his naturalization application. That fact is simply of no relevance. It harms us that we can't ask him questions. It harms the Government that they can't ask him questions. But it doesn't prove anything with respect to Dr. Al Najjar. And I submit that this hearing is about whether Dr. Al Najjar, not Dr. Al Arian, is a threat to national security.

JUDGE TO MR. COLE

Okay.

JUDGE FOR THE RECORD

I'm going to allow Mr. Vera to -- he says he can tie it up. And at this stage of the game, I mean, we can't go on forever with the 5th Amendment, but let's go ahead and proceed a little further.

MR. VERA TO JUDGE

Thank you, Your Honor.

MR. VERA TO MR. AL ARIAN

Q.   Sir, you are familiar with and in fact know a person by the name of Abdel Aziz Odeh, do you not?

A 26 599 077                    114                    August 29, 2000

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that Mr. Odeh is one of the founders of the Palestinian Islamic Jihad Organization?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, you have corresponded with a person by the name of Ghannoushi, have you not?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that at these conferences held by ICP you made, among other statements, statements that included, and I'll put it in quotations, "death to Israel," isn't it true?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that you called Jews the sons of monkeys and pigs?

A.   No, I didn't --

MR. COLE TO JUDGE

Your Honor, I object to the relevancy --

MR. AL ARIAN TO MR. VERA

I did not.

MR. COLE TO JUDGE

-- of this.  Whether or not Dr. Al Najjar -- Dr. Al Arian said something about Jews has no relevance whatsoever to whether

A 26 599 077                    115                    August 29, 2000

Dr. Al Najjar is a threat to national security. I fail to see how that could possibly be tied in as relevant to the question of whether Dr. Al Najjar poses a threat to national security. He said it or he didn't say it, but whether he said it or didn't say it has absolutely no relevance to Dr. Al Najjar. He can ask Dr. Al Najjar what he said, but it has to be tied to whether he's a threat to national security.

MR. VERA TO JUDGE

Your Honor --

JUDGE TO MR. VERA

Mr. Vera.

MR. VERA TO JUDGE

-- the analogy is akin to a bank robber who sits in the car while the robber is going to the bank and robs the bank. The mere fact that the bank is being robbed is relevant to the fact that the person sitting in the car is part of the conspiracy to rob the bank. If Mr. Al Najjar is sitting at conferences that he helped arrange, at which he had meaningful activity, and we've got terrorists or people suspected to be terrorists sitting at these conferences, and we've got people who purport to be upright citizens or upright individuals in the United States engaging in rhetoric that indicates we want money, we want money for the Palestinian Islamic Jihad Organization, death to Israel, Jews are this or that, we believe that under any formulation Mazen Al Najjar was sitting there and he had a meaningful -- even if he

A 26 599 077                    116                    August 29, 2000

was just sitting there.  But in this case we assert that he had a meaningful, meaningful role in setting up those ICP conferences. And if we have an individual who supervises it, an individual who hires, an individual whose organizations he works at, an individual who is his brother-in-law, and we have Sami Al -- or Mazen Al Najjar sitting there, it's highly relevant to the issue of whether or not he poses a threat to national security.

MR. COLE TO JUDGE

Your Honor, the question --

JUDGE TO MR. VERA

The question has already been answered.  He said no.

MR. COLE TO JUDGE

And I'd like it to be stricken from the record.  I think the question is totally out of bounds.  The question does not -- a statement about Jews, one way or the other, is simply not relevant to whether Dr. Al Najjar is a threat to national security.  Suppose he was in the audience and he heard -- suppose Dr. Al Arian said it.  Suppose he was in the audience and he heard it.  Does that, does that prove anything?  It may prove that Dr. Al Arian said something that we don't find, that we find distasteful and offensive, but does it prove that Dr. Al Najjar is, does it even go one step towards proving that Dr. Al Najjar is a threat to national security.  I believe -- I object to the Government's attempt to kind of taint Dr. Al Najjar by posing a set of questions to Dr. Al Arian that don't have a connection.

A 26 599 077                          117                     August 29, 2000

Rhetoric is not a threat to national security. Rhetoric is not a threat. No matter how offensive or distasteful, rhetoric is not a threat to national security. If the rhetoric were we want to, we want you to give us money to blow up buildings, that rhetoric might be relevant if he could tie Dr. Al Najjar into it. But whether he said an anti-Semitic thing or an anti-Israel thing, what possible relevance does that have to whether Dr. Al Najjar, this man who is not alleged to have said any of these things, is a threat to national security? I object to this. I think it is, it is prejudicial. It is trying to taint the record. And it's simply not relevant.

JUDGE TO MR. COLE

Okay. Well, he's already answered and said he didn't say it. And so it's -- I find it to be harmless. So --

JUDGE TO MR. VERA

Okay, Mr. Vera, you may proceed.

MR. VERA TO MR. AL ARIAN

Sir, isn't it true that at these conferences, again, there was fund raising for and on behalf of the Islamic Jihad?

MR. COLE TO JUDGE

Asked and answered.

JUDGE TO MR. COLE

Overruled.

JUDGE TO MR. AL ARIAN

Q.   You may answer it. Do you wish to answer it?

A 26 599 077                    118                    August 29, 2000

A.   Oh, sorry --

MR. VERA TO MR. AL ARIAN

Q.   Isn't it true that at these conferences for the Palestinian Islamic Jihad?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. VERA TO JUDGE

Your Honor, may I approach the witness?

JUDGE TO MR. VERA

Yes.

MR. VERA TO MR. AL ARIAN

Q.   Sir, let me show you what we would like to have marked for identification purposes as Government's Exhibit 1.  Do you recognize that document, sir?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that that is what is commonly known as an I-140 petition filed by you on behalf of Mazen Al Najjar?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that your signature appears on that document?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

JUDGE TO MR. VERA

A 26 599 077                    119                 August 29, 2000

Are you going to put that into evidence?

MR. VERA TO JUDGE

Yes, Your Honor.

JUDGE TO MR. COLE

Any objection?

MR. COLE TO JUDGE

No objection.

JUDGE FOR THE RECORD

That will be Exhibit No. 1.

MR. COLE TO JUDGE

Your Honor, just for clarification, is it going to be Government Exhibit 1 in the respondent --

JUDGE TO MR. COLE

No, it's going to be No. 1.

MR. COLE TO JUDGE

Just so we'll go --

JUDGE TO MR. COLE

Yeah, without the Government or the other side.

MR. VERA TO JUDGE

Your Honor, at this time, we would like to utilize some demonstrative evidence.  We would like to ask a couple questions of this witness about, we'd like to be able to use the board to place a couple of photographs and ask him some questions about it.

JUDGE TO MR. VERA

A 26 599 077                    120                    August 29, 2000

Okay. All right, go ahead.

MR. VERA TO MR. AL ARIAN

Q. Sir, can you see this picture?

A. Yes, sir.

Q. Sir, you recognize what this picture is about?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that the letters I C P on top of that banner stand for the Islamic Committee for Palestine?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that you were in attendance at this conference?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

JUDGE TO MR. VERA

Okay. We're going to need to mark that 1-A.

MR. VERA TO JUDGE

Yes, Your Honor. We've got the small version that we can provide --

JUDGE TO MR. VERA

Okay --

MR. VERA TO JUDGE

-- to the Court.

JUDGE FOR THE RECORD

A 26 599 077                    121                    August 29, 2000

That will be 1-A.

MR. COLE TO JUDGE

Are they offering it into evidence, Judge?

MR. VERA TO JUDGE

We will, at the end of --

JUDGE TO MR. COLE

At this time it's for identification.

MR. VERA TO MR. AL ARIAN

Q.   Sir, do you recognize what this picture depicts?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that this is a picture of the ICP conference at which you were at in, I believe, 1988?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that one of the people sitting up here, the person in glasses, is a person known as Basheer Nafi?

JUDGE TO MR. VERA

Why don't you point him out.

MR. VERA TO MR. AL ARIAN

Basheer Nafi, for record purposes, sitting next to the gentleman in the beard and glasses.

JUDGE TO MR. VERA

That would be the second from the left.

MR. VERA TO JUDGE

A 26 599 077                    122                    August 29, 2000

That's correct.

MR. AL ARIAN TO MR. VERA

Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. VERA TO MR. AL ARIAN

Q.   Sir, isn't it true that the man to the left of Basheer Nafi is Jabbair Al Awani, the person I asked you about earlier?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that the man to the right of Basheer Nafi is Rasheed Al-Ghannoushi, the person I have asked you about previously today?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that Mazen Al Najjar was at this conference?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

JUDGE TO MR. VERA

That will be 2-A?

MR. VERA TO JUDGE

Yes, Your Honor.

MR. COLE TO JUDGE

That's 2-A, Judge?

JUDGE TO MR. COLE

A 26 599 077                    123                    August 29, 2000

Yeah.

MR. VERA TO MR. AL ARIAN

Q.   Sir, I'm going to ask you to take a look at this picture.  Do you recognize what's depicted in this picture?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that this is a picture of a conference held in 1991 by the Islamic Committee for Palestine?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that that in fact is you, the person holding the microphone and standing?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   You're asserting your 5th Amendment privilege for this picture?

MR. COLE TO JUDGE

Asked and answered.

MR. VERA TO JUDGE

I'll move on, Your Honor.

JUDGE TO MR. VERA

Okay.

MR. VERA TO MR. AL ARIAN

Q.   Sir, isn't true that the person sitting here to your left, to the left of this person holding the microphone is Sheik

A 26 599 077                    124                    August 29, 2000

Omar Abdel Rahman?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Isn't it true that that person is also known as the Blind Sheik?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Isn't it true that that person was convicted as a coconspirator in the World Trade Center bombing?

MR. COLE TO JUDGE

Your Honor, I object on relevance. No connection to the World Trade Center bombings have been shown here. To assume for the purposes of argument that this person appeared at a conference and then was convicted of something, without some indication that there was any kind of illegal activity by the Sheik at this particular conference connected to Dr. Al Najjar, it simply proves nothing with respect to whether Dr. Al Najjar is a threat to national security.

MR. VERA TO JUDGE

Your Honor, if, again, ICP, an organization which this witness founded and which the respondent, Mazen Al Najjar, worked, an organization which was in fact sponsoring and arranging these conferences, is inviting people like a convicted, under United States law, convicted terrorist --

MR. COLE TO JUDGE

A 26 599 077                    125                    August 29, 2000

Your Honor, he's not --

MR. VERA TO JUDGE

-- inviting, inviting people like that to attend a conference at which, and we'll prove this later either through the admissions of this witness, the respondent, or through our Government witnesses, at which fund raising efforts on behalf of the Palestinian Islamic Jihad Organization were made is clearly relevant. Our position is that the respondent was here.

MR. COLE TO JUDGE

Your Honor, Sheik Rahman was not convicted -- assuming this is Sheik Rahman, which we haven't even established, he was not convicted at the time of this conference, assuming this conference took place in 1991. He is not even alleged by the Government to have been involved in any way in fund raising for ICP or PIJ or for WISE. He has not connection to this case except for the fact that the Government wants to paint, again, paint Dr. Al Najjar with guilt by association. You've got to be something more -- the fact that he appeared -- Sheik Rahman was a noted figure in Islam. He spoke at conferences across the country. He spoke at conferences sponsored by universities across the country. Are those universities, which invited him to speak, threats to national security because subsequently he's convicted? You know, Michael Milken was convicted of a crime. Before Michael Milken was convicted of a crime, he spoke at conferences across the country. Are those people somehow guilty

A 26 599 077                    126                    August 29, 2000

because they invited him to a conference? I fail to see any tie in between Sheik Rahman and fund raising for any group at this conference. The fact that appeared, thousands of people appeared at this conference, doesn't show, doesn't show -- there is simply no relevance as to whether Sheik Rahman appeared there or not, unless they're going to say, they're going to show that Sheik Rahman somehow was involved in fund raising for the ICP and for the PIJ. And I am certain that they have no such, they are going to make no such connection. The only connection here is taint and guilt by association, Your Honor. I strongly object to it.

JUDGE TO MR. COLE

Okay. I'm going to overrule your objection. He said he's ultimately tie it up, so this is his case. I'll let him present it.

MR. VERA TO JUDGE

Thank you, Your Honor.

MR. VERA TO MR. AL ARIAN

Q. Sir, isn't true that the person sitting next to the prior individual, the person with the beard, the second one with the darker beard is a person by the name of Abdel Aziz Odeh?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Isn't it true that that person, Mr. Odeh, is in fact a founder of PIJ?

MR. COLE TO JUDGE

A 26 599 077                    127                    August 29, 2000

Asked and answered.

JUDGE TO MR. COLE

I don't know if that's been asked and answered.

JUDGE TO MR. AL ARIAN

You can go ahead and answer it.

MR. AL ARIAN TO MR. VERA

Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. VERA TO JUDGE

I'd like to move this into evidence -- or mark it for identification, Your Honor.

JUDGE FOR THE RECORD

And that will be 1 -- what did we say, 1-A, 1-B?  I think we switched around --

MR. COLE TO JUDGE

No, right now we have 1, 1-A, and 2-A.

JUDGE TO MR. COLE

Yeah --

MR. COLE TO JUDGE

So we might want to change the --

JUDGE TO MR. COLE

Yeah --

JUDGE FOR THE RECORD

Let's go with 3-A.

MR. VERA TO JUDGE

A 26 599 077                    128                    August 29, 2000

No. 3-A?

JUDGE TO MR. VERA

Yeah.

MR. COLE TO JUDGE

So should we say 1 is 1 -- should we remark 1?

JUDGE TO MR. COLE

No. We're going to go with the way I'm marking it.

MR. COLE TO JUDGE

Okay. I'm sorry.

JUDGE TO MR. COLE

I'm marking it, not you. Okay?

MR. COLE TO JUDGE

It was just for clarification.

JUDGE TO MR. COLE

You know, I'll be the Judge.

MR. COLE TO JUDGE

Judge, I'm just --

JUDGE TO MR. COLE

We'll use my marking system. As bad as it is, that's the one I want --

MR. COLE TO JUDGE

All right, just trying to clarify, Your Honor. I'm not trying to --

MR. VERA TO MR. AL ARIAN

Q. Sir, do you recognize the picture that's now before

A 26 599 077                   129                   August 29, 2000

you?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't this true that this is also an ICP conference?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that a person by the name of Omar Abdel Rahman is sitting at this dais?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that Sheik Abdel Aziz Odeh is the person sitting here on the dais?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. VERA TO JUDGE

We'd like this marked for identification purposes, Your Honor.

JUDGE FOR THE RECORD

It's 4-A.

MR. VERA TO JUDGE

No. 4-A.

MR. VERA TO MR. AL ARIAN

Q.   Sir, do you recognize what this picture depicts?

A.   Based on the advice of my counsel, I assert my 5th

A 26 599 077                    130                    August 29, 2000

Amendment privileges.

Q.   Sir, isn't it true that this is an ICP conference sponsored here in the United States?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that the person sitting at the far left in this picture is Ramadan Shallah?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that you are the person seated next to the person the Government identifies as Ramadan Shallah?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. VERA TO JUDGE

Your Honor, we again ask that this be marked for identification.

JUDGE FOR THE RECORD

It's 5-A.  The next one will be 6-A.

MR. VERA TO JUDGE

Yes, sir.

MR. VERA TO AL ARIAN

Q.   Sir, do you recognize this picture?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that this picture also depicts an

A 26 599 077                    131                    August 29, 2000

ICP conference held in the United States?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, do you recognize the individual seated right behind this microphone here?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that that's Mazen Al Najjar, the respondent?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. VERA TO JUDGE

We'd like this marked for identification purposes, sir.

JUDGE FOR THE RECORD

It's 6-A.  It will be 7-A.

MR. VERA TO MR. AL ARIAN

Q.   Sir, let me ask you to look at this picture.  Do recognize what is depicted by this picture?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that this picture is a picture of an ICP, taken at an ICP conference held in 1992?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that the person seated at the right

A 26 599 077                    132                    August 29, 2000

hand, far right hand side of this dais, is Ramadan Shallah?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that the person seated right next to the podium here is you?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that fund raising for the Palestinian Islamic Jihad occurred at this conference?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. VERA TO JUDGE

We'd like this marked for identification purposes, Your Honor.

JUDGE FOR THE RECORD

It will be 7-A. The next one will be 8-A.

MR. VERA TO JUDGE

Yes, Your Honor.

MR. VERA TO MR. AL ARIAN

Q. Sir, let me ask you to take a look at this picture. Do you recognize what it depicts?

A. Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q. Sir, isn't it true that this is a picture taken at an ICP conference held in the United States?

A 26 599 077 133 August 29, 2000

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that the person seated at the right hand side of this picture is your brother-in-law, Sami, I mean, Mazen Al Najjar?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that the poster that is depicted on the far left hand side of this picture is a poster for the Palestinian Islamic Jihad Organization?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that the person depicted in that poster is a person by the name of Al-Kassam, Al-Kassam?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that Al-Kassam is a known martyr?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Isn't it true that he is a person whose name is used by Hamas and PIJ to signify their organizations?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

Q.   Sir, isn't it true that also depicted on this picture that appears here within a picture, at the very bottom, is in

A 26 599 077                  134                  August 29, 2000

fact the Palestinian Islamic Jihad symbol?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. VERA TO JUDGE

We'd like that marked for identification purposes, Your Honor.

JUDGE FOR THE RECORD

That will be 7-A -- excuse me, that was 8-A.

JUDGE TO MR. VERA

Right?

MR. VERA TO JUDGE

Yes.

JUDGE TO MR. VERA

Okay.

MR. VERA TO JUDGE

Your Honor, at this time, can we take a very short recess?

JUDGE TO MR. VERA

Okay.  Why don't we take a break until 15 after the hour, according to that clock back there.

MR. VERA TO JUDGE

Thank you, Your Honor.  And, Your Honor, if we can ask the Court, of course, to remind the witness he is still under subpoena and must remain here and, of course, shouldn't discuss his testimony.

JUDGE TO MR. AL ARIAN

A 26 599 077                    135                    August 29, 2000

Okay.  Other than your counsel, don't discuss the case with anybody else.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE TO MR. VERA

Okay, Mr. Vera.

MR. VERA TO JUDGE

Thank you, Your Honor.

MR. VERA TO MR. AL ARIAN

Q.   Sir, do you admit to having attended any conference in which fund raising was conducted for the Palestinian Islamic Jihad Organization?

A.   Based on the advice of my counsel, I assert my 5th Amendment privileges.

MR. VERA TO JUDGE

We pass the witness, Your Honor.

JUDGE TO MR. VERA

Okay.

JUDGE TO MR. COLE

Okay, Mr. Cole.

MR. COLE TO MR. AL ARIAN

Q.   Dr. Al Arian, are you asserting your privilege with respect to any questions to ICP and WISE?

A.   Yes, I am.

MR. COLE TO JUDGE

A 26 599 077                    136                August 29, 2000

Your Honor, in light of Dr. Al Arian's intention to assert any, the privilege with respect to any questions regarding ICP and WISE, I'm not sure what the point of my asking questions. I could ask a list of questions, you know, as long as Mr. Vera's. Do you have any information that Dr. Al Najjar has not raised money for the PIJ? Et cetera, et cetera, et cetera. That Dr. Al Najjar was not at any of these conferences. That that was not Ramadan Shallah. But if he's going to assert the privilege with respect to any of them, there's no point in going through that. So I would just offer as a proffer that we would ask the same questions of Dr. Al Arian, in reverse from Mr. Vera's, that Dr. Al Arian has already testified that he would assert the privilege with respect to any questions relating to ICP and PIJ. And therefore, we don't see the point at this point of proceeding with those questions. We would just note for the record that he is indeed asserting his privilege with respect to all questions regarding the ICP and WISE.

