UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 99-3458-CIV-LENARD
02-20261

MAZEN AL NAJJAR,

    Petitioner,

vs.

JOHN ASHCROFT, Attorney General, United
States Department of Justice, *et al.*,

    Respondents.

_____/



# EXHIBIT 1: TRANSCRIPT OF REMAND CUSTODY HEARING
## (VOLUME 3 OF 9)

### AUGUST 30, 2000

TO

#### SUPPLEMENTAL COMPLAINT AND RENEWED PETITION FOR HABEAS CORPUS

**U.S. Department of Justice**
Executive Office for Immigration Review
United States Immigration Court

Matter of                                              File A 26 599 077

                                          )
                                          )
MAZEN AL NAJJIR                           )   In BOND Proceedings
                                          )
                                          )
                    Respondent            )        Transcript of Hearing

Before R. K. MCHUGH, Immigration Judge

Date:  August 30, 2000              Place:  Bradenton, Florida

Transcribed by FREE STATE REPORTING, INC., at Annapolis, Maryland

Official Interpreter:

Language:

Appearances:

        For the Immigration and
        Naturalization Service:           For the Respondent:

        Daniel Vara                       David Cole

JUDGE FOR THE RECORD

Okay, we're back on the record this morning or this afternoon on the 30th day of August the year 2000 in Bradenton, Florida on the bond hearing in the matter of Mazen Al Najjar, A number is 26 599 077. The respondent is present along with his counsel, Mr. David Cole, Joseph Holenstein and Nancy Chang and Martin Schwartz --

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

Back on the record. So it turns out that Mr. Schwartz is a little late but he'll be here shortly and then the Government is represented by Mr. Daniel Vara, Jorge Perez and Ms. Karin Guttormen.

JUDGE TO MR. VARA

And okay, Mr. Vara, I believe yesterday we took a break and for the purposes of you getting a transcript.

JUDGE FOR THE RECORD

But before we do that, let me go ahead and make sure we're all singing from the same sheet of music. Going over the Exhibits just so that we've all got them marked appropriately.

JUDGE TO MR. COLE AND MR. VARA

Well, I guess who your person, you're ready? Okay.

JUDGE FOR THE RECORD

Exhibit 1 is the I-140. Exhibit 1A is, Exhibit 1A through

A 26 599 077                         271                    August 30, 2000

7A are the photos and we'll probably go over them in more detail later.  Exhibit 8A is also a photo.  Exhibit 2 is a letter from Sami Al Arian and it's dated February 1st, '95.  Exhibit 3 for identification is the document called Pact of Brotherhood. Exhibit 4 is a letter.  Exhibit 5 is a speech.  Exhibit 6 is a packet, thick packet of material.  And Exhibit 7 was the Court interpreter certificate concerning the respondent's ability to speak Arabic into English fluently.  Of those Exhibits, the only one that has been admitted is Exhibit 1, which is the I-140 and all the rest are for identification at this stage of the game. Okay.

MR. VARA TO JUDGE

Your Honor, we were under the impression that the pictures were, in fact, admitted?

JUDGE TO MR. VARA

They were not yet.  We discussed them but I never made a ruling on them.

MR. VARA TO JUDGE

Okay.  We would ask that they be admitted based on the testimony of Special Agent West.

JUDGE TO MR. VARA

Okay.

JUDGE TO MR. COLE

Mr. Cole?

MR. COLE TO JUDGE

A 26 599 077                    272                    August 30, 2000

Your Honor, we have the same objection as before. They are, Mr. Vara made no offer of authentication nor does Mr. West make, he did not testify that he took the pictures. He did not testify that he was there. He did not testify that the camera worked. He did not provide any of the basic fundamental foundational testimony that is required to authenticate a document, particular a document like a photograph.

MR. VARA TO JUDGE

Your Honor, as Special Agent West testified, these were not taken by the U.S. Government. They were taken by the people who were at attendance at the ICP conferences and they were seized and have been in possession of the U.S. Government since the time they were seized from the offices of Wise, home of Sami Al Arian and the offices of ICP. There is an assumption of irregularity, therefore, due to the fact that these documents are, in fact, what they purport to be, moreover the contents, I believe, as we argued several times can hardly be contested, at least in terms of the fact that they contain pictures that show banners that, that indicate that the ICP, the Islamic Committee for Palestine was the sponsor of the conference that's depicted in the pictures. And the fact that certain individuals are present to include the respondent, to include Sami Al Arian and to include the other individuals that we have identified as terrorists or suspected terrorists as known to agents of the federal law enforcement. So, again, the pictures are who, what they purport

A 26 599 077                              273                         August 30, 2000

to be.  We don't know who took them.  We can't possibly know who took them.  The respondent is in the best position to know that and so is Sami Al Arian and of course he's taken the 5th Amendment to all this.  So again the reliability comes from the fact that they were seized, that they have been kept in the possession of the U.S. Government as evidence.  And, in fact, they are what they purport to be.

MR. COLE TO JUDGE

Your Honor, the fact that the Government seizes unauthenticated items does not authenticate the evidence.  If they seize a Hollywood videotape and then presented it as evidence, it wouldn't be authenticated as evidence because there's a presumption of irregularity that attaches to what the Government does.  If they are being offered solely for the purposes of showing that the Government seized them and not for purposes of the truth of what is asserted or represented by those photographs themselves, we have no problem with that.  But that's not what Mr. Vara appears to be offering them for.  He's offering them for the truth of what the contents of those documents tell us.  And if he's doing that, he's got to authenticate them.  And the very fact that he doesn't know who took them illustrates the problem.  If he doesn't know who took them and we don't know who took them, how can we know --

JUDGE TO MR. COLE

I don't know, I agree.

A 26 599 077                              274                    August 30, 2000

MR. COLE TO JUDGE

Right. I'm sure I don't know who took them. How can, how can the Court make an assessment, take them as evidence? The most principle of evidence is it's got to be authenticated so we know that it does, in fact, it is, in fact, what it purports to be and it's an accurate statement. That's why whenever you put in a photograph, you put in the photographer who states that I was there, I took this photograph, I developed this photograph. I did not doctor this photograph, it's an accurate photograph. We have, they've admitted, they don't know who took the photograph. Therefore, they don't know whether the document, whether the photographs were doctored. I don't know who took the photograph, therefore, I don't know whether the photographs were doctored. That's exactly why we have the requirement (indiscernible).

MR. VARA TO JUDGE

Your Honor, if the analogy is that the federal law enforcement agents arrest somebody who has in their possession a knife and we introduce that knife, we don't have to introduce the manufacturer and who it was that made the knife and how the knife was made. We introduce it, just to prove that it was in the possession of the person who was arrested. And in the case of a knife, it's commonly known to just about everybody to be a knife, we say it's a knife. And again the Court determines whether or not our assertions are correct. In this case, again, we're not

A 26 599 077                         275                    August 30, 2000

doing anything other than offering evidence that was seized at the home of Sami Al Arian, at the office of Wise. There have been no testimony, there is no assertion on the table or anywhere else that Sami Al Arian was not associated in a meaningful, meaningful way with the respondent and that, in fact, the respondent worked for Wise and ICP. And therefore, our position is because the pictures were seized, because there has been no break in the chain of custody, because they are what they purport to be, and, again, the Court, itself, can determine whether or not those pictures show what we say they show. Do they show Mazen Al Najjar? Do they show Sami Al Arian? Do they show people that we, the U.S. Government have identified as suspected terrorists? People like Ghanoushi, Nafi, Shallah and others? That's perhaps a question for the Court to determine whether or not our agents' testimony is reliable, whether or not other public information that is available to everybody regarding these folks is reliable. But it doesn't change the fact that these pictures are what they purport to be. The last point I'll make is, again, we're not in Federal Court. We are in an Immigration Court in bond proceedings, an ancillary matter, at which we're seeking to introduce that which will allow the trior of fact to determine if the respondent should be released into the general community. And the position of the Government, of course, is that he's a threat to national security. This is a piece of information that is crucial to that determination, especially

A 26 599 077 276 August 30, 2000

since our assertion relates to him attending fundraising conferences at which people who were associated with terrorism were at.

MR. COLE TO JUDGE

Your Honor, the analogy is not to a knife. A knife is not a representation of a thing. The knife is the thing. The analogy is to a document that says that the defendant had a knife. And suppose the Government said, well, we seized a document that says that the defendant had a knife. Well, then we would want to know who wrote that document. Was it a fictional service? Was it a true and accurate representation? The only person who can tell that is the person who wrote the document. The same thing with a photograph, a picture. Is it, was it a picture taken during Halloween? Was this a picture taken while he was knifing someone? You need -- was this an accurate picture? Was it a doctored picture? Was it for purposes of getting a part in a movie or was it for purposes of some nefarious purposes? The point is, when you're offering something that represents a fact, you've got to authenticate the document. You've got to authenticate the photograph. And the BIA has made clear that the documents and evidence has to be authenticated. That is a rule that applies to Immigration proceedings. It applies in Immigration proceedings because it is a fundamental matter of due process that evidence that is unauthenticated is inadmissible. It is unfair. Now, if they, if the Government thinks that this

A 26 599 077                  277                  August 30, 2000

evidence is so crucial to their case and they, they, you know, they've represented that it's very crucial to their case, then they should have taken some steps to try and determine who took the photograph. Generally, that's what the Government does. They investigate. They have a piece of evidence that's not admissible. They investigate to make it admissible. And that's their obligation. They didn't do that. Instead, they just want to put it on, no authentication, no idea who took the picture. They admit they have no idea who took the picture and just have you take it at face value.

MR. VARA TO JUDGE

Your Honor, I would like to hear a citation from Mr. Cole as to when the Board held that, the kind of authentication that he's talking about is required in this proceeding. Moreover, I think the decision that the Board has issued, in again merits hearings, in cases that determine whether an alien is deportable or not and not ancillary proceedings like this one, the Board has said that documents, such as an I-213, Record of Deportable Alien, unless there is something to show that document is inherently untrustworthy, that document is admissible. So again, the standards are not the same as they are in Federal District Court. They are lessened. The Federal Rules of Evidence, the Board has held many times do not apply to these proceedings.

MR. COLE TO JUDGE

Your Honor, an I-213 is a self-authenticating document.

A 26 599 077                    278                    August 30, 2000

That's a completely disingenuous argument. I'd be happy, Your Honor, to provide you with those cases tomorrow if you want to continue to reserve your ruling. But I, I submit that authentication is the fundamental threshold requirement required by due process for any piece of evidence and we have not had that in regard to the single photograph.

JUDGE TO MR. COLE

Okay.

JUDGE FOR THE RECORD

Now, contrary to Mr. Vara's assertion, the last I heard this is a Federal Court. But in any event, if it's not, my paycheck must be some bad notes. But in any event, this is not a District Court and we're not bound by the rules of evidence as applies to the Federal District Court. So in this particular case, I think Mr. West's testimony does lay the proper predicate for the Exhibits X, or Exhibits 1A through 8A without any evidence to indicate that the photos are tampered with or doctored or anything to that effect. They do have a probative value and at this particular stage of the game, I will admit into evidence Exhibits 1A through 8A.

JUDGE TO MR. COLE

And if you have evidence at a later date that they are doctored or tampered with, I'll be certainly happy to consider it.

MR. COLE TO JUDGE

A 26 599 077                279                August 30, 2000

Your Honor, I will note our objection. We don't know who took them. We don't have the ability to provide that evidence and we don't consider our burden under due process law but our objection is noted.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. VARA

Mr. Vara, as I remember last time we were getting ready to address the tape. You've made the tape transcript available to the respondent's counsel?

MR. VARA TO JUDGE

Yes, Your Honor. We provided, well, first of all, I must apologize to the Court. I did mean, it is not a Federal District Court, I do know it is a Federal Court. But we, last night at about 12:10, 12:15 a.m. we did deliver or attempted to deliver to opposing counsel new composite tape and a certified transcript, translation and transcript of that new composite tape. When I say new composite tape, it is a shorter, much shorter composite than the one that we were seeking to introduce yesterday. We reduced it for a couple of reasons. The first is just simply logistical reasons that would have kept us working on that tape until tomorrow if we went the full hour and 45 minutes. The other is that the composite tape that we were offering before, as I argued yesterday, going to address four points. The first point was that the respondent attended these conferences. The

A 26 599 077                    280                    August 30, 2000

second was that other people that the U.S. Government know or suspect to be terrorists attended the conference, conferences. The third was that there, there was a variety of speeches and a lot of rhetoric at those conferences that were indicative of people who support violence, support the violent overthrow of governments and other terrorist threats and assertions. And the fourth was, of course, there was fundraising for the Palestinian Islamic Jihad as depicted in the videotape. We heard yesterday Mr. Cole stipulate to points one and two. That Mazen Al Najjar had, in fact, attended every one of these ICP conferences. We also heard, I believe, a partial stipulation to the fact that some of these other people were at the ICP conferences. The people known as Odi, Nafi, Ghanoushi etcetera, Shallah. So we are left, in our view, with presenting to this Court for sake of efficiency a videotape that really deals with the last two points. The assertions that are being made at those conferences and what they mean and the fundraising for the Palestinian Islamic Jihad. So we now have a tape that is approximately 13 minutes and 30 some odd seconds. It's a composite tape made from the same tapes that we handed to Mr. Cole in court yesterday. We have a certified translation and we assert that because we did, in fact, leave it at the front desk with messages to both Mr. Cole and Ms. Chang, at their hotel rooms, that we have done so, that they've had sufficient time to review it. So therefore, the answer is, we have provided it.

A 26 599 077                     281                     August 30, 2000

JUDGE FOR THE RECORD

Okay, pick up Tape 8.

(TAPE 8)

MR. VARA TO JUDGE

This Court gets to assess that and this case, we have the perfect witness.  Again, not just a Government agent, not just a Government interpreter, but we have Mazen Al Najjar, himself to tell you, Judge, I wasn't at that conference.  Or Judge, that's not what the tape says.  So our position is that if we're going to go forward and I'll make the last point, we are not going to go forward and provide discovery for opposing counsel.  We're here today to allow you a presentation from both sides of evidence that would allow you to make a decision as to whether or not Mazen Al Najjar should remain in custody.  And this is his day.  This is his week.  If, if we are going to go forward on an issue that relates to, as Mr. Cole has said many times, due process, whether or not the U.S. Government is improperly holding Mazen Al Najjar, we should go forward.  If our evidence doesn't meet the bill, then he should be cut loose.  If it does, under the standards applied to aliens in the United States, that he should not be cut loose.  But I think prolonging this issue with arguments that go to technical requirement really belies the purpose the purpose that has been argued by counsel and that is we want to reach due process here and if due process is reached, Mazen Al Najjar gets the determination, second determination from

A 26 599 077                    282                    August 30, 2000

this Court as to whether he should be released from custody.

JUDGE TO MR. VARA

Okay.

MR. COLE TO JUDGE

Your Honor, can I just respond?

JUDGE TO MR. COLE

Yeah.  Sooner or later, we're going to have to come to an issue here.

MR. COLE TO JUDGE

That's right.

JUDGE TO MR. COLE

We can argue this until the cows come home.

MR. COLE TO JUDGE

We are not seeking discovery, we are not arguing that the 500 tapes should be played.  What we're arguing is that we have a fundamental fairness due process right to confront the evidence offered.  That when the Government provides at 12 midnight, a tape that consists of 13 minutes, a tape culled from 500 hours of tape in Arabic.  We have the right to, to take the time to assess whether or not what has been culled has been fairly culled.  That is a, it's permissible for the Government to offer excerpts, but it's permissible for us to offer in rebuttal our fuller transcripts, fuller tapes in order to illustrate whether the excerpts are, in fact, fair representations or unfair representations.  We cannot do that, Judge.  We cannot, why can

A 26 599 077                    283                    August 30, 2000

we not do that, Judge?  Because we didn't get these excerpts until midnight last night because we were also served yesterday with 11 videotapes, all in Arabic, none of which we have had the time to review much less translate.  They say well, Mazen Al Najjar will be able to authenticate the tape.  They're not offering this evidence in Mazen Al Najjar's testimony.  They're offering it with respect to Special Agent West.  In addition, Mazen Al Najjar can't authenticate these.  Mr. West has repeatedly mischaracterized the evidence and when you see the evidence, I think you'll see that he has mischaracterized the evidence.  He says they were fundraising at the conferences.  The tapes will show fundraising at a single event.  They will not show fundraising at the conferences of the ICP.  They will show fundraising at a single event, the event being the April 7th, 1991 event in Cleveland, which I referred to earlier, which was, if you look at the original tape, an event of the Islamic Center of Cleveland, not an ICP event.  Mazen Al Najjar was not there.  How can he authenticate the videotape of an event that he wasn't there?  This tape was seized, not from Wise's offices but from Sami Al Arian's home.  Mazen Al Najjar has never seen this tape.  He never knew about this conference.  How can he possibly authenticate anything with respect to the conference?  He was, as I say, and we stipulate and I don't think we need to spend a lot more time on it.  He attended the annual conferences of the ICP.  One of the things that is interesting about this case, Your

A 26 599 077                          284                    August 30, 2000

Honor, when you see it, is that the Government does not offer a single second of a fundraising appeal at any of the ICP conferences.  Now, we will stipulate that there were fundraising appeals at the ICP conferences.  Why are they not included?  Because there was no fundraising for any illegal activity.  If they had included it, you would have seen fundraising for full lawful activities.  They're not arguing about discovery.  They're not arguing about the necessity for the Court to see 500 tapes.  We're arguing about the necessity for Dr. Al Najjar and his defense team to be able to have a fair opportunity to present this case and not to allow the Government to present its, this kind of excerpts when we do not have the ability to put it into context.  Once we have the ability to put it into context, then it's fine for the Government to put the excerpts in.  But this was a very foreseeable problem and the Government should have foreseen it and should have, could have, could and should have done something about it.  In addition, Your Honor, in addition, that's, that's a basic point of fundamental fairness.  In addition, Your Honor, we have serious, a serious objection to the introduction of this evidence on authentication grounds.  This is, there are much greater concerns with respect to these videotapes and authentication of these videotapes than there are with respect to the photographs, much greater.  As you will see --

JUDGE TO MR. COLE

A 26 599 077                       285                   August 30, 2000

When you say tapes --

MR. COLE TO JUDGE

I'm sorry, what did I say?

JUDGE TO MR. COLE

When you say tapes plural, what are you talking about?

MR. COLE TO JUDGE

Oh, I'm sorry. The tape which was, the tape, the composite tape, which consists of the Government's effort to cull from 500 tapes its 13 minutes of time. These are obviously doctored by the Government. They'll admit that they were doctored by the Government. They picked and chose. They picked and chose. We don't know who took these videos. You know, they seized the videotapes, but we don't know who took these videotapes. We don't know whether they are, whether the person who took the videotapes was taking a full videotape of the event. We don't know whether the events depicted were actual events or fictional events. Again, without the person who took the videotape here to tell us as you would in any court of law, any court of law, State, Federal, Federal District Court or Immigration Court, I took these videotapes. These are what these videotapes purport to be. I was there, they are an accurate depiction. I used a videotape camera, I kept it on for the entire time or I kept it from Time X to Time Y. I did not doctor the tapes, I did not edit the tapes. When you, when we watched these tapes, there are many cuts and edits. They're obviously produced, they are --

A 26 599 077                    286                    August 30, 2000

some of them anyway.  They were produced by somebody.  We don't know who they were produced by.  They were not produced by Dr. Al Najjar, I can attest to that.  They were not produced by Sami Al Arian.  And so they cannot be authenticated.  So we have a threshold issue of fundamental fairness, in that they are 13 minutes culled from 500 hours without giving us any reasonable opportunity, I mean, any opportunity, to effectively assess the fairness of the excerpts.  Number two, we have a fundamental objection to the introduction of unauthenticated videotapes without any evidence as to who took the videotape, whether it is an of an actual event or fake event, whether it is fictional, whether it is real, whether the videotape machine was on the whole time, whether the video was doctored.  And doctored is obviously a loaded term.  I think we can use the term edited.  But I think there will be no dispute that these tapes were edited, they appear to have been edited by the Government.  They also appear to be edited by somebody else.  And, and we don't know who that somebody else is.  The Government hasn't even brought on, to authenticate who they had do the editing.  But that doesn't respond to the basic problem which is we don't know who took these in the first place.  Suppose the Government seized documentaries of, or not documentaries, films, feature films regarding various terrorist events and then they put them together in 13 seconds, in a 13 minute excerpt and offered it to the Court.  Now, I'm not suggesting that that's what the

A 26 599 077                        287                    August 30, 2000

Government has done here. But I am suggesting that the reason that due process requires authentication is to ensure that what is offered in evidence as representing the truth, in fact, represents the truth. And when you have a witness on the stand, you can ask them that question and that's how you get that. When you have a videotape, I cannot ask a videotape a question. I can't ask the person who took the videotape a question. We have a right to cross-examine. That is part of the fundamental fairness that is accorded to Dr. Al Najjar and we are denied that when the offered evidence, which is unauthenticated without our ability to cross-examine the person who created the tapes. So it's both the fundamental fairness of our ability to assess the accuracy and present a truthful picture of what went on and the failure of the Government to authenticate and provide a witness so we can cross-examine so we can assess whether these videotapes are, in fact, accurate, not edited versions of events. And, and the tapes speak for themselves in terms of that they're clearly edited (indiscernible).

MR. VARA TO JUDGE

Very briefly, Your Honor. We go back to the issue of admissibility versus weight. Again, we're, if we're talking about a picture that's taken of something that there's an argument of what it purports to be, perhaps Mr. Cole's arguments would or should carry some weight. But here, again, we have the situation where if you took a picture of me and you sought to

A 26 599 077                    288                    August 30, 2000

introduce it when I'm testifying and the question is, is that you? I don't think there's a question of reliability of that picture. I either say again, that's me, that's not me, whatever. But the Court can see for itself whether it's me or not and make an assessment. That's what we're trying to do here. That's the basic issue. The second is, back to the admissibility versus weight. If, in fact, there is any prejudice and we assert there is none but if Counsel is seeking time to review the tapes, to me, the appropriate way is to allow the U.S. Government to present its case. To allow you to assess whether or not the videotape depicts what we say it depicts through the witness we're going to present, the witness, in fact, is the person with, along with an FBI interpreter, who edited the tapes. So when we present that evidence and we present it through Special Agent West and then when we get to examine the respondent, Mazen Al Najjar, you'll hear, you'll see it. You'll get to hear from them what they think it is. You'll get to make an assessment of how credible they are in what they have told you they think it is or what it is, what the tape is representing and if you need, and if we believe it's an additional requirement, we can present the FBI translator to do it one more time. If Mr. Cole, beyond argument, has anything to assert that, that evidence that indicates that these tapes have been improperly edited, that they are not what they purport to be, I think his case, in rebuttal, the case that we've already all acknowledged is going to happen here allows us

A 26 599 077                    289                    August 30, 2000

for the Government to go forward, present its cases today, tomorrow or whenever we finish, allows him to go back home or wherever he needs to be to review all the tapes and I would like to hear him come back after he's had a chance to do that, and tell the Court, you know what?  The tape that the Government played for you was doctored.  That poster they said was there was not really there on our version of the original copies of the tapes, etcetera, etcetera.  You won't hear that because these tapes are what they purport to be.

MR. COLE TO JUDGE

Your Honor, I've already said I'm not accusing the Government of doctoring the tapes.  What I'm saying is that the tapes are edited.  The tapes are edited by people before the Government ever got the tapes.  That those people are not here, that we have no offer of proof as to the authenticity of these documents.  Sure, the Government edited them.  But if the Government edits from a feature film, that's one thing.  If the Government edits from a truthful film, that's another thing.  And until you have someone who can be examined as to whether or not this is a representation, a true representation of something that went on, then we don't, we have been fundamentally denied our right to cross-examine.  The Government, Mr. Vara, already seems to be that the party offering evidence needs not offer no authentication whatsoever.  The, the other party has the burden of demonstrating inauthenticity (phonetic sp.).  There is

A 26 599 077                    290                    August 30, 2000

absolutely no support for that and I believe that that violates due process.

JUDGE TO MR. VARA

Okay. Now, do you have a transcript, certified transcript?

MR. VARA TO JUDGE

Yes, Your Honor.

JUDGE TO MR. VARA

And you've made that available to Mr. Cole and his --

MR. VARA TO JUDGE

Yes, we have and here's the 13 minute tape. We would like to marked for for identification.

JUDGE TO MR. COLE

Okay, now, Mr. Cole, I'm going to mark this tape and transcript as Exhibit Tape and for identification. Now, Government would like to call Mr. West and put this tape on. Now, the question is, you stated you were unable to proceed at this time because you have not had enough time to review. The question is, how much time do you need to review the documents and the tape?

MR. COLE TO JUDGE

Your Honor, what makes sense from our perspective is to have the ability, I mean, we cannot, in this week and possibly that should be obvious review 500 tapes, review 11 tapes, get them transcribed, get them assessed and with fairness to the editing, assess the accuracy and the fairness of the representation made

A 26 599 077                    291                    August 30, 2000

thereof.  So what we are seeking is to have the Government, not put on evidence that has not been admitted into the record, not play for the Court evidence which is unauthenticated and which we have not had a fair opportunity to present.  But to present the rest of the case and then take a continuance and give us time to prepare and we will come back and we'll resume the case with the tape.

JUDGE TO MR. COLE

I'm not going to let you run the Government's case.  I'm not letting the Government run your case.  And I'm not going to run either cases, but if you want it, if both of you all know how you want to handle your case, you're supposed to know how you want to do it, the question is, the Government wants to put on their tape now.  The question is, do you need time before the Government does it because I'm letting the Government do it.

MR. COLE TO JUDGE

If you're letting the Government do it, then our objection is noted for the record.

JUDGE TO MR. COLE

So you don't, you're basically backing off, now you don't need any time.

MR. COLE TO JUDGE

No, I'm not backing off, Your Honor.

JUDGE TO MR. COLE

Well, you've been asked for time and you're going to get it.

A 26 599 077                          292                    August 30, 2000

If you want the time, I'm going to give it to you.  If you don't, hold your peace forever.

MR. COLE TO JUDGE

All right.  And what I have said is --

JUDGE TO MR. COLE

I don't want to know what you said.  The question is, do you want time now or not?

MR. COLE TO JUDGE

Well, you're putting, Your Honor, you're putting me --

JUDGE TO MR. COLE

You're right, I'm putting you right on the spot.

MR. COLE TO JUDGE

You put me in a very difficult position because on the one hand --

JUDGE TO MR. COLE

That's what you go to law school for.

MR. COLE TO JUDGE

All right, but on the one hand, Judge, my client has been detained unconstitutionally for three and a half years.  I don't want to delay that any more than I have to.  On the other hand, the Government has put us in a position where we're unable to present a fair opportunity, a fair defense.  What I have requested is that we go, in light of the Dr. Al Najjar is now three years, three months unconstitutional detention that we go forward with the rest of the case, not put in, not view a tape

A 26 599 077                          293                     August 30, 2000

which has not been ruled on as as admissible. Until it has been ruled on as admissible.