JUDGE TO MR. COLE

Now you mentioned -- a minute ago you said PIJ.

MR. COLE TO JUDGE

Right. Well their allegations are --

JUDGE TO MR. COLE

So you want to add that?

MR. COLE TO JUDGE

I'll add PIJ.

A 26 599 077                    137                    August 29, 2000

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. COLE AND MR. VERA

Okay.  So do both sides want him excused?

MR. VERA TO JUDGE

I don't need him anymore, Your Honor.

MR. COLE TO JUDGE

Just to clarify the record.

MR. COLE TO MR. AL ARIAN

Q.   Are you also asserting the privilege with respect to questions relating to -- let me ask -- are you asserting the privilege with respect to any questions relating to ICP, WISE, or PIJ?

A.   Yes, I am.

MR. COLE TO JUDGE

Then my previous statement stands, Your Honor.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. CANNELLA

Do you have anything to add?

MR. CANNELLA TO JUDGE

Your Honor, I would like to make a very brief statement to the Court once, you know, we're excused.  Is the witness excused at this point?

JUDGE TO MR. COLE AND MR. VERA

A 26 599 077                    138                    August 29, 2000

Does anybody object to him being excused?

MR. COLE TO JUDGE

No.

JUDGE TO MR. AL ARIAN

Okay.  You may be excused.

JUDGE TO MR. CANNELLA

And you may say something, Mr. Cannella.

MR. CANNELLA TO JUDGE

Your Honor, and of course Dr. Al Arian is unable to speak, but I simply want to inform the Court that he regrets his position here before the Court today.  He has no choice other than to assert his 5th Amendment privileges here today.  And, you know, he would have liked to have taken a different tact, but it was impossible under the circumstances.

JUDGE TO MR. CANNELLA

Very well, thank you, Mr. Cannella.

MR. CANNELLA TO JUDGE

Thank you, Judge.

MR. VERA TO JUDGE

Your Honor, we would move that our exhibits regarding the videos, Exhibits 1-A through 8-A, be admitted into the record.

JUDGE TO MR. VERA

Okay, these -- okay --

MR. COLE TO JUDGE

We object, Your Honor.  The, I don't see a video.  I see --

A 26 599 077                    139                    August 29, 2000

MR. VERA TO JUDGE

That's photographs. I'm sorry, Your Honor.

MR. COLE TO JUDGE

I see photographs. I don't -- the photographs have not been authenticated. No one has come in to say that they took the photographs. These are not original photographs. No one has certified that these are accurate copies of original photographs. So I object to their admission without any authentication whatsoever.

MR. VERA TO JUDGE

If I may make a proffer? First of all, these are Immigration Court proceedings. This is not even a merits case in which deportation is contested. This is a bond proceeding, an ancillary proceeding. The federal rules of evidence don't apply to these proceedings. This Court, by regulation, may accept evidence that relates to the issues before the Court today. We believe that under those circumstances under the law of evidence, even under the law of evidence, that these exhibits are clearly admissible for the purpose that this Court could use them for, and that's to determine whether or not the Government's assertions in this case are correct. We also further note, and pointedly note, that we fail to understand the basis of anyone asserting that what can be seen by the common eye by anyone, you don't have to be a lawyer to realize that that's the respondent sitting there in the last picture that we have, and that it was

A 26 599 077                    140                    August 29, 2000

the witness sitting in many of the pictures that we had for that. We believe that we provided more than sufficient evidence that indicates that these pictures are what they purport to be, and that's pictures of conferences at which both the witness and the respondent attended.  And it clearly depicts what the Government says they are, so they are clearly admissible in these proceedings for that reason.

JUDGE TO MR. VERA

Okay.

MR. COLE TO JUDGE

Your Honor, authentication is a fundamental requirement of due process.  Due process applies to this proceeding.  The basic idea that you have to authenticate a piece of evidence before you put it in so that the Court knows that it is a legitimate and bona fide piece of evidence -- a picture can be doctored.  A copy can be doctored.  That's why we generally require whenever a photo is introduced that the person who took the photo take the stand and say I took the photo, that this is an accurate photo. You know, I, you know, personally, don't believe that it's going to be a matter of dispute that various people appeared at ICP conferences.  ICP published all of its' proceedings.  They have publications.  But these pictures simply have not been authenticated.  There has been no offer as to who took them, when they were taken, whether the copies are accurate copies, or doctored copies, we just don't have anything whatsoever.  And Mr.

A 26 599 077                    141                    August 29, 2000

Vera says, well, we have evidence that these were taken at ICP proceedings. We don't have any evidence. All we have thus far is a set of questions that Mr. Vera has asked to a witness who has refused to answer all questions. There is no evidence whatsoever in the Court today and, with the exception of Exhibit 1-A which is a petition filed for Dr. Al Najjar on behalf of WISE, there is no evidence. And without any authentication -- I'm sorry, that's Exhibit 1 -- there is a, it violates due process to accept a document that has never been authenticated.

JUDGE TO MR. COLE

Okay.

MR. VERA TO JUDGE

Your Honor, very briefly, under Matter of Toro and Matter of Barcenas (phonetic sp.), in these proceedings -- and again, we're talking about case in chief proceedings as opposed to bond proceedings which are ancillary proceedings. The Board of Immigration Appeals has advised that, has taken the position that mere assertions by counsel or by anyone else that evidence is not what it's supposed to be or what it is depicted to be, isn't sufficient to call into question the reliability of the evidence. Again, we may have an issue weight that this Court can provide to that evidence, but we sure as heck don't have an issue as to whether they're admissible. The documents themselves show you that it's the ICP. The ICP, in itself, is an organization that the respondent himself has acknowledged he was a member of. The

A 26 599 077                    142                    August 29, 2000

pictures, again, show the respondent.  To the common eye, it's the respondent.  They show the witness.  Both of them were the people that organized the conferences.  These were conferences, and the pictures indicate that the conferences were held, that there were people sitting there, that the ICP banners were there, that the PIJ poster was there.  They are what they depict.  And the reliability is inherent in the picture itself.  Again, there may be an issue in terms of us going through the formalities under the federal rules or some other rules of evidence that would certainly strengthen the position of the Government here, but that's not required in these Immigration Court proceedings.  And in fact, even if we were in those proceedings, the issue would not be whether they're admissible.  It would be whether the Court can actually give them the weight that the Government seeks to have the Court give them.

JUDGE TO MR. VERA

Okay.

JUDGE FOR THE RECORD

I'm going to take it under advisement.  I'll let you know a little later.

JUDGE TO MR. VERA

Okay.  Next witness.

MR. VERA TO JUDGE

Your Honor, at this time, we'll call Supervisory Special Agent William West.

A 26 599 077                    143                   August 29, 2000

JUDGE TO MR. VERA

Okay.  Now let me go ahead and tell you.  It's 11:30.  How long do you figure this witness is going to take?

MR. VERA TO JUDGE

He'll be on several hours, Your Honor.

JUDGE TO MR. VERA

Okay.  Well we probably should go ahead and break, rather than do a bifurcated proceeding with him.

JUDGE TO MR. COLE AND MR. VERA

So do we think everybody can be back by 12:30 or should we make it 1?  I don't want to --

MR. VERA TO JUDGE

I'm sorry, Your Honor --

JUDGE TO MR. VERA

Do you want to make it 12:30 or 1?  I don't --

MR. VERA TO JUDGE

Whichever the Court prefers.

MR. COLE TO JUDGE

Yeah, whatever the Court prefers.

JUDGE FOR THE RECORD

Okay.  We'll make it 12:45.

MR. VERA TO JUDGE

What a negotiator.

MR. COLE TO JUDGE

Very Solomonic (sic).

A 26 599 077                    144                    August 29, 2000

JUDGE FOR THE RECORD

Let's go to tape no. 5.

(OFF THE RECORD)

(ON THE RECORD)

(TAPE 5)

JUDGE FOR THE RECORD

This is tape no. 5, on the 29th day of August, the year 2000, case 26 599 077.

JUDGE TO MR. VERA

Okay. Mr. Vera, as I remember, you were getting ready to call a witness.

MR. VERA TO JUDGE

Yes, Your Honor. Before we proceed today, may I ask the Court if the Court would issue an instruction relating to the gallery. During our, during the morning's presentation, and it's something that I forgot to mention at the end of it was we kept on hearing gasps and other things during some of the questioning from the row immediately behind Government's counsel, Government counsel table. We would ask for an instruction to be issued accordingly.

JUDGE TO MR. VERA

Yeah. The other question was -- and I'm sure -- do we have any potential witnesses in the courtroom?

MR. VERA TO JUDGE

We have, as far as I know --

A 26 599 077                    145                    August 29, 2000

JUDGE TO MR. VERA

I mean, other than the guy you're calling next.

MR. VERA TO JUDGE

Yeah.  We have Mr. -- no, he is not here -- oh, yes, Mr. Fulet (phonetic sp.).

JUDGE TO MR. VERA

Okay.

MR. VERA TO JUDGE

He is a potential rebuttal witness.

JUDGE TO MR. VERA

Okay.

MR. VERA TO JUDGE

It depends on what Mr. Mazen Al Najjar testifies to.

JUDGE TO MR. COLE AND MR. VERA

Okay.  Does anybody want to invoke the rule or they want to exclude it --

MR. COLE TO JUDGE

Yes.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

We'd also, we'd also object, Your Honor, that he has not been identified as a witness.  The Government identified four witnesses.  He was not on the list.

JUDGE TO MR. COLE

A 26 599 077                    146                    August 29, 2000

Okay.

MR. COLE TO JUDGE

We don't know who this person is.  We have never heard of him.  We have never gotten any advance notice of the name.  Your Honor ordered us to identify witnesses, and they never made any special request to have him be presented or give us any notice about.

MR. VERA TO JUDGE

Well, Your Honor, first of all, again, the notice requirements under the EOIR rules are for case in chief presentations.  Again, we have identified Suarez (phonetic sp.) as a witness, potential witness for our rebuttal case.  He is an FBI Arabic/English translator.  And certainly in light of the fact that Sami Al Arian has taken the 5th on a lot of the things that we were going to ask him about, to include some of the Arabic language documents we have in our possession, we believe he's relevant to assist this Court in the translation of a variety of things that we have in the Arabic language.  Clearly, he is a potential rebuttal witness.  He is not a case in chief witness, Mr. West is.

JUDGE TO MR. VERA

Okay.

JUDGE TO MR. COLE

So do you want him, do you want him excluded?

MR. COLE TO JUDGE

A 26 599 077                    147                    August 29, 2000

If he's not going to testify to any facts.  He's just going to --

MR. VERA TO JUDGE

He's to translate to what documents say or what somebody has said.

MR. COLE TO JUDGE

Solely a translator.

MR. VERA TO JUDGE

Solely a translator.

MR. COLE TO JUDGE

I don't have a problem, we don't have a problem with that.

JUDGE TO MR. COLE

Okay.

JUDGE TO PEOPLE IN COURTROOM

People in the courtroom, you should remember that this is a court and that we have to maintain decorum.  And if in fact you become unruly, then you will be excluded from the courtroom.  So try to, rather than give your comments by sighs and cheers or anything like that, refrain from doing so.

MR. SCHWARTZ TO JUDGE

Excuse me, Your Honor.

JUDGE TO MR. SCHWARTZ

Yes.

MR. SCHWARTZ TO JUDGE

There's one potential rebuttal witness for the Government in

A 26 599 077                    148                    August 29, 2000

the audience?

JUDGE TO MR. SCHWARTZ

Yes.  But he's more -- does not -- appears to be on the language end.

MR. SCHWARTZ TO JUDGE

Okay.  But it was just one?

JUDGE TO MR. SCHWARTZ

Yes.

MR. SCHWARTZ TO JUDGE

Okay, thanks.

JUDGE TO MR. VERA

That was my understanding.

MR. VERA TO JUDGE

It's correct at this time unless we run into something else.

JUDGE TO MR. VERA

Okay, so, Mr. Vera.

MR. VERA TO JUDGE

We would call Supervisory Special Agent William D. West with the Immigration and Naturalization Service.

MR. WEST TO JUDGE

Your Honor?

JUDGE TO MR. WEST

Q.   Yes?

A.   May a cup of water accompany me to the witness stand?

Q.   Yes.

A 26 599 077                    149                    August 29, 2000

*Beginning of West's Testimony*

A.   Thank you.  I was told I would be here awhile.

Q.   Yes, have a seat.  You can put it right there.

A.   Thank you.

Q.   And if you'll raise your right hand, do you swear the testimony you are about to give today shall be the truth, the whole truth, and nothing but the truth, so help you God?

A.   Yes, sir, I do.

Q.   And would you state your full name.

A.   William D. West, W E S T.

Q.   Okay.  And your home of record, just give me the city.

A.   It's Southeast, Florida.

Q.   Okay.  And your occupation?

A.   I'm a Supervisory Special Agent with the United States Immigration and Naturalization Service.

Q.   Okay.  And what office do you work out of?

A.   The Miami District Office.  I am the Chief of the Special Investigations Division for the INS in Miami.

JUDGE TO MR. VERA

Okay, you may proceed, Mr. Vera.

MR. VERA TO MR. WEST

Q.   Special Agent West, in your capacity as Chief of the Special Investigations Unit, what type of investigations do you oversee?

A.   I supervise and oversee a unit which provides for the INS Investigative participation and a variety of multi-agency

A 26 599 077                    150                    August 29, 2000

investigations that include organized crime, gangs and national security cases such as counter-terrorism and espionage.

Q. Sir, how long have you held that position?

A. Approximately ten years.

Q. Sir, in your capacity as a Supervisory Special Agent in charge of Special Investigations, did there come a time when you encountered or were involved in the investigation of an organization known as the World Islamic Studies Enterprise?

A. Yes, sir.

Q. Did there also come a time when you were involved in an investigation of another organization known as the Islamic Committee for Palestine?

A. Yes, sir.

Q. Sir, in the course of your investigation, did you obtain evidence that indicates that these two organizations provide support to the Palestinian Islamic Jihad?

A. Yes.

Q. Sir, let me ask you, in the course of your investigation, did you participate with any other federal agencies?

A. Yes, sir, the FBI, the Customs Service.

MR. COLE TO JUDGE

Could I just interpose for a moment, Judge. I'm -- just a point of clarification. I believe Mr. Vera said earlier that Special Agent West is going to testify solely on the basis of

A 26 599 077                          151                    August 29, 2000

public record sources, and is not in this proceeding going to rely in any way on confidential sources. And I just want to make sure that that's clear because, obviously, our ability to cross-examine Mr. West would be undermined seriously if he's relying on classified information. I understand from Mr. Vera's prior statement that, in fact, that is all he is asking, all the questions to Special Agent West refer only to public record evidence. And I know from prior --

JUDGE TO MR. COLE

One minute you said classified and one minute you said confidential. Those are two different things.

MR. COLE TO JUDGE

Okay, I'm sorry. Public record evidence versus classified information.

JUDGE TO MR. COLE

So as far as confidential informants that he gets information from --

MR. COLE TO JUDGE

Any information that he cannot share on cross so that we can not go into it, he should not be testifying to on direct. If he is going, if he is going to do that, then it ought to be pursuant to the procedures that this Court has adopted for material that can't be disclosed to the respondent. If -- but my understanding -- again, I'm just trying to clarify because Mr. Vera did say that Mr. West is going to testify solely to his information

A 26 599 077                    152                    August 29, 2000

respecting public record sources.  And I know from the prior testimony -- and the only reason I raise this now, Judge, is that in the prior testimony, Special Agent West was referring sometimes to public record sources, sometimes to sources that could not be shared and could not be gone into on cross-examination.  I just want to make it clear that here we are talking only about public record sources so that we can have a right to, a meaningful opportunity to confront the evidence.

JUDGE TO MR. VERA

     Mr. Vera.

MR. VERA TO JUDGE

     Well, Your Honor, again, by statute in this proceeding, which is the proceeding attended by people who are not authorized access to national security information, I cannot ask Mr. West any questions, and he cannot answer any questions, relating to classified information.  So therefore, we would not be.  We also, because of the federal rules of criminal procedure grand jury secrecy rules, cannot ask him about things that he may be aware of or may not be aware of, but we cannot allow him to testify about anything that would violate (indiscernible) of the grand jury secrecy, the grand jury secrecy rule.  So therefore, our questioning will be limited to his knowledge and the information he has obtained in his participation in the investigation of WISE, ICP, the respondent and others that relate to the type of evidence that would admissible or available anywhere.

A 26 599 077                    153              August 29, 2000

JUDGE TO MR. COLE

Okay?

MR. COLE TO JUDGE

That's fine.

JUDGE TO MR. VERA

Okay.  You may proceed, Mr. Vera.

MR. VERA TO MR. WEST

Q.   Sir, back to the question -- let me ask you the question again.  I didn't remember if you answered.  During the course of your investigation of WISE and ICP, did you obtain information that -- well, let me break this down -- that WISE had an association or had involvement with the Palestinian Islamic Jihad Organization?

A.   Yes.

Q.   And did you obtain similar information in regards to ICP?

A.   Yes.

Q.   Sir, in regards to the federal agencies that you were involved with in conducting this investigation, did there come a time when you sought to obtain evidence by means of a search warrant?

A.   Yes, in November of 1995.

Q.   And are you aware of the circumstances under which that search warrant was obtained?

A.   Yes.  I offered the affidavit for the search warrant.

A 26 599 077                    154                    August 29, 2000

Q. And, sir, was in fact a search warrant granted?

A. Yes.

Q. And, sir, was that a federal search warrant?

A. Yes. It was a federal criminal search warrant.

Q. Who was, who granted the search warrant?

A. A U.S. District Court Judge Magistrate in Tampa.

Q. Did the U.S. Government in fact execute that search warrant?

A. Yes.

Q. And when you and the other federal agents executed that search warrant, was it at a single location?

A. No.

Q. Can you tell us what it was, what the search warrant entailed?

A. Three locations, the offices of WISE, the residence of Sami Al Arian and the University of South Florida office of Sami Al Arian.

Q. And, sir, in summary, what types of evidence was the search warrant for?

A. Records, documents, videotapes, computer equipment and computer records which were contained within those locations.

Q. Sir, did you in fact, along with other federal agents, seize evidence from any of those locations?

A. Yes, all three locations.

Q. To the extent that you remember, sir, let me start out

A 26 599 077                    155                    August 29, 2000

with, for instance, the residence of Sami Al Arian. Do you remember what types of evidence, general types of evidence was obtained from that residence?

A. Yes. Again, computer equipment, including disks and hard drives of computer equipment, videotapes, audio tapes, various letters, other documents related to the WISE and the ICP, and photographs.

Q. And, sir, when you say computer, was that some sort of regularly known, what's regularly known as a stand alone computer?

A. Yes, a personal computer.

Q. And, sir, in fact when that was seized, was it subsequently analyzed for evidence?

A. Yes. The evidence was maintained, and is still maintained, by the FBI in Tampa. And the computer equipment was sent to the computer, to the FBI's Computer Analysis Unit, and they conducted various examinations and tests of that computer equipment, the drives, the hard drives and so on, and the disks associated with that.

Q. Do you know if any evidence was obtained from those hard drives?

A. Yes, yes.

Q. And do you know if there was any evidence obtained from the disks?

A. Yes.

A 26 599 077                      156                  August 29, 2000

Q.   What types of evidence was obtained?

A.   Documents which related to ICP and WISE and other organizations.

Q.   Sir, in the evidence that you obtained pursuant to that evidence, was there anything pertaining to fund raising?

A.   Yes.

Q.   Can you tell us, if you recall, what kind of evidence might pertain to fund raising?

A.   There was a letter that was found which solicited funds for the ICP.

Q.   But, sir, do you recall if that letter had an author?

A.   Yes.

Q.   And can you tell us who that author was?

A.   Sami Al Arian.

MR. VERA TO JUDGE

Your Honor, may I approach the witness?