JUDGE TO MR. COLE

I can't rule on it until I see it. In other words, if you tell me something is in there that's not there or vice versa, I'm going to have to look at it.

MR. COLE TO JUDGE

Well, I -- I think you could look on whether it's authenticated without, if they haven't offered anyone to authenticate it.

JUDGE TO MR. COLE

I've ruled on it, it's coming in.

MR. COLE TO JUDGE

I'm sorry?

JUDGE TO MR. COLE

Mr. West is going to come up here, he's going to review it and I'm going to listen to it and that's where we're going to go.

MR. COLE TO JUDGE

And he's going to authenticate it?

JUDGE TO MR. COLE

I don't know, you're going to have to ask Mr. Grimm, Mr. Vara that.

MR. COLE TO JUDGE

I've played the tape and in view of that.

JUDGE TO MR. COLE

A 26 599 077                294                August 30, 2000

I'm the one determining whether it comes in.

MR. COLE TO JUDGE

Right, I --

JUDGE TO MR. COLE

Not you.  I determine if it's authenticated, if it need be authenticated.

MR. COLE TO JUDGE

No, Judge, and I totally understand that you make the rules here.  I'm just putting our position on the record, for the record.  I'm not suggesting that I should make the rules by any means.  I would like to take five minutes so that I can consult with my counsel given the position that we've been put in, which is to sacrifice our client's interest in either, with either choice, so I'm going to, if I can take five minutes.

JUDGE TO MR. COLE

You can have 10 minutes until after the hour.

MR. COLE TO JUDGE

Thank you.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

Okay.

JUDGE TO MR. COLE

Back to Mr. Cole?

MR. COLE TO JUDGE

A 26 599 077                    295                    August 30, 2000

Your Honor, I, three responses.  One is I note our continuing objection to the failure of the Government to authenticate the document.  Secondly, we will go forward at this time, but I want to correct some errors from the outset, because I think it's important given what Mr. Vara has said and what the transcription, which they have provided for the Court, which is the only English document that anybody has here with respect to what this says.  First of all, the transcript does not identify that the tape is a composite of five separate events.  There is no indication as to which of locations comes from which event.  That is important because when the tape is viewed, you will see that there is fundraising at only one event.  There is fundraising at that event.  There are statements, rhetorical statements made by a person by the name of Faliaz Abudamah (phonetic sp.) asserting that he wants people to donate to the Islamic Jihad, but it is important to, for the record, to note that event is not an ICP conference and that Mazen Al Najjar was not there.  And there is no evidence and will be no evidence that Mazen Al Najjar was there because he was not.  I just want to make that clear, given the ambiguity about what happened yesterday.  There is, so these are five separate events.  They are not indicated a separate events and we would ask that the Government provide us a corrected transcript at some point, that just simply identifies which, which translation which refers to which event, because I think it's obviously important because Dr.

A 26 599 077                    296                    August 30, 2000

Al Najjar was not at an event, that that event has a lot less significance if he is at an event.  So we would ask that.  And then the final thing would be --

JUDGE TO MR. COLE

Give me that one more time, I'm sorry.

MR. COLE TO JUDGE

Well, given the failure of the translation, four page translation which the Government provided to us yesterday, failure in the translation to indicate that this is not a single event, but in fact five separate events.  And given that the focus of this hearing is not Faliaz Abudamah, but Mazen Al Najjar, we want it to be made absolutely clear what was said at which event because it is, we believe, important whether Mazen Al Najjar took part in that event, whether he was there in any way, shape or form.  So we're asking that a transcript be provided, corrected to indicate which translation which refers to which event, that's all.

JUDGE TO MR. COLE

Okay, let me -- don't you think that would be better left until after it was over and then Mr. West will address all those?

MR. COLE TO JUDGE

Yes.

MR. VARA TO JUDGE

Your Honor --

MR. COLE TO JUDGE

A 26 599 077                    297              August 30, 2000

I'm not asking that it be done now. I'm just asking that at some point before the record that we have, we have something the record so this is not the document in the record that appears in the record on its face to be a single event. That's all. I'm not saying that they're trying to make it look like a single event. I'm just saying for clarity purposes, could we have a document which accurately reports that this translation is from this document, from this -- you know, because they're offering five different videos put together in one, we should have an identification of which is which. That's all.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

And then the third thing I would ask is that we be afforded the right to call, recall Sergeant West or Agent West, I'm sorry, at a later time, if necessary to rebut once we've had an opportunity to, in fact, review the full context of each of these tapes and therefore ability to meaningful confront him. I will, I am prepared to go ahead and cross-examine once the Government presents his case. This, given the circumstances, I'm asking that we be afforded the right to call, recall him if and when it proves necessary to rebut in light of the Government's decision to provide erratically shortened excerpts of the original tapes and given our inability to even assess those original tapes.

JUDGE TO MR. VARA

A 26 599 077                    298                    August 30, 2000

Mr. Vara, you had something to say?

MR. VARA TO JUDGE

Yes.   Perhaps Mr. Cole may have missed it but certainly in the hour and 45 minute long tape at the beginning of each segment we do in handwriting show on the tape itself what the seg, what the following segment is from, the conference or the round table or whatever it is.  It is clearly described.  Unless we missed that last night and I don't think we did, that's on this 13 minute composite tape.  So on the tape itself you will see from what occasion, what conference, what meeting, whatever we want to call them, the experts that we provided to the Court came from.

MR. COLE TO JUDGE

And Your Honor, all we're asking is that it be put on paper. That reviewing courts are more likely to look at what's on paper. In addition, in addition, if my recollection serves me correctly and I was not able to view this whole composite, but I do, I did note that at one event and it's specifically this April 7th, 1991 event which is where this person Abudamah says, donate to the Palestinian Islamic Jihad, that that event, the one that Mazen Al Najjar is preceded by two Government, Government created sort of documents that they apparently videotaped.  Once announcing Al Axaca (phonetic sp.) event in 1990 and the next, and then immediately following that another one announcing an event on April 7th, on April 7th, 1991.  So it's actually not clear from their own insertions, I mean, they've created ambiguity in their

A 26 599 077                    299                    August 30, 2000

own insertions.  All I'm asking, Your Honor, is that in the paper record, which is obviously going to be the first thing that anyone looks at it reflect the truth.  And, and it's not a matter, there's no burden on the Government to simply identify, this one comes from the first event.  This one comes from the second event.  This one comes from the third event.  They broke that down when they provided the Notice of Filing.  I simply don't see what the burden is to provide that.  We're not asking that we slow down the proceeding for that.  We're simply asking that that be provided and substituted for this transcript so that the record accurately reflects what the tape depicts.

JUDGE TO MR. COLE

Okay, well let's wait and see.  Maybe after it's all said and done, we'll all know.  Okay.

JUDGE TO MR. VARA

Are you ready to proceed with your witness?

MR. VARA TO JUDGE

Yes, Your Honor.

JUDGE TO MR. VARA

Okay.

JUDGE TO SPECIAL AGENT WEST

Q.   Come forward, Mr. West.

A.   Your Honor, may I (indiscernible) for the table for a glass of water?

Q.   Go right ahead.

A 26 599 077                    300                    August 30, 2000

MR. VARA TO JUDGE

Your Honor, while he's doing that, we'd like very quickly, on Exhibits, where did we -- okay, Exhibits 2, 3, 4, 5 and 6. The objection from counsel is that we had provided no certifications of translations for the documents. We have now had Mr. Vad Gora (phonetic sp.) of the FBI translator review and certify each one of those and we would like to provide to counsel the certification, the same documents. We would also like to provide to the Court documents that we would like to have substituted or we can provide the certification, either one that the Court prefers.

JUDGE TO MR. VARA

Okay. I want to take them in and I want to substitute them. Okay, can we give them --

MR. COLE TO JUDGE

Yeah, we can give them back later.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

Thank you. I just think that there's an error here. The certificates that we've been provided, five certificates, they all say the same thing, which is I do hereby certify that the attached transcription, second composites SA through accurate transcription to the best of my ability with no reference to any of the other documents.

A 26 599 077                          301                          August 30, 2000

MR. VARA TO JUDGE

He's right.  We probably provided the wrong copy.  We will get him the right copy.

JUDGE TO MR. VARA

Okay, great.  Okay.

JUDGE TO SPECIAL AGENT WEST

Q.   And Mr. West, you are reminded you're still under oath.

A.   Yes, sir.

JUDGE TO MR. VARA

Okay, you may proceed, Mr. Vara.

MR. VARA TO JUDGE

Your Honor, at this time, we would like to request permission from the Court to engage in a demonstrative presentation that will involve the playing of a videotape composite prepared from tapes seized from the residences, the residence of Sami Al Arian and the Wise and ICP offices, as previously testified by Special Agent West.

MR. COLE TO JUDGE

Your Honor, just for clarification, Mr. Vara repeatedly says tapes and documents seized from the offices of Wise, ICP or Sami Al Arian's residence.  I think it's actually quite, since Sami Al Arian is not on trial here, Mazen Al Najjar is not on trial here, I think it's quite relevant where documents actually came from.  So I would ask that Mr. Vara be instructed to note precisely where the documents came from and not say, not keep saying or.

A 26 599 077                    302                    August 30, 2000

In many instances, he keeps saying or and the fact that the document came from the residence. And again, this is critical with respect to the tape of the April 7th, 1991 event, which was not seized from Wise offices where Dr. Al Najjar had access but was seized from Sami Al Arian's residence. And we would simply like the record not to be unclear and muddied and sort of, which is kind of assertions that this came from some place or some place else.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. VARA

If you came, through the witness.

MR. VARA TO JUDGE

Through the witness, Your Honor, yes, certainly.

JUDGE FOR THE RECORD

Okay, for the record, the tape is now being played.

MR. VARA TO SPECIAL AGENT WEST

Q. Special Agent West, I am, of course I put it in on pause, but I'm playing right now a videotape and you're seeing the first couple of frames on that videotape. Based on the first screen that you see, do you recognize what you see on this television?

A. Yes, I do.

Q. And how do you recognize it?

A. This is the videotape, the second composite videotape

A 26 599 077 303 August 30, 2000

that was produced by myself and the FBI language specialist, La Gora (phonetic sp.) last night.

Q.   Okay.  Let me go ahead and play the beginning of the tape for you and I'll stop it and ask you to describe for us where the tape is from and what it is that is being done in this particular snippet.  Special Agent West, does that picture have any significance to you as a law enforcement official?

A.   Yes, it's a poster of the Islamic Movement for Palestine.  A poster which was commonly displayed at the ICP conferences that we've been discussing.  And the poster depicts a Star of David in barbed wire and there's additional portions of the poster, I believe below, and there are flags below the Star of David.

Q.   Okay.  Sir, you saw some writing right below that, does that have any significance to you?

A.   Yes.

Q.   Let me rewind it very quickly.

A.   Might I be able to request to be able to review the translation to get the most specific recollection from the wording?

MR. VARA TO JUDGE

Your Honor, I would like to hand Special Agent West what's already been provided to the Court and opposing counsel.  This is a copy of the translation prepared by the FBI specialists along with Special Agent West that relates specifically to this case.

A 26 599 077                    304                    August 30, 2000

JUDGE TO MR. VARA

Okay.

MR. VARA TO SPECIAL AGENT WEST

Q.    Special Agent West, does this language, this Arabic writing that appears on the screen, does that have any significance to you at all?

A.    Yes, it does.  This is a poster and the wording in Arabic is translated by the FBI language translator.  It states that this is the opening session of the conference, of the ICP conference.

MR. COLE TO JUDGE

Your Honor, we have a continuing objection to Agent West who admits that he doesn't speak Arabic telling us what someone else told him the document says, when the Government has the very person in the room who can tell us what the document says in his own words.

JUDGE TO MR. COLE

Overruled.

MR. VARA TO SPECIAL AGENT WEST

Q.    Special Agent West, does that writing say anything else?

A.    Yes, it does.  Specifically it says a word about Islam, the Infinata and the future.  Dr. Sami Al Arian (Palestine) and then the date, Friday, December 22nd, 1988.

Q.    Okay.  Sir, you now have a person that appears on the

A 26 599 077                     305                     August 30, 2000

tape.  Do you recognize that person?

A.    Yes, that's Dr. Sami Al Arian.

Q.    How do you recognize that person?

A.    I personally interviewed Dr. Al Arian in the course of this investigation.  I've encountered him, I've seen photographs on many, many occasions.  I know that's Dr. Al Arian.

Q.    If you know, Special Agent West, without reading from the document, based on your preparation of the tape and the assistance of the FBI interpreter, what is Dr. Sami Al Arian saying at this point?

A.    He's basically, apart from some initial salutations, he is praising certain individuals, several individuals who are martyrs to the, to the Infinata and the Islamic Jihad Movement. He goes on to introduce certain other attendees, invitees to the conference.

Q.    Now, Special Agent West, do you know what Dr. Al Arian is saying at this point?

A.    Well, again, during the course of his entire --

MR. COLE TO JUDGE

Your Honor, I just note that we have a continuing objection to this kind of testimony in which he's reading from a document and paraphrasing a document when he had no knowledge whatsoever in the language which the tape is provided and we have the person who can provide it.  So I note our continuing objection.  I know you have overruled it, but we have that continuing objection.

A 26 599 077                     306                     August 30, 2000

JUDGE TO MR. COLE

So noted.

MR. COLE TO JUDGE

And I do, I guess I also have an objection to the paraphrasing. One thing for Dr., for Special Agent West to be telling us what a videotape says but it's another thing for him to be telling us, in his own words, what a videotape says when he's admitted he doesn't know what the videotape says.

MR. VARA TO JUDGE

Your Honor --

MR. COLE TO JUDGE

The document speaks for itself, the language speaks for itself. There is a translation of the language. We can read the translation into the record but I see no purpose of having Special Agent West give us paraphrases of the document. Here's the best evidence.

JUDGE TO MR. COLE

So you accept it?

MR. COLE TO JUDGE

Well, I accept this as much better evidence than Mr. West's paraphrasing. As I've said, we will accept the translation, when we have time, etcetera. But what I'm saying is we have a document that the Government purports to offer to Your Honor as a certified and accurate translation to what was said. Why don't we simply read that into the record. If Mr. West wants to

A 26 599 077                    307                    August 30, 2000

comment on it, that's fine.  But he's not commenting on it, he's paraphrasing what Mr. Al Arian said when he never had the opportunity to understand in the first instance what Mr. Al Arian said.  So I object to offering paraphrased where we have the actual, at least as offered by the Government, an actual translation of the tape.  The actual translation, we have no objection to reading the actual translation into the record. That's perfectly fine.  If Mr. West wants to read it, fine.  But I see no purpose and I think for him to start paraphrasing the document.

MR. VARA TO JUDGE

Your Honor, that's a wonderful suggestion from Mr. Cole. I think what we could do is play up to the point where each segment stops.  And then have Special Agent West read what's been said as he knows it from the FBI interpreter.

MR. COLE TO JUDGE

I take it he's reading it from the document?

MR. VARA TO JUDGE

From the translation.

MR. VARA TO JUDGE

Right.

MR. COLE TO JUDGE

I'm happy to have him read it from the translation.

JUDGE TO MR. COLE AND MR. VARA

Okay.

A 26 599 077                        308                    August 30, 2000

MR. VARA TO SPECIAL AGENT WEST

Q.    Special Agent West, please read up to the portion that begins poster states.

A.    Sami Al Arian stating, --

SPECIAL AGENT WEST TO JUDGE

A.    And Your Honor, some of these are Arabic names, do you want me to spell them or is this sufficient?

Q.    No, it's sufficient.

SPECIAL AGENT WEST TO MR. VARA

A.    Mohammad Jamal (phonetic sp.), Achmad Elis (phonetic sp.), Siad Brieda (phonetic sp.) and Sami Al Sheik Calel (phonetic sp.).  God have mercy on the souls of the martyrs of Nema Soul (phonetic sp.).  Habu Kassan Kassan (phonetic sp.) Andi Norwan (phonetic sp.).  God have mercy on the soul of Ismail Al Farouki (phonetic sp.).  You are shining planets on your long night.  Dear brothers and sisters, we meet here today and through our Great Islam.  We also received the wishes for success of all the honorable scholars who could not be present at this conference.  Some of these scholars, as you know, from the programs or of the conference are Sheik Abdel Hamed Kisk (phonetic sp.) from Egypt; Sheik Abdelrachman (phonetic sp.) from Egypt, Sheik Asad Bayoud Al Famini (phonetic sp.) from Palestine, who apologized for not being able to leave their countries because of the authorities.  Sheik Adbul Al Zolda (phonetic sp.), the Iman of the Isoden Al Kassan in Gaza who was deported from

A 26 599 077                         309                    August 30, 2000

Palestine, because he was the symbol of the Infinata in Palestine and Sheik Siad Shabon (phonetic sp.), the prince of the Unification Movement in Lebanon and Dr. Fati Abdel Ziss (phonetic sp.) from Palestine, who was also deported from Palestine because he is accused of leading the Jihad in Palestine.  Those three could not attend because they could not get visas from the U.S. Embassies.  Dr. Abdela Hassan (phonetic sp.) also sends his salutations to the conference and he has not been able to be with us due to the political conditions in Afghanistan.  Death to Israel, open parentheses, crowd repeats after him.  Victory to Islam.  Death to Israel, close parentheses.  Death to Israel, victory to Islam.  Parentheses, crowd repeats.  Victory to Islam, death to Israel.  Close parentheses.  Revolution, revolution until victory.  Parentheses crowd repeats.  Revolution, revolution until victory.  Close parentheses.  Rolling, rolling towards Jerusalem.  Crowd repeats, rolling, rolling toward Jerusalem.  God willing, Dr. Basheer Nafi will direct this conference.  And then Sami Al Arian directs Nafi to proceed to podium.

MR. COLE TO JUDGE

I would, just for the record, note that there are several ellipses in the translation in which indicate edited portions.

MR. VARA TO JUDGE

We stipulate that this tape has been edited.

JUDGE TO MR. COLE

A 26 599 077                    310                    August 30, 2000

Okay.

MR. COLE TO JUDGE

I guess I would ask that when Sergeant, when Agent West reads the translation, that he identifies ellipses as appropriate.

JUDGE TO SPECIAL AGENT WEST

Q. Okay, if you can do that.

A. Yes, Your Honor.

MR. VARA TO SPECIAL AGENT WEST

Q. Special Agent West, I'm showing you a frame that says Second Annual ICP Conference. Do you recognize that?

A. Yes, it's the handwritten lead in to the next portion of the videotape that was produced last night.

Q. From the 1989 conference?

A. Yes, the second ICP conference, December of 1989.

JUDGE TO MR. VARA

So you, okay, for the purposes now, we're going to another one, right? Okay. So we can draw a line right there.

MR. VARA TO JUDGE

Right, that's great, Your Honor.

JUDGE TO MR. VARA

Okay. And that will be where, St., Chicago?

MR. VARA TO JUDGE

I believe so.

SPECIAL AGENT WEST TO JUDGE

A 26 599 077                    311                    August 30, 2000

A.   Yes, Your Honor, Chicago.

JUDGE TO MR. VARA

Okay.

MR. VARA TO SPECIAL AGENT WEST

Q.   Special Agent West, I'm showing you a frame here based on your knowledge and work with law enforcement in the area of counter-terrorism, does this poster have any significance to you?

A.   Yes, it's admittedly somewhat blurred but it's a poster showing basically the outlying of the country of Israel and it is, it contains within that outline, photographs of individuals who are purported to be martyrs or people who have been killed or injured or wounded or imprisoned on behalf of the Intifada and the Islamic Jihad effort.

Q.   Now, Special Agent West, it's hard to tell now but there's writing on this.  Before I move on to the next frame, can I read from the transcript the notes of the, on the transcripts?

A.   Yes.  Again this was the translation by the FBI language specialist.  Poster states, quote, all of Palestine is ours, unquote.  Quote, and our witnesses are our martyrs, end quote.  The martyrs of the Intifada.  Long live Palestine, free and Islamic.  Poster displays photographs of martyrs in the form of a map of Palestine.

(TAPE 10)

MR. VARA TO JUDGE

Do you want me to proceed?

A 26 599 077                      312                      August 30, 2000

JUDGE TO MR. VARA

Yeah, go ahead.

JUDGE FOR THE RECORD

Tape 10.

MR. VARA TO SPECIAL AGENT WEST

Q.   Now, sir, did you recognize the person that just spoke?

A.   Yes, that was Dr. Sami Al Arian.

Q.   Can you read from the transcript?

A.   Sami Al Arian stating, quote, and I leave you now with the brother, the director of the program, Brother Mazen Al Najjar, who will talk to you and brief you about the conference and the parts of the conference and the program and the speakers, unquote.

Q.   Before I move on, Special Agent West, do you recognize the items depicted in the left side of the picture here?

A.   To the far left?

Q.   Far left.

A.   Yes, that is the poster that was in the previous frame or the two previous frames, the outline of this country of Israel/Palestine with the photographs of the martyrs.

Q.   Special Agent West, do you recognize the person who just spoke?

A.   Yes, the respondent, Mazen Al Najjar.

Q.   And how do you know that to be the case?

A.   I have over the course of several years personally seen

A 26 599 077                          313                    August 30, 2000

Dr. Mazen Al Najjar as a result of this investigation, observed many photographs and videos of him.

Q.   Sir, can you read from the transcript to what Mazen Al Najjar was stating as depicted on the videotape?

A.   Mazen Al Najjar stating, quote, ellipse, and number of the youth of the Islamic Movement, may God reward him for us. Also, honor us, God, willing at this, at this meeting, Honorable Sheik Abdel Al-Zes Odi (phonetic sp.), the Iman of Isoden Al Kassan Mosque (phonetic sp.).  And the professor at the college of Sharia at the Islamic University in Gaza.  He was the first of the deportees from Palestine for his primary role in the Jihadi mobilization against the occupation.  Sheik Rashed Al Denusi (phonetic sp.), genuine Islamic thinker and the guide and leader of the Islamic Movement in Al Nada Party (phonetic sp.) in Tunisia.  He is also the most interested among the leaders of the Islamic Action in the central cause of which he has his own writings and works, unquote.

Q.   Special Agent West, I know there's been testimony before, but in your capacity as a federal agent, working in counter-terrorism investigations, does the name Sheik Abdel Al Zolda have any significance?

MR. COLE TO JUDGE

Asked and answered several times.

MR. VARA TO JUDGE

If they'll stipulate that it's the same Sheik Abdel Al Zolda

A 26 599 077                        314                    August 30, 2000

that we've described as one of the founders of the Islamic Jihad Organization certainly.

MR. COLE TO JUDGE

I will stipulate that he's asked and answered.  I won't stipulate to the accuracy of what he's previously stated.

JUDGE TO MR. COLE

Okay.  In other words, you'll stipulate that it was said by --

MR. COLE TO JUDGE

Yeah.

JUDGE TO MR. COLE

Previously but you don't, you don't accept it.

MR. COLE TO JUDGE

Sure.

JUDGE TO MR. COLE

You don't accept it as valid?

MR. COLE TO JUDGE

Exactly.

JUDGE TO MR. COLE

Okay.

MR. VARA TO JUDGE

We'll move on then.

MR. VARA TO SPECIAL AGENT WEST

Q.   Special Agent West, can you, first of all, do you recognize the person that was just shown seated at the table

there, with the, the one on the far left side?

A. Yes, that was Abdel Zes Odi.

Q. Special Agent West, can you read from the transcript?

A. Yes. Unidentified speaker introduces Sheik Abdel Zes Odi and states, quote, Sheik Abdel Zes Odi is from Gaza and is the Iman of Isoden Al Kassan Masque and professor at the College of Sharia at the Islamic University in Gaza. He was the first of the deportees in Palestine for his role in the Jihadi mobilization of the masses in the Gaza strip and that was one of the principle elements later on in the eruption of the Intifada Intifada. He was also deported because he was considered as a guide for the Youth of the Islamic Jihad. He will talk to us today, god willing, about the dimension, parentheses one of the principle ellipse Intifada closed parentheses, end quote.

MR. COLE TO JUDGE

Your Honor, if we could just, if I could ask that Mr. Vara rewind for just a moment, because this, I just want to point out to the Court that this is the moment in which the Government has, has two identifying, contradictory identifying indications for the following men. For the record, we can see that as we went through it. See, there was one for round table and one for (indiscernible).

MR. VARA TO JUDGE

We'll stipulate that that's the case, Your Honor. We put the, we put the identifier there. We have one thing that we are

A 26 599 077                    316                    August 30, 2000

putting on the tape from that particular round table conference, the (indiscernible).

JUDGE TO MR. VARA

And that's the one from Cleveland?

MR. VARA TO JUDGE

That's the one that just previously showed.

JUDGE TO MR. VARA

Okay.

MR. COLE TO JUDGE

But not the one from Cleveland?

MR. VARA TO JUDGE

No.  This one that is coming up here.

JUDGE TO MR. VARA

Okay.  Cleveland is coming up.

MR. VARA TO JUDGE

Right.  Let me do it again.  That is one of the frames that shows up on the original hour and 45 long, minute long tape.  We did not take any extra to put on this 13 minute tape from that, but we did put the frame on there.

JUDGE TO MR. VARA

So there's nothing from Al (indiscernible).

MR. VARA TO JUDGE

From 5-90, right.

JUDGE TO MR. VARA

Okay.

A 26 599 077                    317                    August 30, 2000

MR. VARA TO SPECIAL AGENT WEST

Q.   Special Agent West, do you recognize what is depicted on this frame?

A.   Yes, again, the cut in handwritten frame identifying the next segment, round table Jihadi in the Intifada, Cleveland, Ohio, April of '91.

Q.   Special Agent West, before we get to the transcript, do you know who that person was who was speaking based on your experience and investigative work into law enforcement agents?

A.   Yes, it was Faliaz Abudamah, who is --

Q.   That you previously identified as --

A.   Yes.

Q.   As Damra (phonetic sp.)?

A.   Correct.

JUDGE TO SPECIAL AGENT WEST

Q.   Okay, now before you proceed.  The last word in both photographs says Intifada.

A.   Yes, sir.

Q.   Now that is, that portion was in Chicago?

MR. VARA TO JUDGE

Right, was in Chicago.

JUDGE TO MR. VARA

So we need to draw a line there and the next one is going to be Cleveland.

MR. VARA TO JUDGE

A 26 599 077                        318                        August 30, 2000

That's correct.

SPECIAL AGENT WEST TO JUDGE

A. Yes, sir.

Q. Okay.

MR. COLE TO JUDGE

And I would just note for the record, Your Honor, that this aspect of the Cleveland tape appears to have been edited a couple of times, not by the Government. Just for the record that it's not a complete and not a complete representation of an event but it actually, some, there were two breaks during that period of time (indiscernible).