JUDGE TO MR. VERA

Yes.

MR. VERA TO JUDGE

I'd like this marked as Government's, for identification purposes, as Government's exhibit, I believe --

JUDGE FOR THE RECORD

This would be Exhibit No. 2 for identification.

MR. VERA TO MR. WEST

Q.   Special Agent West, have you had a chance to review

A 26 599 077                    157                    August 29, 2000

that document?

A.   Yes.

Q.   And, sir, I actually handed you two documents.  Can you identify those for purposes of the record?

A.   Yes.  The English document is the translation of the Arabic document.  Again, the Arabic document was the copy of a document, the letter soliciting funds retrieved from Sami Al Arian's computer.  And again, the English is the official FBI translation thereof.

Q.   Sir, on that document is there a location where you see anything that would indicate to you who the author was, in the English language translation?  Unless, you don't speak Arabic, do you?

A.   No, I don't.

Q.   Or read Arabic?

A.   No, I don't.

Q.   Okay.

A.   Yes, on the second page, the signature block states your brother, Sami Al Arian, dated 2/1/95.

Q.   What about that letter would indicate to you that it entails fund raising, if anything?

A.   There is wording in the letter which relates to a request for funds.

MR. VERA TO JUDGE

Your Honor, at this time we'd ask that this document be

A 26 599 077                          158                    August 29, 2000

admitted as evidence.

JUDGE TO MR. COLE

Objection?

MR. COLE TO JUDGE

Yes, Your Honor.  First of all, there is no certification that this translation, we have an English, a two page English document with no indication of who translated it, whether it's a translation, whether it's an accurate translation, whether the person who translated it understands Arabic.  In addition, we have never been provided this document before, and so we're not in a position to ascertain, from our standpoint, whether the translation is indeed an accurate translation.  And so we would object on those two grounds.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. VERA

Mr. Vera, all documents are documents are supposed to have affidavits of authenticity.

MR. COLE TO JUDGE

I'm sorry, Judge, if I could just add an objection.  There was no -- this does not appear to be an original.  And there is also no certification that the copy is an accurate copy of the original letter, the Arabic letter, all I see is a copy.  And, again, that's basically, my understanding is that's a basic requirement of admissibility.

A 26 599 077                  159                  August 29, 2000

MR. VERA TO JUDGE

Well, Your Honor, again, our position would be that this evidence has been provided to us by another federal agency.  Even though we are participating or have participated with that agency in obtaining this evidence.  There is two reasons why this document should be admissible.  The first is the testimony provided by Special Agent West that this is in fact a true copy of the document that was seized from the home of Sami Al Arian.  And the second, of course, is that we're providing the translation at this time solely for the purposes of assisting the Court in following the testimony that we will elicit about this particular document.  We are not asserting at this time that this is a true and accurate representation of, as required under the rules of the translation of this document, insofar as it relates to its admissibility.  We are asserting that it is a true and accurate representation of the representation of the translation as it relates to the ability of Special Agent West to testify about what he knows about this investigation and what the evidence says.  Clearly, we will have, the Court has authorized an Arabic speaking interpreter.  We identified a few minutes ago, we have an FBI Arabic/English translator.  And, of course, we have the respondent himself who is by his own certification, and by the certification of the University of South Florida, a person who has served in an official capacity as an Arabic/English translator.  So I believe that something more than a mere

A 26 599 077                          160                    August 29, 2000

assertion from counsel that these documents might not say what they purport to say is required before, again, this evidence is excluded for the limited purpose that we seek to use it at this time.

MR. COLE TO JUDGE

Your Honor, I don't speak Arabic.  I know Mr. West doesn't speak Arabic.  I doubt Mr. Vera speaks Arabic.  You don't speak Arabic.  Nobody here has any basis for knowing whether this unsigned, unsworn, unidentified, typewritten document has anything to do with the attached document.  And it's the burden of the party presenting the evidence to demonstrate that it is a certified translation and that the, and the underlying document is in fact the original.  Or if it's not the original, why they haven't been able to put in the best evidence and that this is a certified copy.  They allege that they have seen this document.  They have the original document.  Why isn't the original document here?  They've had five years to get a certified copy of it.  There is no certified copy.  How can Mr. West testify about the contents of the document, when he doesn't even speak the language that the document was in?  He's going to be testifying based on this, this two page typewritten document which has never been in any way shown to be sworn as an accurate translation.  And I would refer the Court to 8 C.F.R. 3.33 regarding translation of documents.  Any foreign language document offered by a party in a proceeding shall be accompanied by an English language

A 26 599 077                        161                   August 29, 2000

translation and a certification signed by the translator that must be printed legibly or typed.  Such certification must include a statement that the translator is competent to translate the document and that the translation is true and accurate to the best of the translator's abilities.

JUDGE TO MR. VERA

Yeah, we'll have to -- I'll let you tie it up later.  Right now, I can't let it in without those 8 C.F.R. requirements being met.

MR. VERA TO JUDGE

But if we can we mark it just for identification purposes --

JUDGE TO MR. VERA

Yeah, it's marked 2 for identification.

MR. VERA TO JUDGE

Thank you.

MR. COLE TO JUDGE

And I object to any questioning with respect to it if it's not evidence in the Court.

MR. VERA TO JUDGE

Well, Your Honor, we would -- our position, again, would be that this is the information that's available to Special Agent West in the course of his duties.  From the testimony that you have already hear, it is information that was obtained pursuant to an investigative act, the execution of a search warrant.  It is information that is in the regular course of business

A 26 599 077                    162                    August 29, 2000

maintained by the Federal Bureau of Investigation, a federal law enforcement agency that we ask the Court to take administrative notice of. But clearly, whether or not these assertions are true or not, this is exactly what is maintained by the FBI in regards to the evidence that it seized from Sami Al Arian's home and that's all we will ask Mr. West about, to include the contents. It goes to, again, weight, not admissibility, not in terms of what we can ask about what he knows.

JUDGE TO MR. COLE

I'll overrule your objection.

JUDGE TO MR. VERA

You may ask those questions.

MR. VERA TO MR. WEST

Q. Special Agent West, let me ask you about the second to the last paragraph.

A. Yes, sir.

Q. Sir, in your capacity as an official law enforcement agent, what is a jihad, as you know it?

A. It's an armed struggle, an armed effort by various radical Islamic groups to obtain their goals, political ends.

Q. Sir, if you can read the records of the jihad there?

MR. COLE TO JUDGE

Your Honor, it sounds to me like it's beyond what you, what Mr. Vera said he was going to ask him about. I mean, now we're acting as if this document was in evidence. And he's asking *him*

A 26 599 077                    163                    August 29, 2000

to read into the record quotes from a document which Your Honor says is not admissible, which has never been certified, which violates the regulations. I just don't see how -- it's one thing to say it's for him to identify that this is a document that he got from the FBI, but it's another thing to start going into the content of the document when the document is not admissible evidence.

MR. VERA TO JUDGE

Well, Your Honor, counsel can't have it both ways. Either the document speaks for itself because it's in evidence, or we can speak, again, with the notice that we provided to the Court that this is the information maintained by the FBI. This is what Bill West, Special Agent Bill West, knows about what this document says. And what I'm going to ask him is in relation to, again, the central issue here, and that's whether or not persons that were involved with WISE and ICP were engaged in fund raising for the Palestinian Islamic Jihad Organization, and clearly ask him about what this document contains. A document that you have heard, through un-rebutted testimony, was, is a true copy of what was seized by the federal law enforcement agencies pursuant to a lawful search warrant. Clearly, the question should be allowed.

MR. COLE TO JUDGE

Your Honor, the testimony has not been that this is a true copy of what was seized. If anything, what was, is a true copy of what was seized or what has been asserted as a true copy of

A 26 599 077                        164                    August 29, 2000

what was seized, is the Arabic.  Mr. West does not read Arabic. The document on top of it which is uncertified, inadmissible, is not what was seized by the FBI.  And it's been ruled as inadmissible, and it seems to me completely an end run to then say, okay, could you please read from the document which was inadmissible.  Tell us what the document tells you about the case.  If the evidence is admissible, we talk about it.  But if the evidence is inadmissible, we move on.

MR. VERA TO JUDGE

Your Honor, it's like a lead.  If we accept counsel's assertion, then Bill West, Special Agent West, would not be able to talk about what kinds of leads he had to conduct this investigation.  He would never be able to attest to anything that relates to anything other than what's admitted into evidence. That's what we're talking about here is simply the information in a continued investigation that's available to agents of the federal Government, in this case a Supervisory Special Agent of the INS.  So he's telling you what's available to him based on officially seized evidence and the FBI's translation of that evidence.  Whether you want to believe that that's an accurate translation or not is not the issue of whether or not, or doesn't control the issue of whether or not we can talk about, it just controls whether it's admissible or not.  And whether, again, if we certify it as an accurate translation, clearly, then it's admissible, we argue that it's still admissible in its' current

A 26 599 077                    165                    August 29, 2000

state.  But even if it's not, we ought to be allowed to ask questions about what Bill West knows.  Whether what he knows is right or wrong, it's what he knows.

JUDGE TO MR. COLE AND MR. VERA

Okay.  This is a Judge alone, and you all know that the, we don't have the same rules for Judges we do have for juries.  So I'm able to throw out what I don't admit and what I do admit later.  So at this particular time, I'm going to allow the questioning.  If in fact it's not admitted and it's, then we'll go over this again and exclude all that evidence.  Okay.

JUDGE TO MR. VERA

All right.  You may proceed.

MR. VERA TO MR. WEST

Q.   Special Agent West, can you read that paragraph that I asked you to read before?

A.   I call upon you to try to extend true support to the jihad effort in Palestine so that operations such as these can continue.  The entire paragraph?

Q.   No, that's, that's enough.  In your capacity as a federal law enforcement agent in charge of special investigations which include counter-terrorism, does that mean anything to you, sir?

A.   Yes, it does.

Q.   Can you tell us what it means?

A.   To me, it means that the request is being made to

A 26 599 077                    166                    August 29, 2000

enlist additional support to continue the jihad effort.  The jihad effort being violent armed struggle and acts against whatever perceived enemy there may be.

Q.   Okay.  Sir, in your capacity, again, as a federal law enforcement agent and in relation to the search warrant, in this occasion of the offices of WISE, do you know if there was anything seized in that search, in the execution of that search warrant that related to Hamas?

A.   Yes.

Q.   Sir, can you tell us briefly what was seized in relation to Hamas?

A.   Yes.  There was a document which was identified or is shown to be a pact between the Hamas and the Palestinian Islamic Jihad.

MR. VERA TO JUDGE

Your Honor, if I could approach the witness again?

JUDGE TO MR. VERA

Yes.

MR. VERA TO JUDGE

We ask that this be marked for identification purposes.

JUDGE FOR THE RECORD

Exhibit 3 for identification.

MR. VERA TO MR. WEST

Sir, I've handed you, again, two documents.

MR. COLE TO JUDGE

A 26 599 077                    167                    August 29, 2000

Your Honor, I would just note our continuing -- I don't want to repeat myself -- my continuing objection to questions based on inadmissible evidence, on its' face inadmissible.

JUDGE TO MR. COLE

Okay.

MR. VERA TO MR. WEST

Q.   Special Agent West, is this the document you were referring to, the pact?

A.   Yes.

Q.   And, sir, again, for clarification purposes, how do you know that?

A.   I recognize the document from the evidence that was seized.  This is a copy of the document, the Arabic.  And the English is a copy of the translation done by the official FBI translators that I've had regular interaction with.

Q.   And again, it was seized from what location?

A.   The offices of WISE.

Q.   And what is WISE?

A.   The World and Islam Studies Enterprise.

Q.   And do you know if, in fact, the respondent was associated with WISE?

A.   Yes.

Q.   And do you know what capacity his association entails?

A.   Well, he was in a management capacity, subordinate to Sami Al Arian.

A 26 599 077                    168                 August 29, 2000

Q.   Well, do you know what Sami Al Arian's position was with WISE?

A.   It was the head of WISE, I believe, the founder and chairman of WISE.

Q.   In your capacity as an experienced agent who in part has engaged in counter-terrorism investigations, does the word Hamas have any significance to you?

A.   Yes.

Q.   What is Hamas?

A.   Hamas is a designated terrorist organization, designated by the Secretary of State.  And it is in fact an organization that engages in terrorist acts in the Middle East and has operations that actually extend beyond the Middle East.

Q.   And, of course, the Palestinian Islamic Jihad is a terrorist organization?

A.   Yes, it is.  It's a designated terrorist organization, so designated by the Secretary of State, which engages in terrorist activities within the Middle East.

Q.   Thank you.

MR. COLE TO JUDGE

Your Honor, I'd object on the ground that I don't believe that the, with the exception of the statement that these groups are designated by the Secretary, that Special Agent West is testifying based on his personal knowledge.  I don't believe there is any, laid any foundation that Mr. West has any personal

knowledge regarding any activities of PIJ or Hamas, and therefore it's hearsay without any identified sources.

JUDGE TO MR. COLE

So what exactly, what comment are you objecting to?

MR. COLE TO JUDGE

The, the, with respect to Hamas and PIJ, he said, one, that they're designated by the Secretary of State. That's a matter of public record. We don't object to that comment. He went on to state, and they engage in terrorist activities. I, no foundation has been laid for any personal knowledge by Mr. West regarding any activities of PIJ or Hamas, therefore it's hearsay.

JUDGE TO MR. VERA

Mr. Vera.

MR. VERA TO JUDGE

Your Honor, we asked him, with the predicate that he's an experienced law enforcement agent who for a period of at least ten years has engaged in a capacity as a federal agent in counter-terrorism investigations. We believe that in assisting this Court to determine whether or not these organizations engaged in terrorist activities is opinion whether it be as an expert or as a lay person is certainly helpful to this Court, beyond that we ask the Court to take administrative notice. These organizations in various publications have been identified and publicly identified themselves as terrorist organizations, to include certainly the Palestinian Islamic Jihad, the most recent

A 26 599 077                    170                    August 29, 2000

pronouncements of Ramadan Shallah, who used to be, again, a member of the World Islamic Studies Enterprise, saying that he will attack American interests if President Clinton goes forward in setting up his embassy in Jerusalem. We clearly think that's evidence of threatened terrorist activities. So I think that Special Agent West's testimony in that regard is certainly helpful to this Court.

MR. COLE TO JUDGE

Your Honor, Mr. Vera, Vera now seems to be testifying. We haven't had any evidence regarding the, any of the statements which he just made in the record, number one. Number two, he says, well, Mr. West should be entitled to give his opinion as a lay person. As a lay person, he should be testifying as to his personal knowledge, not his opinion, the facts. He has identified no personal knowledge that would support this. And he has not been qualified as an expert. There has been no effort to establish his expertise with respect to these groups. And so his opinion, based on hearsay, is not admissible. If he has personal knowledge, then he can testify to. But if he has no personal knowledge, it's hearsay and it ought to be inadmissible. We can't cross-examine him if he is not, has no personal knowledge with respect to --

JUDGE TO MR. COLE

What do you mean, you can't cross-examine him?

MR. COLE TO JUDGE

A 26 599 077                      171                   August 29, 2000

If he has no personal knowledge with respect to this, then he is not, there is nothing there.  There is no there there.

JUDGE TO MR. COLE

Okay.  And if he, if he answers that, then you should be happy?

MR. COLE TO JUDGE

Well then -- okay, then we throw out the rules of evidence because since people can cross-examine, we'll allow anything under the sun to come in.  It seems if we have a set of rules which are designed to go towards the truth and due process requires that those rules be guided.  And I understand, of course, that the federal rules of evidence don't apply, but due process does apply.  And for a witness to get up and start testifying as to his opinions, to his, to opinions based on fact which he hasn't, has no personal knowledge to -- you know, I could put somebody on the stand and say my opinion is that Mazen Al Najjar has never done a single thing in his life.  If there's no personal knowledge there, why should that be admissible?  It shouldn't be admissible because it's hearsay.  And it's, it could be --

JUDGE TO MR. COLE

I hate to tell you that, but I think we've got evidence in to that effect.

MR. COLE TO JUDGE

I'm sorry?

A 26 599 077                          172                    August 29, 2000

JUDGE TO MR. COLE

I think we have evidence before the Court to that effect, exactly what you just said.

MR. COLE TO JUDGE

To the fact that Mazen Al Najjar has not engaged in any kind of terrorist activity?  My point is that with out any personal --

JUDGE TO MR. COLE

Do you want to ask that question?

MR. COLE TO JUDGE

I'm sorry?

JUDGE TO MR. COLE

Do you want to ask that question about his knowledge about that answer?

MR. COLE TO JUDGE

Well, I don't want to do my cross now, Your Honor.  But all I'm saying is that my understanding is that the witness ought to be instructed to testify with respect to that which he has personal knowledge.  And if he doesn't have personal knowledge, he shouldn't -- it's a basic principle that he shouldn't be testifying as to that which he does not have personal knowledge. If he has personal knowledge, fine.

JUDGE TO MR. COLE

Okay.  So far, no one has asked him that question.

MR. COLE TO JUDGE

And that's right.  The foundation -- that was my original

A 26 599 077                            173                        August 29, 2000

objection. No foundation has been laid that he has any personal knowledge that would allow him to testify as to what he just testified.

JUDGE TO MR. VERA

Mr. Vera.

MR. VERA TO JUDGE

Well, Your Honor, I mean, I think it's very clear, as I stated before, even under the federal rules of evidence, there's two types of opinion testimony that can be provided to the Court, one is expert testimony and one is lay opinion. Here, we haven't gone forward yet to qualify Special Agent West as an expert, Mr. Cole is correct about that, but we clearly, clearly have identified him as an experienced federal law enforcement agent involved in counter-terrorism investigations. His view of what Hamas and the Palestinian Islamic Jihad Organization clearly should carry at least some weight with this Court. And even if they don't, his views are still admissible. If this Court totally discounts Special Agent West's testimony, it doesn't mean he can't have those beliefs. As I think the Court was getting to in the interaction with Mr. Cole, that's a question for cross-examination that might in fact impeach the weight to which this Court might give to a witness' testimony, but we do have the opportunity to do that through any witness but certainly here an experienced federal law enforcement agent. Beyond that, you did hear the foundation, one that Mr. Cole has acknowledged, and

A 26 599 077                    174                    August 29, 2000

that's that these organizations have been classified as a matter of law by regulations and as a matter as terrorist organizations. Mr. West has testified he's aware of that. So I don't see where we have an issue in terms of whether Hamas or the Palestinian Islamic Jihad are terrorist organizations. And I assume here, as federal Judge Leonard indicated, we should be coming back for due process. And I think, as has been argued before, due process encompasses a lot of things, but I think the primary thing it encompasses is a search for the truth. And I think if we're going to attempt to short cut that on even known facts such as pictures are clearly what they say they relate to, that we say they are, we're going to be here for a long time.