JUDGE TO MR. COLE

Okay. And as I understood, you also stated that Dr. Al Najjar was not at the Cleveland event?

MR. COLE TO JUDGE

That's right. And just for the record, the Al Axaca event, which they left the title for and was in an event in which Mazen Al Najjar was the only speaker on the original composite that they gave us, the Al Axaca event, the only speaker was Mazen Al Najjar.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

They decided that was not, apparently was not worth submitting. So just to make clear, the Al Axaca event, Mazen Al

A 26 599 077                    319                    August 30, 2000

Najjar was speaking but the Government is not offering that as evidence. This event, Mazen Al Najjar was not present, it's the Cleveland event.

JUDGE TO MR. VARA

Okay, do you want to offer the Cleveland one later? I mean, the Al Axaca where he spoke. You can do that.

MR. VARA TO JUDGE

Thank you.

MR. VARA TO SPECIAL AGENT WEST

Q. Sir, you identified the speaker as Damra. Did you see somebody pass behind Damra?

A. Yes, it was Sami Al Arian.

Q. Sir, can you read now from the excerpt on the transcript?

A. Yes. Faliaz Abudamah stating, quote, ellipse, tonight Dr. Sami Al Arian, ellipse, he is the president of the Islamic Committee for Palestine and the short briefing about the Islamic Committee for Palestine. It is the active arm of the Islamic Jihad Movement in Palestine and we like to call it the Islamic Committee for Palestine here for security reasons (subject changes due to cut in original videotape). Damra continues. Those who do not receive the support of the Intifada and the monies earmarked for the children of the Intifada, ellipse, end quote.

MR. COLE TO JUDGE

A 26 599 077                    320                    August 30, 2000

I would just note for the record that I think there was also a cut in the videotape, the original videotape above where it says he is the president of the Islamic Committee for Palestine, right there, there's some kind of a break.

JUDGE TO MR. COLE

Right.  But I think they zeroed in or zeroed out.

MR. COLE TO JUDGE

The zero in and zero out I think was later.  But so there are two breaks.  I don't believe they were made by the Government.  I believe they were made by whoever made this tape, but we don't have this person so we can't pass that (indiscernible).

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

And I would note our continuing objection.  I think this, Your Honor ought to take that into account.

JUDGE TO MR. COLE

So noted.

MR. COLE TO JUDGE

In ultimately deciding on this case.

JUDGE TO MR. COLE

I will.

MR. COLE TO JUDGE

Thank you.

A 26 599 077                      321                  August 30, 2000

MR. VARA TO SPECIAL AGENT WEST

Q.   Sir, do you recognize this person that appears about to speak?

A.   Yes, Dr. Sami Al Arian.

Q.   Can you read from the transcript?

A.   Sami Al Arian stating, quote ellipse, protest during the oppressive war, why did we stop?  Let us continue to protest.  Let us damn America, let us damn Israel, let us damn their allies until death.  Why do we stop?  End quote.

Q.   Do you recognize this person with the microphone in his hand?

A.   Yes, that's Faliaz Abudamah.

Q.   Special Agent West, can you read from the transcript?

A.   Faliaz Abudamah stating, quote, donate to the Islamic Jihad end quote.  Nedal Zaloum (phonetic sp.) from the Islamic Jihad held a dagger and stabbed four of the Jews in the courtyard of Al Harran Apudizi (phonetic sp.) ellipse for the Intifada, for the Islamic Jihad.  I say it frankly for the Islamic Jihad.  I say it frankly for the Islamic Jihad.  The Jihad there is still erupting in Palestine from village to village.  I tell you it is not the organizations, it is not for the organizations with respect to everyone but for the Jihad.  The Jihad.  One of them would leave his house with a knife to stab the Jews.  12 Jews after the events of the Gulf War.  The brothers, the Intifada calls you.  $500.  Who would add to $500?  Who would add to $500?

A 26 599 077                         322                    August 30, 2000

If you write a check, write it for the Islamic Committee for Palestine, ICP.  Who would add to the $500 of Haj Achmad (phonetic sp.)?

Q.   Special Agent West, based on your investigative activities as a federal law enforcement agent, do you recognize the Islamic Committee for Palestine?  Does it have relevance to you?

A.   Islamic Committee for Palestine is the organization that was headed by Sami Al Arian with Mazen Al Najjar as another manager along with several others and they were involved in arranging conferences and other events, which brought in various terrorist leaders that we've identified before and wherein fundraising occurred.

MR. VARA TO JUDGE

Your Honor --

MR. VARA TO SPECIAL AGENT WEST

Q.   Oh, Special Agent West, I'm showing you a frame here. Do you recognize that frame?

A.   Yes, that's again the lead in frame to the 4th Annual ICP Conference, December '91, Chicago.

JUDGE TO SPECIAL AGENT WEST

Q.   Okay, 01 Chicago and so at the end of --

MR. VARA TO JUDGE

Haj Achmad.

JUDGE TO MR. VARA

A 26 599 077                    323                    August 30, 2000

Yeah, we would put a line through and now add Chicago.

Okay, you may proceed.

MR. VARA TO SPECIAL AGENT WEST

Q.    Special Agent West, can you read from the transcript?

A.    Yes.  Suli Mandeo (phonetic sp.) stating, quote, ellipse, Isodene and the membership of the brothers Mazen Al Najjar, Badi Ali (phonetic sp.) Suli Mandeo, end quote.

MR. VARA TO JUDGE

I need to rewind for a second, Judge, I skipped over that entry frame there.

JUDGE TO MR. VARA

Okay.

MR. VARA TO JUDGE

It goes very quickly.

JUDGE TO MR. VARA

Okay, that's the 5th Annual.

MR. VARA TO JUDGE

Right.

MR. COLE TO JUDGE

I'm sorry, where does the break come from?

MR. VARA TO JUDGE

Right after Suli Mandeo.

JUDGE TO MR. COLE

In other words, there's just two lines there.

MR. COLE TO JUDGE

A 26 599 077                    324                    August 30, 2000

From the 4th Annual Conference, there's just the two lines.

JUDGE TO MR. VARA

Yeah, that's my understanding. Is that right for everybody? All right. Okay. Now we're going to Chicago again for the 5th Annual Conference?

MR. VARA TO JUDGE

Yes, Your Honor.

MR. COLE TO JUDGE

And just for the record, Your Honor, I'll, just from the first frame, you can see that this again was a, a film edited by somebody I assume not the Government given the zooming in and zooming out.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

Package.

JUDGE TO SPECIAL AGENT WEST

Q. And the date of the 5th Annual Chicago Conference was what?

A. December of 1992, sir.

Q. Okay. And this was ICP Wise?

A. ICP, sir.

MR. VARA TO SPECIAL AGENT WEST

Q. Special Agent West, did you recognize that person on that videotape?

A 26 599 077                    325                    August 30, 2000

A.   Yes, it was Ramadan Abdallah Shallah.

Q.   Same Shallah who used to work for Wise here in Tampa?

A.   That's correct.

Q.   The same Shallah who is now the head of the Palestinian Islamic Jihad organization?

A.   Yes, sir.

Q.   Thank you.  Do you recognize this frame, sir?

A.   Yes, it's --

MR. COLE TO JUDGE

Your Honor, before we go there, please read from the transcript.

MR. VARA TO JUDGE

Sorry.

SPECIAL AGENT WEST TO MR. VARA

A.   Ramadan Abdallah Shallah stating, quote, and the sister who was saying, the first solution is to topple the regimes when we call for toppling the regimes.  Will it be a picnic for Jihad? Now, when we go to topple the regimes, will it be a picnic, meaning Sunday picnic or Jihad?  Now, how do we topple the rulers?  I say to you, we topple the rulers with Jihad.  I propose a way.  I say toppling the rulers and rubbing their nose in the dirt in Jihad against them is not terrorism, end quote.

MR. COLE TO JUDGE

Just for the record, Your Honor, I believe that the transcript omits a sentence, not that it matters, particularly,

A 26 599 077                    326                    August 30, 2000

but omits a sentence of Mr. Shallah's in English that follows sentence now when we go to topple the regime, it will be a picnic, meaning Sunday picnic or Jihad. I think he says, it is the Jihad or something, it is the Jihad, something along those lines.

MR. VARA TO JUDGE

Your Honor, that's for the other side to present in their rebuttal case, if in fact we miss material, a sentence that they believe is material.

MR. COLE TO JUDGE

I'm just trying to correct the record, Your Honor.

JUDGE TO MR. COLE

Very well.

MR. COLE TO JUDGE

They're offering this as a true and accurate transcript and, and when it's obvious from the record we might as well clear it up and clarify.

JUDGE TO MR. COLE

Okay. So I'll note that you took issue with that and added a sentence.

MR. VARA TO SPECIAL AGENT WEST

Q. Special Agent West, do you recognize this frame?

A. Yes. The lead in frame, the 5th Anniversary of the Battle of Alshujahia (phonetic sp.) (BIS versus IPF). The lead in frame representing the next segment.

A 26 599 077                    327                    August 30, 2000

JUDGE TO SPECIAL AGENT WEST

Q.   Do we know where that is?

A.   I'm not sure, Your Honor.   I believe it may have been Chicago, but frankly I'm not sure at this point.

Q.   Okay.   And so that is, that would be line above poster displayed?

A.   Yes.   Yes, Your Honor.

Q.   Okay.   Whereabouts unknown.

MR. COLE TO JUDGE

Just for a moment, Your Honor, do we have a date for this? I don't think there was a date.

SPECIAL AGENT WEST TO JUDGE

A.   I don't believe there was.

MR. VARA TO SPECIAL AGENT WEST

Q.   This is the conference that we previously identified as either, we believe it was late '92, early '93, but probably late '93.   Do you have some information on that, Special Agent West?

SPECIAL AGENT WEST TO JUDGE

A.   Well, if I might elaborate a little bit, Your Honor?

Q.   Yes.

A.   On the date issue.   The battle of Alshujahia, which is referenced there occurred in 1987.   So we're assuming the 5th anniversary would be 1992.

Q.   Okay.

MR. COLE TO JUDGE

A 26 599 077                    328                    August 30, 2000

And the parentheses, PIJ versus IPF.  Is that editorial, some editorial observation by the Government?  Or what is that specifically?  PIJ versus IPF.  Where did that come from?

MR. VARA TO JUDGE

We don't know, Your Honor (indiscernible).

MR. VARA TO SPECIAL AGENT WEST

Q.   Do you know?

JUDGE TO SPECIAL AGENT WEST

Q.   Mr. Wise got asked.

A.   Mr. West, Your Honor.

Q.   I'm sorry.  Go ahead.

A.   I'm not sure I'm wise any more.  That actually that was my editorial reference just for our own internal purposes.  I can explain, would you like me to explain what it means?

JUDGE TO SPECIAL AGENT WEST

Q.   If you would, Special Agent West.

A.   PIJ meaning Palestinian Islamic Jihad versus the Israeli Defense Forces.  The battle was a fight between the Israeli army and Islamic Jihad fighters.

JUDGE TO MR. COLE

Now, Mr. Cole, as I understand, you state that the respondent was not at this conference.

MR. COLE TO JUDGE

That's right.

JUDGE TO MR. COLE

A 26 599 077                    329                    August 30, 2000

Okay.

MR. VARA TO SPECIAL AGENT WEST

Q.   Special Agent West, it's very brief and the other poster started to come on, but you recognize what this frame depicts when you worked with the FBI translator?

A.   Yes, it's a poster, which is a lead in to a number of other posters that we'll see momentarily.  Would you like --

Q.   I think what we'll do, we'll go through the posters and I'll have you read the transcripts, like you did with the others.

MR. COLE TO JUDGE

I'm sorry, can you stop for one moment?  I just want to ask the Judge to watch this, again for authentication purposes, watch this part because I believe it is not clear that, that pictures and pictures that are being presented actually are from an event or were added in some subsequent produced document.

JUDGE TO MR. COLE

Okay.  We'll --

MR. COLE TO JUDGE

That's the video.

JUDGE TO MR. COLE

Okay, why don't we ask Mr. West.

JUDGE TO SPECIAL AGENT WEST

Q.   The posters --

A.   Your Honor, those posters and the scenes that are going to be depicted are from the original tape that was seized during

A 26 599 077                    330                    August 30, 2000

the search warrant operation that was identified from the seizure as the videotape of this event.

MR. COLE TO JUDGE

I'm not suggesting that the Government added them.  I'm just suggesting that whoever made this videotape put, there's a long introduction here, which includes lots of posters and singing and there's a picture of Al Axaca Masque in, in Jerusalem.  I assume we're not representing that this, this took place in Jerusalem or that this picture was at the event.  All I'm indicating is that the production of this video appears to include a long introduction of a number of posters and photographs, etcetera.  And there's no indication that those posters were, in fact, from the event.  There is subsequently footage of the event, where there are some posters, but there's no indication that they, the whole length, a whole long list in here and it all appears they're all photographed in the same setting.  It actually appears that there is, they are taken in some kind of a studio rather than added (indiscernible).

JUDGE TO MR. COLE

Okay, so you're --

MR. COLE TO JUDGE

I just want to make that clear for authentication purposes, that again, given that we don't have the person who made the videotape here.  We can't say, if the Judge considered it relevant, were these posters at the event or were they not?  Were

A 26 599 077                     331                August 30, 2000

they added in by you?  Why did you add them in after?  Etcetera, etcetera.

JUDGE TO MR. COLE

Okay.  So noted.

MR. VARA TO SPECIAL AGENT WEST

Q.  Special Agent West, again, why is this information included on this excerpt of the videotape?

A.  All these scenes that we're going to see for this segment were contained in the original videotape marked for this event that were on the original videotape seized from, I believe it was the Wise office.

Q.  Wise, World Islamic Studies Enterprise?

A.  Correct, correct.

Q.  Here in Tampa?

A.  Yes.

Q.  Independent of this tape, Special Agent West, based on your experience as a federal law enforcement agent involved in counter-terrorism investigations, does this symbol displayed on here have any significance to you?

A.  Yes.

Q.  Can you tell us what it is?

A.  It's the symbol of the Palestinian Islamic Jihad organization.

JUDGE TO SPECIAL AGENT WEST

Q.  And what is, which one would you, on the page three,

A 26 599 077                    332                    August 30, 2000

where, which one would that be?  Would that be Palestinian flag with the symbol of the Islamic Jihad?

A.  Yes, sir, that would be correct.

Q.  Okay.

MR. VARA TO SPECIAL AGENT WEST

Q.  Special Agent West, can you read from the transcript that identifies the posters that we've just reviewed?

A.  Yes.  Beginning at the bottom of page two, poster displaying quote, Palestine Islam Jihad end quote.  Quote, the Islamic Jihad Movement Palestine end quote.  Another poster.  Quote, the flame of the Intifada will burn all the bargainers on Palestine end quote.  Poster displaying the salute to the Sheik of the Musja Hadin (phonetic sp.) and the first of the deportees.  Abdel Zes Odi.  With a nationalist song being played in the background.  Then the Palestinian flag with a symbol of the Islamic Jihad and Palestine.  Again, nationalistic song in the background.  Poster displaying, quote, it is Jihad, victory or martyrdom, end quote.  Poster displaying, quote, the Musja Hadin Nedal Zaloum, the hero of the operation of Jaffa Street (phonetic sp.) in occupied Jerusalem, end quote.  With a photograph of an individual carrying a small Koran.  Poster displaying previous photo with notation.  In the courtroom, the Koran is the path to victory, the symbol of the Islamic Jihad in Palestine is next to the picture.  The Islamic Jihad Movement in Palestine at the bottom of the poster, that's the writing at the bottom of the

A 26 599 077                    333                    August 30, 2000

poster, Islamic Jihad Movement in Palestine. Next poster displaying the dome of the Rach Mosque surrounded by barbed wire in the shape of the Star of David overlaying the outline of the country of Israel. Next poster displaying pictures of male individuals with the Palestinian Islamic Jihad symbol on the top of the poster with a Koranic verse. Next poster of a male individual with wording, quote, the living martyr, the Musja Hadin, Abdul Al Fadi (phonetic sp.). Sulla (phonetic sp.) meaning the hero of Al Kastal (phonetic sp.) operation. An illegible date and then he was sentenced to life in prison. The Islamic Jihad Movement in Palestine, end quote. The next poster with the symbol of Islamic Jihad Movement in Palestine and photos of people killed or injured, quote, wording in quote, massacre of an ineligible word, end quote. The poster is signed by the Islamic Jihad Movement in Palestine. And the last line is illegible. Next poster, poster with a symbol of Islamic Jihad Movement in Palestine with bearded men and the Koranic verse. The, and the previous poster is repeated with additional pictures reading and that's, you can see the poster but it's stepping down with the view of the same poster. Reading, quote, annual anniversary of the Battle of Alshujahia, 6-10-1987 and the start of the Intifada, end quote. And the remaining is illegible. The photo, the poster shows the barrel of an assault rifle in the center of the poster. The poster with the symbol of Islamic Jihad Movement in Palestine. The first word is illegible, quote,

A 26 599 077                    334                    August 30, 2000

A.    The three men were Sami Al Arian, Faliaz Abudamah and Adbul Al Zolda.

MR. VARA TO JUDGE

And if I could rewind (indiscernible), Judge.

MR. VARA TO SPECIAL AGENT WEST

Q.    Can you read from the transcript, Special Agent West?

A.    Gassan Balout (phonetic sp.) stating, quote, ellipse, to Palestine from the sea to the river. Yes to Jihad and arms struggle. Long live the heros of the Islamic Jihad. Long live the heros of Alshujahia. Long live our struggling people. God is great, glory to Islam, God is great, victory to Islam, end quote.

JUDGE TO SPECIAL AGENT WEST

Q.    Before we proceed, what is Alshujahia?

MR. VARA TO JUDGE

Alshujahia?

JUDGE TO SPECIAL AGENT WEST

Q.    That's the battle?

A.    Yes, Your Honor, that's the Battle of Alshujahia that occurred in 1987, that this event commemorated.

MR. VARA TO SPECIAL AGENT WEST

Q.    I'm showing you photographs, prints here. Do you recognize the person who appears in this frame?

A.    Yes, that's Sami Al Arian.

Q.    And, sir, do you recognize or does the poster directly

A 26 599 077                337                August 30, 2000

above the head of Sami Al Arian have any significance to you in your capacity of a federal law enforcement official?

A.   Yes, it's a poster that has been displayed in a number of these conferences.  It's a poster that we have identified as the, the big poster is the Sheik Al Kassan with the dome of the Rach and the wording underneath is the Islamic Committee for Palestine or the symbol.  There's a symbol that you can't really see it there, but there's a better picture, there's a symbol of the Islamic Jihad Movement of Palestine on that poster.

Q.   Who is Al Kassan, if you know?

A.   He's, he is the, one of the founding members of the Muslim Brotherhood.  I believe he died in 1948.  Family member of one of the, of one of the Islamic Movements.

Q.   That smaller poster there, that appears between the two larger ones.  Does that have any significance to you, Special Agent West?

A.   Yes, it's the Palestinian flag with the PIJ symbol in the top.

Q.   Now, sir, again, who, do you recognize who that was speaking?

A.   Sami Al Arian.

Q.   Can you read from the transcript, sir?

A.   Sami Al Arian, parentheses, under Palestinian Islamic Jihad banners closed parentheses stating, quote, ellipse and what happened to them in the path of God and they did not weaken or in

A 26 599 077                    338                  August 30, 2000

God loves the forebearing ways.  And what they said that, ellipse, did we forget the Jews and the sons of the Jews?  God warns us in the Koran, from the sons of Israel, that he cursed them and the holy Koran.  He cursed those who are the sons of Israel, through David and Jesus, the son of Mary.  Because of their disobedience and the use to assail.  They were not held by any prohibition that they committed.  Those people, God made monkeys and pigs.  They kicked you out of your homes.  They gathered to kick you out of your homes.  And who did this other than the colonialists, arrogant Americans, Europeans and NATO. How do we negotiate under their table ellipse Mohammad is leader, the Koran is our constitution, Jihad is our path.  Victory to Islam, death to Israel, revolution, revolution until victory. Rolling, rolling to Jerusalem.

MR. VARA TO JUDGE

I need to rewind for a second here, Your Honor.

MR. VARA TO SPECIAL AGENT WEST

Q.   Special Agent West, do you recognize the man that's depicted in the still frame here?

A.   This is Faliaz Abudamah, the model of the mosque in Cleveland.

Q.   Special Agent West, can you read from the transcript?

A.   Faliaz Abudamah is stating, quote, until ellipse the enemy ellipse it's pride ellipse.  Unless we all move towards kicking out the sons of monkeys and pigs from the land of Gisara

A 26 599 077                      339                    August 30, 2000

(phonetic sp.) and Mirage.  Ellipse, directing all the rifles at the first and last enemy of the Islamic nation and that is the sons of monkeys and pigs, the Jews, end quote.

MR. COLE TO JUDGE

Your Honor, I would just again note for purposes of authentication, our objection to the omission, that there are, in a single, in two sentences here, there are one, two, three, four ellipses.

JUDGE TO MR. COLE

That was your objection?

MR. COLE TO JUDGE

That --

JUDGE TO MR. COLE

So noted.

MR. COLE TO JUDGE

It's going to the issue which hasn't been decided, which is given we don't know who made this tape and we, it's obvious from that, that it is not a complete tape.  It is a tape which has been edited and apparently not by the Government.  That without the person who edited to appear here and tell us why they edited and what was said between the ellipses, it's impossible to know what went on.  I also, (indiscernible).

JUDGE TO MR. COLE

Okay.

JUDGE FOR THE RECORD

A 26 599 077                     340                 August 30, 2000

Go to tape 11.

(TAPE 11)

JUDGE FOR THE RECORD

Pick up on Tape 11, 30 August, 26 599 077.

JUDGE TO MR. COLE

Okay, you were wrapping up?

MR. COLE TO JUDGE

I, I also note that we will have objections to translation of, of some of this, although I don't think it's particular material, particularly with respect to this last event, since Mazen Al Najjar was not there, there's been no evidence that he was there.  And I do object to the Government offering, offering highly inflammatory prejudicial rhetoric without any real connection with the charges here.  Whether Sami Al Arian and Faliaz Abudamah said these things or not, it simply does not reflect on whether Mazen Al Najjar is a threat to national security and it's interesting that the Government decided not to show you what Mazen Al Najjar said and instead to show you what the other individuals said.  So I just point to that.

JUDGE TO MR. COLE

Okay.

JUDGE TO SPECIAL AGENT WEST

Q.   Mr. West.

A.   Yes, Your Honor.

Q.   Going back to the transcript, second composite

A 26 599 077                    341                    August 30, 2000

MR. COLE TO JUDGE

Just to clarify for the record, there isn't, he keeps referring to the Wise offices. In fact, he's testified before that there was one office, Wise and ICP both. So it's just --

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

He keeps calling it the Wise offices.

JUDGE TO MR. COLE

Okay, we'll clarify that, too.

JUDGE TO SPECIAL AGENT WEST

Q. there was, you early stated Wise offices, Sami Al Arian's home and you said third, the ICP offices. Are the Wise and ICP different offices?

A. Your Honor, the three search warrant locations were the Wise offices, which ICP operations were in there. We found ICP materials there. Sami Al Arian's residence and Sami Al Arian's office at the University of South Florida.

Q. So you've got the Wise, and where is the Wise office located? Is that office or offices?

A. One office.

Q. Okay.

A. It was, I honestly can't remember.

Q. That's okay.

A. The exact address, it was on Tyler Avenue, about a mile

A 26 599 077                    343                    August 30, 2000

east of USF.

Q.   Tampa?

A.   Correct.

Q.   And then Sami's Al Arian's residence and is that in, do you got a street or -- we don't need the exact --

A.   130, I believe it's 130th Street.  It's just north of Tyler Avenue, about a mile east of USF.

Q.   And the third site?

A.   Sami Al Arian's office at the university.

Q.   At USF?

A.   Yes, sir.

Q.   And to the best of your knowledge, you believe that all these, everything on this composite tape came from the Wise office?

A.   Correct.

JUDGE TO MR. VARA

And Mr. Vara, if you will later get with Mr. West and if that's changed, you will bring both of us up to date.

MR. VARA TO JUDGE

Yes, Your Honor.

JUDGE TO MR. VARA

Okay, where are we now?

MR. VARA TO JUDGE

I'd like to ask a few more questions of Special Agent West.

JUDGE TO MR. VARA

A 26 599 077                      344                  August 30, 2000

Go right ahead.

MR. VARA TO SPECIAL AGENT WEST

Q.   Special Agent West, I would like to show you another document.  I'd like you to tell me if you, is that your signature at the bottom of that document?

A.   Yes, it is.

Q.   And sir, what is it in brief?

A.   It's a certification concerning the sources of the videotapes utilized to create this composite tape, i.e., the original or copies of the original full tapes that were seized.

Q.   And that is your signature?

A.   Yes, it is.

MR. VARA TO JUDGE

Your Honor, we'd like to have this moved into evidence.

JUDGE TO MR. VARA

Okay, I'll mark it 9 for identification right now.

JUDGE TO MR. COLE

Mr. Cole, any objections?

MR. COLE TO JUDGE

Any objection to the --

JUDGE TO MR. COLE

Exhibit 9 for identification?

MR. COLE TO JUDGE

No, I mean, I guess our only objection is that it doesn't, I'm not sure it sheds any light on it.  We have to figure out

A 26 599 077                    345                    August 30, 2000

what these boxes are, what the references are, it's not clear how they relate to what they have provided to us. An example of what they provided to us on the tapes and I assume what we got was a copy of what you got, has additional information, for example, some of the tapes say Wise 38. Other tapes say residence. Other tapes just say copy of without a reference to Wise. And that's not on the certification. So it's just a little unclear.

MR. VARA TO JUDGE

Your Honor, we did not offer the 10 tapes to the Court, we offered the composite. This is just a certification, further evidence on behalf of the Government of where we obtained the information that is contained in our composite tape.

JUDGE TO MR. VARA

Okay.

MR. COLE TO JUDGE

I guess if they're trying to do that, Your Honor, it seems relevant to me that one, two, three, four, five, six, seven, eight tapes are referenced as coming from Wise. Two tapes are not referenced from coming from Wise. One tape is referenced from coming from residence and that's not, you know, particularly if they're not turning this over to me, it seems to me that ought to be indicated here, because as I said before, where they are might well be relevant to your consideration. So it doesn't seem to me any reason not to hide that and it also contradicts what Mr. West just said about where the tapes were.

A 26 599 077                    346                    August 30, 2000

MR. VARA TO JUDGE

Your Honor, as you, as you just previously instructed, we will go back and look and specifically identify if any of the tapes were from a location other than the Wise office.

JUDGE FOR THE RECORD

Okay.  I'm going to admit Exhibit 9.