MR. COLE TO JUDGE

Your Honor, I'm not trying to short circuit the search for the truth. I'm trying to assure that we actually have a fair proceeding that is designed to get at the truth. That's all I'm asking. You know, if you had an allegation that Mr. Al Najjar was engaged in drug running and the Government brought in an experienced agent who came in and said I believe Mr. Al Najjar is engaged in drug running, even though he had no personal knowledge with respect to whether Dr. Al Najjar was engaged in drug running, that would not be admissible. The fact that he's an -- if that were the case, we would never have to have direct evidence of anything. We could just bring in police officers who could say in my opinion this person is guilty. That's not the

A 26 599 077                    175                    August 29, 2000

way, in my understanding, the search for the truth goes. My understanding of the search for the truth goes as we put in evidence, evidence of personal knowledge. And when that evidence is -- if it's evidence of personal knowledge, it can be tested by cross-examining the person who is offering it as their own personal knowledge. I -- well, Mr. Vera says, well, they've laid the foundation because the Secretary of State designated the group. That doesn't lay any foundation with respect to Mr. West's personal knowledge regarding Hamas and PIJ. I said, we don't object to his statement that the Secretary of State has designated because that's a matter of administrative record. We stipulate that the Secretary of State has designated those groups, in 1997, as terrorist organizations But -- and that's, there is no dispute about that. But that's not a -- that doesn't lay any foundation as to Mr. West's personal knowledge and his, therefore, his capacity to testify in this Court about assertions regarding acts of the PIJ. I don't know whether he's ever witnessed a single act of the PIJ.

JUDGE TO MR. WEST

Q.   Mr. West --

A.   Yes, sir.

Q.   -- what is the basis of your opinion on the Hamas?

A.   Well, Your Honor, beyond the official designation by the Secretary of State, I have had extensive experience dealing with other agencies in the law enforcement and intelligence

A 26 599 077                    176                    August 29, 2000

community relative to counter-terrorism matters. Those matters involve investigations of both PIJ and the Hamas. I have reviewed numerous records and investigative reports, intelligence reports, intelligence surveys, intelligence documents that relate to both the Hamas and the PIJ. And beyond that I have done independent research, part of my job, relative to academic information that is available on the Hamas and the PIJ. All of that information I personally have reviewed. And admittedly, I have never seen PIJ attacked personally, but I have seen documents and photographs of the aftermath of PIJ attacks. All of that information combined over a number of years leads me to state that the PIJ and the Hamas are in fact terrorist organizations that engage in terrorist activities.

JUDGE TO MR. COLE

Overruled. You may follow up on cross-examination.

JUDGE TO MR. VERA

You may proceed, Mr. Vera.

MR. VERA TO MR. WEST

Q. Thank you, Your Honor. Sir, speaking of terrorist acts, are you familiar with the name Alisha Flatow?

A. Yes, sir, I am.

Q. Who is that?

A. Alicia Flatow is a --

JUDGE TO MR. WEST

Q. Can you spell that last name?

A 26 599 077                    177                    August 29, 2000

A.    It's F L A T O W.

MR. WEST TO MR. VERA

Alicia Flatow is an American, was an American citizen of Jewish descent who was visiting Israel, and I believe it was in 1996. She was aboard a bus in Israel that was destroyed by a suicide bomber, and she was killed along with other Israelis on that bus. That bombing was the work of the Palestinian Islamic Jihad.

MR. VERA TO MR. WEST

Q.    Is that based on open source material?

A.    Yes, it is.

Q.    Can you tell us what that open source material is?

A.    Most of the open source material has been memorialized in a civil lawsuit that the parents of Alicia Flatow brought in U.S. District Court in New York against the government of Iran. And as part of that lawsuit and the finding by the U.S. District Court, the Palestinian Islamic Jihad was found to be the organization responsible for that bombing.

Q.    Thank you, sir.

MR. COLE TO JUDGE

The same objection based entirely on hearsay.

JUDGE TO MR. COLE

Okay, overruled.

MR. VERA TO JUDGE

Your Honor, may I approach the witness?

A 26 599 077                     178                  August 29, 2000

JUDGE TO MR. VERA

    Yes.

MR. VERA TO JUDGE

    We'd ask that this be marked for identification purposes.

JUDGE FOR THE RECORD

    Identification number, Exhibit No. 4 for identification.

MR. VERA TO MR. WEST

    Q.   Special Agent West, do you recognize these documents?

    A.   Yes, I do.

    Q.   Can you tell us briefly what they are?

    A.   The document in Arabic is a copy of a document seized pursuant to the search warrant of November 1995.  I believe it was seized at the WISE office.  And the document in front, again, is a translation that was conducted by an official FBI translator in Tampa.

    Q.   Now, sir, I know that you don't read Arabic, but if you look at the copy of the underlying document --

    A.   Yes.

    Q.   -- does that have a letterhead?

    A.   Yes, it does.

    Q.   Is it in English?

    A.   Yes, it is.

    Q.   Can you tell us what that letterhead says?

    A.   It's both in English and Arabic.  The English reads, World Islamic Studies Enterprise.

Q.    And, sir, based on the translation with which you are familiar, do you know who authored (sic) that letter?

A.    Ramadan Shallah.

MR. COLE TO JUDGE

I note our continuing objection.

JUDGE TO MR. COLE

Okay.

MR. VERA TO MR. WEST

Q.    And, sir, do you know who Ramadan Shallah is?

A.    Ramadan Abdallah Shallah, with various spellings thereof, is currently the chairman and the leader of the Palestinian Islamic Jihad Organization.

Q.    And how do you know that, open source?

A.    Open source.  And has admitted to being the same publicly.

Q.    And, sir, what did he do, if you know, immediately prior to becoming the head of the PIJ?

A.    He was an employee and, in fact, a manager of the WISE.

Q.    And, sir, from the translation that you have before you, can you tell who this letter was addressed to?

A.    Yes, Sheik Rasheed Al-Ghannoushi.

Q.    Sir, based on your experience as a federal law enforcement agent and your participation in this investigation, do you know who Mr. Ghannoushi is?

A.    Yes.

A 26 599 077                    180                August 29, 2000

Q. Can you tell us who he is?

A. Rasheed Al-Ghannoushi is a leader of a radical Islamic group based in Tunisia and currently resides, to the best of my knowledge, in England, and he has not lived in Tunisia for some time.

Q. And do you know why he hasn't lived in Tunisia?

A. Because he is a fugitive from Tunisia. The Tunisian government wants him because they have convicted him for --

JUDGE FOR THE RECORD

Okay, pick up --

JUDGE TO MR. WEST

Go ahead.

MR. WEST TO MR. VERA

-- for --

(OFF THE RECORD)

(ON THE RECORD)

(TAPE 6)

JUDGE TO MR. WEST

Okay, go ahead.

MR. WEST TO MR. VERA

For the, I believe it was the attempted murder of the then president of Tunisia.

MR. VERA TO MR. WEST

Q. And, sir, for purposes of the record, from the translation that you have before you, can you spell Mr.

A 26 599 077                    181                    August 29, 2000

Ghannoushi's name?

A.   Yes.   The last name is spelled A L, hyphen, G H A N N O U S H I.

Q.   And, sir, in very summary fashion, if you know, can you tell us what the purpose of that document was?

MR. COLE TO JUDGE

Your Honor, the document speaks for itself, if it's ever admitted into evidence.

MR. VERA TO JUDGE

It's not in evidence yet, Your Honor.

MR. COLE TO JUDGE

If it's admissible, it should speak for itself and we shouldn't have the witness testifying as to what the document consists of.   Again, if the evidence is inadmissible, we don't, we don't sort of launder it into admissible evidence by having someone read it on the stand.   It's either admissible or it's not.   And it hasn't even been offered into evidence.

JUDGE TO MR. COLE

I think it has been offered, but you objected to it.

MR. COLE TO JUDGE

I don't think they actually -- I think they just marked it for identification.

JUDGE TO MR. COLE

Well I know you said the same objection.

MR. COLE TO JUDGE

A 26 599 077                   182                   August 29, 2000

Are you going to rule on this?

JUDGE TO MR. COLE

I am. I am going to overrule you.

MR. SCHWARTZ TO JUDGE

Your Honor, we would also object on the basis that Agent West doesn't have any specific knowledge of this document.

JUDGE TO MR. SCHWARTZ

Do you want to ask me the same --

JUDGE TO MR. WEST

Q. Do you have any specific knowledge of this document?

A. Yes, Your Honor. I personally have reviewed this document many times since its' seizure during the search warrants. I had reviewed that in person and with translators of the FBI and other personnel from the FBI.

JUDGE TO MR. COLE

Any other questions?

MR. COLE TO JUDGE

Again, this -- Your Honor previously declined to admit a document --

JUDGE TO MR. COLE

It hasn't been admitted.

MR. COLE TO JUDGE

-- right, right, on the ground that it was not certified as a proper translation. This document is also, for the same reason, not admissible. If the prior document was not

A 26 599 077                         183                    August 29, 2000

admissible, this one shouldn't be admissible.

JUDGE TO MR. COLE

    I didn't admit it.

MR. COLE TO JUDGE

    So you're not admitting this one?

JUDGE TO MR. COLE

    Not at this stage.

MR. COLE TO JUDGE

    Okay.

JUDGE TO MR. VERA

    Do you have a question hanging?

MR. VERA TO JUDGE

    Yes, Your Honor.

MR. VERA TO MR. WEST

    Q.   Again, in summary fashion from what you're familiar with in regards to this document, the English translation, and your knowledge of this document.  Do you know what that, generally, what that document entails?

    A.   Yes.  It's a letter explaining to Mr. Al-Ghannoushi that efforts, the efforts that are being made and have been made relative to attempting to procure a visa for him to enter the United States so he can attend a seminar sponsored by the WISE.

MR. VERA TO JUDGE

    Your Honor, if that could be marked for identification purposes.

A 26 599 077                    184                    August 29, 2000

JUDGE FOR THE RECORD

That will be Exhibit 5 for identification.

MR. VERA TO MR. WEST

Q.   Special Agent West, do you recognize this set of documents I've handed you?

A.   Yes, sir, I do.

Q.   Can you tell us what they are?

A.   The document in Arabic is a document, a copy of a document that was seized, again, from the offices of WISE pursuant to the November 1995 search warrant.  And the English document is a translation conducted by the official FBI translators in Tampa of the Arabic document.

Q.   Are you familiar with this document, beyond the fact that it was seized during the search warrant?

A.   I have personally reviewed this document on a number of occasions, and I have personally reviewed the translation with the Arabic translators of the FBI and other Government personnel.

Q.   Can you tell us what the document is?

A.   It's a document which is a speech, a written speech by Dr. Sami Al Arian.

Q.   Do you know, can you tell from that document, what you have in front of you, where that speech was given or to be given?

MR. COLE TO JUDGE

Continuing objection on the same grounds as before.  The document has not been admitted.

A 26 599 077                    185                    August 29, 2000

JUDGE TO MR. COLE

Okay.  Overruled.

MR. WEST TO MR. VERA

It was a speech that was to be given at a conference given by the ICP, the Islamic Committee for Palestine, one titled, "Islam, Palestine and the West."

MR. VERA TO JUDGE

If I could have a moment off the record, Your Honor?

(OFF THE RECORD)

(ON THE RECORD)

JUDGE TO MR. VERA

Okay.

MR. VERA TO JUDGE

Your Honor, if we could have this set of documents marked as a group exhibit.

JUDGE FOR THE RECORD

Okay.  The next one will be Exhibit 8 for identification, which is a packet.

MR. COLE TO JUDGE

Your Honor, what was the number

JUDGE TO MR. COLE

It's 8.

MR. COLE TO JUDGE

No. 8.

MR. VERA TO JUDGE

A 26 599 077                    186                    August 29, 2000

I'm sorry, Your Honor, there is a --

JUDGE TO MR. VERA

Wait a minute, how did we get -- okay, I'm sorry.  I messed up.  You're right.  That was --

MR. VERA TO JUDGE

It would be 6 --

JUDGE TO MR. VERA

Yes, okay.

JUDGE FOR THE RECORD

That will be Exhibit 6, No. 8 has not been used.  I was looking at my tapes and my exhibits.

MR. VERA TO MR. WEST

Q.   Special Agent West, do you recognize that document?

A.   Yes.

Q.   Can you tell us how you're familiar with that document?

A.   These copies, or the Arabic document is a copy of a document seized from the residence of Sami Al Arian during the November of '95 search warrant.  And --

Q.   Sir -- go ahead.

A.   And the English document, again, is a translation of the Arabic document, the translation having been done by an official FBI translator.

Q.   And, sir, beyond the fact that you know that it was seized, are you familiar with it in any other way?

A.   Yes, I -- since it's seizure, I have personally

A 26 599 077                    187                    August 29, 2000

reviewed the document on several occasions, to include reviewing it with personnel from the FBI and other Government agencies, and reviewing it with the official FBI translators, I am familiar with this document.

Q.  And, sir, in general, can you tell us what that document is based on your knowledge of the contents of that document?

MR. COLE TO JUDGE

I would note our continuing objection.

JUDGE TO MR. COLE

Overruled.

MR. WEST TO MR. VERA

It's a document that purports to be a charter for something called the Center for Studies, Intelligence and Information.  And it's a rather lengthy in detail document, which includes diagrams and a map.  And there are, in fact, different segments or chapters of the document.  And it basically describes setting up an organization which would have various functions within a particular country or a particular location for gathering information or providing security for the organization, for gathering intelligence, and conducting other operations as the organization saw fit.

MR. VERA TO MR. WEST

Q.  And once again, where was this document obtained from?

A.  From Sami Al Arian's residence.  And it's, the Arabic

A 26 599 077                    188                    August 29, 2000

is handwritten.

Q. Handwritten, does that has any significance to you as a trained law enforcement agent?

A. Yes. It means that somebody took a very long time to sit down and produce this document.

MR. SCHWARTZ TO JUDGE

Your Honor, excuse me, would there be any way that the Court could provide us with a couple copies of this? This is very hard. We're seeing this document for the first time, and it's very hard to be able to follow what's going on here with just one copy for the whole table.

JUDGE TO MR. SCHWARTZ

No, I'm not going to copy it at this stage in the game.

MR. SCHWARTZ TO JUDGE

Or maybe if the Government has an extra copy --

MR. VERA TO JUDGE

We'd be agreeable to give them a short continuance so they can all read it, if that's you want.

MR. SCHWARTZ TO MR. COLE

Do you want that?

MR. COLE TO MR. SCHWARTZ

No.

JUDGE TO MR. SCHWARTZ

Okay. We'll proceed.

MR. VERA TO MR. WEST

A 26 599 077                    189                    August 29, 2000

Q.   Special Agent West, in the search that was conducted at the residence or offices, the residence of Sami Al Arian or the offices of WISE or ICP, did you seize any photographic evidence?

A.   Yes.

Q.   And what types of photographic evidence did you seize?

A.   For photographs that were taken at various ICP conferences from 1998 -- I'm sorry -- 1988 through 1992.

MR. VERA TO JUDGE

Your Honor, at this time, I would like to, again, go through the demonstrative presentation and ask some questions off the pictures that we've presented to the Court previously.

JUDGE TO MR. VERA

Okay.

MR. VERA TO JUDGE

Thank you, Your Honor.

MR. VERA TO MR. WEST

Q.   Sir, let me go ahead and reverse the order.  This is a document that was marked as Exhibit 8-A.  Sir, is this a document that you recognize?

A.   Yes, it is.

Q.   And, sir, obviously, it's a photograph.  For purposes of the record, can you tell us what it's a photograph of, to the best of your knowledge?

A.   Yes.  It's a reproduction of a photograph that was seized pursuant to the November 1995 search warrant.

Q.   And, sir, do you recognize anybody on that photograph?

A.   The respondent.

Q.   And what's his name?

A.   Mazen Al Najjar.

Q.   And, sir, do you place any significance to the poster that's depicted in the far left corner of this document?

A.   Yes.

Q.   Can you tell us what that significance is?

A.   It's a poster which is demonstrative of the Palestinian Islamic Jihad Organization.  The symbol of the PIJ is on that poster.

Q.   And which is the symbol?  Is it the symbol down here --

A.   Correct.

Q.   -- at the very bottom?

A.   Correct.  It's a small circular symbol that's at the very bottom of the photograph.

Q.   But, sir, if you know, who is the person who is depicted, the likeness of the person who is depicted on that poster?

A.   The last name is Al-Kassam.  He was a, one of the founding members of the Muslim Brotherhood, another Islamic organization from early in the 20th century, which continues to exist currently, and is considered a martyr and one of the heroes of the various Islamic movements.

Q.   Let me show you --

A 26 599 077                    191                    August 29, 2000

JUDGE TO MR. VERA

Let me ask him, before that --

JUDGE TO MR. WEST

Q.   Oh, can you spell Kassam's name?

A.   I believe it's A L, hyphen, K A S S A M, or sometimes D M.

JUDGE TO MR. VERA

Okay.

MR. VERA TO MR. WEST

Q.   Special Agent West, let me show you what's identified as Exhibit 7-A, I believe.  Are you familiar with this picture?

A.   Yes, it's a reproduction of another photograph that was seized during the search warrant operation.  And it's a photograph of the 1992 ICP conference in Chicago.

Q.   When you say ICP, what do you mean?

A.   The Islamic Committee for Palestine.

Q.   Sir, do you see anybody on that picture that you recognize?

A.   Yes, Dr. Sami Al Arian, to the immediate right of the podium, and to his, what would be his left or right, is Ramadan Shallah.

Q.   And who is Ramadan Shallah?

A.   Ramadan Abdullah Shallah is the current leader of the Palestinian Islamic Jihad.

Q.   Thank you.  Let me show you Exhibit 6-A.  Sir, do you

A 26 599 077                  192                  August 29, 2000

recognize this picture?

A.   Yes, again, it's a reproduction of a photograph seized during a search warrant operation, and it is a photograph of another ICP, Islamic Committee for Palestine, conference.  The fourth conference held in December of 1991, in Chicago.

Q.   Do you recognize anybody in this picture?

A.   Yes, the respondent, Mazen Al Najjar.

Q.   Can you identify, for purposes of the record, where he is seated, or where he is in this picture?  I'm sorry.

A.   To our left of the speaker at the podium.

Q.   Exhibit 5-A.  Do you recognize this picture, Special Agent West?

A.   Yes, again, it's a reproduction of a photograph seized during the November of '95 search warrant.  It's a photograph of an ICP conference in December of '91.  The fourth conference.

Q.   And, sir, do you recognize anyone in this picture?

A.   Yes.  To the far, our far left, is Ramadan Shallah.

Q.   And do you recognize anyone else?

A.   Yes.  To his, to our right, to the right of Ramadan Shallah, our right, would be Sami Al Arian.

Q.   Do you recognize Exhibit 4-A?

A.   Yes, again, another reproduction of a photograph seized during a search warrant operation.  And it's, again, a photograph taken at the ICP conference.  The fourth conference.

Q.   Is there anyone on this picture familiar to you?

A 26 599 077                    193                    August 29, 2000

A. Yes, two individuals.

Q. Can you identify those individuals?

A. The person on our far left is Sheik Omar Abdel Rahman, otherwise known as the Blind Sheik.

Q. Before you proceed, do you know the spelling of his name?

A. There, again, with many Arabic names, there are often different spellings. The generally accepted spelling of the first name Omar, O M A R, Abdel, A B D E L, Rahman, R A H M A N.

Q. And you say he's also known as the Blind Sheik?

A. The Blind Sheik, yes.

Q. Okay. And in your capacity as a federal law enforcement agent engaged in counter-terrorism investigations, does that name hold any special significance to you?

A. Absolutely. He was convicted in the World Trade Center bombing investigation and is serving a life term in federal prison.

Q. Sir, do you recognize anyone else in this picture?

A. Yes, to his left, our right, would be Sheik Abdel Aziz Odeh.

Q. Can you spell his name for the record?

A. Yes. And again, with individual my research has indicated a variety of spellings of his name, but generally it would be A B D E L, Abdel, middle name Aziz, A Z I Z, Odeh, O D E H.