MR. VARA TO JUDGE

At this time, based on the testimony of Special Agent West and this certification document, we would ask that our Exhibit 8 be admitted into evidence.

JUDGE TO MR. COLE

Okay, Mr. Cole?

MR. COLE TO JUDGE

Your Honor, you've heard, you've heard my objections.  The principle one here is to, I reiterate the objection which I made before.  I think the principle one is to authentication.  As Your Honor saw from the videotapes themselves, they were substantially produced by others.  Those others are not here.  There are substantial breaks in the tape.  Those breaks were not made by the Government.  We can't cross-examine the person who made the tapes to assess whether the breaks were intended to send some message of the person who made the tape as opposed to the people who are on the tape.  And we object based on the absolute failure of the Government to authenticate a single tape to bring in a single videography and to thereby deny us our ability to cross-

A 26 599 077          •          347

examine the people who made these tapes so we can ascertain

whether the tapes are true and correct representations of what

they purport to be.  So I would just reiterate that.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

Back to the same argument, Your Honor, I don't need to

repeat it.

MR. VARA TO JUDGE

Just one further thing from the Government on that issue.

We would note that the information in our possession from federal

agents involved in this investigation is that the complete set of

the tapes were provided to Sami Al Arian shortly after the

documents were seized, the videotapes were seized pursuant to the

search warrant almost five years ago.  Obviously Sami Al Arian is

not the respondent in this case, but as Mr. Cole has previously

stated and the Court has specifically noted, Mr. Cole has

indicated that Sami Al Arian was literally a member of his staff

for a significant period of time in regards to this case.  So we

would hope that if, in fact, they had significant questions about

any of the 500 tapes, that they, they have had in their

possession now for several years, certainly have access to if we

assume that Sami Al Arian wants to assist Mazen Al Najjar who is

represented by counsel, that they review those tapes and again

present what it is that they think has been altered in regard to

A 26 599 077                    348                    August 30, 2000

this composite.

MR. COLE TO JUDGE

Your Honor, their, the Government's failure to authenticate the tapes is not cured by the fact that they sent to the tapes to the brother-in-law of Mazen, of Mazen Al Najjar. There is not, there is not an exception to the rule that we require that documents be authenticated, that documents don't have to be authenticated when they've been presented to a relative of a party to the proceeding. It is true that Sami Al Arian has helped us in preparing for this proceeding and essentially in a paralegal capacity. But that does not, that's simply irrelevant. The Government has the affirmative obligation of any party to authenticate its document. It made no effort to authenticate the documents. Moreover, we have no notice, absolutely no notice, notwithstanding our repeated requests that we be given some notice, we had no notice that the Government was going to introduce any of these tapes. That the Government was going to create a composite. That the Government was going to cut the tapes down. We had absolutely no notice. And so again, an absolute failure to authenticate tapes which are, I think as Your Honor saw are obviously not straightforward documentary representations of events that occurred, but produced videos with edits, cuts, interprelations (phonetic sp.) of images, which do not relate to the event in question. And without our ability to cross-examine the people who made the tapes, to assess whether

A 26 599 077                    349                    August 30, 2000

they are accurate and true, we have been denied the fundamental right of cross-examination of due process and the Government has failed to meet its due process obligation to authenticate a document before it comes in.

JUDGE TO MR. COLE

Okay.

JUDGE FOR THE RECORD

I'm going to admit the, Exhibit 8.  The test is that evidence must be relevant.  Relevant, probative and it must not be fundamentally unfair.  In this particular case, the, the conferences in which the respondent attended, the Wise and the ICP, anyway, he attended a number of these conferences and a number of people spoke at those conferences and certainly their statements would certainly not be what you would call honorable. And the respondent was also a founding or an executive of the, of the organization, which he worked for Wise and Dr. Sami Al Arian. And although I note that he was not at the Cleveland conference, I do find, I do think that other, his boss and other people attending these conferences, these tapes were seized from the Wise office of which he was a member, a member of the staff and executive member of the staff.  So I do find that they are relevant and they are probative and I will admit them at this particular time.  And I do also note that again he was not at the Cleveland conference and he did not participate in any of the statements that were made at the Cleveland conference or

Cleveland seminar, whatever you want to call it.

MR. COLE TO JUDGE

And just to add, Your Honor, and the Chicago event, the last event, Chicago event, he was also not there.

JUDGE TO MR. COLE

Yes.

JUDGE FOR THE RECORD

Also he was not at the last Chicago event.  Okay, so noted and Exhibits 8 and 9 are entered into evidence.

MR. VARA TO JUDGE

And Exhibit, for clarification purposes, Exhibit 8 is the second composite tape and transcript?

JUDGE TO MR. VARA

Yes.

JUDGE FOR THE RECORD

And for purposes of identification, I am going to mark in case anybody should ever, either side should ever appeal this, I'm going to mark the tape that was first handed to me, with the, which I would call composite tape second copy, which was the one handed to me, I think yesterday.

MR. VARA TO JUDGE

Yesterday, yes, sir.

JUDGE FOR THE RECORD

That's for identification only.  In other words, the appellate authorities will just have a ball to read it and watch.

A 26 599 077                    351                    August 30, 2000

That will be Exhibit 10 for identification.

MR. COLE TO JUDGE

Your Honor, I would just restate my requests previously that we be provided with a corrected translation that indicates the breaks in the events and that we be afforded the right to recall Officer West to cross-examine if and when we deem it appropriate after we've had an opportunity --

JUDGE TO MR. VARA

Mr. West will be available, correct?

MR. VARA TO JUDGE

That's correct.

JUDGE TO MR. COLE

And as far as the Government sitting down and marking off this thing, I was able to do it on my own and I would bet that all five of you all were, four of you were equally capable of marking it and so I'm going to, not grant that request.  Okay.

MR. COLE TO JUDGE

And Your Honor, can we also have leave to re-raise this issue if we have the opportunity to --

JUDGE TO MR. COLE

You mean the marking of the --

MR. COLE TO JUDGE

No, no, I'm sorry.  Particularly the rulings on authentications of the photos and the videotapes.  I do believe the documentation --

A 26 599 077                    352                    August 30, 2000

JUDGE TO MR. COLE

If you come in and show me that these tapes are the photos or been tainted or inaccurate or false or anything along those lines, I certainly will consider it. And if they are, then I will reject them.

MR. COLE TO JUDGE

And if we come in and bring in authority that says the BIA has required authentication of such documents, will that be -- will we able to reopen the issue on the basis of the BIA decision?

JUDGE TO MR. COLE

I will always look to the higher authority with respect.

MR. COLE TO JUDGE

Thank you.

JUDGE TO MR. VARA AND MR. COLE

Okay, now where are we now?

MR. VARA TO JUDGE

If I may proceed to ask a few more questions of Special Agent West?

JUDGE TO MR. VARA

Yes, Mr. West. Okay, you may proceed.

MR. VARA TO JUDGE

May I approach the witness, Your Honor?

JUDGE TO MR. VARA

Yes.

MR. VARA TO SPECIAL AGENT WEST

Q.   Special Agent West, let me hand you what we have marked as Government's, for identification purposes is Government's Exhibit 11 or Exhibit 11.  Special Agent West, do you recognize that document?

A.   Yes.

Q.   All right.  Can you tell us what it is?

A.   Well, the first package in English is a translation of the, is a copy of the translation of the Arabic document, which is behind, apparently fairly lengthy document, many pages.  And that the Arabic document is a copy of a document that was found during the search warrant operations that we, that we conducted in November 1995.  And it's a document that's identified in the translation as an internal, the internal manifest.

Q.   Special Agent West, based on your -- or have you had occasion, prior occasions to review the contents of the Arabic document with Arabic speaking reading and writing translators for the Federal Bureau of Investigation?

A.   Yes, I have.

Q.   And Special Agent West, to the best of your knowledge, is the Arabic document a typed document or a, something else?

A.   The Arabic document is a hand, I believe it's a, I believe it's a handwritten document.

Q.   And Special Agent West, does this document hold any special significance to you as a federal law enforcement official

A 26 599 077                  354               August 30, 2000

involved in counter-terrorism investigation?

A. Yes. The translation, and again, I've reviewed the translation with FBI translators. The translation identifies the document as the manifesto, the internal manifesto of the Palestinian Islamic Jihad Movement.

Q. And sir, to the best of your knowledge and your years as a federal law enforcement agent, is such a manifesto for the Palestinian Islamic Jihad organization, has it been previously available to federal law enforcement?

A. I'm not aware of it being available to any U.S. Government agency.

Q. To the best of your knowledge, where was this obtained from?

A. From the search warrant similarly conducted in November of 1995.

MR. VARA TO JUDGE

Your Honor, at this time, we would ask that Exhibit 11 be admitted into evidence.

MR. COLE TO JUDGE

Your Honor, I have a couple of objections. One, certification of the translation. Two, despite our prior policy, in which we ask that there be specificity of where these documents were obtained, counsel has made no offering as to, in fact it was found. We know now that there were three places that were searched. We should have a statement as to where it was

A 26 599 077                    355                    August 30, 2000

found and we have a certification of the translation of the document.

JUDGE TO MR. COLE

I'm inclined to agree.

MR. VARA TO JUDGE

Your Honor, we may have erred.  I believe, perhaps, we may only have provided the Court with the certification.

JUDGE TO MR. VARA

Yeah, well --

MR. VARA TO JUDGE

And we failed to -- yes, Your Honor.  The copy that was provided to the Court has the certification.  We just failed to make a copy for Mr. Cole.  We'll certainly make a copy at the break.

MR. COLE TO JUDGE

The certification, well, no, the certification, for what it is worth, appears to be a form certification.  It just says that the following translation is a true and accurate translation of the past document to the best of my abilities and there is no following translation.  It doesn't identify the documents.  It appears, it could well be that they simply printed out a number of these certifications and just attached to them all the documents.

MR. VARA TO JUDGE

It could very well be, Your Honor, but we would represent as

A 26 599 077                    356                    August 30, 2000

officers of the court that these certifications were prepared by the FBI translator that we previously identified after he personally reviewed these documents.  He's been involved in reviewing these documents for a significant period of time.

MR. COLE TO JUDGE

That's fine.  Our other objection is that we should, it should be specified where, in fact, the documents were found rather than leaving it open as to whether it was in one, two, place one, two or three.

MR. VARA TO JUDGE

We certainly can look into whether this came from the residence evidence.

JUDGE TO MR. VARA

While don't we just ask him?

MR. VARA TO JUDGE

We can ask him, yes, Your Honor.

SPECIAL AGENT WEST TO JUDGE

A.   Your Honor, I believe it was found at the Wise office, but I would have to go back and check the seizure log again. There were literally thousands of items of evidence that were seized.

Q.   Okay.  Yeah, why don't you go ahead and find that out, you know, and narrow it down to where it was seized from.

A.   Okay.

Q.   Let me ask on something else.  Back to Exhibits 1A

A 26 599 077                    357                    August 30, 2000

through 8A were photos of the conferences. Do you remember all those or do you want me to pull them and show you?

A. No, sir, I remember.

Q. And do you remember where they were seized from?

A. I believe those were seized at the Wise offices.

Q. Okay. And if you find out any different, --

A. I'll let you know.

Q. Notify Mr. --

A. I'll check the log, yes, sir.

Q. Okay. Check the log on all, all right.

MR. COLE TO JUDGE

I'm sorry, I just missed that.

JUDGE TO MR. COLE

My question was, the photographs which were Exhibits 1A through 8A, my question was, where did they come from? Mr. Wise, Mr. West said they came from Wise to the best of his knowledge. That he would go further back and check the log and if there was any difference, he would notify Mr. Vara and Mr. Vara would notify the Court and you.

MR. COLE TO JUDGE

Thank you.

MR. VARA TO JUDGE

At this time, we would like to request a short recess.

JUDGE TO MR. VARA

Okay.

A 26 599 077                          358                    August 30, 2000

JUDGE FOR THE RECORD

It is now 20 minutes of, let's take a recess of five minutes before the hour.

MR. COLE TO JUDGE

Your Honor, can we have instruction that each break, Agent West has talked with counsel. Can we have an instruction that I believe it's a common procedure that the counsel should not talk to the witness while he's still on the stand and under oath.

MR. VARA TO JUDGE

Your Honor, if I may respond. Again, the insinuation that we're somehow, that the instruction that we're well aware of, the prohibition, we can't coach him, we can't go over the testimony. If we're asking him when he's on vacation because we think maybe they're going to ask for a continuance, if we're asking if he's available next week versus this week. If we're asking him to do something for us in relation to this case, that's no prohibited under any rules that I'm aware of.

JUDGE TO MR. VARA

Okay.

JUDGE TO SPECIAL AGENT WEST

Q.   Mr. West, you may talk to Mr. Cole and Mr. Vara concerning logistical questions. Do not discuss any, you know, your testimony here or what you may be called to testify during the break today. Okay?

A.   Understood, Your Honor.

A 26 599 077                    359                    August 30, 2000

Q.    Okay.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

Okay.

JUDGE TO MR. COLE AND MR. VARA

Did we resolve Exhibit 11?  Is that still pending?

MR. VARA TO JUDGE

You, no, we didn't allow Special Agent West to go back, we'll check it at the next break.

JUDGE TO MR. VARA

Okay, you can go back and check his log.

MR. VARA TO JUDGE

Right.

JUDGE TO MR. VARA

Okay.  And you, where are we now?

MR. VARA TO JUDGE

Just a couple of other things.  We'd like to provide to counsel so we can correct the prior certifications that we've provided with the documents, that relate to, again the documents that have been identified as Exhibits, Exhibits 2, 3, 4, 5, 6 and 11.

JUDGE TO MR. COLE

2, 3, 4, 5, 6 and 11.

MR. VARA TO JUDGE

A 26 599 077                      360                  August 30, 2000

That's correct.

JUDGE TO MR. COLE

All right.

MR. VARA TO JUDGE

Can we have a moment off the record, Your Honor?

JUDGE TO MR. VARA

Yeah.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE TO MR. VARA

Ready?

MR. VARA TO JUDGE

Yes, Your Honor.  The other issue, administrative in nature, is that we were hoping, we were wondering if the Court had had an opportunity to substitute the documents we provided this morning. Remember we provided some documents to the Court and we were trying to get the --

JUDGE TO MR. VARA

I haven't yet.

MR. VARA TO JUDGE

Okay.

JUDGE TO MR. VARA

They're all right here.

MR. VARA TO JUDGE

At this time, we would pass our witness.

A 26 599 077                          361                    August 30, 2000

JUDGE TO MR. VARA

Okay.

MR. COLE TO JUDGE

Can I just ask a question?

JUDGE TO MR. COLE

Yes.

MR. COLE TO JUDGE

With respect to the substitute documents and clarification as to what those are?  I don't know what you received.

JUDGE TO MR. COLE

Say it again?

MR. COLE TO JUDGE

Provided to you what wasn't provided to us?

JUDGE TO MR. COLE

Well, what he's doing is substituting, if you want to come look at them, you can.

MR. COLE TO JUDGE

Are they documents that were previously --

JUDGE TO MR. COLE

Yeah, they're 2 through 6.  As a matter of fact, you've had more opportunity to look at them than I have.

MR. COLE TO JUDGE

I (indiscernible).  Okay.  So the nature, the nature of the substitution is certification of the documents?

MR. VARA TO JUDGE

A 26 599 077                    362                    August 30, 2000

Certification.

MR. COLE TO JUDGE

Okay, I understand.

JUDGE TO MR. COLE

Okay.

MR. VARA TO JUDGE

Now that counsel has looked at them, we would ask that these be entered into evidence.

JUDGE TO MR. COLE

Okay. It's, I do have one or two questions but I'll resolve those as soon as you finish your cross-examination.

MR. COLE TO JUDGE

We object to their admission. They're not certified copies of the original. They have not submitted an original. Many of these documents, as you recall, we had two objections. One was that the documents submitted were not originals and they're not certified copies. And secondly, that the, that there was not a certification of translation. So they resolved one problem but the objection is still there.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

All right. I'm going to need a few moments. I appreciate counsel's request to have a break immediately before he concluded his testimony, his presentation of Dr. West, Mr. West. It would

A 26 599 077                    363                    August 30, 2000

have been nicer if he gave me an opportunity to take a break.

JUDGE TO MR. COLE

To give you the break instead of him, okay.

MR. COLE TO JUDGE

And I'm actually given that I am now beginning my cross, I'm wondering whether I could take a 10 minute, we could have a 10 minute recess.  If Mr. Vara had simply said that, we wouldn't have needed to but since he gave no notice, if we could have 10 minutes so I could just organize my thoughts.

JUDGE TO MR. COLE

10 minutes would be fine.  How about 10 minutes after 3?

MR. COLE TO JUDGE

Thank you.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

Okay, back with Mr. Cole.

JUDGE TO MR. COLE

And Mr. Cole, one time I stated that only one person per table could question, etcetera.  That doesn't mean that you can't pick A, B, C and D to cross-examine or examine.  I just wanted to say one person from each party raising objections, etcetera.

MR. COLE TO JUDGE

Yeah.

JUDGE TO MR. COLE

Okay, so we don't have a --

MR. COLE TO JUDGE

Yeah, we understand that.

JUDGE TO MR. COLE

Okay.

MR. COLE TO SPECIAL AGENT WEST

Q.   Good afternoon, Mr. West.

A.   Yes, sir. good afternoon.

Q.   I want to get some clarification from you if I can regarding the record keeping with respect to materials seized from Mr. Al Arian's residence, Mr. Al Arian's offices and the offices of Wise and ICP.  Could you explain what your records produced consisted of?

A.   Actually all the evidence that was seized, immediately after the search warrant operation was conducted, was turned over to the custody for processing and review, joint processing and review, but custody of the FBI in Tampa.  It was determined, because of the scope and the volume and the sheer number of items that were seized that INS in Tampa did not have the facilities at the time to store and process that evidence.  And since this was a joint investigation with the FBI, the FBI had that capability and the FBI, from the outset, has maintained custody of, from all of that evidentiary material.

Q.   And so you don't, or do you know what steps they took to identify evidence as coming from Mr. Al Arian's residence, Mr.

A 26 599 077                     365                  August 30, 2000

Al Arian's office or the ICP/Wise offices?

A. Yes. And, in fact, subsequent to the search warrant operation, I, I and an agent that I had at the time assigned to the, to the case, were involved in working with the FBI in cataloguing and recording the seized items. In doing this, in effect, I was involved since it was my search warrant, I was involved in the return of the search warrant. Initially we prepared a return on the search warrant that cataloged a more all encompassing since the items that were seized but subsequent to that, each item was cataloged, recorded. It's, it's in a computer system that the FBI uses to track and record seized evidence.

Q. All right. And that, does that computer system contain a log that identifies each document as coming from --

A. Yes.

Q. One of the three places?

A. Yes.

Q. And does that log, do the references on Exhibit 9, like --

MR. COLE TO JUDGE

I'll show the witness Exhibit 9, Judge.

JUDGE TO MR. COLE

Yeah.

MR. COLE TO SPECIAL AGENT WEST

Q. The references on Exhibit 9 refer to a FBI, that FBI

A 26 599 077                    366                 August 30, 2000

log?

A.   Yes, this is part of the FBI evidence tracking system that was used for all of the items.  Just very brief, well, I'll describe it, in some summary fashion.  The box reference would be a box that these items are stored in.

Q.   What is the box reference, I'm sorry?

A.   Well, it says Box 17 or Box 12 or Box 27 or whatever.  It's literally a box where these items are stored.  And further breakdown delineating the tape number.  But this code here, if you will, does not specifically indicate where these tapes were found.  We have to go back to the actual computer log system, which we're in the process of initiating anyway and plug in each one of these items and that will tell us where it was seized.

Q.   Okay, but you aren't able today to tell us, first, with any certainty, where any particular items were seized.

MR. VARA TO JUDGE

We'll stipulate to that, Your Honor, as previously discussed and the Court has asked the Government to do, when we get done with Special Agent West testimony, he will be --

JUDGE TO MR. VARA

Okay.

JUDGE TO MR. COLE

I do think that he did say that he knew some items came from --

MR. COLE TO JUDGE

Well, that's the thing, he's now, they're now stipulating that he doesn't have the information. Yet previously he said, I know that they came from Wise. And then he said, well, if I find out to the contrary, I'll let you know. But now he's, now they're indicating that he doesn't know in the first place.

JUDGE TO MR. COLE

Well, why don't you just, go ahead and ask then.

MR. COLE TO SPECIAL AGENT WEST

Q. So you don't have the ability here to say with certainty with respect to documents that you have, that have been submitted by counsel, whether they were seized from Mr. Al Arian's residence, Mr. Al Arian's office or the Wise/ICP office. Correct?

A. Well, with regard to the videotapes, the 10 videotapes, there are, I believe, sir, you even reference some of the notations on the labels for the videotapes and those are, they are copies, handwritten copies of what are on our original copies of those 10 videotapes and where the indication is handwritten Wise, then that's, that is an indication that it was seized from Wise. And if it indicates that it was residence, that will indicate that it was seized from the residence. And that was strictly, when we were copying the original seized tapes, that process occurred where that handwritten notation was put on the label.

Q. And if there's no indication, if the document just says

A 26 599 077                    368                    August 30, 2000

copy of Box 17-GA-31 Tape?

A.   Well, for that one, I, I'd have to say that I don't know where that was actually seized from.   But we will be able to go back to the indexing system that we have with the FBI and determine that.

Q.   Okay.   And of course, these 10 videotapes that you've just referred to have not been offered as evidence.   Can you tell us with certainty whether any of the documents that have actually been offered as evidence were seized from Sami Al Arian's residence, Sami Al Arian's office or the Wise/ICP office?

A.   Not with absolute certainty, no.   Again, because of the volume of the evidence that was seized, I can't.

Q.   All right.   I'd like to refer you to Government's Group Exhibit 6.

MR. COLE TO MR. VARA

Could I ask counsel to do me a favor and offer your witness your copy of the documents so that I have a document copy and he has a copy and the Judge can have a copy?

MR. VARA TO MR. COLE

We'd like to accommodate you but we have to review it as you're asking questions.

SPECIAL AGENT WEST TO JUDGE

A.   Thank you, sir.

Q.   Okay, you've got Exhibit 6.

JUDGE TO MR. COLE

A 26 599 077                    369                    August 30, 2000

A copy.

MR. COLE TO JUDGE

Thank you, Judge.

MR. COLE TO SPECIAL AGENT WEST

Q.   Now, this document has, in its, its translation, this document was just today certified as an accurate translation by Mr. Vad Gora.   Do you -- in referring to the English language version, top of the page, where it refers, case number, source, date, translator, translation, notes.   Is it your understanding that that is a translation of the Arabic?

A.   Yes, sir, it is.   It is.

Q.   And this document is dated June 1981.   Is that correct?

A.   I, yes, but I believe that date may relate to a date that is on the Arabic document.

Q.   In June 1981, where was Mazen Al Najjar?

A.   I don't believe Mr. Al Najjar entered the country until after 1981.

Q.   All right.   And if you look right above the date of June 1981, it says residence-Box 1.   Now is it your testimony that that constitutes a translation of the Arabic?

A.   The language specialist that did the various translations, Mr. Gora being one of them, when they conducted these translations, was, would, on a regular basis indicate under sources where the documents or whatever it is that they're translating has been found in a search warrant.   So yes, this is

A 26 599 077                     370                     August 30, 2000

indicative and this particular translation of the document would have been found in Sami Al Arian's residence.

Q. All right. So just to clarify, this is not, when it says residence-Box 1, that's not -- or are you saying that is a translation of something that the Arabic translator added to the document? Because he's testified that this, this material at the top of the page, the first six lines.

A. Right.

Q. Constitutes a translation of the Arabic.

MR. VARA TO JUDGE

Your Honor, we would stipulate that what counsel is asking about is identifying information that was placed on there as I believe Special Agent West is, is, he can testify about by the translator who did the translation.

MR. COLE TO JUDGE

Right. And what I'm asking is, was it placed on the original Arabic document or is this an English, is this in addition to the document which is not, in fact, reflect the translation of the underlying document. That's all.

JUDGE TO SPECIAL AGENT WEST

Q. Do you know the answer?

A. Well, to the best of my knowledge, that, that portion, the top portion of the document here is not actually on the Arabic document. This is what the translator placed for reference purposes.

A 26 599 077                         371                    August 30, 2000

JUDGE TO SPECIAL AGENT WEST

Q.   So you're referring to the English language, the top of the English language document?

A.   Yes, sir.

Q.   Right.  And you're saying that is not a translation of what is on top of the Arabic document?

A.   Well, to the, correct, to the point where it says notes.

Q.   Right.  Okay, good.  Now, so the fact that it indicates residence-Box 1, does that leave you believe that this document was seized from Sami Al Arian's residence?

A.   Yes.

Q.   All right.  And okay, I'm going to refer you to Exhibit 5, Government's Exhibit 5.

A.   I don't have it.

JUDGE TO SPECIAL AGENT WEST

Q.   Oh, I'm sorry, let me find it.

MR. COLE TO JUDGE

Thank you, Judge, for accommodating us on this.

JUDGE TO MR. COLE

No problem.  It may take a while.

MR. VARA TO JUDGE

Your Honor, if we may, can we use our set that's sitting right by you?

JUDGE TO MR. VARA

A 26 599 077                     372                    August 30, 2000

Yeah, I don't know if it's marked.  Is it marked?

MR. VARA TO JUDGE

I can -- it is.

JUDGE TO MR. VARA

Okay.

JUDGE TO SPECIAL AGENT WEST

Q.    Why don't you take a look at that?

A.    Thank you, sir.

Q.    All right, he has his copy.

A.    Yes, sir.

MR. COLE TO SPECIAL AGENT WEST

Q.    And just for, for clarification purposes, if you know, there are two dates referred to, at the top of the English language version of the document.  There are two dates noted.  One, one says date, undated document.  And the next says date, 3-5-96.  Do you know what that refers to?

A.    I believe and again, I, over the course of several years, I've had a number of discussion with the translators, but I do believe the first date indicated as we go down, indicates the Arabic document itself is not, is not dated and the date under the word translator, I believe, refers to the date that it was actually translated.  And there's a reference placed on the translation by the translator.

Q.    Okay.  And on, if you turn to page 2 of the English translation of this document, there appear to be several

A 26 599 077                    373                    August 30, 2000

sentences which are in bold.  Is that correct?

A.  Yes, sir.

Q.  When you look at the Arabic version of the document, there are no sentences in bold.

A.  Uh-huh.

Q.  So is that, is your understanding that this is an editorial interprelation by the translator and not an actual accurate reflection of the document that is -- is there any indication in the Arabic that these particular sentences were meant to be given emphasis?

MR. VARA TO JUDGE

Objection, relevance.

JUDGE TO MR. VARA

Overruled.