A 26 599 077                    194                    August 29, 2000

Q.   And, sir, if you know, who is this person?

A.   Yes, Abdel Aziz Odeh is one of the founding members of the Palestinian Islamic Jihad.

Q.   And how do you know that?

A.   By extensive research and investigations conducted pursuant to my official duties.

MR. COLE TO JUDGE

Objection.

JUDGE TO MR. VERA

Before you move that --

MR. COLE TO JUDGE

Objection, based on hearsay.

JUDGE TO MR. COLE

Okay.  Overruled.

JUDGE TO MR. WEST

Q.   And which one was he?  Describe which one of the three?

A.   He is the gentlemen immediately to our right of the Blind Sheik, Your Honor.

Q.   Okay.

MR. VERA TO MR. WEST

Q.   For purposes of the record, is that the man in the middle?

A.   Yes, the man in the middle.

Q.   Exhibit 3-A.  Do you recognize this picture, Special Agent West?

A 26 599 077                    195                    August 29, 2000

A. Yes, sir. Again, a reproduction of a photograph seized during the search warrant operation. And it is a photograph of the ICP conference held December of 1991.

Q. Do you recognize anyone in this picture?

A. Yes, several people. Standing with the microphone is Sami Al Arian. To his left, our left, is again Sheik Omar Abdel Rahman. And immediately to his left, our left, would be Abdel Aziz Odeh.

Q. No. 2-A, Special Agent West, do you recognize this picture?

A. Yes. The gentleman that is not at the dais, who is looking towards us in the back, the gentleman with the beard --

Q. This gentleman down here --

A. That's correct --

Q. -- at the lower bottom left of the picture?

A. Yes. His name is Hussam Abuj Barra and --

Q. Does that name hold any -- well, first of all, do you know the spelling of the name?

A. The first name would be H U S S A M, Abuj Barra would be A B U J B A R R A, I believe.

Q. Okay. And does his name hold any special significance to you as a federal law enforcement official?

A. I arrested him.

Q. For what violation, sir?

A. For violating his Immigration status in the United

A 26 599 077                    196                    August 29, 2000

States.

Q.   On what basis?

A.   He violated his HB -- his H1B worker status because he was not working where he was legally authorized to be employed.

MR. COLE TO JUDGE

Objection on relevancy grounds.  I'm not sure what this person's H1B visa violation has to do with anything with Mazen Al Najjar.

MR. VERA TO JUDGE

It's an untimely objection, Your Honor.

JUDGE TO MR. VERA

I'm going to let it in because it goes to identify who this individual is and the basis of his identification.

JUDGE TO MR. WEST

Q.   Okay.  Now, a question, do you know the year or the time, the date, anything about this?

A.   Your Honor, this is one of those photographs that we're not certain of the date.  We cannot find a specific date for this particular conference.  We believe it was in the early '90's between -- it was either '90, '91, or possibly '92, but we're not certain about that.

Q.   Okay.

MR. VERA TO MR. WEST

Q.   Special Agent West, do you recognize anyone else in this picture?

A 26 599 077                    197                    August 29, 2000

A.   Yes.   The person furthest on our left and the dark suit with the gray beard and the glasses sitting nearest the podium, I can't quite remember his first name, but I believe his last name is Al Awani (phonetic sp.).   I may be mispronouncing his name, but he is a gentleman who is in a leadership capacity with an Islamic think tank in Northern Virginia who has been affiliated with ICP.

JUDGE TO MR. WEST

Q.   Okay.   Before we proceed, do you want to point him out, point -- is this the guy you're talking about?

A.   Yes --

MR. VERA TO WEST

Q.   Is it the man in the --

A.   Yes --

Q.   -- dark --

A.   Yes, it is.

Q.   -- jacket, balding (sic) head --

A.   Yes.

Q.   -- and a gray beard?

A.   Yes.

JUDGE TO MR. WEST

Okay.

MR. VERA TO MR. WEST

Q.   And, sir, very briefly, because we'll touch on this later on.   Do you know the organization that you believe he is

A 26 599 077                    198                    August 29, 2000

affiliated with in Virginia?

A.   Commonly referred to as the IIIT, it's the Islamic Institute for, I believe, it's intellectual thought.

Q.   Do you recognize the man to, as we're facing the picture, to his immediate right?

A.   Yes.

Q.   Can you tell us who he is?

A.   Basheer Musa Nafi.

Q.   How do you spell his name, last name?

A.   The last name would be N A F I.

Q.   Do you know how to spell his complete name?

A.   Again, various spellings translated.  Generally accepted would be B A S H E E R, or sometimes B A S H I R, and middle name Musa, M U S A.

Q.   Do you know who that individual is?

A.   Yes.  He is the individual referred to by defense counsel as one of their requested witnesses.  He is a subject who has been affiliate with and a member of the ICP and WISE who worked prior to his 1996 deportation at the IIIT in Northern Virginia.

Q.   Sir, do, if you know, in your official capacity with open source information, does he have any affiliation to a terrorist organization?

A.   Yes.  He has, he is one of the founding members and a leading member of the Palestinian Islamic Jihad Organization.

A 26 599 077                    199                    August 29, 2000

Q.   Sir, do you recognize anyone else in that picture?

A.   The individual to Basheer Nafi's left, our right, I believe is Rasheed Al-Ghannoushi.

Q.   This person in the turtleneck?

A.   Yes, I believe so.

Q.   And do you know the spelling of Ghannoushi's name -- you already spelled it --

A.   Yes, sir.

JUDGE TO MR. WEST

Q.   Go ahead and give me that one more time.

A.   The first name would be R A S H E E D, the last name A L, hyphen, G H A N N O U S H I.

MR. VERA TO MR. WEST

Q.   And he's the person that was convicted in absentia in Tunisia?

A.   Yes, sir.

Q.   Sir, the last exhibit that I want to show you this way is Exhibit 1-A.  And I show it to you --

JUDGE TO MR. VERA

Well, wait --

JUDGE TO MR. WEST

Q.   Let me ask you a question before that.  At that time, was he a fugitive?

A.   Yes, sir, he was.

Q.   He was a fugitive during the picture?

A 26 599 077                    200                    August 29, 2000

A.   Well, yes, sir, to the best of my knowledge.  I'm not exactly certain, again, when this occurred, but Rasheed Al-Ghannoushi has been wanted by the Tunisian government for a good many years.  I'll qualify that.  I'll restate that.  I'm honestly not sure.  I believe, I believe he was, but again, because we don't know for sure when this conference took place, I can't say for certain, for certain.

Q.   Do you know when the conviction was?

A.   I believe it was in the late '80's or the early '90's.

Q.   Okay.

MR. VERA TO MR. WEST

Q.   Sir, for purposes of attempting to refresh your recollection, let me ask you to focus your attention on Exhibit 1-A, to the second line on the banner in English, at the very top, first annual convention.  Does that have any significance to you in regards to the ICP conferences?

A.   Yes.  The first conference, the first ICP conference was in 1988, so this could well be the 1988 conference.  Again, we don't have any dates on these photographs.

Q.   Okay.  And I'd like you to take a look.  This is a further shot taken from further back, but if you can, can you tell us if these are the same people at the podium that were identified in Exhibit 2-A?

A.   Yes.

Q.   Sir, you indicated that at least in one of these

A 26 599 077                         201                    August 29, 2000

conferences a person by the name of Odeh was at the podium or at the dais.  Is that correct?

A.   Yes, sir.

Q.   And, sir, have you ever had occasion to conduct an official inquiry as to whether or not there is any evidence that this person has, in fact, entered the United States?

A.   Yes.

Q.   And can you tell us the results of that inquiry?

A.   Well, I had one of my agents at the time conduct an extensive INS record check on all the various names that Abdel Aziz Odeh is known by.  I personally conducted those checks as well, over several times, and I found no record of any lawful entry or any entry under any of the variations of the names that we knew for Abdel Aziz Odeh coming into the United States.

Q.   Special Agent West, how many years have you been with the Immigration and Naturalization Service?

A.   Twenty-two years.

Q.   And have you attended, during that course of time, specialized training, law enforcement training?

A.   Yes, basic law enforcement training, advanced law enforcement training, yes.

Q.   And, sir, are you familiar with the systems that the Immigration and Naturalization Service uses for recording the entry of aliens into the United States?

A.   Yes.

A 26 599 077                         202                    August 29, 2000

Q.   And, sir, based on that specific knowledge, what if any significance do you place on the fact that there was no record of Mr. Odeh's entry into the United States?

A.   He entered the country either under a different identity or otherwise surreptitiously.

Q.   Sir, in the course of your participation in the execution of the search warrants, did you also -- search warrants regarding WISE, ICP and the residence of Sami Al Arian, did you also come across other evidence that might be photographic in nature?

A.   Yes, over 500 video tapes were seized.

Q.   Okay.  Sir, have you had occasion to review some, all, or part of those video tapes?

A.   I have reviewed, I have reviewed a good many of those video tapes personally, yes.

Q.   And, to the best of your knowledge, where are those video tapes, the originals, the one's that were seized?

A.   They're in the custody of the FBI in Tampa.

Q.   Do you know if copies of those originals exist?

A.   Yes.

Q.   And have you ever had possession or custody of those copies?

A.   Yes.

Q.   And, sir, did you in fact review some of these tapes -- well, let me withdraw.  Sir, are these tapes of people speaking

A 26 599 077                    203                    August 29, 2000

in English?

A.    No.   They're almost entirely of individuals speaking in Arabic.

Q.    And, in general, what do they relate to?

A.    Conferences of the ICP between 1988 and 1992, and other gatherings that were not formal conferences but were other seminars.

Q.    To the best of your knowledge, did the federal Government take these video, make these video tapes?

A.    No.

Q.    Do you know who made these video tapes?

A.    The people that orchestrated the conferences.

Q.    How do you know that?

A.    Well, there are documents that were also seized that identified videographers in some of the locations where the conferences were taken.   And in fact on some of the tapes the videographers advertise what they did, so those tapes were not made by the Government.   They were in the possession of WISE. They were in the possession of the persons connected with WISE. So we have deduced that they were made by the people at WISE or ICP, I should say.

Q.    Sir, have you had occasion to review those video tapes, or some or all or, some or all of those tapes?

A.    I have not reviewed, personally reviewed all of the tapes, but a good number of them I have reviewed.

A 26 599 077                    204                    August 29, 2000

Q.   To the best of your knowledge, has anyone in the federal Government reviewed all of the tapes?

A.   I believe all of the video tapes have been looked at over the past several years by personnel assigned for the FBI and the Customs Service and the INS.

Q.   And do you know, if you know, were some of the people that looked at those video tapes that worked for the FBI fluent in Arabic?

A.   Yes, the Arabic translators employed by the FBI.

Q.   Have you had occasion to review any of those tapes with any of those translators?

A.   Yes.

Q.   How many cases, if can tell us ballpark figures?

A.   Since 1995, a dozen or so different occasions.

Q.   Okay.  Sir, let me refer you and see if you, to the best of your recollection, for the conference held in 1988, do you recall from your review of a video tape whether or not Sami Al Arian attended that conference?

A.   Yes, he did.

Q.   Do you recall if, in the review, there was any evidence that Mazen Al-Najjar attended that conference?

A.   Yes, he did.

Q.   And, sir, do you recall if at that conference, for instance, someone like Al-Ghannoushi attended?

A.   I believe in the '88 conference Al-Ghannoushi did not

attend.

Q.   And do you know if a person by the name of Basheer Nafi attended?

A.   I believe in the '88 conference, no.

Q.   Sir, in your review of the video tape for the '88 conference, do you recall if Sami Al Arian is heard saying anything on that tape?

A.   Yes, he gives a speech.

Q.   Do you recall any part of that speech?

MR. COLE TO JUDGE

Your Honor, objection.  He's testified that he doesn't speak Arabic.  The speeches were in Arabic.  The translator might be able to tell us.  Or if they have a transcript, they could provide a transcript, but I don't see where Mr. West has any capacity to tell us what Sami Al Arian said in Arabic.

MR. VERA TO JUDGE

The foundation was laid.  He has reviewed the tapes on numerous occasions with Arabic speaking translators for the FBI in the regular course of his function as a federal law enforcement official participating in an official investigation.  If in fact he's been provided translations through authorized interpreters employed by the U.S. Government.  He can certainly testify as to what those interpreters and translators told him the video tape said.

MR. COLE TO JUDGE

A 26 599 077                    206                    August 29, 2000

Your Honor.

JUDGE TO MR. COLE

Yes.

MR. COLE TO JUDGE

The rule is that evidence is supposed to be certified as properly translated.  Mr. West would be offering hearsay about what an Arabic interpreter told him about what an Arabic interpreter saw on a video tape which the Government apparently has.  They can submit the video tape.  They can submit a transcript of the video tape if it's translated and certified, and that's one thing.  But to ask Mr. West to tell us hearsay upon hearsay, someone who has no basis for knowing, have any personal knowledge as to what actually was said, is improper and a violation of due process.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. WEST

Q.   Sir, did you review the tapes with the FBI translator?

A.   Yes, sir, I did.

Q.   And did you go over the tapes and have them translated?

A.   In detail.

Q.   And so you know what Sami spoke at the '88 conference?

A.   Yes, sir, I do.  I have, I could not give a verbatim record of what he said, but I generally know what he said,  yes.

JUDGE TO MR. COLE

A 26 599 077                    207                    August 29, 2000

Overruled.

JUDGE TO MR. VERA

You may ask.

MR. VERA TO MR. WEST

Q.   Sir, before I proceed with asking you what you recall you might have said, when was the last time you had occasion to sit down and review the '88 conference tape or any portion of it with an FBI interpreter?

A.   Yesterday.

Q.   And when was the last time before that?

A.   Friday.

Q.   And the last time before that?

A.   Thursday, last Thursday.

Q.   Thank you.  Sir, do you recall any of the things that Sami Al Arian might have at that conference?

A.   In 1988, yes, I do, sure.

Q.   Can you tell us?

A.   Well among his -- he gave a speech.  And he, basically, gave his view of what jihad entailed.  And that he also described in various religious terms the meaning of jihad and how that justifies certain armed and violent actions.

Q.   Do you recall if he said anything in relation to Israel?

A.   Yes.  He said death to Israel.

Q.   When you say he --

A 26 599 077                    208                    August 29, 2000

A.    Sami Al Arian stated death to Israel in several parts of the speech.

Q.    Okay.  Sir, do you have occasion to review all or a portion of video tapes made for a conference, an ICP conference, held in December of 1989?

A.    Yes.

Q.    And under what circumstances did you review those video tapes?

A.    Well, since 1995, I've seen those video tapes several times.  And the latest, again, yesterday, Friday, Thursday, with the FBI translators.

Q.    Translator that to the best of your knowledge is fluent in Arabic --

A.    Yes --

Q.    -- and English?

A.    Yes.

Q.    Do you recall if in viewing the video tape, Sami Al Arian attended the conference in '89?

A.    Yes, yes, he did.

Q.    Do you recall if Mazen Al Najjar attended the conference?

A.    Yes.

Q.    Sir, do you recall anything that was said -- well, first of all, let me ask you it this way.  Do you recall if Mazen Al Najjar said anything at that conference, based on the video

A 26 599 077                    209                    August 29, 2000

tape?

A.    I believe in the 1989 conference --

MR. COLE TO JUDGE

Your Honor, I just want to note a continuing objection.  The video tapes exist.  The Government can offer the video tapes.  It can offer the transcripts, but have Mr. West, instead of offering the evidence, have Mr. West tell us what he remembers about the evidence seems to me entirely improper.  If the Government has, the Government has the evidence.  He's testified that he's viewed the video tapes.  He's testified that they've been translated.  Why don't we have the translations?  Why don't we have the -- that's the best evidence here.  To allow a witness to say, well, I remember this is what was said, when we all know that there is a document which indicates precisely what was said, is wholly improper.

MR. VERA TO JUDGE

Well, Your Honor, I certainly can argue that it's not, based on the various arguments that we presented before regarding what we're trying to here.  We're trying to get out, through Mr. West, Special Agent West, what he knows in his official capacity of evidence that was obtained in the regular course of business in the conduct of a search warrant, the execution of a search warrant.  But in light of the invitation that has been proffered by counsel, we do have in fact some tapes that we're willing to provide to opposing counsel.  And for purposes of the assisting

A 26 599 077                        210                    August 29, 2000

the Court we have taken the liberty of, again with the review that Special Agent West conducted with an FBI translator, not only providing a composite tape that we can play which is a much shorter composite tape than what all the other tapes are going to take, it would take numerous hours of playing time, but we have certainly a copy of the composite that was made again by Special Agent West and an FBI translator for the purposes of this hearing, and we have the tapes from which -- or copies of the tapes from which these composites were made.  And we will provide an excerpt to the Court and to counsel of what the composite contained.

MR. COLE TO JUDGE

Your Honor, we object to offering the evidence in this form. If this is an Arabic document, we don't, we don't -- again, nobody here speaks Arabic.  We don't -- we're not going to understand what it's about.  The Court isn't going to understand what it's about without a certified translation.  There has been no offer of a certified translation.  In addition, we object to the provision of excerpts.  As the Court is well aware, it's very easy to excerpt things and take things out of context.  Without the actual -- I mean, this evidence created by the Government. It's based on a set of excerpts.  We don't know what the excerpts were from.  We don't know what the context was.  And so we object to their admission, both because no one here can understand them and because the Government has made no effort to provide us with

A 26 599 077                    211                    August 29, 2000

any kind of translation of them and because they are partial excerpts rather than the originals.

MR. VERA TO JUDGE

Various arguments, Your Honor.  First, we do note that there is somebody in this courtroom who could tell us what they say, and that's going to be the respondent himself.  He's fluent in Arabic and English.  And clearly if we play the tapes for the Court, you can tell what he believes they have to say.  Clearly, we have a rebuttal witness from the FBI who is fluent in Arabic and English who can also tell the Court if the U.S. Government disagrees with what the respondent says the tapes say.  That's point number one.  Point number two, again, this is Immigration Court bond proceedings, an ancillary proceeding.  The federal rules of evidence, the specificity that those rules provide are not applicable to these proceedings.  We are producing, again, the composite solely for the purposes of assisting this Court. And we intend, again, to ask questions of the composite such as regarding this witness, is this what you saw?  Is this what the translator said?  Is this what forms the basis of what you're testifying to here today?  Whether or not this Court believes that, in fact, that's what it says or doesn't say goes to the weight, not the admissibility of the testimony and the playing of the tapes.  Again, our position is that the Immigration Court cases decided by the Board of Immigration Appeals have taken the position that when there is an objection to evidence in even the

A 26 599 077                      212                    August 29, 2000

merits portion of a hearing, the case in chief portion of a Government's presentation, there has to be something more than mere argument, that before the evidence is excluded. The 11th Circuit in criminal court cases against United States citizens in regards to videotaped evidence has taken the position that if a person objects to a foreign translation, that person has to offer their own version of the foreign translation and show that somehow the Government's translation is unreliable or doesn't say what it purports to say. Clearly, here, we've got two types of evidence. We are providing and will provide now copies of the tapes that are still in the FBI evidence room to counsel from which this composite was made. We have a composite, which to assist this Court, we expect that Special Agent West could testify from this since he assisted in the preparation of the composite. We know that Sami -- or Mazen Al Najjar, being fluent in Arabic and English, can tell the Court what is being said on those tapes. And the FBI translator who is fluent in Arabic and English is going to tell the Court, be able to tell the Court what they say. Clearly -- and we've taken the liberty of preparing a memorandum of law on the issue -- clearly, it's our position that for purposes of reaching the truth in this matter, these tapes are in fact admissible. And that the composite tape that we intend to use in a demonstrative presentation to the Court and from which we're going to ask three witnesses, at the very least three witnesses, questions from can clearly be played

to allow this Court to assess some of the central issues. First, whether or not the respondent attended conferences. Second, whether or not those conferences that were attended by the respondent involved the attendance of known or suspected terrorists, of people engaged in terrorism. And thirdly, and most importantly to the issues before this Court, the issue of whether or not fund raising or a known terrorist organization, the Islamic Jihad, was in fact conducted at any of those conferences at which the respondent not only attended but was prominently involved in organizing and in executing. So it's our position that it's highly relevant and clearly admissible under any of the standards for the purposes that we're intending to use them.