SPECIAL AGENT WEST TO MR. COLE

A.  I don't know the answer to that.  I don't know why those are in bold.

Q.  Does this document, who is the author of this document to the best of your knowledge?

A.  The translator?

Q.  No, the author of the underlying document, it's Government Exhibit 5.

A.  It was, well, from the translation, the indication that Dr. Sami Al Arian offered the document.

Q.  And there's no mention of Mazen Al Najjar in this

A 26 599 077                        374                    August 30, 2000

document.  Is that correct?

A.   It's been some time since I reviewed this document personally but I believe that is correct.  There is probably, I believe there is no mention of Dr. Al Najjar in this document.

Q.   And there's no mention of fundraising in this document.  Is that correct?

A.   Bear with me for one moment so I can refresh my recollection on this.

(TAPE 12)

JUDGE FOR THE RECORD

Pick up on tape 12.

MR. VARA TO JUDGE

Your Honor, the Government will stipulate that there's no mention of fundraising in this document.

SPECIAL AGENT WEST TO JUDGE

A.   I believe that's correct.

Q.   Okay.

MR. COLE TO SPECIAL AGENT WEST

Q.   And, to the best of your knowledge, is this a, it's entitled by the translator, apparently, ICP Speech by Sami Al Arian.  Do you know in what, whether this is a speech given at one of the ICP annual conferences?  And just to help you out a little bit, this isn't to trick you or anything, if you look at the first page, second to last paragraph.  Our first meeting was with you on December of 1988 and our conference was on ... and

A 26 599 077                     375                  August 30, 2000

then there was our, it goes on to, then there was our second conference on and then in the next paragraph, then we met during our third conference and then a couple of paragraphs down, since that meeting last December, our predicament was confirmed.

A.    I don't know if this was the speech that Mr Al Arian gave at any conference, I don't know.

Q.    And at the close of the speech, if you look at page six of the translation, could you read into the record the two paragraphs that begin under dear brothers and sisters?

MR. VARA TO JUDGE

Your Honor, the document speaks for itself.  It's our, it's in evidence.

MR. COLE TO JUDGE

Your Honor, we (indiscernible) read into the record from the translation verbatim, I think this is much shorter, I mean --

MR. VARA TO JUDGE

Your Honor, they objected to the introduction of that.

MR. COLE TO JUDGE

We did and we did not object to the reading.

JUDGE TO MR. VARA

Overruled, I'll allow it.

JUDGE TO SPECIAL AGENT WEST

Q.    Go ahead.

A.    Dear Brothers and Sisters, once more, I welcome you to your conference.  Our presence here is to confer in patience and

A 26 599 077                    376                    August 30, 2000

justice and think together using argument and evidence.  The Islamic Committee for Palestine has habituated you, incites and encourages the offendants to listen and discuss in the ethics and spirit of Islam and encourages the quiet advising and committed dialogue and invites the audience to participate in the program seriously and willfully.  Therefore, not all what is said in this conference is the position of the committee.  Because the object of this conference also is providing the occasion for all points of view to be expressed totally and freely, quote.

MR. COLE TO SPECIAL AGENT WEST

Q.   Thank you, that's enough.  Now, is there anything illegal or threatening to national security about holding a conference for the purposes of listening and discussion in the ethics and spirit of Islam and encouraging quiet, advising and committed dialogue?

A.   No, sir, not for that purpose.

Q.   And you have offered no evidence, isn't that true, that any of the ICP annual conferences, the five annual conferences that occurred in December, that any fundraising occurred.  Isn't that true?

A.   In this particular hearing?

Q.   Right.

A.   Beyond what I believe is your stipulation, sir, I don't recall that we have.

Q.   The only fundraising that you've offered evidence of

A 26 599 077                    377                    August 30, 2000

was not taken from an ICP annual conference. Isn't that correct?

A. On the videotape that's indicated, that was not a formal ICP conference. In the portions of the videotape that we, we produced a composite showing the ICP conferences do not show fundraising.

Q. Okay. Now, is it your understanding that there was fundraising at the ICP conferences?

A. Yes.

Q. And have you reviewed the portions of, are there videotaped representations of the fundraising appeals at those conferences?

SPECIAL AGENT WEST TO JUDGE

A. If I may elaborate a little bit, Your Honor?

MR. COLE TO SPECIAL AGENT WEST

Q. I'd like a yes or no first.

JUDGE TO SPECIAL AGENT WEST

Q. Yes or no?

A. Yes, the --

SPECIAL AGENT WEST TO MR. COLE

A. I'm sorry, your question again?

Q. To the best of your recollection, are there videotapes that record the fundraising appeals at the annual ICP conferences that occurred in December 1988 through December 1992, the first one in St. Louis, the last four in Chicago?

A. Yes.

A 26 599 077                  378                  August 30, 2000

Q.   And have you reviewed those?

A.   Not personally, not all of them.

Q.   Now, did you review any of them?

A.   Yes.

Q.   And you chose not to offer them here.  Is that correct?

MR. VARA TO JUDGE

Objection, Your Honor.  Mr. West doesn't control the presentation of this case, he's a witness.

JUDGE TO MR. COLE

Yeah, that is true.

MR. COLE TO SPECIAL AGENT WEST

Q.   Did you offer any advice as to which of you -- you said that you, along with the Arabic translator from the FBI edited this tape.  Is that true?

A.   Yes, sir.

Q.   Did you create the initial composite tape?

A.   I, I was part of creating that.  I was not the only one.

Q.   Okay.  And did you consider including fundraising appeals from the annual conferences in the composite videotape, the Composite Videotape 1, when you were creating it?

MR. VARA TO JUDGE

Objection.  Relevance?  Whether Special Agent West considered something or not is not an issue here.  Again, he is not the person that determines on behalf of the U.S. Government

A 26 599 077                    379                August 30, 2000

what it is that we present in a composite tape.

JUDGE TO MR. COLE

I'm inclined to believe that that's a little outside of his main --

MR. COLE TO JUDGE

Your Honor, he's the one --

JUDGE TO MR. COLE

Beyond his scope.

MR. COLE TO JUDGE

He's the one, as far as we can tell, he's the one, the only one who they've offered who has reviewed the tape, reviewed the tapes.

JUDGE TO MR. COLE

Right.

MR. COLE TO JUDGE

It's, it's --

JUDGE TO MR. COLE

Okay, I'm going to allow it.

MR. COLE TO JUDGE

Okay.

JUDGE TO MR. COLE

Go ahead.

JUDGE TO SPECIAL AGENT WEST

Q.   Do you want to repeat the question?

A.   Yes.

A 26 599 077                          380                          August 30, 2000

MR. COLE TO SPECIAL AGENT WEST

Q.   The question is, did you consider including in Composite Videotape 1 any of the fundraising appeals from the annual conferences?

A.   Yes.

Q.   And why did you choose not to?

A.   That was not my decision to make.

Q.   Did you, did you want to?

MR. VARA TO JUDGE

Objection, relevance, Your Honor.

MR. COLE TO SPECIAL AGENT WEST

Q.   Was it your recommendation that they should be?

MR. VARA TO JUDGE

Objection, relevance.

JUDGE TO MR. COLE

I think you've got what you're after.

MR. COLE TO JUDGE

All right.

MR. COLE TO SPECIAL AGENT WEST

Q.   In any of the fundraising appeals that the, that were done at the ICP, well, first of all, how many -- let's talk about the ICP conferences for a moment.  Isn't it true that the ICP annual conferences were a three day event?

A.   Generally, yes.

Q.   All right.  And isn't it true that they consisted

A 26 599 077                    381                    August 30, 2000

primarily of panels addressing a variety of different subjects of interest to people, of Muslim faith and with some focus on Palestine.

A.   From the videotapes that I've seen, from the documents I've seen, from again I've not reviewed all of them because of the sheer volume, and from the information I've received from other law enforcement personnel who have seen the other tapes.

Q.   I want your own testimony, I don't want you're saying testimony for somebody else.

A.   That's, that's generally accurate, yes, what you've described.

Q.   Okay.  And is it also, isn't it also true that each of these conferences there was a short 30 to 45 minute fundraising appeal that occurred on Saturday evening after the Saturday dinner, the big dinner of the conference?

A.   To the best of my recollection, I remember watching, I believe it was one ICP conference and I don't recall which one it was, because it was quite some time ago, where the fundraising portion was viewed.  I don't remember, I don't know what day it was but basically --

Q.   Do you recall whether it was about 40 to 45 minutes in length?

A.   That, to the best of my recollection, that seems accurate, yes.

Q.   And isn't it true that the stated purposes at each one

A 26 599 077                    382                    August 30, 2000

of those fundraising appeals was to raise money for humanitarian purposes?

A.   The one that I recall personally viewing, the purpose of the fundraising was indicated to include support for widows and orphans in the Middle East.

Q.   So you don't recall any statement in the fundraising appeals that -- let me rephrase the question.  So you don't recall any statements in those fundraising appeals that requested people donate to the Palestinian Islamic Jihad?

A.   In the one that I recall observing, no.

Q.   And you only observed one?

A.   Yes.

Q.   You only recall observing one?

A.   That's correct.

Q.   All right.

MR. COLE TO JUDGE

If you could bear with me for just one moment.  Sorry.

JUDGE TO MR. COLE

Go right ahead.

MR. COLE TO SPECIAL AGENT WEST

Q.   All right.  And isn't it true, Mr. West, that you testified previously that you viewed videotapes of the ICP annual conferences and you stated and I quote, there is always rhetoric concerning violent activities against the West, Israelis, Jews, supporting the martyrs as they call the martyrs, who are suicide

A 26 599 077                  383                  August 30, 2000

bombers who have engaged in bombings in Israel and to support, yes, they request money to support orphans. But the orphans of the suicide bombers who have blown up innocent people in Israel. Do you recall making that statement?

A. Yes.

Q. Where, on the videotapes, of the fundraising appeals for the conferences, did anyone request money to support orphans of the suicide bombers who have blown up innocent people in Israel?

A. The videotapes that I've seen, that I have personally reviewed with FBI translators, not necessarily a fundraising portions, but at various portions, there is rhetoric as I've described.

Q. So you're saying that there was not a request to support and I'll read it to you again.

A. Uh-huh.

Q. To support, yes, they request money to support orphans but the orphans of the suicide bombers who have blown up innocent people in Israel. Are you now testifying that there is not a statement in any of the material that you reviewed?

A. No, that's -- no, just the opposite. I, there, I have seen statements on videotapes at conferences that indicate that.

Q. That request money to support orphans of the suicide bombers that have blown up innocent people in Israel.

A. No, they request, they're seeking money to support the

A 26 599 077                    384                    August 30, 2000

orphans of and the widows of the martyrs.

Q.   Oh, so you're changing.  So it's not the suicide bombers.

A.   May I elaborate?

Q.   Well, I'm asking, you made a very specific and very inflammatory statement here, on oath, that they request money to support orphans of the suicide bombers who have blown up innocent people in Israel.  And I'm asking you, is that a truthful statement of what the people requested in the fundraising appeals at the conferences?

A.   My term suicide bombers is my understanding of the term martyr in that context.

Q.   Okay.  Do you know, could you point to, okay, so you -- so what they actually said was to support orphans of martyrs.  And you interpreted that to mean suicide bombers, who have blown up innocent people in Israel?

A.   I can tell you that nowhere have I seen on a videotape, specifically a request for money to support orphans and widows of suicide bombers and terrorists.  They use the term martyrs.

Q.   Okay.

A.   That is my understanding of their term martyr.

Q.   Okay.  And isn't it true that martyr is a term that applies to anyone who dies in a cause?

A.   It can be.

Q.   Isn't it true that many of the people who were killed

during the Intifada were called martyrs?

A.   Yes.

Q.   Isn't it true that many of the people that killed during the Intifada were not suicide bombers?

A.   That is correct.

Q.   Isn't it true that many of the people who were killed during the Intifada were not engaged in violent activities?

A.   Yes.

Q.   So martyr does not mean suicide bomber, it means someone who has died in the cause of resistance and it can be resistance to occupation.  Isn't that correct?

MR. VARA TO JUDGE

Objection, argumentative.

JUDGE TO MR. VARA

Overruled.

JUDGE TO SPECIAL AGENT WEST

Q.   You may answer.

A.   It can be, but in the context of this investigation, it is my understanding, again from my experience, from my dealing with a variety of other law enforcement agencies that within the context of this investigation, that the term martyr, as used by the Palestinian Islamic Jihad as well as other terrorist organizations, such as Hamas, usually relates to someone of their organization who has died essentially in combat in their perspective.

A 26 599 077                    386                    August 30, 2000

MR. COLE TO SPECIAL AGENT WEST

Q. Okay. And just to bring you back for a moment to the image on the videotape that you saw this afternoon of the map of Israel and the occupied territories and Gaza, which contained what -- well, would it be fair to say hundreds of very small pictures of people who were described as martyrs on the poster?

A. Right.

Q. Now, is it your testimony that all of those people who died were suicide bombers?

A. No.

Q. Is it your testimony that all the people who were pictured in that image, of people who have died during the Intifada in Palestine were engaged in violent combat at the time that they died?

A. No.

Q. So martyr can refer to someone who is engaged in no violent combat whatsoever?

MR. VARA TO JUDGE

Objection.

MR. COLE TO SPECIAL AGENT WEST

Q. By who, by who is killed in the course of resistance to an occupation.

JUDGE TO MR. VARA

Okay, what's your objection?

MR. VARA TO JUDGE

A 26 599 077                    387                    August 30, 2000

Objection, asked and answered.  He's already testified that martyrs can have different connotations in different circumstances.

MR. COLE TO JUDGE

And I'm now bringing him to, but he siad in this circumstance, martyr means someone who is involved in combat. I'm bringing, I, therefore, was referring him to what he has offered as a poster from one of the events that he has identified with ICP where we had pictures of small children and, and adults, all identified as martyrs, hundreds and hundreds of people and I'm asking him, is it his testimony that the reference, the fact that they called them martyrs on the poster means that all those children were suicide bombers or otherwise engaged in combat?

JUDGE TO SPECIAL AGENT WEST

Q.   You may answer.

A.   No, sir, that is not my testimony that all of those people were as you described.

MR. COLE TO SPECIAL AGENT WEST

Q.   Are you aware of when the, --

JUDGE TO MR. COLE

Mr. Cole, Mr. Katan wants to come up to -- at one time he represented Mr. Al Najjar.

MR. COLE TO JUDGE

That's fine, that's fine with us.

JUDGE TO MR. COLE

A 26 599 077                     388                  August 30, 2000

Is that agreeable with everybody?

UNIDENTIFIED VOICE TO JUDGE

He's on our witness list.  I mean, he's on our list that we submitted (indiscernible).

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

Not as witnesses but of people, that some -- we have no objection to him attending.

JUDGE TO MR. COLE

Okay.

MR. COLE TO SPECIAL AGENT WEST

Q.   Can you tell me when the first suicide bombing attributed to the Palestinian Islamic Jihad occurred?

A.   I can't tell you exactly but I believe it was in either 1980, I believe it may have been 1987 or possibly later in the '80s, '88, '87, '88.

Q.   And can you describe that event?  Where did it take place?  Who did it?

A.   I don't, the very, the first one I don't know, I can't describe the details, I don't.

Q.   Can you describe the details of any suicide bombings?

A.   Yes.

Q.   Attributed to the Palestinian Islamic Jihad?

A.   Yes, I believe I did but I noted the Alicia Flato

(phonetic sp.) case.

Q.   That's 1996, right?

A.   Correct.

Q.   Can you describe any prior to 1996?

A.   I believe there were, there have been suicide bombings in the late '80s and then in the early '90s, yes.

Q.   But that wasn't my question.  Can you describe a single suicide bombing prior to 1996?

A.   I don't, I can't describe the details.

Q.   And what's the basis for your belief that there were, in fact, such bombings in the late '80s?

A.   In the course of this investigation, I have had access to other Government agencies with open source and non-open source information related to Palestinian Islamic Jihad organization. As part of my involvement in this investigation, I've done research on that organization through open source, academic sources, Government reports.  I know that the PIJ has been involved in suicide bombing activities for quite some time.  But I cannot describe the specific bombing events that may have occurred in the early '90s or before.

Q.   Isn't it true that the first suicide bombing attributed to the Palestinian Islamic Jihad took place in 1994?

A.   I --

MR. VARA TO JUDGE

Objection.  He's already testified that beyond or aside from

A 26 599 077                    390                    August 30, 2000

the Flato bombing, he can't testify specifically to PIJ bombings.

MR. COLE TO JUDGE

But he, nonetheless, testified that there are prior, there were prior bombings. I'm asking him, isn't it true, that, in fact, the first suicide bombing attributed to Palestinian Islamic Jihad took place in 1994.

JUDGE TO SPECIAL AGENT WEST

Q. Do you know that or not?

A. I don't know that to be true.

Q. Okay.

MR. COLE TO SPECIAL AGENT WEST

Q. Do you know it to be false?

A. It's my belief that there were PIJ suicide bombings prior to that.

Q. I'm not asking about your belief.

A. Well, then --

Q. I'm asking about your knowledge, what you can testify to under oath is your knowledge.

A. Yes, I don't know that to be false.

Q. So you don't know whether there was ever a suicide bombing that occurred at the time period when the fundraising that you have referred to occurred. That's between 1988 and 1992.

A. Well, to be able to say with absolute certainty under oath here, no. My belief, yes.

A 26 599 077                          391                 August 30, 2000

Q.    Thank you.   Now, what was occurring?   What was occurring in the Middle East from 1988 to 1992?   The period of time that you have focused on, at least with respect to alleged fundraising by the Islamic Committee for Palestine?   Isn't it true that the Intifada began in late 1987 or early 1988?

A.    That's correct.

Q.    And can you describe the Intifada?

A.    It was an uprising by Palestinian people in the occupied territories in Israel, in the West Bank and in the Gaza Strip.   And it took the form primarily of riots and attacks on Israeli defense forces and Israeli police in those occupied territories and the response by the Israeli forces.

Q.    Isn't it true that it was note, the Intifada was noted for the lack of terrorist activity during that period?   That is, that the opposition consisted largely of strikes, demonstrations and the throwing of the stones, to the extent that there was violence.   Isn't that true?

A.    All those things occurred, but terrorist attacks also occurred during that time period.

Q.    I'm not asking, isn't it true that the Intifada was noted for a forms of non-terrorist resistance to occupation?   And that was principle noted?

A.    I believe noting the Intifada for whatever characteristics it might have would be from whatever perspective you have.   I don't know that to be true.

A 26 599 077                    392                    August 30, 2000

Q.   All right.  But you do know that during the Intifada some of the resistance consisted of strikes?

A.   Yes.

Q.   You do know that during the Intifada, some of the resistance consisted of demonstrations?

A.   Yes.

Q.   You do know that during the Intifada, some of the resistance, in fact, much of the resistance consisted of stone throwing?

A.   That's correct.

Q.   Now, --

JUDGE TO MR. COLE

Let me make sure you understand.  You said stone throwing is non-violent?

MR. COLE TO JUDGE

Well, no, I'm not saying that stone throwing is not violent.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

I'm just saying that that's what it consisted of.

JUDGE TO MR. COLE

Okay.

MR. COLE TO SPECIAL AGENT WEST

Q.   Now, does, do strikes in the West Bank threaten American national security?

A 26 599 077                    393                    August 30, 2000

A.   I'm not sure I'm qualified to answer that question.

Q.   Do you, do you believe Mazen Al Najjar is a threat to national security?

A.   Yes, I do.

Q.   All right.  Do you believe that threats, that economic strikes in the West Bank are a threat to national security?

MR. VARA TO JUDGE

He's already answered that, Your Honor.

JUDGE TO MR. COLE

He has answered that.

MR. COLE TO SPECIAL AGENT WEST

Q.   Do you believe that stone throwing in the West Bank and Gaza during the Intifada is a threat to national security?

MR. VARA TO JUDGE

Your Honor, objection.  Relevance?

JUDGE TO MR. COLE

I think he's already answered that one, too.

MR. COLE TO JUDGE

I don't think he's answered, he has answered --

JUDGE TO MR. COLE

Well, he said stone throwing and then you say stone throwing through Intifada.

MR. COLE TO JUDGE

Well, he siad the stone throwing occurred.  The question now is whether that stone throwing constituted a threat to national

A 26 599 077                    394                    August 30, 2000

security.

JUDGE TO MR. COLE

Okay, that's --

MR. VARA TO JUDGE

Your Honor, we're not alleging that Mazen Al Najjar was throwing stones at the West Bank, it's not relevant.

MR. COLE TO JUDGE

Your Honor, what they're alleging is that Mazen Al Najjar was involved in a group which they allege was supporting a group which was engaged in the Intifada at a time period when that was what was going on in the West Bank.  So it seems to me relevant, highly relevant if their claim is that somehow he was supporting an organization that was involved in activity to threaten the national security, I want to hear what are the activities that threatened the national security.  So does the stone throwing during the Intifada, in your view, constitute a threat to American national security.

JUDGE TO SPECIAL AGENT WEST

Q.   You may answer that.

A.   It could.

MR. COLE TO SPECIAL AGENT WEST

Q.   Okay.  Did the demonstrations that occurred almost daily during the Intifada constitute a threat to American national security?

A.   It could.

A 26 599 077                    395                 August 30, 2000

Q.   Did they?

A.   That's a question that I don't think I'm qualified to answer.

Q.   Were the demonstrations illegal?

MR. VARA TO JUDGE

Your Honor, Mr. West is not a lawyer.  He's certainly not a lawyer versed in the law of a foreign nation.

JUDGE TO MR. VARA

Yeah.

JUDGE TO SPECIAL AGENT WEST

Q.   Well, do you know if they were illegal or not?

A.   It's my understanding that under Israeli law, that they were, in fact, illegal.

MR. COLE TO SPECIAL AGENT WEST

Q.   Demonstrations were illegal?  Peaceful demonstrations are illegal under Israeli law, that's your understanding?

A.   Are you talking -- you didn't qualify peaceful or otherwise.  There were --

Q.   So is it your testimony that demonstrations are illegal under Israeli law?

A.   Demonstrations within the context of the Intifada that turned violent I believe would be.

Q.   All right.  Did all demonstrations during the Intifada turn violent?

A.   I don't know.

A 26 599 077                    396               August 30, 2000

A.   I don't know that for certain.

Q.   What does the word Jihad mean to you?

A.   It means an armed struggle, an armed conflict or violent conflict to obtain a, an Islamic goal, an Islamic political and religious goal.

Q.   So --

A.   I do understand that there are other possible connotations of the word, Jihad in the Arab language.  But that's what it means to me.

Q.   Okay.  That's what it means to you, but you understand that to Islamists, it means different things.

A.   Well --

MR. VARA TO JUDGE

Objection, argumentative.

MR. COLE TO JUDGE

Well, I'm trying to, I'm trying to clarify his answer, Your Honor.  I asked him what does the word Jihad mean to you.  He said, he gave his interpretation to what Jihad means to him but then he acknowledged that others have different understandings.

JUDGE TO MR. COLE

But you said --

MR. COLE TO JUDGE

I'll rephrase.

JUDGE TO MR. COLE

Okay, go ahead.

A 26 599 077                    398                    August 30, 2000

MR. COLE TO JUDGE

I'll rephrase.

MR. COLE TO SPECIAL AGENT WEST

Q. What is your understanding of other, other connotations of Jihad, which you just referred to?

A. It could refer to different types of struggles, but it's, again, I'm getting this from people who are fluent in Arabic, mainly the FBI translators.

Q. No, I want your own understanding.

A. Well, that's it, that's where I get my understanding of the word Jihad as well as some independent research I've done. But --

Q. What's the independent research you've done?

A. I've read a number of books on the Islamic, the various radical Islamic movements as well as Government reports about these activities, etcetera.

Q. And can you cite a single source which states that Jihad is used as an armed struggle in Arabic?

A. A single specific source?

Q. Yeah, a single source.

A. Probably an Arabic dictionary that I specifically know beyond that.

Q. Have you looked at an Arabic dictionary and seen a definition that says Jihad equals armed struggle.

A. Actually --

A 26 599 077                    399                August 30, 2000

MR. VARA TO JUDGE

Objection. All of this is argumentative, Judge. He can only testify as to what he knows.

MR. COLE TO JUDGE

He said an armed --

MR. VARA TO JUDGE

He said, I imagine a dictionary, he didn't say that he knows.

MR. COLE TO JUDGE

He said probably an Arabic dictionary and now I'm trying to get at whether or not he actually, this is a source he's pointing to or whether he's simply speculating.

JUDGE TO SPECIAL AGENT WEST

Q. Okay, are you speculating or have you been there?

A. Actually I have looked at it in Arabic to English dictionary at one point. I don't remember exactly when. And I've looked at the definition of the word Jihad and it includes, among others, again, I don't know exactly what it said but essentially it could be an armed struggle, an armed violent action.

MR. COLE TO SPECIAL AGENT WEST

Q. And it could be.

A. Yes.

Q. Not that it is.

A. That's correct.

A 26 599 077                           400                    August 30, 2000

Q.   All right.

A.   And it's one of the definitions.

Q.   And isn't it true that it could be any form of struggle against resistance?

A.   Again, it's my understanding and you asked my understanding, it's my understanding that the word Jihad in Arabic, the meaning has to be taken into whatever context is being used.  I, within a larger sentence or within a larger speech.

Q.   Did you review the video, you testified that you put together Composite Video 1 with other people and reviewed it extensively prior to this hearing.  Is that correct?

A.   Yes, yes.

Q.   In Composite Video 1, do you recall Ramadan Shallah talking about the meaning of Jihad and stating that Jihad can be economic, Jihad can be all sorts of struggle.

A.   But he said more than that.

Q.   I'm asking you whether you recall whether he said that?

A.   Yes.

Q.   All right.  But you didn't include that in Composite Videotape 2, did you?

A.   That's correct.

Q.   Does Jihad mean terrorism in your view?

A.   That's not the definition of the word Jihad from my understanding.

A 26 599 077                    401                    August 30, 2000

Q.   Isn't it true that it was quite common to refer to the Intifada as a Jihad, particularly among influences during the Intifada?

A.   I don't know, my, my understanding and my experience in dealing with Muslim people when they talk about Intifada, they use the word Intifada.

Q.   Okay.  I'm going to refer you to Government Exhibit 8, the transcription of the second Composite Videotape, page two.

JUDGE TO MR. COLE

Let me see if I can find it.

SPECIAL AGENT WEST TO MR. COLE

A.   If you can bear with us one moment, please.

JUDGE TO SPECIAL AGENT WEST

Q.   See if that's it, Mr. West.

A.   Yes, sir.

SPECIAL AGENT WEST TO MR. COLE

A.   Page two?

Q.   Yeah.  And in the first full paragraph in the first unidentified speaker, introducing Sheik Abdel Zes Odi.  And he states, the first of the deportees in Palestine for his role in the Jihadi mobilization of the masses in the Gaza strip and that was one of the principle elements later on in the eruption of the Intifada.  Do you see that?