MR. COLE TO JUDGE

Your Honor, what we have been offered is a videotape in a language that nobody here, that none of the counsel, that the witness and the Court can't understand. It's, it would be one thing if they put on the videotape with their Arabic translator. But even there, it seems to me that they've had these videotapes for five years. They should have provided us in advance with a translation so that we could assess that translation. We don't have a translator here to question their translation. If they had provided a translation in advance, then there might have been some ability to ascertain what is, in fact, the accurate translation of what's going on. But to put an Arabic document

A 26 599 077                          214                    August 29, 2000

into evidence, and then to ask an English speaker --

JUDGE TO MR. COLE

    Go ahead.

                        (OFF THE RECORD)

                        (ON THE RECORD)

(TAPE 7)

MR. COLE TO JUDGE

    -- speaker to tell us, based upon hearsay, what he remembers somebody who does speak Arabic told him the people on the tape were saying, where it would be no problem whatsoever for the Government to produce a certified translation of the document is unacceptable.  It's, it's hearsay and it's simply unreliable. I've never heard of a proceeding which we put on -- we put it into evidence a document that nobody understands, and then we ask someone who has admitted that he doesn't understand the document to tell us based on what somebody else told him what this document is about.  Why didn't we -- I mean, we don't object to the admission of the videotapes, the excerpt that we have never viewed, but we don't object to the admission of the videotapes themselves.  We don't object -- these -- all of these speeches have been transcribed.  We don't object to the admission of those transcriptions, but we want to see a translation.  We can't -- you know, otherwise we are put at an incredible disadvantage. Nobody here speaks Arabic.  They're going to put something on in Arabic and then he's going to tell us what the Arabic means, even

A 26 599 077                    215                    August 29, 2000

though he doesn't speak Arabic. You don't speak Arabic. Mr. Vera doesn't speak Arabic. And I don't speak Arabic. That's not the way you proceed with an effort to find the truth. You put someone on who can at least understand and explain what the document says. Mr. Vera says it should just go to weight, not admissibility. How is Your Honor going to give weight to something that you can't understand? The only way you can give weight to it is if we get, and anybody can give any weight to it, is if we get it offered in a form that people can understand. Nobody -- they have not offered it in a way that people can understand and can have --

JUDGE TO MR. COLE

I think they did. He offered it through Mr. West who worked with his interpreter so we could understand.

MR. COLE TO JUDGE

Right. And the interpreter might be able to help us understand, but Mr. West telling us what he remembers the interpreter saying about language that he can't even, he's not even going to know what the language is. What are they going to do, play the tape and then say, well, I think I remember the interpreter told me that he was saying X, Y and Z. Why don't we -- I just don't see why we put the evidence in in a way so that everybody is playing from the same page, so that we have a translation. We can check that translation. We can argue about that and we can proceed, but to have some English speaker who

A 26 599 077                     216                     August 29, 2000

doesn't speak Arabic tell us what he remembers somebody said about the document, is wholly unacceptable.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. VERA

How many tapes are we talking about?

MR. VERA TO JUDGE

We're talking 2, 4, 6, 8, 10 tapes.

MR. COLE TO JUDGE

How many of those were used to produce a composite?

JUDGE TO MR. COLE

Hold on for one minute.

JUDGE TO MR. VERA

Do we have 14 -- we have 10 tapes for the respondent?

MR. VERA TO JUDGE

These are theirs.  I am going to go on the record to say that we are handing those over.  And I would ask the Court to indulge me in one point, to address and I think further assist the Court beyond the fact that Special Agent West has in fact worked with an FBI interpreter, I would like at this time, even though I can get it admitted through Special Agent West, but I would like the Court to take a look at an original and a copy. We'd ask that they be marked for identification purposes of a court, not an administrative agency or anything else, a court certification presented to the INS by the respondent himself,

A 26 599 077                    217                  August 29, 2000

Mazen Al Najjar, that indicates that he is a court certified interpreter. If we play a tape and he sits there on the witness stand, under oath, and he says, and we say, doesn't it say this? He certainly is going to be somebody in this room, at that table, that say that's not what it says, because he'll understand both English and Arabic. And we'd like to have that document, and we'd like to have it substituted.

JUDGE TO MR. VERA

Okay. You want the original?

MR. VERA TO JUDGE

Yes, Your Honor.

MR. COLE TO JUDGE

Your Honor.

JUDGE TO MR. COLE

Yes, Mr. Cole.

MR. COLE TO JUDGE

Mazen Al Najjar is not on the stand. Mr. West is on the stand. Mr. West has no ability to tell us what the documents say, except to tell us, through hearsay, what he remembers somebody told him they might say. It will have no connection to the actual thing on the, the actual statements that we're entering on the videotape, because he can't tell us whether they have any connection to the actual statements based on the videotape because he doesn't speak, he doesn't speak Arabic. Again, they have had these tapes for five years. They have had

A 26 599 077                    218                    August 29, 2000

full transcripts of these tapes for five years.  We are being ambushed, essentially, at the last moment here, given Arabic documents, Arabic documents with no translation whatsoever. Before we were given Arabic documents with uncertified translations, and you refused to admit those.  Now we're given Arabic documents with no translations, not even the certified translation, number one.  Number two, we can stipulate that Mazen Al Najjar attended ICP conferences.  We'll stipulate that at various conferences the various people that they want to prove attended, attended, Basheer Nafi, Al-Ghannoushi, Sheik Omar Abdel Rahman, and thousands of others.  We'll stipulate to that.

JUDGE TO MR. COLE

These are all the things that you objected to in the photo?

MR. COLE TO JUDGE

We object to the admissibility of the evidence.  What I'm saying is what we will stipulate to, Your Honor.  We will also stipulate that there were fund raising appeals at each of the conferences.  So, you know, we're stipulating to that.  And, but what we are objecting to is the use of documents that have never been offered in any translated form to us, where no one of counsel speaks Arabic.  Yes, Dr. Al Najjar has translated Arabic, but Dr. Al Najjar is not in a position to be able to -- he doesn't have a VCR.  He's not in the position to be able to review these carefully, determine what the translation is, and then tell us whether the translation is accurate or not.  Maybe

A 26 599 077                     219                    August 29, 2000

if they had been provided to us with some advance notice, we might have been able to do that. But instead, we're provided with an Arabic document, no translation whatsoever. And I'd say under the regulation which says that you have to have a certified translation, it follows a fortiori that a document with no translation is inadmissible.

MR. VERA TO JUDGE

Well -- I'm sorry --

JUDGE TO MR. VERA

Go ahead.

MR. VERA TO JUDGE

Very briefly, again, it overlooks a very simple point. If we are submitting this videotape for the sole purpose of asking this Court to accept the contents that it has as the truth, perhaps one could argue that we haven't done our job. But what we're saying is, we can play that here. Mr. West, Special Agent West, a trained special agent who has sat down with FBI interpreters to listen to this, can tell us what those FBI interpreters have said. Hearsay is admissible in these proceedings. Mazen Al Najjar, a court certified interpreter, and I intend to do it this way at a certain point and that's why Mr. Al Najjar was on our witness list, can sit up there and while we play snippets of this tape and we say, doesn't it say this, he can say yes, it absolutely says that. Or he can say no, it absolutely does not. He can say whatever he wants to, assuming

A 26 599 077                    220                    August 29, 2000

he's telling the truth under oath.  And if we disagree with him, then we present a rebuttal witness who is also fluent in Arabic and English who we can go through the same exercise with.  That makes the document and the contents reliable because then the Court can assess, based on the testimony of known, admitted, uncontested, fluent Arabic/English speakers.  The testimony will corroborate and will tell the Court what it is that the contents of the tape are.  And then the Court can assess whether or not that's material, or not material, or proves a point, or doesn't prove a point.

MR. COLE TO JUDGE

Objection, Your -- I mean, Your Honor, we are -- it's one thing if Dr. Al Najjar can understand the videotape, but if we can't understand the videotape, we have had no advance notice of what the videotape says, how are we supposed to be able to advise Mr. Al Najjar to represent him in this proceeding.  We don't even know what's being presented.  The evidence is gibberish to me, to you, to Mr. Vera.  Now it was very easy for the Government to have dealt with that problem, if they had transcribed and translated and certified translations and provided them, then that would be in accordance with the regulations.  That would be admissible.  And we could, we could argue about what the significance of the evidence, but here they have failed to follow the most basic requirement, which is that you translate.  They have failed to follow the next requirement, that you certify the

A 26 599 077                   221              August 29, 2000

translation.  And instead they're offering a document with a witness who doesn't speak Arabic, with a Judge doesn't speak Arabic, with counsel who don't speak Arabic, but they want to put in on and have this person tell what he remembers another witness, who they are going to have testify later, told him the document, the translation, the videotape said.  It's just, it's tremendously prejudices our ability to proceed in this case when the Government, having had years with these documents, having had lots of opportunity to translate them, to transcribe them, hits us on the day of the proceeding with ten Arabic tapes, with excerpts from those tapes, without any translation whatsoever, much less a certified translation, and we just can't, we cannot do our job in representing Dr. Al Najjar.  Dr. Al Najjar has a right to representation here.  He has a right to a meaningful opportunity to a fundamentally fair proceeding, and it is not a fundamentally fair proceeding to put in evidence that counsel can't understand, that the Government can't understand.  That's why the regulations require a certified translation.  And for the Government to say, well, we never got the certified translation but now we want to put up Arabic language documents and let counsel founder as they might, is wholly unfair.  And --

MR. SCHWARTZ TO JUDGE

Judge, if I might add --

JUDGE TO MR. SCHWARTZ

We're going to have one counsel from each table speak.  I

A 26 599 077                    222                    August 29, 2000

can't have everybody and their brother --

MR. SCHWARTZ TO JUDGE

Okay, okay --

JUDGE TO MR. SCHWARTZ

-- you know, we'll be here --

MR. SCHWARTZ TO JUDGE

-- okay --

JUDGE TO MR. SCHWARTZ

-- I think we're going to be here for the rest of our lives, though.  If we had two counsel from every table, we'll be here for two or three lives.

JUDGE TO MR. VERA

Okay.  Now you have all tapes?

MR. VERA TO JUDGE

Yes.  And we would at this time, for purposes of the record, have the record reflect that we have, in fact, handed over ten tapes to counsel.

JUDGE TO MR. VERA

Okay.  Do you have a transcription and a translation?

MR. VERA TO JUDGE

No, we do not.

JUDGE TO MR. VERA

Okay.

JUDGE TO MR. COLE AND MR. VERA

Here's what I'm going to do.  Both of you all can take those

A 26 599 077                          223                    August 29, 2000

tapes home, to include this, the excerpt tape, and review it tonight and come back tomorrow. But presently, I find that this witness at this particular time may testify as to what he and the FBI interpreter went over time and time again.

JUDGE TO MR. VERA

So you may --

JUDGE TO MR. COLE

Your objection is overruled at this stage of the game. I'm not admitting those. If you want to take them home, if you want to put him back on the stand tomorrow after you have had an opportunity to go through these tapes, that's fine.

MR. COLE TO JUDGE

Your Honor, I don't have an opportunity to go through these tapes --

JUDGE TO MR. COLE

You have -- you told me earlier that Sami Al Najjar -- Al Arian was on, just about on your staff. You told me that two weeks ago before I went on vacation. And you told me he was a member of your staff and he, you objected to him being called. He speaks Arabic, and you have others that speak Arabic.

MR. COLE TO JUDGE

That's correct.

JUDGE TO MR. COLE

So you can certainly use those on your staff to review those tapes.

A 26 599 077                    224                    August 29, 2000

MR. COLE TO JUDGE

We've been handed, we've been handed ten tapes, Your Honor.

JUDGE TO MR. COLE

Um-hum.

MR. COLE TO JUDGE

I don't know what the, how many hours this is.  The rules say that if the Government wants to offer --

JUDGE TO MR. COLE

They're not being introduced.  I already said that.

MR. COLE TO JUDGE

Well, then we object, we continue to object -- I mean, so far, so far, I don't think any evidence has been admitted, and we've got testimony upon testimony based on evidence which is not admitted.  And we object, again, to hearsay and to the use of testimony to get around the fact that the Government have yet to offer, with the exception of this first document, an admissible piece of evidence.  So we'll note our continuing objection.

JUDGE TO MR. COLE

Your objection is overruled.

JUDGE TO MR. VERA

You may continue to cross -- with direct examination of this witness.

MR. VERA TO JUDGE

Thank you, Your Honor.

MR. VERA TO MR. WEST

A 26 599 077                    225                    August 29, 2000

Q.   Special Agent West, regarding videotape for the December 1989 conference, do you recall having reviewed that tape?

A.   Yes, sir, I did.

Q.   And, sir, I think we discussed that briefly, and you indicated already in your testimony that from your recollection that Sami Al Arian and Mazen Al Najjar attended that conference?

A.   Yes, sir, that's correct.

Q.   Do you recall anything in regards to your review regarding what was said, or who spoke at that conference, first of all?

A.   Sami Al Arian spoke and Mazen Al Najjar also spoke.  I believe Mazen Al Najjar introduced other individuals that were attending the conference.

Q.   Do you recall some of those other individuals who attended that conference?

A.   Yes --

MR. COLE TO JUDGE

Objection just as to form.  Those individuals who Mr. Al Najjar introduced or just individuals who attended the conference?

JUDGE TO MR. VERA

Yeah, that is a pretty large area.

MR. VERA TO MR. WEST

Q.   Based on your review of the videotape, did you identify

A 26 599 077                     226                     August 29, 2000

any of the people that, in your capacity as a federal law enforcement agent, you believe are involved with terrorist organizations that might have attended that conference?

A.   Yes.

Q.   Can you name some of those people?

A.   Abdel Aziz Odeh.

Q.   Anyone else?

A.   The '89 conference?

Q.   Yes, if you recall.  If you don't recall, that's fine.

A.   Abdel Aziz Odeh.  And without referencing the notes that I took, off the top of my head I can't recall.  I know there were others but, specifically, I don't recall.

Q.   Okay.  Sir, do you recall if Odeh, Mr. Odeh made any comments at that conference, from your review of the videotape with an FBI interpreter?

A.   He was one of the speakers.

Q.   Do you recall anything about what he might have said at that conference?

A.   Yes.  He, again in general terms, spoke about issues relative to the jihad and religious connotations of jihad.  And I believe it was a fairly lengthy speech at that point.

Q.   Do you recall if in fact there was anything said about Israel at this conference?

A.   Yes.  At various points in the conference the term death to Israel was said.

A 26 599 077                      227                   August 29, 2000

Q.   Let me ask you about the May 1990 conference.  Did you have occasion to review that videotape under similar circumstances with the FBI?

A.   Yes.  I don't believe that was a national conference in the context of the others.  It was a different setting.

Q.   Right.  And what -- okay.  You're right.  Can you describe what the difference was?

A.   I believe it was, I believe it was a seminar, essentially, or a gathering, not as large or not in the same format as the prior two conferences.  I believe it had to do with the, I believe it had to do with celebrating or commemorating a battle that occurred.

JUDGE TO MR. WEST

Q.   What was the year of that conference?

A.   1990, I believe, Your Honor.

MR. VERA TO MR. WEST

Q.   Do you recall if Mazen Al Najjar attended that conference?

A.   Yes, he did.

Q.   Sir, the April '91, 1991 conference, do you recall reviewing a tape with an FBI interpreter regarding that conference?

A.   Yes.

Q.   And to the extent that you might recall, do you remember who might have attended that conference, in terms of

A 26 599 077                    228                    August 29, 2000

either Sami Al Arian or Mazen Al Najjar or any of the other people who we have mentioned?

A.    Sami Al Arian, Mazen Al Najjar attended.  This was the '91 conference, and Abdel Aziz Odeh attended. I believe Omar Abdel Rahman attended as well, and Al-Ghannoushi.

Q.    Are you familiar with the name Fawaz Abu-Damra?

A.    Yes.

Q.    Let me spell that for the record, F A W A Z, the next name, A B U, hyphen, D A M R A.  Are you familiar with that name, sir?

A.    Yes, I am.

Q.    Do you know, from your review of the tapes, if that person attended that conference?

A.    Yes, he did.

Q.    Do you know if that person spoke at that conference?

A.    Yes, he spoke.

Q.    And to the best of your recollection, what was that person's role at that conference?

A.    Beyond giving, I believe it was more than one speech, he acted essentially as a moderator.  He introduced various other speakers, and he basically acted in a coordinating capacity within the conference.

Q.    Do you know if Sami Al Arian spoke at that conference?

A.    Yes, he did.

Q.    Do you know if Mazen Al Najjar attended that

A 26 599 077                    229                    August 29, 2000

conference?

A.   Yes, he did.

Q.   Do you know if this fellow by the name Abu-Damra introduced Sami Al Arian?

A.   Yes, he did.

Q.   And do you have any recollection about that introduction, based on your review of the videotape?

A.   Damra introduced Sami Al Arian as the head of the ICP in America, the Islamic Committee for Palestine.  And he also noted in his introduction that the ICP was the arm of the Islamic Jihad in America and that for security reasons they, the conference people called the ICP the ICP so that it would not, well, for security reasons.

Q.   And when you say ICP, what are you referring to?

A.   The Islamic Committee for Palestine.

Q.   Sir, do you recall anything else that Mr. Damra -- well, before I go there.  Do you recall in your review of the videotape anything that Sami Al Arian might have said at that conference?

A.   He gave a speech.

Q.   Do you recall anything about what he might have said?

A.   Similar to other speeches, he essentially gave his views of the jihad, what jihad meant, the Palestinian cause, the support for the Palestinian cause.  And he spoke in certain terms related to religious background backing up his views.

A 26 599 077                    230                    August 29, 2000

Q.   Do you recall, since you say he was speaking of some of those things, do you recall if he said anything that might indicate to you that he was in support of the peace process?

A.   He said he was not.

Q.   And when we speak of the peace process, can you tell us what you mean?

A.   The ongoing peace process between the Israelis and the Palestinians.

Q.   And do you recall from your review of the tape if he said anything, since he didn't support the peace process, anything that he did support?

A.   Yes.  He supported armed struggle against Israel.

Q.   Sir, do you recall if at any time during the speech that he gave, Sami Al Arian asked the attendees for money?

A.   Yes.

Q.   Do you recall anything in particular that he might have said about that?

A.   He said that it was the duty of Muslims to give I believe it was one percent of their earnings to the Islamic cause.

Q.   And did he, in asking for that one percent, did he say anything about what the purpose might be?

A.   For the armed struggle against the enemy, Israel.

Q.   Did he, to the best of your knowledge, did he say anything about any other country during that speech?

A 26 599 077                    231                    August 29, 2000

A.   Yes.  He commented on the, on the United States, and he condemned the United States for its' support of Israel.

Q.   Do you know if he mentioned anything about the Iraqi War?

A.   Yes.  He condemned the United States for being involved in the -- oh, in the Iraqi War?

Q.   Yes.

A.   The Persian Gulf War you mean.

Q.   The Persian Gulf War.  I'm sorry.

A.   He condemned the United States for its' involvement in the Persian Gulf War, and condemned the Saudi regime, the Saudi government for being supportive of the United States' efforts in the Persian Gulf War.