A.   That's what it says.

Q.   Right.  Now, when he says Jihadi mobilization of the

A 26 599 077                      402                      August 30, 2000

masses in the Gaza Strip, do you understand that to mean the Intifada?  A struggle in general?  Or the Islamic Jihad?

A.    It's my understanding from this statement that it's referencing Abdel Zes Odi's involvement in helping to instigate the Intifada.

Q.    Okay.  So it's not, there the reference to Jihadi mobilization is not a reference to the Islamic Jihad, but a reference to instigation of the Intifada.

A.    That's, that's my understanding.

Q.    All right.  So you have, you're aware then that some Muslim speakers, whose speeches you have reviewed quite extensively in preparation for this hearing used the term Jihad to refer to the Intifada.

A.    Correct.

Q.    Okay.

A.    Correct.

Q.    You testified --

A.    Thank you.

Q.    Under oath in the deportation hearing regarding Mr.  Al Najjar and I quote, Palestinian Islamic Jihad is the, is a terrorist organization that exists for no other reason except to conduct acts of violence against their perceived targets in the Middle East and other parts of the world.  Do you recall that?

A.    Yes, sir.

Q.    Is that still your belief?

A 26 599 077                          403                    August 30, 2000

A.   Yes, sir.

Q.   Are you aware of the, any non-violent activities that the Palestinian Islamic Jihad engages in?

A.   No, I'm not aware of any.

Q.   Are you aware of any violent activity that the Palestinian Islamic Jihad is engaged in since 1997?

A.   I believe there, I believe there was a terrorist attack that occurred in November of 1998 that's been attributed to the PIJ.

Q.   Any others?

A.   Since 1997?  Specifically, I'm not, I can't cite to any right now.

Q.   And how many people do you believe belong to the Palestinian Islamic Jihad?

A.   Relatively small number compared to other organizations.

Q.   Okay.  More than 10?

A.   Yes.

Q.   More than 500?

A.   I can tell you that the latest estimate that I've seen is probably no more than 200 to 300 total.

Q.   Oh, 200 to 300 total?

A.   Correct.

Q.   And those 200, 300 total people have no other reason other than to conduct acts of violence against their perceived

A 26 599 077                     404                    August 30, 2000

targets in Middle East and other parts of the world.  That's your testimony?

A.   Within their, within the, within the context of their membership in the Palestinian, Palestinian Islamic Jihad, yes.

Q.   And yet these 200 to 300 people have engaged in, to your knowledge, a single terrorist incident in the last three years?

A.   Correct.

Q.   Could you give me some specifics about this November 1998 terrorist incident?  Where did it occur?

A.   It occurred in Israel.

Q.   Where in Israel?

A.   I believe it was the bombing of a market, a suicide bombing of the market in Israel.  I don't know the exact location.

Q.   And who attributed to the Palestinian Islamic Jihad?

A.   Well, the PIJ claimed credit for it, but I believe there's been confirmation of that from other sources.

Q.   And this is based on, this testimony is based on what source?

A.   Some recent research that I've done.

Q.   And can you tell me the source?

A.   One source, I believe was a State Department document that I reviewed that's not --

Q.   And what was that State Department document?

A 26 599 077                  405                  August 30, 2000

Okay.

JUDGE FOR THE RECORD

Let me go to tape 13.

(TAPE 13)

JUDGE FOR THE RECORD

Pick up tape 13.

JUDGE TO MR. COLE

You may go ahead, Mr. Cole.

MR. COLE TO SPECIAL AGENT WEST

Q.   How do you define terrorism?

A.   Paraphrasing the U.S. Government's definition of terrorism, it's violence in any form that's committed against persons of a particular group by an organization or individuals to obtain a political goal.

Q.   Persons of a political, of a particular group?

A.   Yeah.  Or innocent, or innocent persons who are non-combatants, non-military personnel.

Q.   Okay.  So it's just to clarify, would you agree that terrorism consists of attacks against civilians, not attacks against military personnel?

A.   I believe that terrorism can be conducted against military personnel as well.

Q.   All right, do you, is it your understanding that the United States' definition of terrorism includes targeting military?

A 26 599 077                    407                    August 30, 2000

A.   Yes, I believe it's actually been recently amended to include that possibility.

Q.   And where has it been recently amended?

A.   I can't cite it now but I believe, I believe it has been.  There are several definitions of, official U.S. Government definitions of terrorism.

Q.   All right.  And so --

A.   I mean, what agency you're talking to.

Q.   So is it your testimony then that terrorism is not limited to non-combatants or is limited to attacks against non-combatants?

A.   Are you asking my opinion or the U.S. Government's version?

Q.   I'm asking for your working definition.

A.   Terrorism in my working definition could include attacks against military personnel.

Q.   Against non, against combatants?

A.   Both, yes, both military and non-military personnel.

Q.   Is it, is it terrorism when the -- strike that.  You do recognize that armed struggle is not the same thing as terrorism?  Is that correct?

A.   It can be something other than terrorism.

Q.   Okay.  And it's, and when is armed struggle not terrorism?

MR. VARA TO JUDGE

A 26 599 077                    408                    August 30, 2000

Objection, Your Honor.  Relevance.

MR. COLE TO JUDGE

Your Honor, the --

JUDGE TO MR. VARA

I think it is relevant.

JUDGE TO MR. COLE

Are you saying it's all right to blow away American soldiers?

MR. COLE TO JUDGE

No.

JUDGE TO MR. COLE

You just said it's all right, it's not terrorism --

MR. COLE TO JUDGE

Your Honor, I'm not testifying, I'm just asking questions.

JUDGE TO MR. COLE

No, but you've just sort of said to him that that's the definition of terrorism.  And I must say that I take exception to that.

MR. COLE TO JUDGE

What I'm asking him is what's the difference between armed struggle and terrorism.  He's indicated there's a difference between armed struggle and terrorism.  Armed struggle, Your Honor, includes the United States war with Iraq as armed struggle.  Armed struggle includes World War II.  I think it's generally understood that those, those do not constitute

A 26 599 077                     409                  August 30, 2000

terrorism.  It is generally understood that terrorism consists of -- I don't want to testify, Your Honor.  I want to ask the witness.  He's stated there's a difference between armed struggle and terrorism.  I'd just to get that out.

JUDGE TO MR. COLE

Okay.

SPECIAL AGENT WEST TO MR. COLE

A.    Legitimate recognized military conflict is not terrorism.  Actions that occur, violent street crime, for instance, is not necessary, necessarily terrorism.  It isn't terrorism.  However, violence that is committed against innocent people, be those innocent people civilians or military persons, violence which is committed for political goal is terrorism, in my view.

Q.    Violence against innocent people committed for a political goal is terrorism?

A.    Yes.

Q.    You stated that the Palestinian Islamic Jihad exists for no other reason except to conduct acts of violence against their perceived targets in the Middle East and other parts of the world.  Are you aware of any actions that the Palestinian Islamic Jihad has taken, any terrorist actions that have been taken outside of the Middle East?

A.    Outside the Middle East?

Q.    Yeah.

A.   No.

Q.   In the deportation hearing, Mr. West, you testified that the ICP had received, quote, somewhere in the nature of a $1 million per year through a Swiss bank account or accounts.

A.   I testified --

Q.   Is that still your testimony?

A.   Yes, I testified to that.

Q.   Is that still your testimony?

A.   Yes.

Q.   What's the evidence upon which you base your opinion, your statement that they've received in the nature of a $1 million per year through a Swiss bank account or accounts?

A.   The investigation that has been going on now for a number of years and the information that has been developed from that investigation.

Q.   What specific sources?

MR. VARA TO JUDGE

Your Honor, at this time, I would have to advise Mr. West that he can, certainly, of course, answer the question unless it relates to information that at this point is still either classified or relates to classified information and would reveal sources and methods of the U.S. Government in obtaining such information in a national security investigation.

MR. COLE TO JUDGE

I was under the impression that we clarified earlier that

A 26 599 077                      411                    August 30, 2000

all of Mr. West's testimony can be based solely on open source, public record evidence and so forth.

JUDGE TO MR. COLE

Well, if you go far enough in cross-examination, I mean, you know, you're probably going to undercover all kinds of stuff.

MR. COLE TO JUDGE

Well, I'm expecting that his answers should be limited since this is an open source, an open hearing and we have a right to cross-examine, he should be limiting his answers to open sources so that we can pursue those.

JUDGE TO SPECIAL AGENT WEST

Q.   Do you understand that?

A.   Yes, sir.

Q.   So you do.

A.   Yes, sir.

SPECIAL AGENT WEST TO MR. COLE

A.   I can't answer your question any further without going beyond the scope of what Mr. Vara has described.  I, --

Q.   So you can make the assertion, but you can't identify a single source to support the assertion.

A.   That's what I just did.

MR. COLE TO JUDGE

Your Honor, we ask that the assertion be stricken from the record since we have no opportunity to cross-examine Mr. West about the sources of the information.

A 26 599 077                    412                    August 30, 2000

MR. VARA TO JUDGE

Your Honor, I would note for the record that counsel is the one that brought it up in this proceeding. He, at the beginning of his question, he represented and identified the testimony as coming from deportation proceeding. A proceeding that's had its judicial review and at which Mazen Al Najjar has been represented all along. That issue is res judicata and collateral estoppel at this point.

MR. COLE TO JUDGE

Your Honor, it wasn't an issue in the deportation hearing.

JUDGE TO MR. COLE

Well, Mr. Cole, you cannot go, take a previous hearing and then ask a question about it and then say, let's have it stricken because I'm the one that brought it up.

MR. COLE TO JUDGE

No, I'm asking that the answer be stricken because he, because he's has testified --

JUDGE TO MR. COLE

You furnished the answer.

MR. COLE TO JUDGE

No, I said --

JUDGE TO MR. COLE

You stated --

MR. COLE TO JUDGE

My question is not evidence. His answer is evidence.

A 26 599 077                        413                   August 30, 2000

JUDGE TO MR. COLE

You furnished the question.

MR. COLE TO JUDGE

Right.

JUDGE TO MR. COLE

The question was --

MR. COLE TO JUDGE

I'm not asking that the question be stricken.

JUDGE TO MR. COLE

Is there $1 million in Swiss accounts?

MR. COLE TO JUDGE

Right. And I'm asking whether, I'm asking that the answer be stricken because he is unwilling to identify the source of his, the information.

JUDGE TO MR. COLE

No, absolutely not. You're the one that brought it up, you're the one that is going to have to live with it.

MR. COLE TO JUDGE

Your Honor, I -- this witness has made a lot of statements about the Islamic, the Islamic Committee for Palestine under oath. A number of them, particularly in retrospect, particularly in light of what has happened in the last five years, seem to be to, to be very questionable and I believe that we ought to have the opportunity to cross-examine him with respect to this. I also believe that he should be limited and must be limited in

A 26 599 077                   414                   August 30, 2000

this hearing to answer questions based on open source information so that we have the opportunity to cross-examine.  Here I ask a question, based on his prior testimony, which I believe is not true, and I believe there is no evidence of this, I want to get at why he made a statement like that without any source.  And then he says, I can't tell you the sources.  If he can't tell me the sources, I have been blocked from my ability to pursue this issue of Mr. West's credibility regarding the kinds of allegations he's willing to make in a proceeding involving Mr. Al Najjar.

JUDGE TO MR. COLE

(Indiscernible).

MR. COLE TO JUDGE

And what, what I am --

JUDGE TO MR. COLE

There's only one question that he can't answer so far.

MR. VARA TO JUDGE

And Your Honor, we would note again that what we're dealing with here and Mr. Cole should know this is a separate proceeding from the deportation proceeding.  In fact, the Government has not introduced, to my knowledge, unless something happened while I was out of the room, the transcript of the merits proceedings in the prior case.

MR. COLE TO JUDGE

I haven't --

A 26 599 077                     415                     August 30, 2000

MR. VARA TO JUDGE

So therefore, we believe that if he raises issues that come from other proceedings, what other Government agencies might have known, what Mr. West know in an entirely different context, he opens the door. Mr. West is not his witness. Mr. West is not on their witness list. Mr. West is up here on cross-examination based on the direct examination we conducted today. We did not ask him any questions related to non-open source material.

JUDGE TO MR. COLE

Mr. Cole?

MR. COLE TO JUDGE

I, my, again, all I'm trying to get, Mr. West made a number of statements over a course of, under oath, in connection with Mr. Al Najjar. Of course, I understand that the deportation hearing record is not part of this record. But it is nonetheless a prior sworn statement of the witness. If it's made an unfounded prior sworn statement of the witness, that would, I think call into question the credibility of the witness in many of the statements that he's made here today. But for him then to say, yes, it's true but I can't answer any questions about what it's based on is basically to get confidential information, possibly classified information. In any event, information that I cannot pursue with Mr. West into a record, which is supposed to be about providing Mr. Al Najjar an opportunity to cross-examine the witnesses and test the evidence. Here he's saying, I'm going

A 26 599 077                    416                    August 30, 2000

to assert this.  It's still true, but I can't tell you how, where or why it is true.

JUDGE TO MR. COLE

So your complaint is you don't believe there should be secret evidence?

MR. COLE TO JUDGE

No, there hasn't been any secret evidence.  My, I thought, I thought we, I thought the agreement, I'm not sure whether it was an agreement or order or what, but what Mr. Vara represented was that Mr. West was going to testify solely on the basis of open source testimony, solely.  And my understanding of Judge Leonard's ruling is that the public proceeding is supposed to convey solely on open source testimony.  So when I ask him a question and he answers that question based on non-open source testimony and then I ask him up a follow-up question and he says, well, I can't tell you the answer to that.  Then I think the answer should be stricken because then by definition, he's relying on non-open source evidence and I am then unable to pursue Mr. Al Najjar's due process rights in questioning the witness.

JUDGE TO MR. COLE

You can go down all kinds of roads and you can do all kinds of cross-examination, I'm sorry, but I can't authorize him to answer that question.

MR. COLE TO JUDGE

A 26 599 077                        417                    August 30, 2000

I'm not asking you to do that.  What I'm asking you to do is, is to strike answers where he reveals that the answer was based upon non-open source information.  If it was open source information, I have no problem, but at this type of --

JUDGE TO MR. COLE

That didn't have anything to do with direct examination. You went down a road that was totally different.

MR. COLE TO JUDGE

It goes to an assertion that Mr. Wise has made against Mr. Al Najjar.

MR. VARA TO JUDGE

Your Honor, again --

MR. COLE TO JUDGE

Under oath.

MR. VARA TO JUDGE

Again the order of Judge Leonard indicates the reason we're here is because there is at least, at this point, there is an indication that the prior proceeding and the way the Government presented the evidence and the way it was conducted may have violated due process.  But if counsel seeks to open the door, I don't know that he can violate due process against his own client.  He asked the question that relates to classified evidence.  Special Agent West cannot testify to that evidence. If you don't want to ask the question, don't ask the question.

MR. COLE TO JUDGE

A 26 599 077                      418              August 30, 2000

No, I --

MR. VARA TO JUDGE

It exceeds the scope of direct.

MR. COLE TO JUDGE

But if he can't, if he can't answer the question, then I'm happy if he says, I can't answer the question. Then there's not an answer that needs to be stricken. What I'm objecting to is the --

JUDGE TO MR. COLE

Well, if he hadn't answered the question, he had already answered the question on, you know, about the $1 million.

MR. COLE TO JUDGE

That's right.

JUDGE TO MR. COLE

In the deportation hearing.

MR. COLE TO JUDGE

Right. And the problem, Your Honor, is that you often can't tell until the follow up question whether or not he was answering based on open source testimony. If he said, no, I have no open source basis for making that statement, then fine, we move on. Maybe there's a secret evidence source, maybe you'll see it, maybe you won't. But this hearing is supposed to be about open source testimony. And so --

JUDGE TO MR. COLE

Well, you can't go down roads and lay traps and then throw

A 26 599 077                    419                    August 30, 2000

them out and say --

MR. COLE TO JUDGE

I'm not trying to lay a trap, Your Honor.

JUDGE TO MR. COLE

Well, it certainly looks that way to me.  You got a trap one way or the other, whether you wanted to or not.

MR. COLE TO JUDGE

No, I, Your Honor, I'm not trying to lay a trap.  What I'm trying to do is find out whether there are sources that we can, for some of the assertions that Mr. West has made.

JUDGE TO MR. COLE

Well, I think you can go ahead and ask him.  But the one that you just asked him is off limit.

MR. COLE TO JUDGE

Right.

JUDGE TO MR. COLE

And, and all I'm trying to get clear, Your Honor, is when he answers a question, I have no objection to him saying I can't answer that question because I have no open source testimony.  What I object to, I'm going to answer that question but then I'm going to tell you, I'm going to answer that question based on non-open source testimony, which is what he did and then I'm going to tell you that I, I can't let you ask me any more questions about that.  That, that kind of assertion, I think has no place in an open source public record proceeding and I think

it violates Mr. Al Najjar's due process rights to challenge the source.  He could say all kinds of things in response to my cross-examination, based on secret classified information and then when I follow-up, he says, well, I can't tell you the source of that.  Then he's basically getting classified information or evidence based on classified information into the public record without my ability to cross-examine him.  I thought that's why the Government said, from the outset, that Mr. West is going to be testifying based solely on public source information.  If he's going to be testifying solely on --

JUDGE TO MR. COLE

They did.

MR. COLE TO JUDGE

Public source information.

JUDGE TO MR. COLE

They did, you went down that road.

MR. COLE TO JUDGE

No, I did not ask him about non-public source information.

JUDGE TO MR. COLE

Well, you're going to have to live with that answer.

MR. VARA TO JUDGE

Your Honor --

MR. COLE TO JUDGE

Can I have an instruction for the future then, to Mr. West, that he only answer questions based on open source information?

A 26 599 077                    421                    August 30, 2000

And if I ask him a question that he cannot answer because his knowledge is based on information that he cannot disclose that he simply state that and not give an answer and then frustrate my client's ability to pursue that question.

MR. VARA TO JUDGE

Your Honor, if he asks questions such as the one that he asked, did you say on a prior occasion that a $1 million was funneled through an account, answer yes or no.  Mr. West answered yes or no, I said that.  He's not saying that he has a new assertion, yes, I have information that says they funneled $1 million.  He didn't say that.  He said, that's what I testified to in a prior hearing.  I think that's the issue.  If Mr. Cole wants to go down the road of prior testimony or other information, if he wants to ask him, are there any federal agencies in possession of information related to X, Y and Z.  Mr. West might say yes.  Well, can you tell us what that information is?  No, I can't.

MR. COLE TO JUDGE

And all I'm asking is that we just for clarity purposes and so that we can have a proceeding here in which he has a fair opportunity to confront the witness, that the witness, if an answer requires reliance on classified information, information that he can't share, he simply say that.  And then we move on to the next question.

JUDGE TO MR. COLE

A 26 599 077                    422                    August 30, 2000

Okay. I'm pretty sure, that's my understanding of what just happened.

MR. COLE TO JUDGE

All right, can we have, can we make it clear that that will be what will happen? That Mr. West should not answer any question that he cannot answer on the basis of classified information?

JUDGE TO SPECIAL AGENT WEST

Q. Do you understand that?

A. My version of the 5th Amendment, Your Honor?

JUDGE TO MR. COLE

You know, it seems to me when he answers a certain question that it's a flag that goes up in here to everybody and they say, oh, then that's a classified matter.

MR. COLE TO JUDGE

Right. And that's why I'm trying, I'm trying to avoid that because I think, because this is a proceeding that is supposed to be an open source proceeding. So I, all I'm saying is let's, let's not have testimony that is then backed up by an assertion that you can't probe the testimony.

JUDGE TO MR. COLE

Well, he's got to be honest. And if you ask him a question, does he know something?

MR. COLE TO JUDGE

And he can say, I can't answer that question because it was

A 26 599 077                    423                    August 30, 2000

based solely on classified information or information I cannot reveal.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

That's fine.

JUDGE TO SPECIAL AGENT WEST

Q. If there's an answer where you cannot give because of classified information, try to answer it as honestly as possible, answer all questions as honestly as possible, but within those guidelines.

A. Understood, Your Honor.

MR. COLE TO JUDGE

Thank you.

MR. COLE TO SPECIAL AGENT WEST

Q. You testified earlier that you believed that Sheik Abdel Zes Odi entered illegally or surreptitiously because you could find no entry in an INS computer, no records of his entry in the INS computer. Is that correct?

A. I believe I testified that, correct, I could not find any record of his entry under any versions of his name that I was aware of. And that if he did, in fact, enter, in all likelihood, it would have been under another identity or surreptitiously.

Q. Does the INS record the entry of all aliens who come to the United States?

A 26 599 077                    424                    August 30, 2000

A.   Not all of them, no.

Q.   Did you, who issues visas?

A.   The State Department.

Q.   Did you check with the State Department to ask whether they have issued a visa to Sheik Odi?

A.   Yes.

Q.   Did they?

A.   The response I got from the State Department was that there, they had no record under the identities that we knew.

Q.   And so --

A.   The variations of the names.

Q.   Did you check with the American Embassy in the United Arab Emirates?

A.   No.

Q.   The American Embassy in the United Arab Emirates issued Sheik Odi a five year visitor's visa in September of 1989 under his, under the name that you have used for him today.  Do you believe the State Department would have a record of that?

MR. VARA TO JUDGE

    Objection.  Lacks foundation, assumes facts not in evidence.

JUDGE TO MR. VARA

    Overruled.

JUDGE TO SPECIAL AGENT WEST

Q.   You may answer if you can.

SPECIAL AGENT WEST TO MR. COLE

A.   The last part of your question, I'm sorry?

Q.   Do you believe the State Department would have a record of that?

A.   I would hope they would.  I don't, I wouldn't know that they would but I would hope they would.

Q.   And when you, is it your understanding that the State Department did an exhaustive search in, in connection with your request and that they then said to you, no, we never issued a visa to Sheik Odi?

A.   I don't know what kind of search the State Department did.  I made the inquiry and I got a response or one of my agents did.

Q.   Isn't it true that Sheik Odi has, is now living in Gaza with Israel's permission?

A.   I personally don't know where Sheik Odi is right now.

Q.   Do you know if Sheik Odi has ever been convicted of engaging in any terrorist act?

A.   Yes, I know that he's been convicted in Israel of, I don't recall the exact wording of the violation, but I believe it had to do something with him inciting, inciting violence of some sort, but I don't believe -- but that may have been in 1984.

Q.   1984?

A.   I believe, I'm not certain.

Q.   During that period of time when he was, you testified that he was here in the United States, has he been convicted of

A 26 599 077                      426                    August 30, 2000

engaging in any criminal activity during that period of time? From 1988 to 1992?

A.   I'm not aware of that.

Q.   Mr. Al Ghanoushi, you testified that he was convicted of attempting to assassinate the president of Tunisia.  Is that correct?

A.   I believe so, correct.

Q.   Do you know how many other people were convicted in the same trial with him in attempting to assassinate him?

A.   The exact number, no, but there were several, I believe.

Q.   More than 10?

A.   I don't know that.

Q.   Do you know whether the trial was criticized by the State Department as lacking in procedures that would ensure a fair trial?

MR. VARA TO JUDGE

Objection, relevance.  Mr. West's opinion on whether or not the State Department may or may not have criticized a trial procedures of another country is irrelevant.

JUDGE TO MR. VARA

Overruled.

JUDGE TO SPECIAL AGENT WEST

Q.   You may ask, answer if you know.

A.   I don't know what the State Department did relative to

A 26 599 077                        427                    August 30, 2000

that trial.

MR. COLE TO SPECIAL AGENT WEST

Q.   Are you aware that Robert Pelletreau, Ambassador Robert Pelletreau, the Assistant Secretary of State for the Near East Affairs stated that Rashid Ghanoushi of the Tunisia Not a Party is also I think a moderate, as far as we know, he has not advocated any violence or encouraged any terrorism.

A.   I am not aware of that statement.

Q.   You're not aware of that statement?

A.   No.

Q.   I'm going to --

MR. COLE TO JUDGE

May I approach the witness?

JUDGE TO MR. COLE

Yes.

MR. VARA TO JUDGE

I'm going to object, Your Honor.  He's approaching the witness with a document that hasn't been presented to counsel for the Government.

JUDGE FOR THE RECORD

That will be marked as Exhibit 12 for identification.

MR. COLE TO SPECIAL AGENT WEST

Q.   If you look at --

MR. VARA TO JUDGE

Your Honor, we would object to any questions being asked

A 26 599 077                    428                    August 30, 2000

No, it's a magazine.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

And it's Volume 12, Number 4, dated May/August 1996.

JUDGE TO MR. COLE

Okay.   And what is your question.

MR. COLE TO SPECIAL AGENT WEST

Q.   Have you seen this document before?

A.   I don't recall seeing this before, no.

Q.   Have you reviewed the file for Mazen Al Najjar in preparation for this hearing at any time?

A.   I've reviewed his file, yes.

Q.   But you don't recall this document which we submitted in the deportation hearing in which Robert Pelletreau, Assistant Secretary of State for Near East Affairs contradicts your assertion regarding Mr. Ghanoushi?

MR. VARA TO JUDGE

Well, Your Honor, first of all, we object to counsel's characterizing what is contained in this document.  Second of all, counsel assumes that the alien file for Mazen Al Najjar is the same as the litigation for Mazen Al Najjar.

MR. COLE TO SPECIAL AGENT WEST

Q.   Have you reviewed the litigation file regarding the prior bond and deportation hearings with respect to Mr. Al

A 26 599 077                    430                    August 30, 2000

Najjar?

A. Only parts of it.

Q. Do you have any open source information to connect Mr. Ghanoushi to any kind of terrorism? Beyond the in absentia conviction that, for attempted to assassinate the president of Tunisia?

A. I believe Ghanoushi is identified in the State Department open source global terrorism reports that, that are available. I think he's been identified as the leader of a radical Tunisian Islamic group in that document. There are, I have seen various academic books, essentially academic documents from those books or books that are academic productions that, on Middle East matters that have identified him as such.

Q. And have there any evidence, any open source evidence that he is engaged in any terrorist acts, other than the -- let me repeat the question, because I don't think I heard an answer, other than the in absentia conviction is there any open source evidence that Mr. Ghanoushi engaged in any terrorist acts?

A. Can I ask for a clarification by which you mean Ghanoushi engaging in terrorist acts? In throwing bombs or shooting people or what's your -- could you clarify?

Q. Throwing bombs, shooting people, ordering a terrorist attack, any actual terrorist involvement in a specific terrorist incident?

A. No, he's identified as a leader of a group, an

A 26 599 077                    431                    August 30, 2000

organization.