Q.   Now back to Mr. Fawaz Damra.  You said he spoke more than once.  Did he speak at any time near or at the time that Sami Al Arian spoke?

A.   Yes.  I believe it was right after Mr. Al Arian spoke.

Q.   Okay.  Do you recall if any -- in your review of the videotape, do you recall what he might have said?

A.   Yes.  He essentially espoused the jihad struggle, his support of the jihad struggle.  He referenced, specifically, Islamic Jihad, the Palestinian Islamic Jihad in his speech.

Q.   Did he do that once, twice?

A.   Many times.

Q.   Did he say anything about fund raising?

A 26 599 077                    232                    August 29, 2000

A.   Yes.  He exhorted the crowd at one point to give money.

Q.   Do you recall if he said anything about violent acts?

MR. COLE TO JUDGE

Objection, leading.

JUDGE TO MR. COLE

Sustained.

MR. VERA TO MR. WEST

Do you recall if he said anything that based on your training, knowledge and experience in conducting counter-terrorism investigations would indicate to you, as a law enforcement agent, that he was speaking or enticing people to the issue of violence?

MR. COLE TO JUDGE

Same objection.

JUDGE TO MR. COLE

I'll overrule that one.

JUDGE TO MR. WEST

Okay, go ahead.  You may answer that.

MR. WEST TO MR. VERA

Yes.  The wording, the words that he used and the nature of his speech, the words that he used, specifically, praised violent acts, the individuals who were members of the Palestinian Islamic Jihad had committed, martyrs as they're called, suicide bombers, other individuals who committed acts of violence, members of the PIJ who have committed acts of violence.

A 26 599 077                    233                    August 29, 2000

MR. VERA TO MR. WEST

Q.   Do you recall --

A.   And --

Q.   I'm sorry.  Go ahead.

A.   He praised those people.

Q.   Do you recall if he spoke of any particular act?

A.   Yes.  He referred, I believe, to an incident where a member that he identified as a member of the Islamic Jihad by the name of Nidal Zaloom.

Q.   Do you know how that's spelled?

A.   Yes.  I believe it's N I D A L, Zaloom, Z A L O O M, probably a common spelling, who had stabbed, I believe it was four Israelis.

Q.   And do you know in what context he may have mentioned that?

A.   While he was exhorting the crowd to give money.

Q.   From your review of the tape, do you, did you see, in fact, any money given to anybody in that tape?

A.   Yes.  As Fawaz Damra was speaking at that point, many people came to the podium, came to the stage, and gave money, checks, cash.  And as people were providing money at various points, Fawaz Damra, assisted by another individual that we didn't identify, would state how much money was given and for what purpose.

Q.   What was that purpose?

A.   There were, during that period of the tape, the fund raising was noted for two purposes, one was for the support of orphans, the other purpose was to support the Islamic Jihad. Specifically, Fawaz Damra states, this money is for Islamic Jihad many times.  And as funds are given, he would state that X amount of money is provided either for the orphans or X amount of money is provided for the Islamic Jihad.

Q.   Did you see any information on that videotape that would indicate how the money was being broken down, in terms of what goes to what fund and what goes to the other?

A.   Well, again, as the money was coming in, it was identified as such.  And there were specific amounts that were provided for Islamic Jihad purposes, and that was identified by Damra.

Q.   Did you have anything in your review of that information on the videotape that would indicate whether or not, say, equal amounts were raised for both purposes, disparate amounts?

A.   The, the FBI translator had, at one point, totalled the amount for the Islamic Jihad.  And I believe it was somewhere in he order of $6,700 at that time.

Q.   Was a total taken for the funds for the orphans?

A.   I don't recall that, no.

Q.   Okay.  Sir, did they take only money, cash?

A.   They took checks as well.

A 26 599 077                    235                    August 29, 2000

Q.   Was anything said about that?

A.   Fawaz Damra, at that point in his speech, told the crowd if you want to give a check, make the check out to the ICP. He repeated that several times to the ICP, in effect, so that -- in English, that part is in English.  You can understand.

Q.   Okay.  Sir, did you review a videotape regarding a conference held December of 1991?

A.   I believe --

Q.   I mean, again -- I'm sorry?

A.   The same conference in '91?

Q.   No.  The prior conference was, that I was speaking to you of was a round table of April '91.

A.   Yeah --

Q.   This was a --

A.   -- correct.

Q.   -- conference.

A.   December of '91.

Q.   December of '91.

A.   Correct.  I reviewed that tape.

Q.   Okay.  Do you recall if, do you recall if Sami Al Arian was present at that conference?

A.   Sami Al Arian was present, yes.

Q.   How about Mazen Al Najjar?

A.   Yes.  He was there too.

Q.   Anybody else of the people that we have identified

A 26 599 077                    236                    August 29, 2000

MR. WEST TO JUDGE

We believe it was either '91 or '92, probably not beyond that. We had undated material on there.

MR. VERA TO MR. WEST

Q.   Do you recall if anyone spoke at that conference?

A.   Yes. Again, Sami Al Arian, and Ramadan Shallah I believe also spoke, and Abdel Aziz Odeh.

Q.   Do you remember if the crowd was allowed to participate in any way in that conference?

A.   Yes.

JUDGE TO MR. VERA

Did you say the crowd?

MR. VERA TO JUDGE

The crowd.

JUDGE TO MR. VERA

Okay.

MR. WEST TO MR. VERA

Yes, the crowd became very involved at various points and shouted chants, various chants. At one point when Abdel Aziz Odeh and Sami Al Arian entered the room, the crowd broke into, or certain elements of the crowd, broke into a loud chant. And that's obvious in the film.

MR. VERA TO MR. WEST

Q.   Do you recall, through the FBI interpreter, what he heard that crowd say?

A 26 599 077                     244                     August 29, 2000

Q. Do you remember if Mazen Al Najjar attended?

A. Yes. He was there.

Q. Do you recall if any of the other people we have identified today attended?

A. Yes. I believe Abdel Aziz Odeh was there, a couple of the others were. Ramadan Shallah, I believe, was there. But again without referring to my notes again, I can't say for sure.

JUDGE TO MR. WEST

Q. Can you say those names again? I didn't get them.

A. Ramadan Shallah, Abdel Aziz Odeh --

Q. And Sami --

A. -- Sami Al Arian.

Q. Anybody else?

A. The respondent.

MR. COLE TO JUDGE

For clarification, can we get the time period?

MR. VERA TO JUDGE

Yes, this was '92, 93, the end of '92, early '93.

JUDGE TO MR. WEST

Q. Does that sound correct?

A. Yes, sir.

Q. In '90 -- I believe it was '92. Well, that may be one that we're not sure of the date --

MR. VERA TO JUDGE

We're not sure of the date.

A 26 599 077                    243                    August 29, 2000

in summary, that when discussing jihad and the term terrorism comes up that people within the group, within the organization, should only be concerned about the term terrorism and terrorist when, in fact, they're discussing that with people outside the organization. When the people are, when they're talking in house, essentially, that should not be a concern. And he went on to say that basically his view of jihad meant struggle, armed struggle, violent acts. And that he could not really, in a 35 minute discourse, give a full strategy for his view of jihad. That was in response to a question.

Q. Was anything said about governments?

A. Yes. At one point a young teenage girl, in English, asks Ramadan Shallah about, or states her view of jihad would include the toppling of Arab governments, existing governments, and asked Shallah what he thought of that. And he, at one point, responded that that was an issue that needed to be considered.

Q. Do you recall if you reviewed a videotape that relates to the fifth anniversary of a particular battle?

A. Yes. I may have misspoke (phonetic sp.) on the earlier seminar, that's the one I thought you were referring to then. But there was a seminar held by ICP which commemorated a battle, and I won't pretend to be able to pronounce it properly, but a battle between PIJ fighters and the Israeli defense force.

Q. Do you recall if Sami Al Arian attended?

A. Yes, he did.

A 26 599 077                    242                    August 29, 2000

JUDGE TO MR. WEST

Q.   Wait a minute, Al-Ghannoushi?

A.   Yes, sir.

Q.   Who else?

A.   I'll restate that.  I'm not -- at the '92 conference, I'm not sure if Al-Ghannoushi was there or not, but Ramadan Shallah was there.

MR. VERA TO MR. WEST

Q.   Sir, do you remember if anybody spoke at that conference?

A.   Sami Al Arian spoke, Ramadan Shallah spoke, Abdel Aziz Odeh spoke.

Q.   Do you remember what, if anything, Ramadan Shallah said at that conference?

A.   Ramadan Shallah gave a lengthy speech describing again the jihad movement, relations with other Middle East, or the leadership of other Arab countries.  He praised various, he did praise certain acts of jihad operations in the past.  And he, I believe he engaged in a question and answer period with the audience at one point.

Q.   Do you recall what, if anything, was said during that question and answer period?

A.   Yes.  At one point Shallah was asked by a member of the audience his views on jihad and killing and armed struggle.  And his response, basically, was that, again a lengthy response but

A 26 599 077                     241                     August 29, 2000

recollection I have of that particular speech, Al Arian made reference to some of the leaders of the Islamic Jihad movement. He identified some of those people, mentioned those people in his speeches in various connotations.

Q.   At this conference, was there any discussion of terrorist acts?

A.   Yes.

Q.   By whom, if you recall?

A.   By martyrs, as they put them, of the Palestinian Islamic Jihad.  Sami Al Arian as well as some of the other speakers specifically praised the violent acts of some of these, some of these, again as they term them, martyrs of the Islamic Jihad.

Q.   Let me go to the December 1992 conference.  Do you recall if you reviewed a videotape regarding that conference?

A.   Yes, I did.

Q.   And do you remember whether or not, based on your review, Sami Al Arian attended?

A.   Al Arian was there.

Q.   How about Mazen Al Najjar?

A.   Mr. Al Najjar was there.

Q.   Do you recall if any of the other people we mentioned today attended?

A.   Yes, Abdel Aziz Odeh, and I believe Al-Ghannoushi, Ramadan Shallah was there --

A 26 599 077                    240                    August 29, 2000

A.   The '91 conference, yes.  He gave another speech, again, espousing the Palestinian cause, the plight of the Palestinians, relations with Israel, the term death to Israel is used at various points.

Q.   Was there any reference to anyone else or anything in particular in regards to information that might be tied to the Palestinian Islamic Jihad?

MR. COLE TO JUDGE

Objection, leading.

JUDGE TO MR. VERA

What was your question?

MR. VERA TO JUDGE

Is there anything else that he reviewed that might have been said that relates to the Palestinian Islamic Jihad?

JUDGE TO MR. VERA

Okay.  That's broad enough right now to get you in the door.

JUDGE TO MR. COLE

Okay, I'll overrule that.

JUDGE TO MR. WEST

You may answer that, just yes or no.

MR. WEST TO MR. VERA

Yes.

MR. VERA TO MR. WEST

Q.   Can you tell us what that is, what that was?

A.   I believe, and again, I'm going from my best

A 26 599 077                    239                    August 29, 2000

MR. VERA TO JUDGE

I'll rephrase, Your Honor.

MR. VERA TO MR. WEST

Q.   Do you recall if he said anything else, Special Agent West?

A.   Yes.  Yes, again, as in prior conferences, the term death to Israel was used.

MR. COLE TO JUDGE

I just note our continuing objection, Your Honor.  I just want to make it clear that we object to all, this entire line of testimony --

JUDGE TO MR. COLE

So noted.

MR. VERA TO MR. WEST

Q.   Sir, do you know, based on your review, if anything else was said by Mr. Odeh that might be relevant to you in your law enforcement capacity?

A.   At that '91 conference?

Q.   The '91 conference.

A.   Yes.  Odeh, Odeh referred to the jihad movement.  He gave background and then religious connotations describing the jihad effort and a religious justification for the jihad.

Q.   Do you remember -- you said Sami Al Arian spoke at the conference.  Do you remember him saying anything in particular at that conference?

A 26 599 077                       238                  August 29, 2000

previously to the Court?

A.   Abdel Aziz Odeh was there.  I believe the Blind Sheik was there.  I believe Al-Ghannoushi may have been there.

Q.   How about Mr. Shallah?

A.   Yes, Ramadan Shallah was there.

Q.   Sir, do you recall if anyone spoke at that conference, based on your review of that tape?

A.   Sami Al Arian spoke as well as a number of other of the individuals that I just mentioned.  Abdel Aziz Odeh spoke. Ramadan Shallah spoke.

Q.   Do you remember, regarding Mr. Odeh, do you remember anything that he might have said on that videotape?

A.   Again, speaking about the Palestinian cause and jihad, relations with Israel.

Q.   Do you remember if he said anything about or related to, in your opinion, to terrorism?

MR. COLE TO JUDGE

Objection, leading.

JUDGE TO MR. COLE

Sustained.

MR. VERA TO MR. WEST

Do you recall if he said anything regarding the struggle in Israel?

MR. COLE TO JUDGE

Objection, leading.

A 26 599 077                    237                    August 29, 2000

A.   Yes, basically, it was jihad to victory, revolution to victory, and death to Israel, basically, words to that effect.

JUDGE TO MR. WEST

Q.   And whose entry was that?

A.   Sami Al Arian and Abdel Aziz Odeh, and I believe there was a third individual.  I'm not quite sure.  I can't remember who the third individual was.  There was a third person that entered but --

MR. VERA TO MR. WEST

Q.   Do you recall if anybody spoke at that conference?

A.   Sami Al Arian and Abdel Aziz Odeh.  I believe Fawaz Damra was also there.

Q.   Do you know the name Ghassan, G H A S S A N, last name Ballout, B A L L O U T?

A.   Yes.  He's, he is, or was a leader, director of the ICP branch in Chicago.

Q.   Again --

JUDGE TO MR. VERA

What was that name?  I didn't get that.

MR. VERA TO JUDGE

Okay.  Ghassan, G H A S S A N, last name B, as in boy, A L L O U T.

MR. VERA TO MR. WEST

Q.   And when you say ICP --

A.   Islamic Committee for Palestine.

A 26 599 077                    245                    August 29, 2000

Q.    Do you remember if he attended this conference?

A.    He was there, yes.  He spoke also.

Q.    Do you remember what, if anything, he might have said?

A.    He introduced Abdel Aziz Odeh.  I believe he also introduced Sami Al Arian.

Q.    Do you remember if he may have said anything at the conference?

A.    Beyond the introductions he gave some, I believe he gave a speech about the Palestinian cause and the jihad effort.

Q.    Do you remember if Sami Al Arian spoke?

A.    Sami Al Arian spoke at that conference.

Q.    Do you remember if he said anything at that conference, in particular?

A.    Yes, again, background on the Palestinian, Palestinian cause, the struggle, the armed struggle, the relations with Israel, the relations meaning they are the enemy and that it is Israel and the Jewish people are the enemy of the Palestinian people, and espousing support for the jihad effort.

Q.    When he said relations with Israel, did he say anything in particular about people from Israel?

A.    Yes, he did.

Q.    What did he say?

A.    At one point in his speech he referred to Jews as pigs and monkeys.

Q.    And was that done, from what you could see on the

A 26 599 077                    246                    August 29, 2000

videotape, in the speech given to the attendees at that conference?

A.    Yes.

Q.    And Mazen Al Najjar was there?

A.    Yes.

Q.    Do you remember if Sami Al Arian said anything else?

A.    Yes.  He went on to espouse support for the jihad effort, jihad being struggle, armed struggle against Israel.  He, at one point in his closing remarks towards the end of his speech he led, essentially, a chant, again saying jihad, I believe it was jihad to victory and death to Israel and several other similar phrases.

Q.    Do you recall if anybody else spoke after that?

A.    Abdel Aziz Odeh, I believe, spoke after Sami Al Arian.

Q.    Do you know, based on your review of the tape, if there was any fund raising at that conference?

A.    Yes.  I believe the tapes reflect fund raising at all the conferences to some extent.

Q.    Special Agent West, in the course of your investigation involving WISE and ICP, did you have occasion to review the alien file for Mazen Al Najjar?

A.    Yes, I did.

Q.    Tell me, if you recall from your review, whether or not there were any visa applications for Mr. Mazen Al Najjar?

A.    Yes.  There were various, there were visa petitions

A 26 599 077                       247                  August 29, 2000

that were filed on Mr. Al Najjar's behalf.

JUDGE FOR THE RECORD

Go to tape no. 8.

(TAPE 8)

JUDGE FOR THE RECORD

Pick up tape number 8, 29 August, 26 599 077, Mr. Vara is questioning. All right, Mr. West, you may proceed, Mr. Vara.

MR. VARA TO SPECIAL AGENT WEST

Q.   Sir, can you answer that question one more, just to make sure?

A.   Yes.  Contained in the Immigration file for Mr. Al Najjar's file, there was actually, I believe two visa petitions and support documents, etcetera for Mr. Al Najjar.

Q.   Okay.  And when you say two visa petitions, do you know the clarification of visa?

A.   I believe one was for the H-1B visa petition.  The other, I believe, was a permanent resident visa petition, an I-140, based on employment status.

Q.   Okay.  Do you know, based on your review of the file, who, in fact, was had submitted these visa petitions or at least either one of them?

A.   Sami Al Arian.

Q.   And do you know if he did that in a personal capacity?

A.   No, in his capacity as director of Wise.

Q.   And sir, generally, I know you're not an examination,

A 26 599 077                    248                 August 29, 2000

in the examination branch of the INS, but generally what is an H-1B visa?

A. It's a temporary skilled worker or temporary specialized worker status that allows somebody, a foreign national, to come into the United States for a temporary period of time to engage in either skilled or very specialized employment that, where there is a shortage of such workers here in the United States already here.

Q. In review of the H-1 visa, on behalf of Mazen Al Najjar that the visa was for?

A. Yes, I believe it was the Director of Research for Wise.

Q. Do you remember if there was any mention of salary for that position?

A. Yes, there was but I don't recall the specific amount.

Q. Do you, in fact, to the best of your knowledge, Mazen Al Najjar was ever employed by Wise?

A. Yes, he was employed at Wise.

Q. And do you know what position he, in fact, held at Wise?

A. Well, his, his official position would be as director of research. The investigation, however, indicated that he was basically involved in helping to manage the overall operation of Wise.

Q. Do you recall if, in fact, the H-1B visa petition,

A 26 599 077                    249                    August 29, 2000

there was any mention of duties that Mr. Al Najjar would have?

A.   Yes.

Q.   Do you recall if any of those duties might entail financial duties?

A.   I recall there was some reference to dealing with financial aspects of the Wise operations.  I don't recall the exact details of that, however.

Q.   During the course of your investigation, did you come across any evidence that Mazen Al Najjar was, in fact, dealing with finances related with Wise?

A.   Yes.  He, we, pursuant to the search warrant, we seized various records, including some financial records for Wise that bore his signature, including various checks that he signed under the, under Wise checks that he signed.

Q.   In very ball park fashion, sir, do you remember if those checks involved small amounts?  Large amounts?  The size of the amounts of money?

A.   Often in the thousands of dollars, sometimes several thousands of dollars, at any given time, sometimes some what smaller amounts, but their, he had access, according to the records that were seized to, he had access and control or had access to Wise accounts.

MR. VARA TO JUDGE

Your Honor, at this time, can we take a short break?

JUDGE TO MR. VARA

A 26 599 077                    250                    August 29, 2000

Yeah.

JUDGE FOR THE RECORD

Let's take a break until 3:20.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

Okay, we're back on the record.  29 August.

JUDGE TO MR. VARA

Mr. Vara?

MR. VARA TO JUDGE

Yes, Your Honor.

JUDGE TO MR. VARA

You've asked for a recess.  You want to proceed or what, how do you want to proceed?