Q.   Okay.  Do you have any evidence that Mazen Al Najjar sought to obtain a visa for Mr. Ghanoushi?

A.   Directly?  No.

Q.   Do you have any evidence that Mr., that Mazen Al Najjar sought to obtain a visa for Abdel Zes Odi?

A.   Not directly.

Q.   You say not directly.

A.   That's correct.

Q.   Do you have any evidence and I'd like you to keep in mind the Judge's instruction that your answers are supposed to be open source information.

A.   Right.  Right, well, if you'd like an answer to that, I'll have to elaborate.

Q.   Let me clarify that.  Do you have any open source information that Mr. Al Najjar sought to obtain a visa for Mr. Al Ghanoushi?

A.   Again, my answer is not directly.

Q.   And the same question with respect to Mr. Odi.

A.   Same answer, not directly.

Q.   Do you have any evidence that -- do you have any indirect evidence that Mr. Al Najjar sought to obtain a visa for Mr. Al Ghanoushi?

A.   Yes, but I need to elaborate to explain that answer. Going back to the totality of the circumstances if you will, in

this regard, with Mr. Al Najjar and his role in Wise and ICP, as part of his efforts in managing and running Wise and his efforts in ICP and assisting in orchestrating conferences where these people appeared, to that extent, being involved in the orchestration and, and production of these conferences, wherein these people were invited to come to speak, yes that's an indirect involvement in arranging to bring these people into the United States.

Q.   Do you need an invitation to seek a visa to come into the United States?

A.   In some circumstances, yes, you do.

Q.   And do -- what circumstances?

A.   Someone coming to speak at a conference, legitimately, for instance, who is seeking a visitor's visa, a B-1 or B-2 visitor's visa may be asked by the issuing Consulate office to provide a letter of invitation from whatever organization is inviting them to help establish the benefits of their trip to the United States.

Q.   Is it legally required to obtain a visitor's visa that you have an invitation from someone in the United States?

A.   That's, that's, not a stand alone requirement, no.

Q.   Plenty of people obtain visitor's visa without any invitation from the United States?

A.   Of course.

Q.   Thousands and thousands every year, right?

A 26 599 077                    433                    August 30, 2000

A.   Maybe millions.

Q.   And in fact, there is no legal requirement to a visitor's visa that you have an invitation to come to the United States?

MR. VARA TO JUDGE

Objection.  Asked and answered.

JUDGE TO MR. COLE

Sustained.

MR. COLE TO SPECIAL AGENT WEST

Q.   Is it your view that it is a, that it poses a threat to national security to invite someone to a conference who the Government might determine shouldn't be admitted to the country?

A.   Do you want a yes or no answer or something more?

Q.   A yes or no.

A.   Yes.  It can be.

Q.   To simply invite someone to a conference, that the Government may find to be excludable.

A.   It can be.

Q.   Is it illegal to invite someone to a conference who the Government finds excludable?

A.   It can be.

Q.   Do you know whether anyone has ever been convicted for extending an invitation to anyone to come to the United States to speak at a conference?

A.   I'm not aware of that, no.

A 26 599 077                    434                    August 30, 2000

Q.   Do you have any open source evidence that Ramadan Shallah engaged in any terrorism while he was in the United States?

A.   Again, I'd ask for clarification for Ramadan Shallah engaging in terrorism.  What do you mean by that?

Q.   What I said before, in any way was he, did he conduct, order, inspire to, commit an act of terrorism while he was in the United States?

A.   I can't answer that relative to open source information.

Q.   So you have no open source information?

A.   That's correct.

Q.   Do you have any open source information suggesting that Ramadan Shallah did not work for Wise during the period of time when he was here on an H-1B visa petition to work for Wise?

A.   I don't believe Mr. Shallah ever was here on an H-1 visa.  I know that petitions were filed, but I know that he was here on a B visa.

Q.   I'm sorry, on a --

A.   On a B, visitor's visa.

Q.   Do you have any evidence that the petitions filed, the petitions filed on behalf of Ramadan Shallah were into work as with Wise, were in any way fraudulent?

A.   Yes.

Q.   What about them was fraudulent?  What statement of the

A 26 599 077                        435                  August 30, 2000

H-1B petition was false?

A.   Well, we're getting into an area not open source, not necessarily not open source, but --

Q.   Remember, I want only open source information.

A.   All right, then I'll have to change my answer to no.

Q.   Okay.  So you have no open source information that the petition, that any statement on the petition was false?

A.   I, that's correct.

Q.   Okay.  And with respect to Basheer Nafi?  Do you have any open source information that the H-1B visa petition filed for Basheer Nafi was false?

A.   Yes.

Q.   What statement was false?

A.   The fact that he was employed for various periods of time at Wise, when, in fact, he was not.

Q.   So is it your testimony that he, that the H-1B visa petition states that he -- I'm sorry, let me rephrase that question.  The H-1B visa petition states that he is going to work for Wise, correct?

A.   They're, I believe there were two H-1B visa petitions.  One was an original one, an original wherein he was granted the status and the other was an extension.

Q.   All right.  And which one are you claiming was, was false?

A.   The, again without looking at the documents, the

A 26 599 077                    436                    August 30, 2000

extension request I believe stated that in a certain part that he, Mr. Nafi had been employed at Wise for a certain period of time. And in fact, he was not employed at Wise during that time.

Q. What period of time was he not employed at Wise when it was stated that he was employed at Wise?

A. Without reviewing the documents, I cannot say exactly when it was.

Q. Do you know whether anyone has ever been charged with fraud with respect to the H-1B visa petition with respect to Basheer Nafi?

A. Criminally or otherwise?

Q. Yeah.

A. Not criminally.

Q. Criminally?

A. Not criminally.

Q. Has there been any deportation charge filed against the petitioners for Mr. Nafi?

A. Not the petitioners, no.

Q. Mr. Nafi was deported, correct?

A. Correct.

Q. And he was deported, isn't it true he was deported because for one month after Wise was closed as a result of the seizure of its all of entire offices he worked for another organization without having formally notified the INS of that. Isn't that correct?

A 26 599 077                     437                  August 30, 2000

A.    Not entirely, I believe he was deported, he was deported because he was found to have violated his H-1B status by not working at Wise.

Q.    By not working at Wise during a single month when Wise no longer existed.  Is that correct?

A.    I don't, I don't know that.

Q.    Okay.  So do you have any open source information that he violated his H, was found to have violated his H-1 visa petition by not working for Wise, during the time period that Wise existed?

A.    Yes.

Q.    And what, what was the time period?  What's the open source information?

A.    Investigative reports generated by a special agent. of an INS.

Q.    That, that state that he was deported for having not worked for Wise at a time when Wise existed?

A.    No, that, the investigative reports don't to an investigation that was conducted by the INS that established, in fact, while Mr. Nafi was supposed to be working at Wise, he was, in fact, working somewhere else.  Those investigative reports.

Q.    Right.  And but you have no open, isn't it true that you have no open source information that the period of time that that allegation refers to and the period of time for which he was ultimately deported was the one month after Wise closed, was

A 26 599 077                              438                    August 30, 2000

closed down because of the search that you participated in?

A. No, the, the time, the one month time period, the investigative reports that I'm referring to deal with time periods beyond one month.

Q. Okay. And they, those -- just to clarify, those reports state that he was deported for having worked, not worked for Wise at a time when Wise existed.

A. Those investigative reports were prepared, I believe they were prepared prior to his deportation proceeding.

Q. So they don't say that he was deported for having worked for Wise?

A. That's correct.

(TAPE 14)

JUDGE FOR THE RECORD

Pick up on tape 14.

MR. COLE TO SPECIAL AGENT WEST

Q. What's the open source basis for your statements that Basheer Nafi is a founding member and leading member of the Palestinian Islamic Jihad?

A. There are a number of open sources. Again, I refer to academic research documents, number of books that have been written by, on the topic of radical Islamic groups. In fact, a number of them were written by individuals that are from the Middle East and open source, U.S. Government documents, State Department report. I believe those exist that relate to Mr. Nafi

being identified as a founding member of the PIJ.

Q. The State Department report?

A. I believe there are.

Q. Well, what --

A. I can't site the specific report, but I'm, I'm, I do believe I have read State Department reports that relate to that.

Q. So you cannot point me to a State Department report?

A. Correct. Not right now.

Q. Can you point me to a single source? Specific source?

A. Yes, I, there is a book and this is just one of many books, but I believe it's Islamic Fundamentalism and I'm probably not getting the title correct, but it's, I believe, Islamic Fundamentalism and the West Bank or something to that effect.

Q. Who wrote the book?

A. Top of my head, I can't remember the author, although I believe his last name begins with a Z. But again, it's just one.

Q. And what did the book say?

A. It identified Nafi as one of the founding members of the Islamic Jihad Movement of Palestine from, along with, Al-Zolda and Fatisha Cogna (phonetic sp.).

Q. And what was the source, what was the source of that assertion in the book?

A. I don't recall.

Q. Was there any, did the book refer to any source? Did this book have footnotes?

A 26 599 077                           440                    August 30, 2000

A.   No, it did.   It was a footnoted book, it referred to research.

Q.   Did you look into the source?

A.   I actually did and I don't know if this was from this specific book, but there, I did, in fact, obtain some additional documents from, as a result of information continued, if not in that book, another book.  And again, this has been several years ago.  But one of the documents, one of the additional documents that, that, if not that book another book led me to was a document that was published by a research, an academic research facility in Israel.  I believe that, that document refers to Nafi in that historic sense as well.

Q.   And what's that document?

A.   I don't recall the title of it.  Again, it was several years ago.

Q.   Do you remember who was the author?

A.   I believe a gentleman by the name of Recis, L. E. Recis (phonetic sp.) was one of the authors.

Q.   And what was his source?

A.   I don't recall.

Q.   Did Basheer Nafi, to the best of your recollection, engage in fundraising for the Palestinian Islamic Jihad while he was in the United States?

A.   In order to answer that, in my view accurately I'll have to elaborate.  That's not one I can really give a yes or no

A 26 599 077                    441                    August 30, 2000

answer to.

Q.   Well, let me ask you this.  You reviewed the videotapes and in fact in the Composite Videotape 1, you included short segment of footage of Basheer Nafi.  Isn't that correct?

A.   That's correct.

Q.   Did he, was he doing a fundraising appeal?

A.   Not directly, no.  Not in that videotape.

Q.   Was he indirectly doing a fundraising appeal?

A.   Well, I would -- may I elaborate with my answer?

Q.   Did he appear, he appeared at a conference.  Is it your testimony that he was, by appearing at the conference, indirectly engaged in fundraising for the Palestinian Islamic Jihad?

A.   The appearance at the conference of Mr. Nafi along with other notable radical Islamic leaders in itself, at least indirectly would contribute to the, the environment of people attending that conference in the audience wanting to give money to the cause because they have come to listen to the speakers, the leaders of the group, of the organizations and that contributes to the willingness of your view of these, the attendees to contribute money.

Q.   All right.  But you testified previously that you can't recall any fundraising at the conference, at the annual conferences.  He appeared at one annual conference.

A.   Right.

Q.   According to your videotape.  You can't recall any

A 26 599 077                      442                      August 30, 2000

fundraising at those conferences toward the Palestinian Islamic Jihad?

A.   The one videotape I recall watching specifically, the conference, the fundraising part of it, that's correct.

Q.   All right.  So even though you can't recall any evidence that the conference, the annual conference had fundraising for the Palestinian Islamic Jihad, the mere fact that he participated in a conference to which thousands of people came, an academic conference means that he was indirectly fundraising for the Palestinian Islamic Jihad?

MR. VARA TO JUDGE

Objection.  This is argumentative. He's already asked all these questions in separate questions.

MR. COLE TO JUDGE

I'm just trying to get the basis of this assertion that he's indirectly.

JUDGE TO MR. VARA

Overruled.

JUDGE TO SPECIAL AGENT WEST

Q.   You may answer.

A.   Yes.

MR. COLE TO SPECIAL AGENT WEST

Q.   Okay.  Do you have any open source evidence that Mazen Al Najjar was aware of Ramadan Shallah's connections to the Palestinian Islamic Jihad if he had any while Ramadan Shallah was

A 26 599 077                        443                    August 30, 2000

working in the United States?

A.    Again, if I answer that, it would require some elaboration.

Q.    Do you, do you have any open source evidence?  The answer is --

A.    In my view, yes.

Q.    Okay.  When did you develop that open source evidence?

A.    Over the past five years.

Q.    When specifically did you develop that evidence?

A.    Well, I can't say there was a specific time.  It was the beginning at the onset of the investigation, which literally is still going on as we speak.

Q.    And what, what is that evidence?

A.    I'll go to the totality of the evidence that's been seized so far, that while, maybe not necessarily presented in the court but we do have it in our possession, establishing a relationship between Mazen Al Najjar, Ramadan Shallah through Wise, through the ICP. Combined with the fact that Mr. Al Najjar is a highly educated and intelligent individual who has purported himself in documents submitted by himself in various visa petitions, in support of visa petitions and such as someone knowledgeable of Middle Eastern affairs.  Combined with the, what's generally accepted as the historic acknowledgement of Basheer, I'm sorry, that Ramadan Shallah has been connected to the PIJ for a long time.

A 26 599 077                      444                      August 30, 2000

Q.   Okay.  So we have Ramadan Shallah and Mazen Al Najjar worked at Wise.

A.   Correct.

Q.   Mazen Al Najjar is intelligent.  And what was the third thing?

A.   More than three.  He has, he has established himself or represented himself in, in, to be someone who is --

Q.   Knowledgeable.

A.   Knowledgeable individual in Middle Eastern affairs.

Q.   Okay.  So I thought there was a third thing. Intelligent, knowledgeable in Middle Eastern affairs, Ramadan Shallah and Mazen Al Najjar worked together and there was a third?

A.   Yes, there's, it's, through academic resource documents, as far as open source publications, etcetera, Ramadan Shallah has been identified as someone who has been a member of the Islamic Jihad Movement of Palestine for a long period of time, prior to his coming to the United States.

Q.   Okay.  What, what documents are those?

A.   Well, again, I refer back to various academic research documents and books that I've seen, that I've been told of in the past.  Some of which, several, probably half a dozen or so, which I've read right now, over the past five years, right now I just can't name the specifics.

Q.   Now, at the deportation hearing, you admitted that you

A 26 599 077                445                August 30, 2000

had no evidence either open source or classified that Mazen Al Najjar knew of Ramadan Shallah's involvement in Palestinian Islamic Jihad. Yet, you knew at that hearing that he, that he and Ramadan Shallah had worked together. You knew that Mazen Al Najjar was intelligent and knowledgeable in Middle East affairs, you read this academic research. So what is it that has changed your testimony?

A.   I had not done the academic research or read that research material at the time.

Q.   Okay. And, okay, and what about the academic research led you to believe that Mazen Al Najjar was committed in that research?

A.   I'm sorry?

Q.   So the only thing that changed from the time when you said you had no evidence, that Mazen Al Najjar knew of Ramadan Shallah's involvement in Palestinian Islamic Jihad, you read some academic research that identified Ramadan Shallah as being involved in the Palestinian Islamic Jihad. What evidence do you have that Mazen Al Najjar read any of those documents?

A.   Oh, I don't have direct evidence that he did.

Q.   Okay. Do you have indirect evidence that he read any of those documents?

A.   No.

Q.   Do you have any open source evidence that Mazen Al Najjar ever received funds from a terrorist organization?

A 26 599 077                    446                    August 30, 2000

A.   I can't answer that as far as open source evidence.

Q.   You answered in the deportation hearing that you had no open source evidence.

A.   That's my answer now, too.

Q.   So you're not saying you can't answer it.  I asked you, did you have any open source evidence that Mazen Al Najjar ever received funds from terrorist organizations, your answer is no.

A.   That's correct, no.

Q.   Do you have any open source evidence that Mazen Al Najjar ever sent any money to a terrorist organization?

A.   No.

Q.   Do you have any evidence, open source evidence, that Mazen Al Najjar attended the April 7th, 1991 event which was depicted on the videotape?

A.   No.

Q.   Do you have any open source evidence that Mazen Al Najjar attended the last event, the event in Chicago, which you refer to as the fifth year, the fifth anniversary of the Battle of Alshujahia?  Do you have any evidence that he attended that event?

A.   No.

Q.   Do you have any open source information that Mazen Al Najjar has ever advocated terrorism?

A.   No.

Q.   Do you have any open source evidence that Mazen Al

A 26 599 077                   447                   August 30, 2000

Najjar ever advocated support for the Palestinian Islamic Jihad?

A. In order to accurately answer that question, in my view, I'll have to go back to the totality of the circumstances in this investigation. If you want me to answer that, I'll be happy to.

Q. I'd first like a yes or a no. And then if it's a yes, then okay, what is the open source information upon your base your conclusion that he has advocated support for the Palestinian Islamic Jihad?

A. He has, he has been a manager in the ICP organization and in the Wise organization. He has helped to run those organizations. He helped to establish those organizations. He was involved in the day to day operations of these organizations, which included the efforts and the activities that we've seen. Setting up conferences, helping to bring or bringing known terrorist leaders into the --

Q. Wait a minute, we're talking about advocating support for the Palestinian Islamic Jihad.

A. I'm getting there. Bringing, bringing known leaders of the PIJ into the United States to attend these conferences and to that process, being part of that entire oversight and management and, and organizational process. In my view establishes a, establishes his support for the PIJ.

Q. No, establish, no the question was, whether he had advocated support for the Palestinian Islamic Jihad.

A 26 599 077                         448                    August 30, 2000

A.   Well, by doing what he did in the ICP and the PIJ, that, in my view, translates to advocating the support for PIJ.

Q.   Okay.  And, I'm just not, I'm sorry, I'm just not getting it.  Being involved in the organization and the fact, so we've got two facts.  One, he's involved in the organization, Wise and ICP.  Two, that the organization brought known leaders of the Palestinian Islamic Jihad to these annual conferences, those two things leave you to -- that's the basis of your evidence from your statement that Mazen Al Najjar advocated support for the Palestinian Islamic Jihad?

A.   With the totality of the circumstances, yes.

Q.   Okay.  You have no other open source evidence.

A.   Correct.

Q.   To support that assertion.

A.   Correct.

Q.   Do you know whether Mazen Al Najjar had any control over what anyone said at any of the conferences?

A.   I don't know that.

Q.   Do you know whether at any of the annual conferences, any of the, these so-called leaders of the Palestinian Islamic Jihad advocated support for the Palestinian Islamic Jihad?  At the annual conferences.

A.   Yes.

Q.   And can you point me to the specific example?

A.   Well, there are speeches that are given by Ramadan

Shallah, Adbul Al Zolda, where they --

Q.   Okay, let's go to -- okay.

A.   Where they espouse their support and encourage others to support the Islamic Jihad Movement.

Q.   Okay, let's go to what you provide, the only evidence that your counsel has provided of what went on at the conferences.  And I'm going to ask you to point to where --

JUDGE TO MR. COLE

Which Exhibit?  Which Exhibit?

MR. COLE TO JUDGE

I'm sorry, Exhibit 8, it's the transcription of the second composite videotape, which are the selections chosen by Mr. West along with counsel to illustrate why Mr. Mazen Al Najjar is a threat to national security.

JUDGE TO SPECIAL AGENT WEST

Q.   Where in this transcript, does one of the known leaders of the Palestinian Islamic Jihad advocate in support of the Palestinian Islamic Jihad?

A.   You asked me about open source evidence.

Q.   Right, which is open source evidence.

A.   It exists, it exists in videotapes, not necessarily in the composite that we did.

Q.   So it doesn't exist in the evidence that you've submitted, that your counsel has submitted.

A.   They're --

A 26 599 077                        450                   August 30, 2000

Q.   You admit that it is not, there's no such evidence in the record at this point.

A.   No, well, if we're talking about speeches by Adbul Al Zolda, which are not identified here and were not put in the composite tape, or speeches by Ramadan Shallah, although we do have, if I may have one second, in the question and answer, on page two, I believe it's page two, Ramadan Shallah portion.  I would submit that that statement certainly indicates that Ramadan Shallah, current head of the PIJ, advocates toppling through Jihad if necessary Arabic leaders.  That's one of the goals of the Palestinian Islamic Jihad.

Q.   Are you testifying that your understanding of what Ramadan Shallah is saying on the videotape is that people should support the Palestinian Islamic Jihad?

A.   What he's saying, in my view, is that he supports the concept of Jihad, of armed struggle in toppling Arab regimes.  That's one of the goals of the Palestinian Islamic Jihad organization.

Q.   But he does not advocate support of the Palestinian Islamic Jihad in that --

A.   Not in this particular segment.

Q.   Okay.  And again, you have no evidence, do you, that Mazen Al Najjar either authorized Mr. Shallah to make this statement or approved his statement or disapproved his statement?

A.   Yes, sir that's correct.

A 26 599 077                          451                     August 30, 2000

MR. COLE TO JUDGE

Your Honor, can I take a, can we take a 10 minute break?

JUDGE TO MR. COLE

10 minutes?  Yeah.  We'll come back after 25 after the hour.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

Okay.

JUDGE TO MR. COLE

Mr. Cole?

MR. COLE TO JUDGE

Thank you, Your Honor.

MR. COLE TO SPECIAL AGENT WEST

Q.  You testified yesterday, Mr. West, at the April 1991 event in Cleveland, the following people were present.  Mazen Al Najjar, Abdel Al-Zes Odi, Sheik Rachman and Al Ghanoushi.  Is that true?

A.  Which date?

Q.  April 1991 in Cleveland event, the only event in Cleveland.

A.  I believe I did testify to that, yes.

Q.  None of those people were there, isn't that correct?

A.  Well, names again, please?

Q.  Mazen Al Najjar.

A.  Right.

A 26 599 077                    452                    August 30, 2000

Q.   Well, let's go one at a time.   Mazen Al Najjar.

A.   Right, correct.

Q.   He was not there.

A.   That's correct.

Q.   Sheik Abdel Al-Zes Odi?

A.   Correct.

Q.   He was not there?

A.   To my knowledge, he was not.

Q.   Sheik Omar Abdelrachman.   He was not there?

A.   I'm sorry, go back to Sheik Odi?

Q.   Sheik Odi.

A.   In the '91 April?

Q.   At the April 7th, 1991 event in Cleveland, the one in which Faliaz Abudamah makes the incendiary statements and exhorts people through some sort of, the Palestinian Islamic Jihad.

A.   I believe Odi, I believe Odi may have been there, I have to go back and check the log, but.

Q.   Your, in the excerpt that you provided us, there's no indication that Odi was there.   Isn't that correct?

A.   In that excerpt?

Q.   Yes.

MR. VARA TO JUDGE

Your Honor, the excerpt that we provided is a translation of what we put on the tape.   It doesn't relate to everything that occurred at the conference and everything that we had regarding

A 26 599 077                    453                    August 30, 2000

it, not the conference but the event.  And it doesn't relate to everything we had regarding the event.

JUDGE TO MR. COLE

So let me ask and make, if I can.  Was your question, do you, was Odi there?

MR. COLE TO SPECIAL AGENT WEST

Q.    Was Odi there?

A.    I believe Odi was but if I, I can explain?

Q.    That's fine.

A.    The, the process of producing this composite tape occurred over, apart from yesterday, about a four day period, where myself and the FBI translator were involved in reviewing all 10 of those tapes.  I personally probably spent 16, maybe 18 hours over a four day period reviewing tapes and making, and other documents relating to the tapes, but making nine pages of detailed handwritten notes.  A lot of detailed information, a lot of, a lot of information concerning what conferences, who attended what, when and where and who said what.  Yesterday when I was testifying, unfortunately I did not have my notes with me and frankly some of the questions that Mr. Vara asked me relative to who attended what conference, when and where, I got a little bit confused and I made an error.

Q.    Yeah, I'm not, I'm not --

A.    So relative --

Q.    I'm just trying to clarify who you now say was, because

A 26 599 077                    454                    August 30, 2000

my sense, it was my sense and it might have been confusing the last event as Sheik Adbul Al-Zes Odi did appear with April 7th, 1991 event.  I would note on your, this might help refresh your recollection.  On your, the notice of filing the videotape excerpt from Composite 1, each, you had Sheik Adbul Al-Zes Odi at the second annual conferences ICP conference.

A.    Right.

Q.    You had him at the fourth annual, no I'm sorry, you had them at the second annual ICP conference in December 1989 and you had him at the last event, which we don't know the date of, but not in any other event.  And this April 7th, 1991 event, was that -- to the best of your recollection, do you remember whether Sheik Adbul Al-Zes Odi was there?

A.    I, I can't recall now if he was.  I, I believe that he might have been but I can't recall with certainty if he was and I would have to review my notes on the videotape.  Review.

Q.    Would you like time to review your notes on the videotape just to ascertain whether --

JUDGE TO MR. COLE

I'm inclined if we're after the truth that we, I mean, if that's --

MR. COLE TO JUDGE

Yeah, sure, that's fine.  Go ahead.

SPECIAL AGENT WEST TO JUDGE

A.    I don't have them, Mr. Vara has them.

A 26 599 077                     455                 August 30, 2000

MR. VARA TO JUDGE

May we be off the record, Your Honor?

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

Okay, we're back.

JUDGE TO MR. COLE

Mr. Cole?

SPECIAL AGENT WEST TO MR. COLE

A. The April '91.

Q. Event in Cleveland.

A. The commodation of the battle.

Q. No, well -- no, it was, it was unclear what it was.

A. Yeah.

Q. You titled it round table.

A. Right

Q. Jihad Intifada.

A. Correct.

Q. For all we know, all we know for sure it occurred in April 1991 in Cleveland.

A. Okay.

Q. And the only two people that appear on the tape at any time are Sami Al Arian and Faliaz Abudamah.

A. Right, you're correct. It appears that Odi did not attend that conference.

A 26 599 077                    456                    August 30, 2000

Q.   Okay.  Ghanoushi also didn't attend that conference?

A.   Correct.

Q.   Okay.  So the only person who, who -- and is there any evidence, or isn't it true that Mr. Damra in the tape of that proceeding announces it as an Islamic, let me get the specific language.  Islamic Center of Cleveland event.

A.   Are you referencing Exhibit --

Q.   No, it's not in these.

A.   Oh.

Q.   You didn't excerpt that but in the original tape, isn't it true that Mr. Damra identifies the event as an Islamic Center of Cleveland event?

A.   That may be true but I don't recall that specifically now.

Q.   Is there any evidence from the, in terms of what you offered that Sami Al Arian was present when the fundraising appeals took place?

A.   The only evidence --

Q.   At the April 7th, 1991 event?

A.   The only evidence that I have related to that, to his presence at that event is what is depicted in the composite tape, videotape.

Q.   Right.

A.   Correct.

Q.   Okay.  So if when, Faliaz Abudamah is making his appeal

A 26 599 077                     457                  August 30, 2000

and there's no indication that Sami Al Arian is in the room, we have no, we don't know.