MR. VARA TO JUDGE

Well, that's the administrative issue.  Where we intend to proceed now is based on the arguments we made before.  We would like, with the Court's permission, to play the composite tape for Special Agent West and see, specifically he assisted in the preparation again, utilizing the FBI interpreter, so that he can again, show us the portions of the tape that we say evidence say they evidence.  And again, that's the fundraising, the people who attended the conferences, what was, in particular, said at those conferences and of course, what that or the contents of the tape indicated regards to support of the (indiscernible) and Islamic

A 26 599 077                     251                    August 29, 2000

Jihad.

JUDGE TO MR. VARA

Okay, one thing I do feel is that, that Mr. Cole and his party should be allowed to access to the tape, if they want to, before he testifies on that.

MR. VARA TO JUDGE

Okay.

JUDGE TO MR. COLE

I don't know if you want it or not?

MR. COLE TO JUDGE

We not only would like access to the tape, but we would like a certified translation from the Government of the tape so that we can prepare our witness. I mean, we, you know, they have provided with us, like we said, 11 tapes here, all of them in Arabic, no translation. I, I just don't know, Mr. Vara says well, you know, that's okay because Mr. Al Najjar will be able to talk about them and then the other person will be --

JUDGE TO MR. COLE

Okay, I won't allow the tape without the certified translation.

MR. COLE TO JUDGE

Okay. Then we'll, obviously once that's, if that is ever provided to us, we'll need a continuance to be able to respond to that.

JUDGE TO MR. COLE

A 26 599 077                    252                    August 29, 2000

Yeah --

MR. COLE TO JUDGE

I also want to note for the record, Your Honor, during the break, all three counsel were advising Mr. West. Mr. West was talking to them at some length. He was also reviewing notes and talking on the telephone. All of which, in my understanding, is entirely improper and unethical behavior.

JUDGE TO MR. COLE

Okay.

MR. VARA TO JUDGE

Your Honor, we were speaking to Special Agent West about where we were going and not where we had been. We discussed the issue of what we were going to do next, in terms of playing the tape and providing access to his notes that he mentioned in his prior testimony and counsel, that's why he had them in his hand. That's what we discussed.

MR. COLE TO JUDGE

Your Honor, my understanding is that once the witness is on the stand, it is inappropriate to consult and coach the witness and that's essentially what counsel said they had been doing. They don't, you're not supposed to talk to the witness when he's on the stand. They know that. That's a basic rule of witness, treatment of witnesses.

MR. COLE TO JUDGE

If he's -- Your Honor, again, he's speaking to coaching.

A 26 599 077                    253                    August 29, 2000

Coaching again would be to tell Special Agent West, well, this was what you were weak on, this is what we want to emphasize, this is where we're going, in terms of the particular evidence that you need to be emphasizing. We discussed we're going to put on the videotape. We discussed that I wanted his personal notes, since he mentioned the personal notes. We got the personal notes. And again, one of the purposes was for, for our determination about releasing those to counsel, so he can better follow the tapes.

JUDGE TO MR. VARA

Okay. We're not going on the tape, so I don't know if he's going to testify further.

MR. VARA TO JUDGE

Well, Your Honor, when you say we're not going on the tapes, is the Court's ruling that, as opposed to the tapes being admissible or not admissible, that we can't even play the tapes for Special Agent West?

JUDGE TO MR. VARA

Not without a transcript, certified transcript.

MR. VARA TO JUDGE

Your Honor, if we present an FBI interpreter who is fluent in Arabic and English to, on, from the stand advise what the tape says, will we be allowed to play the tape?

JUDGE TO MR. VARA

So in other words, you're going to have the interpreter.

A 26 599 077                    254                    August 29, 2000

MR. VARA TO JUDGE

Sitting right in front of us, subject to cross-examination.

MR. COLE TO JUDGE

Your Honor, we object to that. We have the right to have, this is information that we have no expertise to assess. Yes, we have an Arabic speaking respondent, but the, but it's a foreign language evidence and there's no exception for foreign language evidence when the respondent speaks a foreign language. The rule is, the Government has to provide a certified translation. Having someone get up on the stand and make a blind, kind of contemporaneous translation, how in the world is Your Honor going to adjudicate any dispute between this person's contemporaneous translation and somebody else's contemporaneous translation? What we need to have is this, this material reduced to a form which could be worked with by the Court.

JUDGE TO MR. COLE

I agree, I agree. It has to be a certified translation.

MR. VARA TO JUDGE

Your Honor, if I may again, for purposes of the record, what is more reliable? A translator, a person who says they're a qualified translator sitting in a room reviewing tapes, preparing a little sheet of paper that says, I'm fluent and I certify that's what they say or one who sits here, under oath, subject to full cross-examination before this Court, telling the Court, that's what that tape says. That's what those people on that

A 26 599 077                     255                     August 29, 2000

tape are saying in Arabic. And the reason I know is because I'm fluent in Arabic and English and I'm telling you that under penalty of perjury and I'm telling you beyond a certification, under penalty of perjury. I'm telling you in a context where I can be impeached by opposing counsel who has people who can tell him or her that my translation is incorrect? Which is more reliable?

JUDGE TO MR. VARA

Well, I fully agree with you but the regulation says, certifiable copy. So that's what we're going to go with. So if you all want to get a certified transcript, I'll be happy to give you copies.

MR. VARA TO JUDGE

Okay. Then at this time, we would take the Court's offer to get some time and do that. So we would like to break for the day and begin at the Court's convenience tomorrow.

JUDGE TO MR. COLE

Mr. Cole?

MR. COLE TO JUDGE

And tomorrow, we're going to get a transcript of 11 videotapes? Because we can, or are they going to get a transcript of the composition is not sufficient, because we don't know how, how legitimate the composite is, whether the editing was fair or not. Whether they've taken stuff out unless we can review it in connection with all the other material that they

took it from. I think we need 11, before we have any testimony about these videotapes or showing these videotapes, we need to have what the rules require which is a transcript of the tapes.

JUDGE TO MR. COLE

Of what they're offering, not everything under the sun.

MR. COLE TO JUDGE

That's right, the transcripts of the tape. Of what they've, they've offered 11 tapes. And they've offered it in particular to show a composite, which we can't assess without having the ability to determine what, how, what was it was taken from, what was excised, what was kept in. I can't do that, you know, I can't possibly do that overnight. These are 11, I mean, we've got, I don't know how many hours of tape this is but if I watched every one, if I spoke Arabic and I watched all these tapes, from now until morning, I probably wouldn't have enough time. I mean, this is just, it's just not the way to proceed.

JUDGE TO MR. COLE

My understanding that the only one he is going to introduce is the summarized transcript. The summarized tape.

MR. COLE TO JUDGE

The extracted --

JUDGE TO MR. VARA

Is that right?

MR. VARA TO JUDGE

That's correct. And to assist the Court, to determine the

A 26 599 077                    257                    August 29, 2000

veracity of the testimony of the witnesses in this proceeding to include the respondent. When we play that tape and ask him, is that you at an ICP conference, he'll say either yes or no. If we say, did Person X say this at that conference? He'll say yes or no or I don't know. How does that relate -- again, if we were submitting these to prove what, to make the assertion that they contain, that the truth contained therein is the truth, I could see an argument. If we're playing it to show the Court, to allow the respondent an opportunity to tell the Court, no, that's not me, that's my twin brother or no, I don't, that's not a conference I attended. Or no, that's not what being said on that tape because I'm fluent in Arabic or English, I think that's an entirely different thing. We're using it as demonstrative evidence of a fact that we're asserting here. The Court's determination of whether or not we have properly asserted a fact comes from all of the evidence, to include the respondent's testimony under oath, to include the testimony of the FBI interpreter under oath as to what that tape says. I don't see where we are in relation to a document or a videotape. Again, we're not saying, if you review this tape, in and of itself, Judge, it's our smoking gun. We're saying, review this tape to tell you some of the things that we think you need to know and that's what was there conferences? Was there fundraising? Were known or suspected terrorists at those locations? Did he know them? Did he know what was going on at those conferences? And

A 26 599 077                    258                    August 29, 2000

since he speaks Arabic, was he sitting there at times when people were saying, death to Israel, all sorts of things that relate to violence and, and terrorist acts and did he go to all those conferences that he, again, helped arrange?  And I would point out one other thing and that's just the regulation that is being cited here.  Is the regulation, by its very wording relates to documents?  Now, I can understand an argument that by inference, it relates to anything.  It relates to documents.  Again, all we want to do is play the videotape and we can ask him, under oath. Sami, I mean, Mazen Al Najjar, we can ask him under oath, is that you?  Is that what that tape purports to be?  Were you at that conference?  Is that Ghanoushi?  Is that Odi (phonetic sp.)?  He can say no.

MR. COLE TO JUDGE

No, we're not arguing about what he's going to do on cross of Mazen Al Najjar.  What we're here right now is Mr. West's testimony.  Mr. West's testimony.  And I reiterate my objection. There has been no translation and if they're going to provide a set of excerpts, they should provide the originals from which the excerpts were taken, again, in translation so that we can assess whether the excerpts are misleading or not.  And you can't assess that, I can't assess that, Mr. Vara can't assess that until we get the transcripts of the evidence.  They've had these documents, these tapes for five years, Judge.  This is not, this is not something that they, you know, came upon yesterday and

A 26 599 077                   259                 August 29, 2000

it's an emergency, we have to go forward because you know, otherwise the sky will fall in. They've had these for five years. They've taken no action with respect Mazen Al Najjar, with respect to Sami Al Arian, with respect to any of the individuals that have been named. No action whatsoever. And then they come in at the last moment with a set of excerpts from a set of 11 tapes, none of which we can even understand without providing any kind of a transcript. And they want to have Mr. West, somehow, lead us through this material that none of us can understand. It seems to me that it's totally improper, it's in violation of the regulations. And I think we can not fairly represent our client and confront the evidence without, from the Government, a transcript of the tape that they're offering and from what that was taken so that we can assess whether or not and so you can assess, you, I, you don't, I assume, don't want to have before you, you know, three words from a sentence without the sentence. You want to have the full document from which the material was taken. That, I think that's a basic principle. They have essentially taken, you know, words from here, minutes from, minutes from hour and put it on a composite tape. That might be totally appropriate. That might well be totally appropriate. We might have no objection to it but we can't, Your Honor, we can't tomorrow make a determination as to whether we have an objection to it because we need the time to be able to review transcripts, review them with an expert person who speaks

A 26 599 077                    260                    August 29, 2000

Arabic, none our counsel do. And it's just, it's just, it puts us in a position where we cannot have a fair opportunity to confront the evidence against us. And we, the most, the most problematic and the most troubling thing here is that the Government knows this and the Government has had this material for five years, five years. Why is Mr. Vara now all of a sudden showing up with, you know, material that is in Arabic that neither you, me, my co-counsel can understand?

MR. VARA TO JUDGE

Your Honor --

MR. COLE TO JUDGE

Particularly giving his understanding of the regulations, the clear requirement that any document in foreign language and document would extend to a videotape be provided with a transcript so the parties and counsel can effectively do their jobs searching for the truth.

MR. VARA TO JUDGE

Well, I don't think the assertion that it's obvious, it's that obvious. The Section 3.33 is regarding translation of documents. It relates solely to documents at 8 C.F.R. But again, I think even beyond that regulatory force of law argument that we have, we're talking about videotapes here. We're not talking about documents. Again, the point that we make reasserts, we have a videotape composite that says for us, in terms of evidence certain things. First thing it says or

A 26 599 077                    261                    August 29, 2000

provides to the Court is, information as to whether or not the respondent was, in fact, at ICP conferences.  Those are pictures. Whether you have Arabic sub-titles or English sub-titles, that picture doesn't change.  The other is and I guess the only thing he can say is that's not me.

MR. COLE TO JUDGE

(Indiscernible).

MR. VARA TO JUDGE

But if I may finish, Your Honor.

JUDGE TO MR. COLE

Yeah, let me finish.

MR. VARA TO JUDGE

The other thing that this videotape says is that a variety of other people that are again known to the Government that have been identified through pictures that can be identified again on the videotape were at these conferences and that some of these people, based on the knowledge that we have are people that are known or suspected terrorists.  And then we get to the issue, what is being done at that conference?  It doesn't take English, Arabic or any other language to determine if someone is walking up to somebody and putting dollar bills at their feet, if that is what the video shows.  And the last thing is the rhetoric.  If you've got people at those conferences giving speeches, including this man's employer, his brother-in-law and the person that is the founder and chairman of the board of the organization that he

A 26 599 077                    262                    August 29, 2000

was employed by, that he was part of, that set up these conferences is getting up there in front of everybody and saying, death to Israel. Well, what do they want? 500 tapes that he said a ton of other things. He still said death to Israel. If he said Jihad is the only way, he still said it no matter what else he said. So again, our position is that the tape ought to be allowed to be played. The regulation does not require because it's not a document that a certified translation be presented. We cannot do counsel work them, for him. If he believes that exculpates his client, he can do that. These are their videotapes that we seized from him. What we're intending to do is play a videotape that even the respondent, he's not prejudiced because he is fluent, a court certified interpreter in Arabic and English can tell you, Judge, the Government is full of baloney. What they say that piece of tape says it doesn't say. And he's doing it under oath and we can present our interpreter who can tell you it's something else and then you as a trior of fact can say that I like this version than the other one. That's what we're trying to do here and I don't think anyone is prejudiced by those pictures, by what the Court will see in those videotapes, by what Special Agent West can tell you was happening in those tapes based on his experience as a law enforcement officer and what was said at the conference as depicted in the composite tape.

JUDGE TO MR. COLE

A 26 599 077                    263                    August 29, 2000

Mr. Cole?

MR. COLE TO JUDGE

Your Honor, you've already ruled that the transcript is required before we go forward with this.

JUDGE TO MR. COLE

The transcript will be required and certified of the composite tape.

JUDGE TO MR. VARA

And so I understand you're going to furnish that tomorrow morning?

MR. VARA TO JUDGE

Yes, Your Honor.

JUDGE TO MR. COLE

And if you need time at that particular time, you want to review it with whoever, I will take that under advisement.

MR. COLE TO JUDGE

And we would also like transcripts of the tapes from which the excerpts were taken so we can assess whether or not the fact that the excerpts were fair representative excerpts, whether they would take him out of context, what context they were provided in, etcetera. We simply can't make an assessment and provide respondent with the defense that he is constitutionally entitled to when they come forward with a document, which they compiled --

JUDGE TO MR. COLE

If they are offered into evidence, they will have to have a

A 26 599 077                    264                    August 29, 2000

transcript.

MR. COLE TO JUDGE

And we're objecting to the offering into evidence of excerpts without the originals from which the excerpts are taken.

JUDGE TO MR. COLE

All right.  Your objection is overruled.

JUDGE TO MR. VARA

Okay, now where are we now?  Do you want to take a break now?

MR. VARA TO JUDGE

At this time, we would, the Government would like to adjourn for the purposes of trying to accomplish and certify translation of the composite videotape by tomorrow morning.

JUDGE TO MR. VARA

And what time do you want to do it?

MR. VARA TO JUDGE

I'm sorry?

JUDGE TO MR. VARA

What time do you want to come back?

MR. VARA TO JUDGE

Whatever is convenient to the Court.

JUDGE TO MR. VARA

Well, I --

MR. VARA TO JUDGE

9 or after.

A 26 599 077                          265                    August 29, 2000

JUDGE TO MR. VARA

All right, 9 and I'm thinking about, at the earliest possible time can you get, either fax Mr. Cole or whatever a copy of that so --

MR. VARA TO JUDGE

It will be in the middle of the night.

JUDGE TO MR. COLE

Do you want it in the middle of the night or do you want it first thing in the morning?

MR. COLE TO JUDGE

You can, if he would like to fax us, we're staying at the Bradenton Holiday Inn, you can fax it to us at the Bradenton Holiday Inn. But I think we're going to be, again, I say a serious disadvantage in our ability to respond when we are confronted with this at the last minute without any advance whatsoever.

JUDGE TO MR. COLE

All right. That's why I'm asking. Tomorrow morning, I want you to get a copy first thing in the morning.

MR. COLE TO JUDGE

Right.

JUDGE TO MR. COLE

And my point is, are you going to be ready at that time or do you need further time to digest it?

MR. COLE TO JUDGE

A 26 599 077                    266                    August 29, 2000

I, my guess is that we'll need time to digest it.  I can't say, I don't know what it's, what it's going to look like, you know, very -- how long is this tape?

MR. VARA TO JUDGE

The tape in its current version is an hour, approximately an hour and 45 minutes.  If we're going to do a transcript, because there's a lot of background, Sami or Mazen Al Najjar are just speaking generally in many portions of that, we can cut it down. Because again, in that particular portion of it, it's not what he's saying but it's the fact that he's there.

MR. COLE TO JUDGE

And we've stipulated that Mazen Al Najjar attended these conferences.  We don't need to offer these, we don't need to go into that, if that's what they're offering them for.  What they're offering them for is the rhetoric, the specific language, the specific statements.  We will offer testimony that there are significant semantic issues that Mr. West, Mr. West and his translator have apparently misconstrued.  That, in fact, a number of things that Mr. West says or said were never said, we believe. We obviously had not had a chance to view the videotape, but we believe that, in fact, what Mr. West said will not be borne out, but we're not in the position to be able to, to, in any coherent way, be able to respond without an ability to go through this.  I mean an hour and 45 minutes, I mean, we're going to have, we're going to have to find someone who can create a certified

A 26 599 077                    267                    August 29, 2000

translation to check our sources (indiscernible), myself and my counsel can review our certified translation against their certified translation and see whether there are, in fact, issues which Your Honor needs to resolve.  You know, it's mind boggling how we're supposed to proceed here and it would have been a lot simpler.

JUDGE TO MR. COLE

It would have been, but you know, we can talk about should have, would have, could have until we're blue in the face.

MR. COLE TO JUDGE

Right.  And (indiscernible).

JUDGE TO MR. COLE

And what I'm trying to do tomorrow is get us a time so we can come back.  Okay, now, he's going to give you a copy at 9 o'clock.  Do you want to come back, do you think 12 o'clock is sufficient for you to have reviewed it and be ready to go or at that time, you want to come in and make another request for continuance, I will certainly consider it.

MR. VARA TO JUDGE

Your Honor, before they formulate an answer, in consulting with co-counsel, I think maybe I was a bit too optimistic.  We may need until say noon time before we're done tomorrow.

JUDGE TO MR. VARA

Okay, it needs, you know, when you talked about the background we should, the interpretation is going to have to be

A 26 599 077                    268                    August 29, 2000

certified true and accurate?

MR. VARA TO JUDGE

Right.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

Now, it's going to be noon time.  I mean --

MR. VARA TO JUDGE

Well, we may get it to them before 9 o'clock in the morning, but we're just talking about giving us some room if we're going to go through an hour and 45 minutes worth and try to do a verbatim transcript.  It's going to take some time.

JUDGE TO MR. VARA

Okay.

JUDGE FOR THE RECORD

We're coming back 12 o'clock tomorrow morning, 12 o'clock noon for all concerned.

JUDGE TO MR. COLE

Anything --

MR. COLE TO JUDGE

And will the transcript be provided to us in advance prior to --

MR. VARA TO JUDGE

As soon as we get it --

MR. COLE TO JUDGE

A 26 599 077                    269                    August 29, 2000

(Indiscernible).

JUDGE TO MR. COLE

Either you or Mr. Schwartz' office.

MR. COLE TO JUDGE

Not Mr. Schwartz' office because we're in --

JUDGE TO MR. COLE

Okay, you can work out your addresses.

JUDGE FOR THE RECORD

Off the record.

<u>HEARING ADJOURNED</u>