A.   I don't know.

Q.   You can't say?

A.   That's correct, I do not know.

Q.   Do you have any evidence that Mazen Al Najjar was aware of that event?  Open source evidence.

A.   No.

Q.   Do you, well, then I suppose it follows that you don't have any evidence that Mazen Al Najjar had any role to play in organizing that event?

A.   Not at that particular event, correct, yeah.

Q.   Do you know whether any steps were taken to investigate, based on open source testimony, the money that Mr. Damra raised ever went to the Palestinian Islamic Jihad?

A.   I can't answer that relative to open source information.

Q.   Do you have any open source information that the money raised by Mr. Damra ever went to the Palestinian Islamic Jihad?

A.   Only what Mr. Damra says on the tape.

Q.   Right.

A.   Beyond that, no.

Q.   Do you have evidence of, of Mr. Damra's immigration status?

A.   Yes, Mr. Damra is either a permanent resident alien or

a naturalized citizen. I can't recall for sure which. We did, in fact, check the status.

Q. Okay. Do you have any open source information that the Government ever took any steps against Mr. Damra for his activities on the videotape?

A. To my knowledge, well, Mr. Damra, I guess to accurately answer that would be yes, but then I would have to explain.

Q. Okay.

A. Mr. Damra was an unindicted co-conspirator on the terrorist bombing case out of New York.

Q. I'm not sure that answers the question. Was Mr., do you have any evidence that any, that the Government took any steps against Mr. Damra for his actions at the April 7th, 1991 event?

A. Okay, I thought, I misunderstood. I thought you asked Government taking action, okay. No, correct.

Q. Do you know how many unindicted co-conspirators the Government identified in the World Trade Center bombing?

A. I didn't say the World Trade Center bombing, I said the terrorist op bombing case, which was the case involving the conspiracy to bomb the Lincoln Tunnel and those.

Q. The tunnels, okay.

A. Correct.

Q. Okay. Do you have any idea how many unindicted co-conspirators the Government identified in connection with that

A 26 599 077                    459                    August 30, 2000

case?

A.   I believe there were, there was more than one but I don't know how many.

Q.   Was there more like in the neighborhood of 50 to 60?

A.   I don't know that.

Q.   Isn't it true that Nassar Ahmed (phonetic sp.) was one of the people identified by the Government as an unindicted co-conspirator in the tunnel conspiracy trial?

A.   I believe that's correct, but I don't know for sure.

Q.   And isn't it true that the Immigration Service has concluded that Nassar Ahmed does not pose a threat to national security and has released him?

A.   I don't know the details of that case.

Q.   Do you know that he has been released?

A.   I'll accept it if you say so.  I believe, I do not know the details of that case, I'm vaguely familiar with it.

Q.   All right.  Yesterday you testified that after April 7th, 1991 event, Sami Al Arian asked the attendees to give money for armed struggle against Israel.  Can you point to me where in the transcript that you, where in Exhibit 8.

JUDGE TO MR. COLE

Can you tie that down date wise?

MR. COLE TO JUDGE

On the -- I'm sorry, the April 7th.

MR. COLE TO SPECIAL AGENT WEST

A 26 599 077                     460                  August 30, 2000

Q.   You testified yesterday.

MR. COLE TO JUDGE

I'm sorry, Your Honor, you're absolutely correct, Your Honor.

MR. COLE TO SPECIAL AGENT WEST

Q.   I'll begin, I will restate the question.  You testified that at the April 7th, 1991, Sami Al Arian asked the attendees to give money for armed struggle against Israel.  All right, could you point to where in the transcript of the excerpts that you decided to present to the Court such a statement was made?

A.   It's not in that transcript.

Q.   Yesterday you said that Sami Al Arian praised suicide bombers at the April 1991 event.  Where in the transcript does he, that you provided of the translation of the April 7th, 1991 event does he praise suicide bombers?

A.   May I look at Exhibit 8 to be familiar with this?

Q.   Yes.

A.   Thank you.

Q.   It's in (indiscernible), I believe it's on page two in the middle.

A.   I may have made an error relative to the specific conference.  I believe I was probably referring, and in fact, I was referring to what is really the first conference in St. Louis on that issue.

Q.   The first conference?

A 26 599 077                         461                    August 30, 2000

A.   Yes.

Q.   And could you identify the suicide bomber that is praised in the first conference made by Sami Al Arian in the excerpt?

A.   I don't know which of these, there may be more than one of the people that are named in that.  In that portion of suicide bomber, but I believe at least one of them is.

Q.   So you can't tell us?

A.   Not right now.

Q.   Which one it is?

A.   No, I can't.

Q.   Are you certain that one of them is?  Or you think you believe in something, you say you believe and are you --

A.   No, I'm -- and again, I'm going from recollection from several years ago.  I believe that when these names are identified initially during the tape review and translation process, we conducted, we, INS and the FBI conducted some inquiries on the background of these specific names and I, I recall from that, I believe that at least of these people had been identified as a suicide bomber.

Q.   But you can't testify today that Mohammad Al Jamal was a suicide bomber?

A.   That's correct.

Q.   Or Hamad El Hess (phonetic sp.) was a suicide bomber?

A.   Correct.

A 26 599 077                    462                    August 30, 2000

Q. Or Siad Rita (phonetic sp.) was a suicide bomber.

A. Correct.

Q. Or any of the people named here were a suicide bomber.

A. No. Or perhaps all of them.

Q. Okay. You testified yesterday that in 1989 conference, Abdel Al-Zes Odi stated death to Israel. Can you point to me where in the transcript of the 1989 conference, Abdel Al-Zes Odi states death to Israel.

A. It's not in the portion of the tape.

Q. The one conference, the one event which you decided to omit when you made the second composite videotape from the first composite videotape was the one conference in which Mazen Al Najjar actually made some substantive comments. Isn't that correct? I'll --

A. The Al Axaca --

Q. Yes, the New Jersey symposium.

MR. VARA TO JUDGE

Your Honor, we'd like clarification of the word substantive.

MR. COLE TO SPECIAL AGENT WEST

Q. Well, isn't it true that the most extensive statement that you had on the composite videotape by Dr. Al Najjar was an English statement made at the New Jersey symposium.

A. That's correct. I believe he also introduced some speakers, but that's correct.

Q. Right. And yet you didn't introduce that when you,

A 26 599 077                      463                      August 30, 2000

when you decided to give the Court evidence in this proceeding, you focused on whether or not Mazen Al Najjar is a threat to national security. Why is that?

A. The decision to not include that segment of the tape goes to your stipulation. You stipulated that Mr. Al Najjar attended these conferences. The purpose, the original purpose in the larger composite tape to include that tape was merely, was basically to show Mr. Al Najjar, in fact, attended this conference.

Q. Okay. And his, his comments at that conference, did he support the Palestinian Islamic Jihad?

A. That was not in the statement.

Q. Did he advocate violence of any kind?

A. That was not in the statement.

Q. Did he engage in fundraising of any kind?

A. No, that was not in the statement.

Q. And you've offered us no evidence that Mazen Al Najjar has -- strike that, asked and answered. You testified that the, in your view, the State Department believes that Mr. Ghanoushi is a terrorist because he heads up a terrorist organization. Correct? Al Nada Party (phonetic sp.)?

A. That's correct.

Q. Isn't it true that the Al Nada Party is not on the State Department's list of designated terrorist organizations?

A. It's one of a number of terrorist organizations and

A 26 599 077                           464                    August 30, 2000

they're not on the list.

Q.   And the, isn't it true that the list is supposed to include any foreign organization that is engaged in terrorism whose acts threaten the national security of the United States?

A.   That's, that's correct.

Q.   And the State Department nonetheless decided not to include the Al Nada Party?

A.   That's correct.

(TAPE 15)

JUDGE FOR THE RECORD

This is tape 15.

MR. COLE TO SPECIAL AGENT WEST

Q.   It's also --

JUDGE TO MR. COLE

No, go ahead, you're all right.

MR. COLE TO SPECIAL AGENT WEST

Q.   Also true is it not that, Mr. West, that you have submitted no evidence to this Court regarding Wise's activities as Wise?

A.   At this particular hearing?

Q.   Yeah.

A.   That's, well, --

MR. VARA TO JUDGE

Your Honor, that's a mischaracterization of what's being provided, at least one Exhibit relates to a visa petition filed

A 26 599 077                    465                    August 30, 2000

by Wise.

MR. COLE TO JUDGE

That's correct, that's correct.

MR. COLE TO SPECIAL AGENT WEST

Q.   With the exception of the visa petition, isn't it true that you offered no evidence with respect to Wise's activities in these proceedings?

A.   Well, I've testified about Wise and its relationship with ICP and people that are, were involved in managing and overseeing both organizations.

Q.   Isn't it true that Mr. Al Najjar's primary responsibilities were with respect to Wise?

A.   Relative to what?

Q.   Relative to ICP?

A.   I'm, I need clarification, please.

Q.   Isn't it true that Mazen Al Najjar's primary responsibility were with respect to Wise rather than respect to ICP?

MR. VARA TO JUDGE

Your Honor, that mischaracterizes the evidence of record. We believe that the visa petition in Exhibit 1 evidences that he had independent duties with both Wise and ICP.

MR. COLE TO SPECIAL AGENT WEST

Q.   Is it your understanding that Mazen Al Najjar's primary, primary duties were with Wise or with ICP or that he, he

A 26 599 077                    466                    August 30, 2000

was a 50/50 doing Wise half the time, ICP half?

A.   Well, I testified before and I'll testify to the same thing and, and my believe stemming from the evidence that I've seen is that Wise and ICP existed as separate entities, at least Wise did on, on paper.  Wise was an entity, it existed and it had an office.  ICP, while not legally incorporated, well, not legally incorporated entity in the State of Florida certainly existed.  The people who ran Wise, the people who ran ICP were the same people.  Their stated purposes, as long as Wise was concerned differed that as of ICP, but there is interaction, there is intermingling of activities by the people who ran both organizations.  I can't say that Dr. Mr. Al Najjar spent 50 percent of his time with Wise and 50 percent of ICP, I don't know.  There was involvement in both.

Q.   Did, okay, so you just don't know.  You don't know whether he spent 95 percent with Wise, five percent with ICP, 99 percent with Wise, one percent with --

A.   Right.

Q.   Or vice versa?

A.   Correct.

Q.   But you are viewed, you don't really distinguish Wise and ICP?

A.   Distinguished, yes.  I distinguished them as far as legitimate appearing existence of Wise.

Q.   All right.  Do you, isn't it true that Wise was a

A 26 599 077                    467                   August 30, 2000

research entity?

A.   That's what it purported to be.

Q.   Isn't it true that it published some 20 volumes of an academic journal called Political Reading, which I'm sure you've seen.

A.   Well, I know that they published journal, I don't know exactly how many.  Yes.

Q.   I'll show you just --

MR. VARA TO JUDGE

Your Honor, I'd like to be shown the document or anything that is being shown to the witness.

MR. COLE TO JUDGE

Yeah (indiscernible).

JUDGE TO MR. COLE

Okay, go ahead.

SPECIAL AGENT WEST TO MR. COLE

A.   I believe I may have seen this before, yes.

Q.   All right.  Isn't it true that Wise regularly published an academic journal called Political Readings.

A.   I believe that's correct.

Q.   Isn't it true that Mazen Al Najjar's responsibilities were principally to edit and publish this academic journal?

A.   I believe that was one of the duties listed on some visa petition documents that was submitted.

Q.   Do you have any evidence that he did not edit and

A 26 599 077                    468                    August 30, 2000

publish these, this journal?

A.   No.

Q.   Isn't it true that Wise sponsored forums and events with the University of South Florida of an academic nature?

A.   Yes, it did.

Q.   And isn't it true that Wise published the proceedings of those academic conferences, in particular a round table with Hassan Terabi (phonetic sp.) and a round table with Kershed Ama (phonetic sp.)?

A.   I don't know that that was published, I don't know that myself.

MR. VARA TO JUDGE

Your Honor, we would stipulate that Wise and ICP, other than other activities, their public persona was one; their private one was another.  What we're dealing with here is the activities of two individuals that had prominent roles in both Wise and ICP. If they sold Girl Scout cookies in the street corner on Saturdays, it's not relevant to the issues before the Court.

MR. COLE TO JUDGE

Your Honor, I think we're dealing with one individual here and the individual is Mazen Al Najjar.  It's our, it would be our testimony that it is virtually his entire responsibility was with respect to Wise, that Wise was a totally legitimate organization, that Wise never raised a cent for anybody.  And we believe that it's appropriate to establish and, and it's particularly

A 26 599 077                    469                    August 30, 2000

pertinent if Mr. West, the principle agent, is unaware of the perfectly legitimate activities, non-violent academic activities of Wise.

MR. VARA TO JUDGE

Well, we'll stipulate that they had other legitimate non-threatening activities that Wise did and certainly that evidence can come more appropriately through the respondent.

MR. COLE TO JUDGE

The respondent, it's fine if they stipulate that. Let me just go with a few further questions with respect to that.

JUDGE TO MR. COLE

Go ahead.

MR. COLE TO SPECIAL AGENT WEST

Q. Isn't it true that you have offered no evidence that Wise raised any money, Wise as distinct from ICP, raised any money for any one.

A. Correct.

Q. Other than Wise.

A. Correct.

Q. Wise was not a fundraising organization. Isn't that correct? Wise.

A. Well, it's public persona, it's legitimate existence, no, correct.

Q. It's private persona.

A. Correct.

A 26 599 077                    470                    August 30, 2000

Q.   It's a private persona.

A.   Correct.

Q.   There's no evidence of any kind, public or private that Wise raised a single cent of money for any other organization. Isn't that correct?  Wise.

A.   Wise, as it existed as an up front legitimate entity, correct.

Q.   Wise and I'd like you to answer the following question. Did Wise raise, do you have any open source evidence that Wise raised money for any other organization?

A.   No.

Q.   You testified in 1997, in the previous bond proceeding, that Mazen Al Najjar was being investigated for multiple crimes. Isn't that correct?

A.   That's correct.

Q.   Okay.  You testified that he was under investigation for visa fraud.  Is that correct?

A.   That's correct.

Q.   Has he ever been charged with visa fraud?

A.   No.

Q.   You testified that he was under investigation for bank fraud.  Is that correct?

A.   That's correct.

Q.   Has he ever been charged with bank fraud?

A.   No.

A 26 599 077                    471                    August 30, 2000

Q.   You testified that he was under investigation for currency violations.  Is that correct?

A.   Yes.

Q.   Has he ever been charged with currency violations?

A.   No.

Q.   You testified that he had been charged, had been investigated for voter law violations.  Is that correct?

A.   Yes.

Q.   Has he ever been charged with violating any voter law?

A.   No.

Q.   You testified that he was being investigated for the illegal providing of funds to known terrorist organizations.  Is that correct?

A.   Yes.

Q.   Ever been charged with illegally providing funds to known terrorist organizations?

A.   No.

Q.   You also testified, page 131 to 32 of the bond transcript that was submitted by respondent's, by respondent in connection with the Motion for Bond Redetermination, that there was a grand jury investigation at the time ongoing into visa fraud with respect to Mr. Mr. Al Najjar.  Is that correct?

A.   That's correct.

Q.   Is there still a grand jury investigation into visa fraud with respect to Mr. Al Najjar?

A 26 599 077                    472                    August 30, 2000

MR. VARA TO JUDGE

Your Honor, we are back in an area where we're not talking about classified evidence, but a discussion, even an acknowledgement at this point of what is or what is not happening before a grand jury is a situation in which Mr. West essentially is going to be violating the federal rules of criminal procedure.

JUDGE TO MR. COLE

Yeah --

MR. COLE TO JUDGE

Your Honor, he answered the question before.  He, it can't be that he can answer yes but to answer no doesn't violate the rules.  The rules only would permit him from providing any content of any, anything that went on the grand jury investigation.  The rules are not barred him from saying simply whether it exists or not.  He said that when he thought, when the Government thought it helped him, they told Your Honor that there was a grand jury investigation going on of Mr. Al Najjar.  Now, I, my strong belief is, three years and three months later, there is no grand jury investigation going on of Mr. Al Najjar.  He should know that, you should know that.  That's certainly relevant to whether or not Mr. Al Najjar with respect to national security.  It does not reveal the contents of any Rule 60 material.

MR. VARA TO JUDGE

Your Honor, the Government would stipulate that as has been

A 26 599 077                        473                August 30, 2000

testified indirectly, there is a continuing Government investigation that essentially might include a grand jury and the fact that the respondent may have, in fact, be included as a potential target of that investigation. That is as far as we can go.

MR. COLE TO JUDGE

Your Honor, that's, that's not an answer to the question. That, that's -- I mean, he could, I didn't ask whether he was being investigated. I asked whether there is a grand jury investigation. That's a very different thing. I mean, there could be an investigation going for 10 years, but there's a grand jury investigation, that indicates a certainly level of, of the seriousness of the Government considers the charges. Here they use that fact to, to suggest to the Court that Mr. Al Najjar was possibly, very possibly a criminal. I just like a statement as to whether or not there is now an on-going grand jury investigation with respect to visa fraud. If he can answer the question before yes, he can answer it now.

JUDGE TO MR. COLE

We'll take that under advisement and see about an answer for that in the morning. Okay. And the question is, is there a grand jury --

MR. COLE TO JUDGE

Is there a grand --

JUDGE TO MR. COLE

A 26 599 077                    474                    August 30, 2000

Ongoing that includes the respondent?

MR. COLE TO JUDGE

Right.

JUDGE TO MR. COLE

Okay.

MR. COLE TO SPECIAL AGENT WEST

Q.   Mr. West, you testified that in his capacity at Wise, Mazen Al Najjar reported to Sami Al Arian, isn't that correct?

A.   In, what testimony?  Today?  May of '97?

Q.   Well let me just ask you.  Do you believe that at Wise, Mazen Al Najjar reported to Sami Al Arian?

A.   Yes.

Q.   Everything you've said about Mazen Al Najjar and his alleged involvement in any kind of activity that might threaten national security could be equally said about Sami Al Arian. Isn't that correct?

A.   Everything?

Q.   Yeah.

A.   Yes.

Q.   In fact, Sami Al Arian and not Mazen Al Najjar signed the petitions for Basheer Nafi and Ramadan Shallah.  Isn't that correct?

A.   That's correct.

Q.   Sami Al Arian made the rhetorical statements that you, that you submitted in your videotape, not Mazen Al Najjar.  Isn't

A 26 599 077                    475                    August 30, 2000

that correct?

A.   Yes.

Q.   In fact, in your search warrant affidavit, that you wrote the search warrant affidavit to get the warrant to search the office of Wise, ICP and Sami Al Arian's residence and Sami Al Arian's office.  Isn't that correct?

A.   I wrote it with a little bit of help from my friends.

Q.   Okay.  And in fact, isn't it true that you didn't even mention Mazen Al Najjar in your search warrant affidavit?

A.   Sir, that was five years ago, I --

Q.   I'll provide you with it if it will help you refresh your recollection.

A.   I think you're correct, but I honestly can't say that I'm 100 percent certain that I did not include Mazen Al Najjar.

MR. COLE TO JUDGE

Yeah, I'm going to --

JUDGE TO MR. COLE

Yes, go right ahead.

MR. COLE TO JUDGE

Offer to allow him to look at it.

MR. COLE TO JUDGE

I'll show him.

SPECIAL AGENT WEST TO MR. COLE

A.   Sure.  Thank you.

Q.   To see whether he mentioned Mazen Al Najjar.

A 26 599 077                    476                    August 30, 2000

MR. VARA TO JUDGE

Your Honor, we would ask for an instruction from the people from the gallery to cease from making comments in open court about the proceeding.

JUDGE TO MR. VARA

Yeah.

JUDGE TO COURT

Yeah, I again remind you all that you're guest in the court and if you become disruptive through noise, you will be asked to leave.

MR. COLE TO SPECIAL AGENT WEST

Q.   I may have given you more than one copy.

A.   That was a long affidavit.  I believe you're correct, sir.  There appears to be no mention of Mr. Al Najjar in the affidavit.

Q.   Okay.  Isn't it true that you mention Sami Al Arian 44 times in the 18 page affidavit?

A.   I don't know how many times.

MR. VARA TO JUDGE

Your Honor, if --

MR. COLE TO JUDGE

I'll --

MR. VARA TO JUDGE

Your Honor, if this is material, we would certainly stipulate to the introduction of the criminal search warrant

A 26 599 077                     477                     August 30, 2000

affidavit into the proceedings.

MR. COLE TO JUDGE

Yeah, we're going to offer it.  We'll offer it to tomorrow morning, simply because we only have one copy of it at this point to offer it.

JUDGE TO MR. COLE

Okay, I think the only problem is you're asking him questions about it when you've got it and he doesn't.

MR. COLE TO JUDGE

Well, I mean, the document will speak for itself.

MR. COLE TO SPECIAL AGENT WEST

Q.   Isn't it true that you, the focus of the search warrant affidavit was Sami Al Arian.

A.   Focus was Wise and ICP.

Q.   Isn't it true that Sami Al Arian, well, I think the record will reflect that Sami Al Arian was mentioned 44 times in an 18 page affidavit.

MR. VARA TO JUDGE

Objection, Your Honor.  Again, we stipulated to the introduction.  The document will speak for itself.

JUDGE TO MR. VARA

Okay.

JUDGE TO MR. COLE

You're going to have to show him if you want an answer from him.

A 26 599 077                    478                    August 30, 2000

MR. COLE TO JUDGE

I don't necessarily want him to, if he wants to count, he can count.

JUDGE TO MR. COLE

Well, when you ask him, if he doesn't know the answer unless he can see the thing.

SPECIAL AGENT WEST TO MR. COLE

A.   Do you want me to count how many times --

Q.   Is Sami Al Arian mentioned on virtually every page of that?

A.   Mr. Al Arian is mentioned frequently in this affidavit.

Q.   Is Ramadan Shallah mentioned over 20 times in that affidavit?

A.   I don't know the exact number, but frequently mentioned, yes.

Q.   Is Basheer Nafi mentioned 10 times?

A.   I don't know the exact number but frequently mentioned.

Q.   And Mazen Al Najjar never?

A.   That's correct.

Q.   Do you consider Sami Al Arian to be a threat to national security?

MR. VARA TO JUDGE

We would instruct the witness if he can answer only based on open source evidence.

JUDGE TO SPECIAL AGENT WEST

A 26 599 077                    479                    August 30, 2000

Q.   Yeah, if you have an opinion, you may do that, answer that.

A.   Yes, I do.

MR. COLE TO SPECIAL AGENT WEST

Q.   Yet he has been out free for the last five years since you wrote that affidavit?  He's been out free for the last three years and three months since you testified in this proceeding with respect to whether Mr. Al Najjar should be detained without any undermining of national security.  Isn't that correct?

MR. VARA TO JUDGE

Well, I think that's a compound question, Your Honor, we would object.

JUDGE TO MR. COLE

Yeah, that is.  If you want to break it in half or --

MR. COLE TO SPECIAL AGENT WEST

Q.   He's been, well, let me just simplify.  Yet he has been walking the streets free for the three years and three months that Mazen Al Najjar has been detained without any undermining of national security.  Isn't that correct?

MR. VARA TO JUDGE

Objection.  That's still a compound question.

MR. COLE TO SPECIAL AGENT WEST

Q.   Oh, okay.  Is it, is it correct that Sami Al Arian has been out free, walking the street for the three years and three months that Mazen Al Najjar has been locked up?

A 26 599 077                    480                    August 30, 2000

A.   Yes.

Q.   And is it true that Sami Al Arian has not, his being free has not undermined the national security during those three years and three months?

A.   I don't know whether I'm qualified to answer that.

Q.   What is your opinion, based on open source evidence?

A.   I believe that Mr. Al Arian not having been charged with any violation of any law at this point has not resulted in a direct threat to the national security over the past three years.

Q.   And the INS has made no effort to seek his deportation for supporting terrorist activities or engaging in terrorism or any connection with Palestinian Islamic Jihad and they've not sought to detain him.

MR. VARA TO JUDGE

Your Honor --

MR. COLE TO SPECIAL AGENT WEST

Q.   As a threat to national security.  Isn't that correct?

MR. VARA TO JUDGE

Your Honor, that's --

JUDGE TO MR. VARA

You have an objection?

MR. VARA TO JUDGE

I'm sorry?

JUDGE TO MR. VARA

You have an objection.

A 26 599 077                    481                    August 30, 2000

MR. VARA TO JUDGE

Yes, objection.

JUDGE TO MR. VARA

Okay.

MR. VARA TO JUDGE

Compound question.

MR. COLE TO SPECIAL AGENT WEST

Q.   Has the, has the INS made any effort to, has the INS charged Sami Al Arian as deportable for engaging in terrorist activities?

A.   No.

Q.   Has it charged him as deportable for engaging in any activity that might threaten the national security?

A.   No.

Q.   Has it sought to detain him?

A.   No.

Q.   As a threat to national security?

A.   No.

MR. COLE TO JUDGE

I have no further questions, Your Honor, except for the outstanding question with respect to the affidavit, I mean, with respect to whether there is an ongoing grand jury investigation regarding Mr. Al Najjar.  And our right to recall Mr. West if, upon reviewing the full materials from the videotapes, we deem it's necessary to give Your Honor a set of context to consider.

A 26 599 077                    482                    August 30, 2000

JUDGE TO MR. COLE

Okay.

MR. VARA TO JUDGE

Your Honor, on the second point, if we can get some clarification on what counsel anticipates they will have fully reviewed the tapes that they say are the basis for essentially calling, recalling Mr. West as a witness.

JUDGE TO MR. COLE

Do you have any idea?

MR. COLE TO JUDGE

At this point, I don't. I can try to give you an idea tomorrow morning, I mean, the Government reviewed them for five years. We obviously want to act as expeditiously as we can, because we want Mazen Al Najjar out and so we will endeavor to give you that.

JUDGE TO MR. VARA

Okay. Any other questions for this witness?

MR. VARA TO JUDGE

We have redirect, Your Honor.

JUDGE TO MR. VARA

Okay. And how long do you figure that will take?

MR. VARA TO JUDGE

At least an hour, perhaps even two.

JUDGE TO MR. VARA

Okay. Do you want to break and come back tomorrow morning?

MR. VARA TO JUDGE

That would be fine with the Government or we could continue, either way.

JUDGE FOR THE RECORD

I think we've been here for about six hours, 15 minutes so why don't we go ahead and break.

JUDGE TO SPECIAL AGENT WEST

Q.   And Mr. West, one of the questions that you're going to have check with your, whoever the source is, the AUSA or U.S. Attorney and find out you can ask the question.

A.   Yes, sir.

Q.   Answer the question, whether there was an on-going investigation, grand jury investigation that includes the respondent.

A.   Yes, sir.

Q.   Okay.

JUDGE FOR THE RECORD

And 9 o'clock tomorrow morning.

MR. VARA TO JUDGE

Thank you, Your Honor.

                        HEARING ADJOURNED

A 26 599 077                    484                    August 30, 2000