UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. ~~99-3458~~-CIV-LENARD
02-20261

MAZEN AL NAJJAR,

    Petitioner,

vs.

JOHN ASHCROFT, Attorney General, United
States Department of Justice, *et al.*,

    Respondents.

_____/



# EXHIBIT 1: TRANSCRIPT OF REMAND CUSTODY HEARING
## (VOLUME 9 OF 9)

## OCTOBER 13, 2000

TO

## SUPPLEMENTAL COMPLAINT AND RENEWED PETITION FOR HABEAS CORPUS

**U.S. Department of Justice**
Executive Office for Immigration Review
Immigration Court

Matter of                                          File A 26 599 077

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
| MAZAN AL NAJJAR | ) | In BOND Proceedings |
|  | ) |  |
|  | ) |  |
| Respondent | ) | Transcript of Hearing |

Before R. KEVIN MCHUGH, Immigration Judge

Date:  October 12, 2000                    Place:  Bradenton, Florida

Transcribed by FREE STATE REPORTING, INC., at Annapolis, Maryland

Official Interpreter:

Language:

Appearances:

For the Immigration and
Naturalization Service:          For the Respondent:

Daniel Vara                      David Cole
Jorge Perez                      Nancy Chang
                                 Joseph Holenstein
                                 Mark Schwartz

JUDGE FOR THE RECORD

This is Immigration Judge McHugh on the 13th day of October, the year 2000, Bradenton, Florida.  This is in the matter of Mazen Al-Najjar, file A 26 599 077.  He's present in court today with his counsel, Mr. David Cole, Joseph Holenstein, Martin B. Schwartz and Ms. Chang is presently not here.

MR. COLE TO JUDGE

She had to go to back to New York.

JUDGE TO MR. COLE

Okay.

JUDGE FOR THE RECORD

She had a departure today.  And the Government counsel is present, Mr. Daniel Vara and Mr. Jorge J. Perez.  Okay.  Yesterday we broke and the Government was going to proceed today with some new evidence.

JUDGE TO MR. COLE AND MR. VARA

Any, anything we need to take up before, Mr. Cole or Mr. Vara?

MR. COLE TO JUDGE

Nothing from us, Your Honor.

JUDGE TO MR. COLE

Okay, very well.

JUDGE TO MR. VARA

How do you wish to proceed, Mr. Vara?

MR. VARA TO JUDGE

Well, Your Honor, again this morning we'd like to recall Supervisor Special Agent West for purposes of addressing a declaration that, that he has signed and we seek to get it into evidence.  We will then follow with an FBI financial analyst to present, again, additional evidence which has now been declassified.

JUDGE TO MR. VARA

Okay.

SPECIAL AGENT WEST TO JUDGE

A.   Your Honor, can I bring my water?

Q.   Yes, go right ahead.

A.   Thank you, Your Honor.

Q.   And please have a seat, Mr. West and you're the same Mr. West that testified yesterday?

A.   Yes, sir.

Q.   And (indiscernible).

(OFF THE RECORD)

(ON THE RECORD)

JUDGE TO SPECIAL AGENT WEST

Q.   And it's William?

A.   D.

Q.   D.  Okay.  And you're reminded you're still under oath.

A.   Yes, sir.

JUDGE TO MR. VARA

Okay, Mr. Vara?

A 26 599 077                      803                    October 13, 2000

MR. PEREZ TO JUDGE

Your Honor, for the record?

JUDGE TO MR. PEREZ

Mr. Perez, okay.

MR. PEREZ TO JUDGE

I'll be conducting the direct examination of Special Agent West.  May I approach the witness?

JUDGE TO MR. PEREZ

Yes.

MR. PEREZ TO JUDGE

Your Honor, at this time, I am handing the witness what we request be identified as Exhibit 63.

JUDGE TO MR. PEREZ

Okay.

MR. PEREZ TO SPECIAL AGENT WEST

Q.   Agent West, if you could please review that document.

A.   I recognize the document.

Q.   Is that your signature on the last page of the document, sir?

A.   Yes sir, it is.

Q.   If you could please identify the document for the record?

A.   This is a document, a declaration covering evidence that was developed in this investigation.  Certain items of evidence that were developed in this investigation.

A 26 599 077                    804                    October 13, 2000

MR. COLE TO JUDGE

Your Honor, Your Honor, could we take a moment to review? We've never seen this.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

Mr. Al Najjar has never seen this document.

JUDGE FOR THE RECORD

We'll go off the record for a minute.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE TO MR. PEREZ

Okay, proceed, Mr. Perez.

MR. PEREZ TO JUDGE

Yes.

MR. COLE TO JUDGE

Judge, I'd just like to make an objection.

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

To any questioning of this document.

JUDGE TO MR. COLE

Okay.  It's Mr. Cole speaking, okay, go ahead.

MR. COLE TO JUDGE

This is really, it's really quite remarkable, Your Honor,

A 26 599 077                    805                    October 13, 2000

the, the document that you have before you is a post-trial brief. It is a post-trial brief. For some reason rather than Mr. Vara or Mr. Perez writing a post-trial brief, they decided that it would be more effective to have Mr. West write the post-trial brief. But we've just reviewed this document. As far as we can tell, there is no new information in this document. It repeats information, which has been presented previously in this courtroom. There is not a single piece of new evidence. There is not a single piece of evidence which, which was not presented earlier. The witness testified, now, presumably why would the Government come in with a declaration to say, to have the witness summarize what he testified and what the evidence in this case consisted of. They could have him do that on the stand. They did seek to have do that on the stand. He did it on the stand. He was subjected to cross-examination. Apparently they didn't feel that it, it presented their case sufficiently to you and sow what they've now done is have him submit a written declaration, which I repeat, contains no new information. It simply summarizes in, in the light most favorable for the Government, the evidence of the case. Now, we have no objection, Your Honor, to your, to you considering these arguments. But these are arguments. These are arguments about the evidence. The evidence has been presented. This witness presented the evidence. They, initially, there is nothing new here and there is simply no justification for, for sort of turning what is essentially

A 26 599 077                   806                   October 13, 2000

closing argument or a post-trial brief into attempting to try to create it as a, make it a statement of facts. And so, maybe one thing that we could do is ask the Government, is there anything new in here? Are they offering any new evidence? Because I don't think, you know, we're here and we came for a whole extra day for the Government to offer a post-trial brief. And if there is any new evidence that's in here that was not presented before by, by Mr. West, then I'd like it to be identified so that we can determine whether or not it's appropriately within the scope of a rebuttal case. Again, nothing in here appears to be new. All of this appears to be information which could have been presented before, which for the most part was presented before. Let me just, let me qualify. The only thing that appears to be new is that Mr. West has done some research, I guess, and identified some specific acts of the Palestinian Islamic Jihad in November 1998, March 1996. This is on page seven. November 6th, 1998, March 1996, April 1995 and January 1995. With the exception of those accounts, which are on page seven, I don't think there's anything new in here and with respect to those accounts, it appears that there, that Mr. West has admitted that he has no first hand knowledge. And what, the only source that he sites is an AP account. In addition, what possible relevance are events of 1995, 1996, 1998 given Mr., the concerns about Mr. Al Najjar, which extend from, essentially 1989 to 1992 or 3.

MR. PEREZ TO JUDGE

A 26 599 077                    807                    October 13, 2000

Judge, if I may?

JUDGE TO MR. PEREZ

If he's finished.

JUDGE TO MR. COLE

Are you finished?

MR. COLE TO JUDGE

Yeah, I think so the, I, honestly, Your Honor, I've never been in a proceeding in which the Government decides that its witness wasn't good enough so they rewrite his testimony and present it as a declaration. Now, obviously that's one of the things about a declaration, that the Government can nicely tailor the testimony as they want, rather than having live testimony. That's one reason why live testimony is preferred. Mr. West has been here for live testimony. He was here for a long time for live testimony. To allow them to now come in with this brief at, at the close, it seems to me, it's simply beyond, beyond the pale. So I guess, our, our objections are number one, to the extent that it is argumentative and summarizes prior testimony. It is not evidence. And number two, to the extent that there is any new evidence in here, there is, there has been no showing that these are issues which arose only in our presentation in our case. These are all issues which were fully gone into by the Government in presentation of its case through Mr. West and could have been provided before. So either they are trying to turn an argument into evidence, with respect to most of this document.

A 26 599 077                           808                   October 13, 2000

Or, they're trying at a belated date to put in evidence which they maybe felt that they should have put in before but failed to.  But that's not, neither of those, neither of the using as this argument nor using it as sand bag are permissible on rebuttal and so we object to any questioning on it and we object to the, to the offering of it for admission.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. PEREZ

Mr. Perez?

MR. PEREZ TO JUDGE

Judge, first of all, the Government would note that these are objections that can and should be raised in closing arguments or cross-examination of a witness after the document has been admitted or after the document or after the document seeks to admit the document.  The Government would note that Mr. Cole initially states that the declaration contains no new information and then as his objection proceeds, he concedes there is new information in this document.  But again, this can be brought out through Agent West in terms of what the document contains and what the counsel for the respondent has particular objections or has particular cross-examination questions.  The Government has not yet even sought to admit the document into the record.  For example, the Government would note on page three, the declaration does refer to the threat of national security letter, information

A 26 599 077                    809                October 13, 2000

that has not previously been set forth in these proceedings.  So Mr. Cole has already pointed out new facts provided in this declaration.  There's another new fact provided in this declaration.  And the Court can take into account the weight, whatever appropriate weight it feels necessary after the document has been offered into evidence by the Government, which the Government would like to do so now through Mr. West.

MR. COLE TO JUDGE

Your Honor, as, as what was probably apparent by my presentation, I did overstate initially in the heat of the moment, overstated the case in saying that there was no new evidence.  There is some new evidence but, but then what I would, my objection is as I made clear at the close of my objection.  My objection is two-fold, to the extent that it's not new evidence and we can go through it.  95 percent of it is not new evidence. It's simply a summary of prior evidence and prior testimony. That's what a closing argument is for.  That's what a post-trial brief is for.  That's not what you put an agent on the stand for, to allow him to put in a document written by his lawyers and then signed by him, because that maybe presents their case in the way that they'd rather have it be presented rather than having a life witness testify.  So that's with respect to what covers that has already been covered.  There is some new information, but I think it's all immaterial new information.  I, I identified previously the statements about Palestine Islamic Jihad events, terrorist

A 26 599 077                          810                    October 13, 2000

events.  Again, no link is made to any of the crimes, any of the people who have been named in this proceeding, much less to Mr. Al Najjar.  And the fact that, and it's evidence which could have been presented in their opening, in their initial case.  The fact that they got some of the information, which they then submitted in their proceeding pursuant to a national security letter, is a new fact, but that's a fact which, which they could have provided in their opening case.  They've presumably known that since they got the information.  It's of no particular relevance to this proceeding, whether they got it by finding it on the street or whether they got it by conducting a search warrant or whether they got it by using a national security letter, what's relevant is the evidence and the force of the evidence and the weight of the evidence and that's what Your Honor is supposed to be assessing.  How they got it simply not, not material.  And it is not a fact that they could not have presented when they presented the evidence.  If they felt it was important, Your Honor, to indicate when they presented the evidence, that they got it, part of it pursuant to a national security letter and part of it pursuant to a search warrant, then they could have.  They knew that five years ago.  They knew that when Mr. West testified.  But when they asked Mr. West, he said, we got it pursuant to a search warrant.  I mean, I don't think it matters, I honestly think it's totally immaterial as to who they got it, as I said.  But it is not, to the extent that there's no new evidence offered

A 26 599 077                          811                    October 13, 2000

here is not evidence that they could not have been presented before. It is not evidence that is in response to some new issue that we raised in our case. And therefore anything new should be rejected on the ground that it's beyond the scope of a rebuttal case. A rebuttal case is not an opportunity for the Government to sand bag. And so the new evidence should be excluded on that ground. The bulk of the affidavit, and again, I think it's probably 95 percent, we could go through it. I'm sure you will. The bulk of the affidavit is simply a closing argument, simply a post-trial brief, simply a summary in, in their words of what the evidence purports to be. Why should that be subject to a sworn statement as if it is evidence? It doesn't turn it into evidence. Mr. Vara is perfectly capable of making all those arguments as we have seen. But what possible justification is there to, to turn a post-trial brief into a declaration. So those are two objections to any proceeding on this ground. Mr. Vara brought us back here, brought all of us back here. Many of us who came from out of town, all of us back here to put in a declaration from his witness, which consists of evidence that they could have provided months ago, years ago and consists of otherwise of commentary of evidence which has already been presented. And I just, I, it seems to me that at some point this has got to stop. At some point this has got to stop. And a rebuttal case, as I say is an opportunity for the Government to either turn their closing into an evidentiary declaration or to

A 26 599 077                    812                    October 13, 2000

submit new evidence that they could have provided before and did not.

JUDGE TO MR. COLE

Okay.  At this stage of the game, it hasn't yet been offered into evidence.

JUDGE TO MR. PEREZ

And so you may ask questions at this stage of Mr. West. Proceed, Mr. Perez.

MR. PEREZ TO JUDGE

Thank you, Judge.

MR. PEREZ TO SPECIAL AGENT WEST

Q.   Agent West, if you could please identify this document for the record?

A.   Yes, this document is a declaration, which relates to evidence that has been developed in the investigation over the past five years.  The investigation focusing on WISE, ICP, Sami Al-Arian, Mazen Al-Najjar and others.  It's, it relates to evidence that has been obtained both from non-classified sources as well as classified information that has been subsequently declassified.

Q.   And Agent West, are you personally familiar with the contents of this declaration?

A.   Yes, I've gone over it numerous times.

Q.   And Agent West, was this declaration prepared within the course of the Government's investigation of this matter?

A 26 599 077                     813                    October 13, 2000

A.   Yes.

MR. PEREZ TO JUDGE

At this time, Your Honor, the Government would move to have this document admitted into the record as Exhibit 63.

JUDGE TO MR. COLE

Any new objections since then? Since the last two minutes have passed by?

MR. COLE TO JUDGE

No new objections, but maybe if I could, for purposes of shedding light on what's actually new in this document, I could ask Mr. West a couple of questions.

JUDGE TO MR. COLE

Absolutely.

MR. COLE TO JUDGE

Just to identify.

MR. COLE TO SPECIAL AGENT WEST

Q.   Mr. West, can you identify what specifically in this document was previously declassified and has now been -- I mean was previously classified and has now been declassified?

A.   The references to information obtained from the national security letters.

Q.   Okay.  And what information, the document state that at page three, the fact that a national security letter has been used to obtain financial records in a particular investigation and the information derived therefrom is normally classifiable as

A 26 599 077                        814                    October 13, 2000

national security information.  So that fact that a national security letter has been used was previously classified and has now been declassified?

A.    That's, That's correct.

Q.    And what else in this document was previously classified but has now been declassified?

MR. PEREZ TO JUDGE

Objection, Your Honor.  The document does speak for itself.

JUDGE TO MR. PEREZ

It's cross-examination.  He may ask.

SPECIAL AGENT WEST TO MR. COLE

A.    To the best of my knowledge, I believe the financial record information is.

JUDGE TO SPECIAL AGENT WEST

Q.    What page?

A.    Well, the financial information, I believe, Your Honor, is towards the back.  I'll point it out to you momentarily.  I believe it's page 12, Al Najjar financial records.

MR. COLE TO SPECIAL AGENT WEST

Q.    Okay.  Now let's see now, let's look at page 12.  We have three paragraphs there, all right.  First paragraph says, financial information obtained through the use of national security letter described below disclose Al Najjar's access to and transfer of significant amounts of money to and from his account and between his account and accounts overseas.  The

A 26 599 077                        815                    October 13, 2000

following is an accounting of selected transactions against Al Najjar's personal bank account at the University of South Florida Credit Union from the period of June, January 1990 to May 1995. (A) on September 21st, 1992, Al Najjar wrote a check in the amount of $99,500 against his account for deposit into his money market account at Barnett Bank.  (B) on February 7th, 1994, Al Najjar wire transferred a $102,872 from his personal bank account to Beirut, Lebanon for the account of Mohamed Taser Hasam Al Khateeb.  Right?

A.   Yes, sir.

Q.   Now, what information, now isn't it true that all of this information was actually in the record of the deportation proceeding?

A.   The information was obtained by national security letter method as well as covert law enforcement practices as well.

Q.   Okay.  But could you answer this question?  Isn't it true that all this information was presented in the deportation proceeding, and in fact, was presented by Mr. Al Najjar as part of his financial records?

A.   Yes.

Q.   His financial records, it is true?

A.   Yes.

Q.   Okay.  So in fact, none of the actual information here was previously classified?  None of the, so what's classified was

A 26 599 077                 816                 October 13, 2000

the fact that you got the, you got the information in addition to getting it from us giving it to you, you also got through other means.  That's all that's classified about the financial record information.

MR. PEREZ TO JUDGE

Objection, Your Honor, first of all --

MR. COLE TO SPECIAL AGENT WEST

Q.   Is that true?

JUDGE TO MR. PEREZ

He can ask the objection, he can have an objection.  Okay, Mr. Perez.

MR. PEREZ TO JUDGE

Thank you, Your Honor.  First of all, Agent West is being asked questions about every aspect of the deportation case that he may or may not have recollection of at this moment.  The Government would submit that, that the references, specific references to the $102,000 wire transfer, it is not clear that that information may or may not have been in the deportation case.  But again, the declaration does speak for itself.  The references to the national security letter as, as has been testified to by Mr. West is previously undisclosed information.  This should not be a memory test as to whether what specific information may or may not have come out of the deportation case, which lasted over the course of the week with Judge Dowell in Orlando.  So the Government would object to the whole line of

A 26 599 077                    817                    October 13, 2000

questioning, trying to reference back to the deportation case and asking Mr. West if this was ever mentioned in the deportation proceedings. That's irrelevant.

MR. COLE TO JUDGE

Your Honor, the point is, --

JUDGE TO MR. PEREZ

Overruled. I'm going to allow it.

MR. COLE TO JUDGE

I'm sorry?

JUDGE TO MR. COLE

I'm going to allow it.

MR. COLE TO JUDGE

Okay.

MR. COLE TO SPECIAL AGENT WEST

Q. Now, I can't remember the question? What was my question? Oh, yes, I'm sorry. So, so the only piece of information in this three paragraphs that was previously classified and has now been declassified is the fact that you got some of this information through a national security letter and the actual information as you just admitted was, in fact, provided to you on Mr. Al Najjar's initiative in the deportation hearing. Isn't that a fact?

A. The part about a national security letter is correct, yes. And as far as other financial information that was obtained during the course of the, of testimony. I don't actually recall

A 26 599 077                    818                    October 13, 2000

that the exact amount of the $102,000 was brought up.

Q.   But you do --

A.   I know there was testimony about, in the prior hearing, about financial transactions.

Q.   Well, you do recall also that there was a specific disclosure that $100,000, an amount of about $100,000 had come to Mr. Al Najjar.

A.   Right.

Q.   Had stayed with Mr. Al Najjar and then had to return to his brother-in-law in Beirut.

A.   Yes, yes.

Q.   Okay.  Can you point to any other information in this document that was previously classified and has now been declassified?

A.   To the best of my knowledge, that's it.

MR. COLE TO JUDGE

Your Honor, this is -- I think that makes my point.

JUDGE TO MR. COLE

I'm going to ask you a question.  The Mohamed Taser Hasam Al Khateeb, that is his brother-in-law, right?

MR. COLE TO JUDGE

Yes, and he testified to that.

JUDGE TO MR. COLE

I don't know if we had his whole name.

MR. COLE TO JUDGE

A 26 599 077                    819                    October 13, 2000

Well, we'll stipulate that that's his brother.

JUDGE TO MR. COLE

Okay, that's what I was after.  Okay.  So what, you have --

MR. COLE TO JUDGE

So I have, I think his responses made clear, this is not, Mr. Vara came in yesterday very dramatically we have previously classified information which we have declassified.  This will make Mr. Cole happy.

JUDGE TO MR. COLE

And it didn't.

MR. COLE TO JUDGE

And it didn't.  And it didn't.  And in part it didn't because it required me to not go home, not be able to do my, you know, duties of school and to be here, to have the Government submit a document which in the Government's own witness contains a single fact which was previously classified and it's simply that they got some of this unframed, which was made available to them at Mr. Al Najjar's initiative in open proceedings, which has never been a secret.  They got, they also happen to get the information pursuant to a national security letter.  That has absolutely no relevance to the issues here.  How, again, how they got it simply has no relevance and that information, in addition, that fact, they have made no showing of that fact could not have been disclosed if they think it's relevant that they got it through a national security letter in addition to getting it from

A 26 599 077                    820                    October 13, 2000

Mr. Al Najjar's own initiate. If they thought that was a material fact, Mr. West could have presented that information on his direct testimony. There's nothing about new issues which were raised by our case which would justify that. With respect to the rest of it, there's simply nothing new that, that's here, that should be permitted as a declaration. The witness is here. They've put him on the stand. What, if they decide to put him on the stand and then decide to just repeat the testimony that they provided in the opening, in their initial case, that would clearly not be permissible, that's not what rebuttal is for is to repeat prior testimony. This document repeats prior testimony, you know, with the exception of this national security letter. Makes some statements about the Palestinian Islamic Jihad, makes some statements about the Islamic Committee for Palestine starting on page eight, which I will simply reiterate the, the videotape. It makes some statements on the next page that reiterate, again, information from the videotape that Mr. Al Najjar was at the ICP conferences. Then quotes again what Mr., what Mr. Al Arian has said at various of these incidents. Again gives us the kind of, yes to Intifada, yes to Jihad kind of language by Mr. Al Arian. It is not Mr. Al Najjar. It shows that Mr. Al Najjar worked for WISE. It is, it is a summary of their prior testimony. It is not evidence. And at this late date, Your Honor, it's simply inappropriate. It's inappropriate for the document to be admitted and it's inappropriate for Mr.

A 26 599 077                        821                     October 13, 2000

West to be repeating testimony that he has provided before and was cross-examined on, where there has been no new information that requires a response that could not have been provided before.

MR. PEREZ TO JUDGE

Judge, if I may?

JUDGE TO MR. PEREZ

Yes.  Go ahead, Mr. Perez.

MR. PEREZ TO JUDGE

Based on Mr. Cole's statements, it is undisputed now that this declaration does contain new facts.  It is also undisputed that this declaration contains information that was previously classified that is now unclassified and has been presented in open court for the first time.  As to how much or how little new information, how much weight to give to this declaration, that is something that the Court can do without Mr. Cole's prompting. And the Government would also note that as far as references to the $102,000 being exposed previously in the deportation proceedings, the respondent was, quite frankly as established yesterday in the cross-examination, was not truthful about his financial transactions.  And ironically Mr. Cole is confusing the $99,000 and $102,000, something that we, he accused the Government of doing yesterday.  There are separate transactions, there is new information that was previously classified information that is now unclassified.  Agent West is available

A 26 599 077                   822                   October 13, 2000

for any additional cross-examination and the Government believes that the foundation has been laid to, for the entry of this document as Exhibit 63 into the record.

MR. COLE TO JUDGE

Your Honor, I don't want to belabor this but Mr., Mr. Perez has accused me of trying to confuse the monetary transactions. If you look at page 12, it's on September 12th, 1992, he wrote a check of $99,500 against his account into his money market at Barnett Bank.  He admitted that yesterday in testimony.  And that was, and the account he gave and it was fully consistent, both in direct and in cross, was that he received an amount of about $100,000 from his brother-in-law in September of 1992.  He kept it in his various bank accounts and he returned in early 1994, when his brother-in-law had moved from the United Arab Emirates to Beirut.  That is, that is the same transaction.  The other transaction, which Mr., which I was concerned about Mr. Vara confusing because it is a separate transaction was a $96,000 transaction in 1993 which is the one in which $24,000 was family money for Mr. Al Najjar and $72,000 was money that had been raised in the United Arab Emirates for WISE and/or the mosque, etcetera.  Those are two separate accounts, I mean, two separate transactions.  I think it is important that we don't confuse the two.  We testified about those in direct.  They were both in the record of the deportation proceeding.  There is nothing new about them, Your Honor.  And, and simply as Mr. West has admitted,

A 26 599 077                    823                    October 13, 2000

nothing here in terms of the fact, other than the fact that a national security letter got the same information that Mr. Al Najjar provided, that they went through the trouble of getting it through a national security letter as well, that's the only new fact. And again, that, that is not a fact which they could not have provided before. This is not an opportunity, rebuttal is not an opportunity to bring in new evidence that you could have brought before on the issues that you testified about in the opening statement, in opening presentation.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. COLE AND MR. PEREZ

Well, as everyone knows, this is a bond proceeding and the rules of evidence are somewhat relaxed at bond proceedings. The Judge is encouraged to take as much evidence as possible to help him make his decision. There are a lot of types of hearings --

(TAPE A-27)

JUDGE TO MR. COLE AND MR. VARA

Types of hearing with aspects like telephonic hearings that hamper the other sides' ability to cross-examine but we allow them in bond hearings to try to get as many facts as possible. In this particular case, it does appear that there are some facts that were not previously brought out and so over your objection, Mr. Cole, I am going to admit Exhibit 63 into evidence.

JUDGE TO MR. VARA

A 26 599 077                    824                    October 13, 2000

Okay, now Mr. Vara, you said you had one other witness or what?

MR. VARA TO JUDGE

Yes, Judge, actually (indiscernible) procedural, housekeeping issues.  Number one.

MR. COLE TO JUDGE

Your Honor, are we permitted to?  I thought --

JUDGE TO MR. COLE

I thought you were through with that?

MR. COLE TO JUDGE

Well, I'm through with my cross-examination, my cross-examination, I thought that was with respect to the evidentiary issue before Your Honor.

JUDGE TO MR. COLE

Oh, okay.

MR. COLE TO JUDGE

I'd like to ask just a couple of questions.

JUDGE TO MR. COLE

Go right ahead.

MR. PEREZ TO JUDGE

Judge, if I can have a brief --

JUDGE TO MR. PEREZ

Are you through with redirect?

MR. PEREZ TO JUDGE

Not yet, sir.

A 26 599 077                          825                    October 13, 2000

JUDGE TO MR. COLE

Okay, let him finish redirect then.

JUDGE TO MR. COLE AND MR. VARA

I guess I was hoping that everybody was done.

JUDGE TO MR. PEREZ

Okay, go ahead, Mr. Perez.

MR. PEREZ TO JUDGE

Thank you.

MR. PEREZ TO SPECIAL AGENT WEST

Q.   Agent West, may I draw your attention to page six of the declaration, the last sentence of the first full paragraph. On the lower page, the last sentence that begins with the manifest.

A.   Yes, sir.

Q.   The manifest also indicates that PIJ's general or central command is located abroad and is charged with offering amoral, financial.  Amoral, is that a typographical error?

A.   I'm still having trouble finding it.  I --

JUDGE TO SPECIAL AGENT WEST

Q.   It's at the bottom of the paragraph, right above where it says PIJ.

A.   Oh, yes, that's correct.  That's a typographical error, yes.

MR. PEREZ TO SPECIAL AGENT WEST

Q.   That word should be moral?

A 26 599 077                    826              October 13, 2000

A.   That's correct.

MR. PEREZ TO JUDGE

For the record, Judge.

JUDGE FOR THE RECORD

So we'll strike out the a.

SPECIAL AGENT WEST TO JUDGE

A.   Yes, sir.

MR. PEREZ TO JUDGE

The Government has no further on redirect.

JUDGE TO MR. PEREZ

Okay.

JUDGE TO MR. COLE

Cross-examination, Mr. Cole.

MR. COLE TO JUDGE

Okay.   I think this shouldn't take too long, Your Honor.

MR. COLE TO SPECIAL AGENT WEST

Q.   On page four of the declaration, Mr. West.

A.   Yes, sir.

Q.   You state that the PIJ factions started in the 1970s as part as the Islamic Fundamentalist (indiscernible).  Do you have any first hand knowledge?  Is that statement based on first hand observation?  First hand observation.

A.   Could you clarify what you mean by first hand observation.

Q.   Do you have any first hand, other than reading about

A 26 599 077                   827                October 13, 2000

it, talking to other people about it, doing research, do you have any first hand information that the PIJ faction started in 1970s?

A.   No.

Q.   Do you have any first hand information that the PIJ is headquarter in Damascus, Syria?

MR. PEREZ TO JUDGE

Object to the form.   Is counsel asking the witness whether he was personally present?

MR. COLE TO JUDGE

I'm asking whether this is all hearsay or whether it's based on first hand knowledge?  I think it's relevant to the weight that the Judge, that the Court will accord it.

JUDGE TO MR. COLE

Okay, so in other words, the basis of the statement.  You may, that's cross-examination, you may ask it.

MR. COLE TO SPECIAL AGENT WEST

Q.   Yeah, do you have any first hand knowledge that the PIJ is headquartered in Damascus, Syria?

A.   Well, yes, if by first hand knowledge do you mean have I been to Damascus, Syria to see the head of the PIJ, their headquarters, no I have not.

Q.   Okay.

A.   No, I do not.

Q.   Now, the next sentence speaks for itself, it's public source information.  The, on the bottom of page six.

A 26 599 077                    828                 October 13, 2000

A.   Yes, sir.

Q.   I'm sorry.  When you stated, I'm sorry, at the top of page six that Shaikaki, Shaikaki described PIJ the decision making process as follows.  Is that based on first hand information?  Were you there when he described the PIJ decision making process?

A.   No, sir.

Q.   That's based on my reading of a news, a reading of a newspaper article which was then reported in FIBIS, isn't that correct?

A.   Well, there's more than that.  Not first hand knowledge but I, I've done, I have had discussions and briefing with other Government officials.

Q.   I'm asking about first hand knowledge.

A.   No, sir, no first hand knowledge, no.

Q.   Then on the bottom of page six, since the 1980s, PIJ has engaged in random acts of terrorism to accomplish its objectives.  And its leader Ramadan Shallah routinely makes public statements indicating PIJ's intent to continue to do so.  Is that based on first hand knowledge?

A.   Not first hand knowledge as you define it.

Q.   Right.  PIJ has killed and/or injured U.S. citizens abroad in its effort to achieve its goals.  Is that based on first hand knowledge?

A.   Not as you define it, sir.

A 26 599 077                    829              October 13, 2000

Q.   And then you list some acts for which you assert the PIJ has claimed responsibility.  Are any of those assertions based on first hand knowledge?

A.   No, sir.

Q.   The first one, all right, I'm not --

MR. COLE TO JUDGE

I have no further questions.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. PEREZ

Any redirect?

MR. PEREZ TO JUDGE

No redirect, but one brief housekeeping matter.

JUDGE TO MR. PEREZ

Yes.

MR. PEREZ TO JUDGE

Government made a proffer, yesterday Mr. West testified as to additional investigations in Reston Investments, the entity that had provided pay stubs to Mr. Basheer Nafi.  Just so the record is clear, Agent West did additional investigation yesterday evening in which it was ascertained that there was no additional investigation of Reston Investment after Mr. Nafi was ordered deported because there was no need to.  Deportation occurred quite soon after the, the initial investigations, just so the record is clear on that one issue.

A 26 599 077                    830              October 13, 2000

JUDGE TO MR. PEREZ

    Okay.

MR. COLE TO JUDGE

    And if I can just follow up with that, Your Honor?

JUDGE TO MR. COLE

    Yeah.

MR. COLE TO SPECIAL AGENT WEST

    Q.   So Mr. West, you lied yesterday when you said specifically --

MR. PEREZ TO JUDGE

    Objection, Your Honor.

MR. COLE TO JUDGE

    Mr. Vara has been permitted to accuse of --

JUDGE TO MR. COLE

    Go ahead and finish your question.

MR. COLE TO JUDGE

    Yeah.

MR. COLE TO SPECIAL AGENT WEST

    Q.   You lied yesterday when you specifically answered my question, was there a follow up with Reston Investments to determine whether or not Mr. Nafi had been employed by Reston Investments.  You said there was.  You named the person.  You said that he told you that Mr. Nafi was employed by Reston Investments.  Isn't that true?

JUDGE TO MR. COLE

A 26 599 077                          831                    October 13, 2000

Okay.

JUDGE TO SPECIAL AGENT WEST

Q.   Hold one second.

MR. PEREZ TO JUDGE

Objection, Your Honor.

JUDGE TO MR. PEREZ

What's the objection?

MR. PEREZ TO JUDGE

Object to the form, object to the characterization.  Also argumentative, Mr. West obviously testified to the best of his information, knowledge and belief and at the time that was the case.  Mr. West engaged in additional investigation to confirm that and the Government counsel provided clarification so that the record was clear.

JUDGE TO MR. PEREZ

Overruled.

JUDGE TO SPECIAL AGENT WEST

Q.   You may answer, ask that question.

SPECIAL AGENT WEST TO MR. COLE

A.   No, sir, I did not lie.  Yesterday when I testified, I testified again to the best of my knowledge at the time.

SPECIAL AGENT WEST TO JUDGE

A.   And if I may explain, Your Honor, the circumstances?

Q.   Yeah, go ahead.

A.   At the, in 1996, four years ago, over four years ago

A 26 599 077                    832                October 13, 2000

when Mr. Nafi was arrested, there was as a result of the Miami INS and a group of agents that I supervised having sent in a request and an auxiliary investigative request to the Washington District Office to pursue the possibility of charging Mr. Nafi in the deportation proceedings.  That was done, the agent, Special Agent Ambrogio in Washington that was assigned to that matter effected the arrest.  The agent that I had assigned to the matter at that time was subsequently retired, had advised me shortly after the arrest that Agent, Agent Ambrogio had told him that he would be doing additional follow up investigative efforts concerning Mr. Nafi's employment here in the United States.  I, yesterday during my testimony I believed that that follow up investigative activity included Reston Investments from the best of my knowledge as of yesterday.  I double checked yesterday evening with Agent Ambrogio and he confirmed that that did not take place, that the follow up investigative efforts related to other entities, not (indiscernible).

MR. COLE TO SPECIAL AGENT WEST

Q.   But isn't it true that you didn't testify yesterday, I believe follow up activities occurred.  You testified follow up activities did occur and agents talked to people at Reston Investments and they informed the agents specifically, Mr. Ambrogio, that Mr. Nafi had worked for Reston Investments. Wasn't that your testimony yesterday?

A.   That was to the best of my knowledge, yes.

A 26 599 077                         833                    October 13, 2000

MR. COLE TO JUDGE

No further questions at this time, Your Honor.

JUDGE TO MR. COLE

Okay.

JUDGE FOR THE RECORD

Matter of housekeeping, let's see, Exhibit 59, that has not yet been admitted. I believe you all have moved for its admission and I think Mr. Cole objected.

JUDGE TO MR. COLE

Anything further on, that was Sheik Abdel Al-Zes Odi's bio.

MR. COLE TO JUDGE

Well, we continue to have the same objection. You can't offer a, a translation without the original.

JUDGE TO MR. COLE

Yes.

MR. PEREZ TO JUDGE

Judge, unfortunately we do not have the Arabic language at this time. We haven't been able to obtain (indiscernible) the Arabic language copy. We note that the Court can give whatever appropriate weight it feels the document, without the Arabic original, should be given.

MR. COLE TO JUDGE

Your Honor, I -- you know, I understand the bond proceedings are very lax, but there's got to be a line somewhere and if you don't even offer the original document and you only offer what

A 26 599 077                    834                    October 13, 2000

purports to be a translation of something which is not even offered, we have no opportunity to assess whether the translation is accurate or not.  It's, it simply should not be admitted.

JUDGE FOR THE RECORD

Okay, with the rules as I remember set forth, you know, for whatever particular reason, I didn't make the rules, so I'm going, not going to admit 59 in evidence.  Okay.  And I also believe Exhibit 50, I believe that was also not, still open.

MR. COLE TO JUDGE

That's the travel document or passport of Sheik Abdel Al-Zes Odi.

JUDGE TO MR. COLE

Do you admit it?

MR. COLE TO JUDGE

We offered that, right, so we have no objection.

JUDGE TO MR. VARA

And objection on that?

MR. VARA TO JUDGE

Yes, Your Honor.  Our position again is that there has been no evidence offered except for some sort of self-serving testimony from the respondent that still never presented anything other than his views that the name represented in the document proffered by the respondent relates to the same Odi that we've been talking about since the beginning of this hearing.  Again, whether or not that is the person that they say it is, at best,

A 26 599 077                     835                     October 13, 2000

it evidences that he used an alias to get into the country.  But we have no information.  U.S. Government has no information that that is the same Odi that we have focused on in this proceeding.  So we believe that the document is inherently unreliable and there is no evidence that indicates that it applies to the person that is relevant to these proceeding.

MR. COLE TO JUDGE

Your Honor, the fact that the Government doesn't have anything to contradicts the document doesn't mean that the document is admissible as evidence.  Mr. Al Najjar testified that he recognized the person whose photograph is in the passport as, as Sheik Abdel Al-Zes Odi.  The Government was quite happy to have Mr. Al Najjar identify people on its photographs.  It was quite happy to Agent West identify people on its photographs.  It's a, there has been a positive identification, it is Sheik Abdel Al-Zes Odi.  The fact that the Government has not contradicted doesn't mean it's not inadmissible.

JUDGE TO MR. COLE

Okay.

JUDGE FOR THE RECORD

I'm going to admit that Exhibit and the objections go more to the weight than the admissibility.

JUDGE TO MR. PEREZ

Okay.  I think we're back to Mr. Perez.

MR. PEREZ TO JUDGE

A 26 599 077                    836                    October 13, 2000

No, nothing further.

JUDGE TO SPECIAL AGENT WEST

Q.    Okay, you may step down.

A.    Thank you, Your Honor.

JUDGE TO MR. VARA

Okay, back to Mr. Vara?

MR. VARA TO JUDGE

Yes, Your Honor.  We have one last witness and that is Brian Brynjolsson And I'll spell that name for the record.  It's B R Y N  J O L S S O N.  He is a financial analyst with the Tampa Division of the Federal Bureau of Investigation.

JUDGE TO MR. VARA

Okay.  And can you give me that last name again?

MR. VARA TO JUDGE

Yes, Your Honor.  It's Brynjolsson, Brian M.

JUDGE TO MR. VARA

Okay.

JUDGE TO MR. BRYNJOLSSON

Q.    And if you'll come up, Mr. Brynjolsson.  If you will raise your right hand.  Do you swear the testimony you're about to give today shall be the truth, the whole truth and nothing but the truth, so help you God?

A.    Yes, sir.

Q.    Okay.  And if you'll speak loud enough so that the lady in the corner over there can hear you and that way the microphone

A 26 599 077                            837                     October 13, 2000

will pick up everything you say.

A.   Yes, sir.

Q.   Would you state your full name, please?

A.   My name is Brian M. Brynjolsson.

Q.   And your occupation?

A.   I'm a financial analyst with the FBI.

Q.   And you're assigned to what office, if I may ask?

A.   Tampa, sir.

Q.   Okay.

JUDGE TO MR. VARA

Very well, you may proceed, Mr. Vara.

MR. VARA TO JUDGE

Thank you, Your Honor.

MR. VARA TO MR. BRYNJOLSSON

Q.   Mr. Brynjolsson, in the course of your official capacities with the FBI, did you come occasion, did you have occasion to come across information related to a person known to you as Mazen Al-Najjar?

A.   Yes, sir.

Q.   And sir, when did you come across that information?

A.   That information was provided to me on last Friday.

Q.   And do you recall for what purpose that information was provided to you?

A.   To, to present today.

MR. VARA TO JUDGE

A 26 599 077                     838                     October 13, 2000

Your Honor, I would like to have marked for identification purposes as Exhibit 64 a group of documents.

MR. VARA TO MR. BRYNJOLSSON

Q.   Mr. Brynjolsson, do you have --

MR. VARA TO JUDGE

Excuse me, Your Honor, may we have time to review this document before Government --

JUDGE TO MR. COLE

Yeah.

JUDGE FOR THE RECORD

We'll go off the record for a minute.

(OFF THE RECORD)

(ON THE RECORD)

JUDGE TO MR. VARA

You amy proceed, Mr. Vara.

MR. VARA TO JUDGE

Thank you.

MR. VARA TO MR. BRYNJOLSSON

Q.   Mr. Brynjolsson, do you recognize the Exhibit that has been provided to you?

A.   Yes, sir, I do.

Q.   And can you tell us very briefly what the cover, the document on the very top is?

A.   This is the NSL, it was used to obtain the information that's attached to it.

A 26 599 077                    839                October 13, 2000

Q.   When you say NSL, can you tell us what that means?

A.   National security letter.

Q.   And sir, pursuant to a national security letter, what is it that FBI seeks to do?

A.   Obtain information, in this particular case, financial information.

Q.   And who was this national security letter directed to?

A.   This was directed to the University of South Florida's credit union.

Q.   And do you know from the document or from your own independent knowledge as to who the person or person were that the FBI was seeking to get information on?

A.   Yes, sir, it's on the face of the document.

Q.   And sir, can you tell us who those, that person or persons were?

A.   That was Mazen Al-Najjar.

Q.   Mazen Al-Najjar?

A.   Yes, sir, I'm sorry.

Q.   And it also names a few other names.  I know they're hard, potentially hard names to pronounce but it names Mazen Abdul Karem Al-Najjar?

A.   Yes, sir.

Q.   Mazen Al-Najjar.  Mavin Najjar and Mazen Najjar.

A.   Yes, sir.

Q.   And sir to the best of your knowledge, based on the

A 26 599 077                     840                     October 13, 2000

document in front of you, well, first of all, I noticed at the very top of the document, it says secret.

A. Yes, sir.

Q. Why is that document in court today?

A. The document was declassified by the ASAC, at the FBI.

Q. When was that?

A. That occurred yesterday, sir, on the 12th.

Q. And what is ASAC, sir?

A. That is the Assistant Supervisory Agent in Charge at the FBI headquarters.

Q. And sir, attached to that cover letter, we have a variety of documents. And let me, let me direct you without really belaboring the point. Let me direct you to the flow chart that's included in the package of documents.

A. Yes, sir.

Q. Have you reviewed this flow chart?

A. Yes, sir, I have.

Q. And based on your review of the documents that you have in your hand, does this flow chart a true and accurate representation of what happened to $99,990 that came into Mazen Al-Najjar's account on 9-15-92?

A. Yes, sir.

Q. And, sir, can you tell us from your review of that, what happened to that money? Give us a little bit of detail?

A. Yes, sir. The $99,999, it was $99,990 was wire

A 26 599 077                    841                    October 13, 2000

transferred in from the Arab Bank in Abadabe (phonetic sp.) to the Federal Credit Union account in the defendant's name. And funds were then transferred or written, a check written on 9-18 of '92, in the amount of $99,500, it was check number 854 from the defendant's account at the FSU Credit Union, I'm sorry the USF Credit Union to his account at the Barnett Bank. Then on 9-29-92, $98,500 was, was invested in the R&F Securities accounts.

Q.   And then what happened with the money after that.

A.   There was a check for $50,000 on 5-13-93 that went from the securities account back to the Barnett, we'll call it the operating account if you will. It's a market line type account. And then another check on 8-23-93 for $50,522.68 which went back to that same account. From there what we see is a check for, checks totaling the $105,020 which went from that account into the USF Credit Union account.

Q.   Let me stop you there. Now did those two checks, the 250, the one for $50,000 and the one for $50,520, were those issued on the same date?

A.   No, sir they weren't. One was 6-14-93 and one was 8-25-93.

Q.   Okay. Please proceed.

A.   The funds were moved into the credit union account and a wire transfer of $102,872 was made to the Beirut, Lebanon, it was transferred, a copy of the wire transfer, in fact, is here in the documents. The date on that transfer is included in the flow

A 26 599 077                      842                  October 13, 2000

chart.  And that's 2-7-94.

Q.    And that went to a person by the name of Hassan Mohamed Teseer Taja Al Katec (phonetic sp.)?

A.    Yes, sir.

Q.    At Arab LTD?

A.    Yes, sir.

Q.    Now, sir, let me direct your attention to the last two pages in the group of documents.  Let me start with the one that says statement date, 6-7-93.  Based on your review of that document, do you know who the account holder was?

A.    Yes, sir.  It's the defendant.

Q.    Mazen Al-Najjar?

A.    Yes, sir.

Q.    And sir, this report is for what period of time?

A.    This is for the period 5-6 of '93 through 6-7 of '93.

Q.    Now sir, I noticed here that it says that there was a deposit, how much was that deposit for?

A.    The deposit was for $50,000 even.

Q.    Were there any debits from the account?

A.    There was, yes there were.

Q.    How many?

A.    There were three checks totalling $52,530.

Q.    Now there's a section that's entitled money market investment account transactions.  Do you see a transaction for 5-27-93?

A 26 599 077                     843                October 13, 2000

A.   I'm sorry, sir, could you repeat the question?

Q.   Yes.   There's a section entitled money market investment account transactions?

A.   Yes, sir.

Q.   And right under it, it says date, amount, description and then date and balance.   Under the first date column it says 5-27.   It's the second entry.

A.   Yes, sir.

Q.   What is, well, first of all, is there a transaction on that day?

A.   Yes, sir, there is.   It's a $2,500 outgoing international funds transfer.

Q.   Now, do you know where that money went to?

A.   No, sir, I don't.

Q.   What does that mean to you as a financial analyst when it says outgoing international funds transfer?

A.   That would mean that there would be funds being transferred outside the country.

Q.   Now, ultimately you see a transaction dated 6-4-93, the very bottom.

A.   Yes, sir.

Q.   And what is that for?

A.   That's the $50,000 check.   It's check number 106.

Q.   Now sir, let me ask you one last question about this document.   What was the beginning balance, if you can tell from

A 26 599 077                     844                  October 13, 2000

this document before the $50,000 deposit?

A. The balance on the last statement which is an entry that's made on the statement is $9,762.35.

Q. Now based on your training and experience and knowledge, would you label this account a dormant account?

A. No, sir.

Q. And why is that?

A. Well, the activity on the account, there's checks being processed through the account, there are wire transfers, wire transfer being processed through the account, so it's, it's an active account.

Q. And again, based on your review of the debits, it appears that the only debit is the $2,500 for a transaction sending money somewhere abroad.

A. Yes, sir, that's correct. Plus the check.

Q. Right, plus the check. Let me direct your attention to the second statement, the last document in this group.

A. Yes, sir.

Q. That's dated 9-8-93. Who is the account holder on this account?

A. The defendant.

Q. Mazen Al-Najjar?

A. Yes, sir.

Q. Sir, do you see any deposits into this account during this period of time?

A 26 599 077                    845                    October 13, 2000

A.   Yes, sir, on the statement, it reads that there are two deposits and credits totalling $56,322.68.

Q.   And what was this period of time?

A.   The statement date runs from 8-6 of '93 through 9-8 of '93.

Q.   Now sir, based on this document, were there any transactions of money going out of the account?

A.   Yes, sir, there are, they were identified in the lower half of the statement.  And on 8-9.

Q.   Let me stop you before you get there.  Is there a summary in this document that shows how many transactions there were?

A.   Yes.

Q.   Of money going out of the account?

A.   Yes, sir, there is.  In the upper part of the statement,it's summarized for six checks and debits totalling $58,350 even.

Q.   Now, sir, this document also reflects an annual yield on this account, does it not?

A.   Yes, sir.  That's correct, 2.25.

Q.   I'm sorry 2.?

A.   2.25 percent.

Q.   Based on your knowledge and experience in the area of finance, in 1993, what, would you say 2.25 interest on an account was a low yield, a medium yield or a high yield?

A 26 599 077                    846                    October 13, 2000

A.   Low.

Q.   Sir, let's get to the individual transactions.  Do you see a transaction dated 8-9-93?

A.   Yes, sir, I do.

Q.   And can you tell us what that transaction says?

A.   It's 8-9-90, I'm sorry, 8-9 of '93.  It's $1,000 outgoing international funds transfer.

Q.   What does that mean to you?

A.   That $1,000 was transferred outside the United States.

Q.   Sir, do you see another transaction dated 8-16-93?

A.   Yes, sir, I do.

Q.   And what is that?

A.   On 8-16, there was a $5,800 deposit made to the account.

Q.   And do you see another transaction for 8-16-93?

A.   Yes, sir.  It's a $5,770 outgoing international funds transfer.

Q.   And what does that mean to you?

A.   That's $5,770 was transferred outside the United States.

Q.   Now, do you know where that money went to that went abroad on 8-16?

A.   No, sir, I don't.

Q.   Do you know where the money went to, the $1,000 that went out on 8-9, do you know where that went to abroad?

A 26 599 077                     847                  October 13, 2000

A.   No, sir, I don't.

Q.   Now, based on your knowledge, training and experience, would you say that this is a dormant account?

A.   No, sir, I would not.

Q.   And why is that?

A.   Well, there's activity in the account, there's, we see the two funds transfers, the money going out of the country, and we also see checks 108 and 109 that were written in the account.

MR. VARA TO JUDGE

At this time, we ask that Exhibit 64 be admitted into evidence.

MR. COLE TO JUDGE

No objection, Your Honor.

JUDGE FOR THE RECORD

Exhibit 64 will be admitted into evidence.

MR. VARA TO JUDGE

And we pass the witness.

JUDGE TO MR. COLE

Mr. Cole?

MR. COLE TO JUDGE

We have no questions of this witness, Your Honor.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. VARA

Anything else, Mr. Vara?

A 26 599 077                    848                    October 13, 2000

MR. VARA TO JUDGE

No, Your Honor.

JUDGE TO MR. VARA

He may be excused?

MR. VARA TO JUDGE

Yes.

JUDGE TO MR. BRYNJOLSSON

Q.   Okay, thank you very much, sir, you may be excused.

JUDGE TO MR. VARA

Okay, Mr. Vara?

MR. VARA TO JUDGE

Your Honor, at this time, the Government has no further open source evidence to present.

JUDGE TO MR. COLE

And Mr. Cole?

MR. COLE TO JUDGE

Your Honor, I'd like a moment, I'd like to take some short break to talk to my client.

JUDGE TO MR. COLE

Yeah, that would be okay.

MR. COLE TO JUDGE

And we may be prepared to do closing, you know, when we come back (indiscernible).

JUDGE TO MR. COLE

Okay.

A 26 599 077                          849                    October 13, 2000

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

Okay, back.

JUDGE TO MR. COLE

So, Mr. Cole, how do you wish to proceed?

MR. COLE TO JUDGE

We have nothing further at this time, Your Honor.  We would, since the Government has put in these new documents, we'd like the opportunity to, to leave the record open so that we can submit, we may have some documents that respond to the particular financial transactions that were just recently brought out by Mr. Vara.  So we would like, we would ask that we can have the documents and we can submit them shortly if --

JUDGE TO MR. COLE

Okay.

MR. COLE TO JUDGE

If we can find them.

JUDGE TO MR. COLE

Okay.  And then as, you said yesterday that you wanted to present your summation by brief?

MR. COLE TO JUDGE

Yeah, we're happy to do it by brief.  Mr. Vara objected to that and was concerned about delay and so we've actually prepared a closing, we're ready to go with a closing.  We obviously don't

A 26 599 077                          850                    October 13, 2000

want to delay Mr. Al Najjar's freedom any longer than is necessary and so I think it's up to Your Honor what you think would be most helpful.  But we are certainly happy to do a closing now.  We're also happy to do a post trial brief.  What we do not want is to have the, the briefing delay prompt resolution of the case, because as you know, this is not the end of matter, whatever happens.

JUDGE TO MR. COLE

Right, right.  Yeah, either one is fine with me, whatever you all want.  Whichever you prefer.

MR. VARA TO JUDGE

We're still ready to go either way, Your Honor.

MR. COLE TO JUDGE

Well, we might as well go with closing, yeah.

JUDGE TO MR. COLE

Okay.

JUDGE TO MR. COLE AND MR. VARA

Who wants to go first?

MR. COLE TO JUDGE

It's the Government's burden.

JUDGE TO MR. COLE

Okay.

MR. VARA TO JUDGE

No, Your Honor, I think that's incorrect.  I believe it's the respondent's burden to establish that he is eligible for a

A 26 599 077                    851                    October 13, 2000

bond and the Government, of course, is opposing that on a particular basis. But it is the respondent's burden in this case.

MR. COLE TO JUDGE

Your Honor, Judge Leonard's --

MR. VARA TO JUDGE

It's his application.

MR. COLE TO JUDGE

Judge Leonard specifically provided under Patel, it's Government's burden to show that Mazen Al-Najjar is a threat to national security. That's what, she remanded it, not for an opportunity for Mr. Al Najjar to prove his innocence, but for an opportunity for the Government, which had unconstitutionally deprived him of freedom for many years, to give the Government another opportunity to make a case. That's why the Government went first here, not us. And so on the closing, the Government also ought to go first.

MR. VARA TO JUDGE

Not a big issue for me, Your Honor.

JUDGE TO MR. VARA

Okay.

MR. VARA TO JUDGE

I just believe for purposes of clarification and for purposes of, and I know this Court is well aware of that. And regardless of any development or phase of this case, it's always

A 26 599 077                    852                    October 13, 2000

the respondent's burden in applying for relief from any action taken by the INS in relation to an alien's presence in the United States, it's the respondent's burden to establish that they are, in fact, eligible for that relief for which they ask.  With that, I will, I will go forward with a closing, a very brief closing argument.  Your Honor, the issue before the Court on remand and as it has always been is the question of who is Mazen Al-Najjar. If you are to believe them, Mazen Al-Najjar is a mild, meek scholar, whose sole purpose in life is to come here to the United States to study, to do research and to assist other people who might, in fact, be in need.  But that's their version of who Mazen Al-Najjar.  And of course, the Government has another one. Mazen Al-Najjar is a terrorist as defined under the Immigration and Nationality Act.  He has engaged in terroristic activities. And he has done so as many other who commit this type of activity must do when they're in a country such as ours.  He's done this by attempting to and actually concealing his activities and his true identity while he's been in the United States.  And when did that begin?  That began at the very early, early stages of his presence in this country.  As the Court can clearly note from the Government provided by the Government, the declaration of Jan Fairbetter, Exhibit 53, as early as the 1980s, Mazen Al-Najjar was attempting to commit fraud in order to stay in the United States.  And of course, you can say or they can say that the reason that a person who is in the United States under his

A 26 599 077                      853                      October 13, 2000

circumstances must, must do that is simply because they desire to stay in the country that offers more opportunity.  Well, that is not the case here.  One of the things that we have to always keep in mind is that when a person like Mazen Al-Najjar comes to a country where there are significant freedom, a country where there are significant financial opportunities, a country that allows people to gather together and under the First Amendment use a variety of speeches and rhetoric and other opportunities by which to raise money for a particular cause, a person who wants to do that, who maybe has an assignment to do that.  And our position is that Mazen Al-Najjar, from the earliest days of his presence in the United States knew that he had to try and stay in the country under any circumstances.  And as I said before, the first instance of fraud is when he enters into a fraudulent marriage, a marriage of convenience so that he, himself, can try to stay in the United States.  He also, as noted by Ms. Fairbetter, in her declaration, sworn declaration that's in evidence, sought to impress the Immigration and Naturalization Service by opening up a bank account, excuse me, with $20,000 so that he can, of course, tell the INS that and the people of the United States, that he's an alien in this country who is not going to take advantage of the financial support that this country provides to those in need.  And because he knows that some of the criteria for getting a visa in the United States clearly relates to whether or not an alien can provide for

A 26 599 077                    854                    October 13, 2000

himself and those that might be part of his family.  And the reason it's so important to note that, that Mazen Al-Najjar did that back in the early '80s is because that's the same thing, that's the theme of what he was doing for ICP and WISE in relation to other people associated with the terrorist organization that we know as the Palestinian Islamic Jihad.  And we move from the '80s when he's in Greensboro, North Carolina and we move to Tampa, Florida.  And we see Mazen Al-Najjar now again in his public persona of joining by his own testimony, a mosque, joining the University of South Florida as a, at one time apparently getting paid by WISE as indicated in the report to the, to the management of the University of South Florida, the report that had to do with WISE and its operation.  He was getting paid and this is Exhibit 30, Report to President Freddy Castor.  He was getting paid by WISE while being employed by the University of South Florida.  And again, why would he have to do that?  Why would WISE and again, Mazen Al-Najjar, have to do things like getting employment and joining a mosque and doing the other things that, of course, are regular things that people do in this country?  Well, because again, he has to have a public persona that conceals the real person that he is.  And who is helping him in his endeavors?  None other than his brother-in-law, Sami Al-Arian.  And what do they both decide to do once they're in Tampa?  Well, they first decide to organize and create an organization that, by some accounts, is known as the Islamic

A 26 599 077                    855                    October 13, 2000

Concern Projects.  By other accounts, it's known as the Islamic Committee for Palestine.  And by their accounts is known as the same organization.  Of course, their account being an account that the U.S. Government only receives after we find out about the fact that they're, in fact, the same organization.  And why do they create this think tank?  This research organization called ICP?  Well, it's to allow them to do again that which they were sent here to do.  And that's to raise money for the terrorist organization, Palestinian Islamic Jihad.  And how do we know that?  Well, we know that even though they've objected vehemently, vehemently to the identification of even Sami Al-Arian, the person who sat in this courtroom throughout the majority if not the entire part of this case.  They refuse to even admit that he was at these conferences.  But what we do know now from the respondent's own testimony and of course, from the unrebutted testimony of the Government and of course from the Composite Exhibit that we entered into the record as Exhibit 8 and the other Exhibits, the pictures that were admitted into the record, Exhibit 1A through 8A, that we had Sami Al-Arian and Mazen Al-Najjar holding conferences at which people, such as Basheer Nafi, who again, if you believed them six months ago, if you believed them at the beginning of this hearing was a person that they didn't know was associated with the Palestinian Islamic Jihad.  But a person, only upon direct or cross-examination of Mazen Al-Najjar, in a situation where he has no choice but to

A 26 599 077                    856                    October 13, 2000

admit this, he finally admits that they knew was reported to be associated with the PIJ. And who else do they have there? Abdel Al-Zes Odi. Another person that a few weeks ago, the respondent, through counsel, was vehemently saying there is no evidence that this person has ever been associated with the PIJ. And what do we know about him now at the conclusion of this hearing? Again, if we only limit it to Mazen Al-Najjar's testimony, we know that he is a person that has been associated with the PIJ since the 1980s. And through the respondent's own testimony, we know that he knew that fact. But again, the ICP being managed by WISE and being managed by Mazen Al-Najjar was in the business of inviting people such as Basheer Nafi and Abdel Al-Zes Odi and of course the Blind Sheik, Sheik Rachman, who again, I believe nobody, even though they tried to, but nobody can now contest came to this country under the guise of being just a mere cleric, but in fact the person who was planning and, in fact, at some point, did carry out through some operatives a terrorist attack against not the interest of the United States, but the very people that allowed him to be here in the United States, American citizens. And of course, we know that he's now in jail, having been convicted by a jury of that offense. Why were they inviting these people? Why were they holding these conferences? If you believe Mazen Al-Najjar, it was just as a matter of discourse, to discuss and to present varying view points on the Middle East issue to anybody in the audience who might or anybody in the

A 26 599 077                    857                    October 13, 2000

United States who might want to attend these open conferences. Was that really the case? No, I think again Mazen Al-Najjar's own testimony tells you that that wasn't. What you had here was an organization that was, in fact, seeking to raise money. And the term I used in asking the question of Mazen Al-Najjar is very illustrative. They were seeking to get some star power as is done in almost every other fundraising endeavor in the United States and elsewhere. They were seeking to bring people in, who again, based on their views, based on their status, based on their known affiliation with PIJ and anti-Israeli and anti-peace process views were going to generate attendance and fundraising. And they were effective at that. They were able to invite some of the Who's Who of Terrorist Organizations. Rashid Ghanoushi was, of course, one of the other attendees. And if you look at the list that it's in some respects, an unending list of the people that attended these conferences, we have people that we, of course, in open source evidence know are affiliated with terrorist organizations. And I would have to assume that anyone in this courtroom can also understand that there might have been others that the U.S. Government may or may not know or may not, may or may not be able to reveal are, in fact, known or suspected terrorists. But again, who was handling these conferences? Well, ICP, the same ICP, of course, that Mazen Al-Najjar was senior official of and yet again just a few hours ago, less than a day ago, if you believe what Mazen Al-Najjar's role.

A 26 599 077                    858              October 13, 2000

(TAPE A-28)

JUDGE TO MR. VARA

    Go ahead.

MR. VARA TO JUDGE

    If you believe Mazen Al-Najjar was telling you about his role in regards to these conferences, he was nothing more than a person who ensured that these known and suspected terrorists received food service during their attendance at these conferences. But I think Mr. Al Najjar was a little shy of his representations in direct examination. And of course, only opened up on cross where he revealed, of course, because he had no choice based on another Exhibits that's in evidence and that's his own application for employment certification that he submitted in, noted as Exhibit 56, and the qualifications statement 57, Exhibit 57 that he submitted along with his attempt to get a visa to remain in the United States, he was, in fact, a person in charge for fundraising for ICP. He wasn't a mere food caterer, he wasn't a mere clerk. He wasn't a mere person to sit there and arrange travel as some secretary might do, but he was a person that was designated by Sami Al-Arian and, by his own choice, to conduct more than that. And if you're in charge of fundraising at the conferences at which you're inviting the Who's Who of the Terrorist Organizations around the world, those that can get into the United States, then I would assume, and I believe the Court has to assume that you are something more than

A 26 599 077          859          October 13, 2000

just a mere meek scholar researcher and cleric.  And you hear Mazen Al-Najjar, to hear Mazen Al-Najjar say it, the reason you shouldn't believe that he's a terrorist is because he didn't attend two of these conferences or round tables or other events at which the Government does have significant evidence of fundraising.  And yet what he, of course, seeks to have this Court overlook is the fact that the head of ICP, Sami Al-Arian, his brother-in-law, the person who is his supervisor at WISE, the person who is his benefactor in Tampa, the person who, in fact, from the testimony of Nahala Al-Arian, let him reside for a brief period of time when he first came to Tampa in his household.  The person, in fact, is, of course, at the very forefront of some of the activities that we have been presenting to the Court.  But that person is at that conference.  At the conference where you here Faliaz Damra, a person that you now know Mazen Al-Najjar knows and that you know now based on the testimony of Nahala Al-Arian is a person known to Sami and Nahala Al-Arian.  But you hear and you see Faliaz Damra doing two significant things at that conference in 1991.  The first is, he identifies Sami Al-Arian as the head of the ICP, the active arm of the Palestinian Islamic Jihad in the United States.  An organization known for security reasons as the ICP in the United States.  And you see Sami Al-Arian walking right behind Faliaz Damra as that introduction is being made.  You don't see Sami Al-Arian reacting in shock, you don't see Sami Al-Arian leaving that room.  You

A 26 599 077                         860                    October 13, 2000

don't see Sami Al-Arian saying I wish to clarify the record, I am not a member of PIJ. No, you see Sami Al-Arian giving a speech immediately thereafter. And what does he say in that speech? Death to Israel, Revolution. Victory until death. Are these the statements of somebody who is a scholar and researcher and a person who is the member of the mosque? Are the words of a terrorist? And again, the question that keeps on getting poised by the respondent is, well, if Sami Al-Arian is a bad guy, if he does bad things, if he says bad things, how can you attribute to us? Mere association, gee, just can't be enough to label me a terrorist. But it's not mere association, is it? We have somebody here in this courtroom who is, again, not somebody who has no education. We have somebody not who is at the beck and call of somebody so superior to him that he can't reject that person's pronouncements or activities. We have somebody here who, through his own admissions, and through his own evidence, that of course has only now been presented in the forum that has been presented, but it's evidence under his signature, under the signature of Sami Al-Arian, the visa petitions that were filed by WISE and a variety of other documents that we have was an integral member of the ICP. He was Sami Al-Arian's right hand man. And I don't think there's any question of that issue. So when the principle of ICP attends a conference at which the ICP is identified as the active arm of PIJ and at which such statements as violence until death, victory until death, death to

A 26 599 077                    861                    October 13, 2000

Israel and revolution are made, when that person tries to instance themselves by simply saying, I wasn't there, so I shouldn't be held accountable for that.  And oh, by the way, my brother-in-law, my benefactor and my immediate superior and the, the person in charge of the very organization that I belong to as the head of fundraising goes to a fundraising conference, a conference that again on the videotape you see Faliaz Damra standing at, exhorting people to put money at his feet, which they do.  By making stabbing motions and seeking to glorify the violent acts of a terrorist who killed several innocent people in Israel, he tries to tell you there's no way he knew about it. There's now way Sami Al-Arian would have told me.  There's no way I could have known.  And you know what?  Even though the Government has now shown me that he has did that, well, you know, I can't even denounce him now because he, he's my brother-in-law, he's a human being and I really don't think I can denounce him now because I guess his activities and conduct aren't so bad to me.  And again why can't he do that?  Is it really, is it truthful that he can't do that because he can't denounce human beings?  Well, he denounces Ramadan Shallah at the very end of his testimony.  He does that, why?  Because of course Ramadan Shallah isn't here, Ramadan Shallah doesn't have to be, doesn't have to worry about some Government action in the United States that might affect his freedom and ability to remain in the United States.  And certainly Ramadan Shallah is not a person that we,

A 26 599 077                    862                    October 13, 2000

the U.S. Government can touch at this point and seek to tell us what he really knows about Mazen Al-Najjar.  So he can denounce Ramadan Shallah very clearly because as now acknowledged, Ramadan Shallah is the head of the Palestinian Islamic Jihad.  But he cannot denounce his brother-in-law, who again, from everything you've seen, from all the evidence, the unrebutted evidence, the admitted evidence now that you've seen makes such statements as we've already talked about and makes additional statements such as death to Israel and damn America and those people God made monkeys and pigs and stands along side a person who is, of course, fundraising for the Palestinian Islamic Jihad.  And let's talk about some of the other associations that this very bright and educated man with a significant level of sophistication in a variety of subjects; academic research, finances, and just the ability to represent himself in a variety of forums.  What were his associations in the United States?  He says don't hold me accountable for having been in the same office with Ramadan Shallah because gee, I came in other doors and I really didn't like Ramadan Shallah, so you know, we didn't hang out together so I didn't know him that well.  Well, again, I think Mr. Al Najjar is a little too modest because as you see from their own Exhibit, the Exhibit that was given to you that was a diagram of the WISE office, there's no way he could have avoided interaction with Ramadan Shallah.  And I think the one thing that you have to absolutely accept as a truism is that you don't become the head

A 26 599 077                        863                    October 13, 2000

of a terrorist organization, a secretive, violent, international terrorist organizations by filing an application and your resume. You become a member of that organization because your ties are so significant to that organization and so long standing with that organization, that they have selected you as the successor to Fati Shaikaki, the person who was, of course, the head of the PIJ until he was killed in 1995. You have a person with Mazen Al-Najjar's sophistication, training, knowledge sitting here telling you under oath, gee, I, there's no way I could have known Ramadan Shallah was a PIJ member and I'm really astonished that he got the head, he got to become the head of the PIJ in 1995. That's simply is incredible in light of the totality of the facts in this case. And I'll add one more fact, something that, of course, as they've done with so many facts in this case, they tried to obviscate (phonetic sp.) and that's the fact that it's very convenient and it's, to believe them it would just be unusual circumstance and coincidence that the very same people we're talking about here, all were in Cairo, Egypt in the 1970s. They all were attending one university or the other. They were all the people that are now admitted, according to Mazen Al-Najjar, of course with the exception of himself and Sami Al-Arian that are now associated with the Palestinian Islamic Jihad. So you have to ask yourself, under all the facts about the presence of Ramadan Shallah in the United States and all the facts that relate to the history of Ramadan Shallah and Mazen Al-Najjar and

A 26 599 077                    864                    October 13, 2000

Sami Al-Arian and Basheer Nafi and Abdel Al-Zes Odi.  If it is really a significant coincidence that they all end up in some form or fashion being in the United States today about 10, 15, 20 years after they were all together in Cairo, Egypt.  You have, again, an individual who seeks to conceal his true identity.  And I can tell you having been involved in this case for a significant period of time, as it has come so many times in this case, that all of the agents and all of the people in the U.S., on the side of the U.S. Government involved in this case, have tried very hard to pierce the veil of legitimacy that has been presented by Mr. Al Najjar.  And we think we've done a good job, but we'll admit today as Mr. Cole has so vehemently argued that we haven't pierced it totally, not with open source evidence, not with evidence that we can present in an open source proceeding that allows us to, to deal with the very issue that we want this Court to deal with.  But we believe that we've done a good job of presenting to you information that's going to allow you to ask you the very significant question that I posed at the beginning of this closing argument.  And that's who is Mazen Al-Najjar?  Who are his associates?  What were his activities, why would he have engaged in such activities?  Why is it that the U.S. Government believes he's a terrorist?  And to summarize it, we have him associated meaningfully, very meaningfully associating with the Who's Who of the Terrorist Organization, PIJ.  We have him engaged in financial transactions, a person who is so poor in

A 26 599 077                        865                    October 13, 2000

the early 1990s and late '80s, so poor in terms of income, that he doesn't even have to file an income tax return. We have him dealing with hundreds of thousands of dollars and multiple transactions to the Middle East that we have now, of course, presented evidence on. Transactions that belie his own testimony as to why he handled the one transaction that we can talk about and that's the $100,000, $99,990 in which he received those monies into his account in 1992 and the $102,000 transaction in which he sent the money back to Beirut in 1994. It belies the very testimony that he provided, because he said, gee, I'm just being a nice guy for my brother-in-law, my other brother-in-law, and I'm putting this money in some better accounts to earn better interest. And of course, I gave him his money back with interest when I sent it back in 1994. What he didn't tell you until we presented the evidence toady is, of course, these were active accounts and he was sending monies to other people or other locations for other purposes, certainly during the period that we're able to get records for and that's 1993, before he sent the money off to Mr. Al Cateb in Beirut, Lebanon. So again, Mr. Al Najjar was a bit too modest in, as they put it, him being so open about this transaction. He was very modest because he didn't want to tell you about those additional transactions that relate to him sending money to other unknown entities or individuals in the Middle East. And again he has to do that because his job, of course, is to raise money for the PIJ and if he tells us that

A 26 599 077                    866                    October 13, 2000

that's what he's doing or he makes it so obvious that that's what he's doing, of course, there wouldn't be a question before this Court today as to whether he's a terrorist or not.  What else could he do?  Well, of course, he assisted in obtaining visas for people that he knew by his own admission, knew were people who were associated with a known terrorist organization.  And the one that we have to, you can ignore any of the other --

(OFF THE RECORD)

(ON THE RECORD)

MR. VARA TO JUDGE

The one that we absolutely have to focus on is the one regarding Basheer Nafi.  And of course, we have to note that Basheer Nafi was presented as one of their witnesses and he did a pretty good job on direct examination, I think, of sounding like a nice scholarly researcher.  And of course, he did a good job of denying that he was associated with the Palestinian Islamic Jihad.  And I think he also, of course, did a good job of trying to leave this Court with the impression that he couldn't even begin to believe that anybody would think that he's associated with the Palestinian Islamic Jihad.  But again, his own testimony was belied by the respondent's testimony that even the respondent had read accounts of the fact that Basheer Nafi was a PIJ associate in, as early as the 1980s.  But what did they do for Basheer Nafi to allow him to stay in the United States?  They didn't just file a visa on his behalf, they lied about what they

A 26 599 077                    867                 October 13, 2000

were saying to the U.S. Government on behalf of Basheer Nafi. They lied about him coming to work at WISE and being here at WISE. They lied about the fact that he was going to be in Tampa, when, in fact, they knew he was in Herndon, Virginia. They lied about the fact that in 1995, after they admittedly knowing that he was up in Virginia, that they were filing another application with the U.S. Government, the Immigration and Naturalization Service indicating that he was, of course, going to be working full-time, 8 to 5, at WISE or for WISE. And of course, they tried to obviscate their lie by saying that he was doing research for them in Virginia and he didn't have to work in the offices of WISE. But I believe this Court being very well-versed in the Immigration and Nationality Act can see through that obviscation and note that, in fact, the representation as it would have been taken by the Federal Government who processes this application for an H-1B visa would be that this work was going to be conducted as represented on that form. And why did they have to do that? Well, of course, they had to do that because they knew that Basheer Nafi's true activities in the country were something other as researcher and scholar. In fact, they knew, of course, that he was also a meaningful PIJ fundraiser and a meaningful PIJ associate. And as we know now from the evidence that we presented and has been admitted into the record, he's an individual who while he says he's working for WISE is, in fact, working for IIIT in Herndon, Virginia and working for an

A 26 599 077                    868                    October 13, 2000

organization called Reston Investments as evidenced by the pay stubs that he had in his possession at the time of his arrest and the insurance card issued to him on behalf of Reston Investments.

(OFF THE RECORD)

(ON THE RECORD)

MR. VARA TO JUDGE

So what we have, of course, is again another factor under Section 212 of the Immigration and Nationality Act that would tell you that Mazen Al-Najjar, in particular, engaged in terrorist activity in that he provided not only financial support but false documentation to a person that he knew or should have known was a, was affiliated with the Palestinian Islamic Jihad, a known terrorist organization.  So what do we have and what do we know about Mazen Al-Najjar?  What we know, I believe is that he'll misrepresent the facts at every turn to allow him to remain in the United States.  He's done so since day one, as we've already argued.  And he's continued to do so until today.  He wants desperately to stay in the United States and he wants desperately to be free in the United States to do that which he does.  As he noted in his own testimony yesterday, if I was released, I would go back to doing what I used to do.  Well, I know what they'll tell you that means.  But I can tell you what the U.S. Government would believe that would mean.  And that's that he would go back to the very activities that are inimical to the best interests of the people of the United States.  That's

A 26 599 077                          869                    October 13, 2000

providing support to a terrorist organization.  Now one last remark we'll make is that we'll concede one, one significant point here and that's that we don't have evidence that Mazen Al-Najjar ever took a gun or a rifle and shot it at a busload of innocent people.  We don't have Mazen Al-Najjar planting bombs under buildings to blow up American citizens or other people.  We don't have Mazen Al-Najjar even launching rockets at ships or other U.S. properties or facilities or enemies.  No, we don't have any of that on Mazen Al-Najjar because that's not his role with the PIJ.  In every organization, you have the people that are given assignments to carry out.  You've got the people that are the middle persons to assist those persons carrying out the assignment.  You have the up, the lower management people that are providing the background support.  And then you have the people, of course, give the orders, what it is to do.  I believe that the evidence that you've heard here very clearly, what evidence, should evidence to you, that Mazen Al-Najjar is not a bomb thrower.  No, he's the person who fits in the organization in the support category and in the management group because he's certainly a person without whom the people that actually throw the bombs and fire the bullets would be able to conduct their terrorist activities.  So we would ask this Court once and for all to determine that Mazen Al-Najjar is, in fact, a threat to national security.  And that this deportable alien, an alien who is here at the will and permission of the great people of the

A 26 599 077                       870                    October 13, 2000

United States, be held in custody until and if we can execute his deportation order.

MR. VARA TO JUDGE

Thank you, Your Honor.

JUDGE TO MR. COLE

Mr. Cole?

MR. COLE TO JUDGE

Thank you, Judge. We have now completed at least a phase of the hearing that you presided over three years and four months ago. At that time, three years and four months ago, the Government have had all of the evidence that it presented here today for two years. It had seized all of WISE's and all of ICP materials, including its financial records, including 500 videotapes, including all of its documents. It had seized similar document from Sami Al-Arian's residence. It had seized documents and computer files from Sami Al-Arian's home. Three years and four months ago, they weren't able to establish in the open record hearing that Mazen Al-Najjar posed a threat to national security. Notwithstanding the fact that they have had two years to try to establish that. At that time, Your Honor found insufficient evidence on the public record to conclude that Mazen Al-Najjar is a threat to national security. In July of this year, on remand from Judge Leonard, Your Honor again found that there was no open record evidence, that the open record evidence presented to Your Honor in the bond hearing was

A 26 599 077                    871                    October 13, 2000

insufficient to establish that Mazen Al-Najjar was a threat to national security. So the question today is, what has changed? What has changed with respect to the open record? From the Government's side, we have largely the same charges, the same charges that were advanced three years and four months ago in which this Court found were insufficiently support. That Mazen Al-Najjar supported the Palestinian Islamic Jihad through activities at WISE and ICP. By fundraising for the Palestine Islamic Jihad and by helping known or suspected terrorists to enter the United States. On the legal side, what has changed is Judge Leonard's opinion has made clear that the Government bears the burden of showing that Mazen Al-Najjar is a threat to national security and where it does so based on association, which is what it's doing here, that he is a threat to national security because he is alleged to be associated with the Palestine Islamic Jihad. Judge Leonard ruled, under the INA, the Government must show a degree of participation in activities of the organization posing a threat to national security. That's the May 31st slip opinion at page 68. So the question before the Court is, has the Government shown that Mazen Al-Najjar participated in activities of the Palestine Islamic Jihad that threatened the national security of the United States? The single most significant difference between the bond hearing that you presided over three years and four months ago and the bond hearing that you presided over the last month, month and a half

A 26 599 077                        872                        October 13, 2000

is that Mazen Al-Najjar testified  You've had the chance to hear from Mazen Al-Najjar in his own words, under oath, direct testimony about what he was doing and what he wasn't doing. About who he is and who he isn't and about what he believes and what he does not believe.  He has explained in great detail the activities that he engaged in while in Tampa.  They included in substantial measure, working at his mosque, tending to the needy, leading prayers, counseling, raising funds to try to expand the mosque from a one room house with a garage to a multi, multi building property.  You've heard evidence that he has also been very closely involved with his kids' school, including teaching courses at the school, including substitute teaching at the children's school.  You also heard that he was very substantially involved in finishing his dissertation, which he did not complete until 1994.  You also heard that he was the work horse behind WISE which edited, which published major academic journal, ran major conferences and published the results of those conferences. And you also heard that he was involved in the ICP, which has been from the outset well before this proceeding, stipulated by everybody that its name was known both as the Islamic Concern Project in its initial incorporation papers and as the Islamic Committee for Palestine more popularly.  He helped out with the ICP annual conferences.  He testified that he did.  He testified that he helped out in a range of ways.  He testified that he helped out by selecting speakers, by, by moderating panels, by,

A 26 599 077                          873                        October 13, 2000

and by doing basically the grunt work that is necessary to run a conference effectively. He dealt with the food, he dealt with the audio equipment, he dealt with picking people up from the airport. He was working very hard for the ICP. There is no, no one has ever denied that. You've also heard his views. He's opposed to violence, he's opposed to terrorism. He's opposed to threats against the United States. He did not denounce Sami Al-Arian. Mr. Vara is correct. But what I think Your Honor will, I hope Your Honor recalls from the testimony is that the reason he didn't denounce Sami Al-Arian because it is not within his principle of faith appropriate to denounce anybody. He will not denounce any human being. That is not in the Muslim faith, that is a sin to denounce a person. Mr. Vara said again, well, he denounced Ramadan Shallah. But again, the testimony will reflect that he did not denounce Ramadan Shallah. He denounced a specific act, which Mr. Vara represented was the threat of, to the United States. He denounced that act. He also denounced and criticized statements that Mr. Al-Arian made. But no, he did not denounce the person because he will not denounce any person. Mr. Al-Arian, I mean, Mr. Al Najjar also flatly denied under oath any role in the Palestine Islamic Jihad. He flatly denied providing any support to the Palestine Islamic Jihad. He flatly denied providing any support to any terrorist activity of any terrorist organization of any kind. And probably the most significant piece of evidence in this case is that the Government has offered

A 26 599 077                    874                    October 13, 2000

nothing to contradict any of the denials.  Its own witness, Special Agent West essentially admitted that it has no open record evidence to contradict those denials.  Let's turn to Mazen Al-Najjar's work at WISE, which was his principle, his principle work that the Government has singled out as somehow suspicious, somehow making him a threat to national security.  He's provided a very detailed account of what he did at WISE and what WISE did.  That account has been corroborated by Arthur Lowrie, by Jamial Jreisat, by Basheer Nafi, and by Naseer Aruri.  All consistently testified that WISE was a fully legitimate although under-funded serious academic research institute.  All have testified and there's been no contradictory evidence that WISE took no sides politically or religiously that it was an academic institute.  It was devoted to expressing ideas.  It was not devoted to propagandizing, it was devoted to academic research.  It published 19 issues of a very serious and seriously respected Arabic journal.  Mazen Al-Najjar, Basheer Nafi and Ramadan Shallah and Khalil Shaikaki were the people who put out that journal, put out that journal.  That is a substantial enterprise.  No suggestion has been made that anything with respect to that enterprise was illegitimate.  It also put on substantial round tables, at which we had a who's who.  But it wasn't a who's who of terrorists.  It was a who's who of Islamic scholars in the United States.  And again, we've had uncontradicted and fully corroborated testimony from several witnesses to the high qualify

A 26 599 077                          875                    October 13, 2000

of the scholars who came to those round tables.  If WISE were a front, if WISE were illegitimate, if WISE were not an academic research institute, why would all of these people, respected scholars in the United States have come to these round table?  Why would the probably most respected scholar of Islam in the United States, John Espisito, submit a declaration in this case attesting to WISE's legitimacy if WISE were some sort of shell for supporting terrorist organization?  Mazen Al-Najjar testified that WISE is, and his testimony was corroborated that WISE did not fundraising for anyone.  That WISE had enough trouble meeting its own expenses.  It did not donations to anyone, much less to any terrorist organization or the Palestine Islamic Jihad.  This was an organization that was seeking to raise money for itself, yes, because publishing a journal like that which was distributed in the thousands cost a lot of money because putting on those round tables and publishing books costs money.  And academic research centers are not profitable institutions.  So it raised money, but it raised money for itself, it was not in the business of making donations to anybody.  Not to Islamic charities, not to Christian charities, not to UNICEF and not to the Palestine Islamic Jihad.  What is the Government's evidence with respect to WISE and fundraising?  They've provided not a single piece of evidence showing a single penny that went from WISE to the Palestine Islamic Jihad or indeed any other group nor did they even cross-examine Mr. Al

A 26 599 077                     876                   October 13, 2000

Najjar on that question.  They make all sorts of claims and assertions, WISE is a front group to raise money for the Palestine Islamic Jihad.  But when the witness gets on the stand and directly denies that assertion, they come forward with no evidence to contradict it.  No evidence to contradict it.  With respect to the finances of WISE, the only thing that the Government, the only question that the Government raised was the fact that WISE at one time had $110,000 in its account.  Again, there was no evidence that there was something illegal about this, something nefarious about this.  That the $110,000 then went out to the Palestine Islamic Jihad.  Simply that at one time, a research institute had an account balance of $110,000.  Mr. Al Najjar has testified and there's been no contradictory evidence that the, that WISE's budget ran between $70,000 and a $120,000 per year.  That is a very small budget.  $110,000 is a very small amount for a research institute.  Again, that testimony has not been contradicted.  And I think and also it accords with common sense.  Professors commonly earn over $100,000.  To try to run a research institute that publishes quarterly journal, that puts on an annual round table for $70,000 to $120,000 is as I think as Mazen Al-Najjar testified, a money poor organization.  So with respect to WISE, we have not a single document that shows a single penny going to any other organization, much less the Palestine Islamic Jihad.  And that's a very important fact in light of the fact that the Government

A 26 599 077                         877                    October 13, 2000

has had the entire financial records of WISE from 1995 to the present.  And yet they didn't offer that to Your Honor.  Why didn't they offer that to Your Honor?  One can only presume that there was nothing illegal, there was nothing nefarious, there was nothing that would indicate any support to any other organization, much less the Palestine Islamic Jihad.  Mazen Al-Najjar also offered an account of what he did for the Islamic Committee for Palestine or the Islamic Concern Project and what that project was about.  He explained that it was founded to foster discussion and debate on issues of concern to the Islamic world with a particular but not exclusive focus on Palestine.  And why the particular focus on Palestine?  Because the period of time when ICP was in existence was the period of time of the Intifada, when Palestinians across the world and indeed non-Palestinians had a particular focus on Palestine.  Because there was a mass, largely non-violent uprising in the territories that many people were sympathetic to, that led many people in the occupied territories to be, to be in severe economic and medical situations that led many people to provide humanitarian support who were demonstrating in a non-violent way, who engaged in boycotts, who engaged in strikes and therefore were suffering very greatly.  What did ICP do?  Mazen Al-Najjar testified and his testimony was corroborated by Nahala Al-Arian and by Terde Hamde.  It held conferences, it held annual conferences, it held five annual conferences.  Mazen Al-Najjar has admitted from the

A 26 599 077                      878                  October 13, 2000

beginning that he attended all of those annual conferences, that he helped organize those annual conferences. These conferences, the Government suggests, were put together for the purpose of fundraising for the Palestine Islamic Jihad. That is the charge repeated virtually, certainly every day by Mr. Vara. Unfortunately for Mr. Vara, he --

(OFF THE RECORD)

(ON THE RECORD)

JUDGE FOR THE RECORD

Go to tape 2.

(TAPE A-29)

JUDGE TO MR. COLE

Okay, Mr. Cole, you may pick up.

MR. COLE TO JUDGE

Thank you, Your Honor. Mr. Vara and the Government have come forward with no evidence, no evidence whatsoever that a single penny raised by the Islamic Committee for Palestine at this, at the five annual conferences or indeed at any time ever went to the Palestine Islamic Jihad. What do we know about the conferences? And this is all uncontradicted, unrebutted, direct testimony. We know that they were openly advertised, that they were open to the public, that hundreds of people came, that they were videotaped, that they were transcribed, that the transcriptions were made available by the Islamic Committee for Palestine to the public at large for a nominal fee. Now if these

A 26 599 077                    879                    October 13, 2000

conferences were designed to raise money for a terrorist organization, why would they be open to the public?  Why would they be videotaped and transcribed?  Why would they be openly advertised?  Perhaps more importantly if these conferences were designed to raise money for anyone, much less a terrorist organization, it would be a very stupid way to do so.  Because as was testified, these conferences all lost money.  We're talking about putting on an event over a course of three days, bringing in all kinds of people to speak, putting them up in hotels, bringing them there.  And the testimony, again unrebutted from Mr. Al Najjar, corroborated by Mr. Hamde was that these events cost more money than they raised.  And yet they did them, every year.  Now you think if the purpose was to fundraise, a rational person would say we're not doing our job and we've got to do it some other way.  But did they?  No.  What they did was they held annual conferences every year notwithstanding the fact that it cost them money.  Why did they do so?  Because the purpose of ICP was to foster discussion and debate on issues of concern to the Islamic world with a particular but no means exclusive focus on Palestine.  They did that, they successfully did that.  The testimony, again unrebutted, is that these conferences which lasted for three days and had many panels consisted of a wide diversity of use, a wide diversity of use.  They were not in any way an attempt to espouse some particular line.  And again the Government testified that it seized over 500 videotapes and that

A 26 599 077                      880                October 13, 2000

Mr. West here, or not Mr. West, Mr. West testified that Government officials had reviewed all 500 videotapes of these annual conferences. And yet what did they offer to Your Honor? 13 minutes. And in those 13 minutes, at those annual conferences, there is not a single word about fundraising. There are some offensive statements, there are some heated and emotional statements. There are some statements that many people, many people would find deeply offensive. But deeply offensive statements do not constitute a threat to national security. And Mazen Al-Najjar, himself, admitted that some of these statements were offensive, criticized some of these statements, stated that he was very disappointed with much that was said. But notably from the 500 hours of videotape that they reviewed and the 13 minutes that they offered to Your Honor the only thing Mazen Al-Najjar does is introduce a couple of speakers. He makes no statements, he advocates no support for the Palestine Islamic Jihad. He advocates no violence. He doesn't say death to Israel, he doesn't say, let us damn America. He doesn't say Jews are the sons of monkeys and pigs. What he says is the next two speakers are Sheik Abdel Al-Zes Odi and another person. That's all he does. That, you have to believe if they reviewed 500 hours of videotape, that's the best evidence that they could offer against Mazen Al-Najjar. It's perfectly consistent with what he has testified to here today and what you saw in listening to, here. Now there was fundraising at these,

A 26 599 077                  881                  October 13, 2000

at the ICP conferences, we don't deny that and we've offered, again, uncontradicted, unrebutted evidence that there was fundraising at each conference.  But what did that fundraising consist of?  It consisted of a single session on either a Saturday or Sunday night of maybe 45 minutes, estimates are 30 to 45 minutes to an hour in length, at which money was raised for two purposes.  One, to cover the ICP's own expenses.  These conferences were expensive.  And two, to provide charitable support to needy children and medical institutions in the Middle East during this period of time where there was an, undisputed, there was a tremendous amount of need in the Middle East.  No matter what side you take on the issue, there was clearly a tremendous amount of need.  Many innocent people were suffering greatly.  But those were the only purposes, those were the only purpose stated.  It's entirely unrebutted.  We offered and Your Honor has heard what you didn't hear three years and four months ago, the testimony of Nahala Al-Arian concerning in detail how the fundraising was done and how money was raised for needy children at these conferences and outside of these conferences. And there's absolutely nothing nefarious about it.  What she did was she saw a need, she tried to respond to the need, and she did so by identifying needy children and identifying sponsors for those needy children and putting them together and having the sponsors come in, make a moral commitment, not an enforceable commitment to send $40 a month to a family of a needy child.  She

A 26 599 077                      882                   October 13, 2000

testified she provided the application forms of the children, she provided the sponsorship forms of the sponsor.  She provided the records of the instruction that she sent identifying, you know, which child gets $70 and which child gets $105.  She provided evidence that she, that they have been contemporaneous evidence that they have been thanked for the support that they have provided from the Arab Orphans House, which was one of their central places, where the needy children were.  She also testified that there were no religious criteria, for which children would be supported.  There were no political criteria for which children would be supported.  There were no criteria that the children had to be fathered by a member of a terrorist organization or a member of a terrorist organization who was killed in violence.  That was not an issue.  The issue was that there was a great need, a humanitarian need, children were starving, Palestinian people in this community felt an obligation to support the people who were back home and they did so in a perfectly legal way.  Again, what has the Government offered to contradict this?  Nothing.  Testimony corroborated by Mazen, by Terde Hamde, Dr. Basheer Nafi.  What does the Government offer to rebut it?  They didn't challenge Ms. Al-Arian with respect to any of this, the details of what went on.  They have come forward with no evidence from any of these annual conferences that contradicts the uncorroborative testimony that the limited amount of fundraising was done at these conferences was for wholly

A 26 599 077                          883                    October 13, 2000

legitimate purposes, wholly legitimate purposes.  And they had all the tapes.  Mr. West testified that he watched the tapes of the fundraising sessions.  While yet, he said in prior testimony that he saw people seek to raise money for orphans of suicide bombers, he recanted that testimony here and that there were no such statements and what you saw were statements of seeking support for orphans.  Well, that's fully consistent with the facts and that's not activity that threats the national security.  It's not activity that was illegal.  It was activity that was perfectly appropriate.  The single piece of evidence, the single piece of evidence that Mr. Vara most focuses on is a single event in the videotape, an event that took place in April 1991 at the Islamic Center of Cleveland.  And as Mr. Vara has said, on that, on the videotape of that event, if we are to accept the videotape, it says, Mr. Damra says that the ICP would be active on behalf of the Palestine Islamic Jihad.  That statement was denied, under oath by Mr. Al Najjar.  The Government does not dispute, does not dispute that Mazen Al-Najjar was not there. Does not dispute that Mazen Al-Najjar was never even made aware of this event.  Does not dispute that this was not an event of the ICP.  It was an event of the Islamic Center in Cleveland, a mosque, which invited Sami Al-Arian to speak.  It is undisputed that Faliaz Damra is not a member of the Islamic Committee for Palestine nor was he authorized to speak for the Islamic Committee for Palestine.  Perhaps most significantly the

A 26 599 077                    884                October 13, 2000

Government has offered no evidence to show that any money raised by Mr. Damra ever went to the Islamic Committee for Palestine much less to the Palestine Islamic Jihad.  And again, they have all the financial records, Your Honor.  They seized all the financial records.  And they have not come forward with a single piece of evidence to show that what Mr. Damra said on that tape led to any money, a single penny, actually going to the Palestine Islamic Jihad.  Finally, with respect to that event, who are the people in that event on that tape?  Sami Al-Arian and Faliaz Damra.  What has the Government done with respect, if this is their most strongest piece of evidence that someone is raising money for the Palestine Islamic Jihad, it's Faliaz Damra.  Faliaz Damra is the person raising money.  There's not, during the fundraising portion of that tape, Sami Al-Arian is not even in the room.  Faliaz Damra is raising money for the Palestine Islamic Jihad.  So the question, the natural question is, well, the Government knows that Faliaz Damra is raising money for the Palestine Islamic Jihad and they contend that you are a threat to national security if you are in any way a middle man or in any way involved with raising money for the Palestine Islamic Jihad. Did they do anything to Mr. Damra?  Yes, they did.  They made him a naturalized U.S. citizen three years after this event took place.  They have never approached him to question him, to ask him to testify, to interrogate him.  If they're concerned about threats to national security and if their contention is that any

A 26 599 077                     885                    October 13, 2000

fundraising for the national, for the Palestine Islamic Jihad is a threat to national security, then why aren't they, why have they taken no action against Faliaz Damra other than to grant him naturalization? The other person at the event, not there during the fundraising but there when the statement was made, falsely, that the Islamic Committee for Palestine is an active arm of the Palestine Islamic Jihad was Sami Al-Arian. But Mr. Al-Arian has been in this courtroom every day, he's free to go, he's free to leave, he's free to come. And at the Government's discretion that he's free to leave, free to come, free to go as (indiscernible) maintains. Is it plausible, is it plausible that Mazen Al-Najjar has to be detained, has to be locked up in the Bradenton County Jail because if he's released, the national security of the United States will be undermined. But that neither of these people pose a sufficient threat for the Government to take action against them. Finally with respect to the fundraising concern, allegation, because that is the heart of the Government's case, that the, these organizations, the ICP and WISE were, even though they appeared to, from all evidence before Your Honor, they were doing legitimate things. From all evidence before Your Honor, they were doing legitimate things. The fact is that you should presume that they were raising money for the Palestine Islamic Jihad. The single most important fact is that the Government has not offered any evidence to support that claim. They have not evidence of a single penny that went to the

A 26 599 077                    886                    October 13, 2000

Palestine Islamic Jihad.  Again, strongest piece of evidence is the videotape of Mr. Damra, but they didn't even follow up with that and there's no indication that ever went to the Palestine Islamic Jihad.  And if the Government wanted to establish that, in fact, money went to the Palestine Islamic Jihad, they had the documents.  They had the records of the ICP, they had the records of WISE, they could have done so, they chose not to.  So this leaves the Government the fundraising has never been established, there simply has not been established a single penny going to the organization, much less to the terrorist activities of the organization.  And we've established, again, uncontradicted that the Palestine Islamic Jihad was engaged in a wide range of lawful activity.  So the mere fact that one is associated with it or the mere fact that one supports it does not render one a threat to national security, unless under Judge Leonard's ruling you can show participation in the activities of the Palestine Islamic Jihad that directly threaten national security.  So yes, if you could show that money was raised for the purposes of supporting terrorist activities that would establish a threat to national security.  That would also be a prosecutable offense.  But they haven't even shown a single penny to the Palestine Islamic Jihad in general, much less to the illegal activity of the Palestine Islamic Jihad.  So with the fundraising put to the side, this leaves the Government with two general theories for while Mazen Al-Najjar is nonetheless still a threat to national security.

A 26 599 077                    887                 October 13, 2000

The first is that the terrorists spoke at the ICP conferences. Excuse me for one moment, Your Honor. And the second is that WISE petitioned for visas for Basheer Nafi and Ramadan Shallah. So I'm going to take those in turn. The ICP, Mazen Al-Najjar is a threat to national security because at ICP conferences, known or suspected terrorists spoke. That's the claim. Now, having a known or suspected terrorist speak is not a crime. Allowing a known or suspected terrorist to speak does not threaten national security. Indeed, allowing somebody to speak no matter how bad the person is, is protected by the First Amendment, is in now way criminalized and could not be criminalized Indeed, the First Amendment protects speech advocating criminal conduct. The First Amendment protects speech advocating criminal conduct unless the Government can show that the speech was intended and likely to incite imminent lawless action, as in the case Brandonberg v. Ohio. So short of that kind of, of speech, speech, the speaker intends and is likely to incite imminent lawless action, the First Amendment protects speech, it protects speech of us all, no matter how bad we are, no matter how many convictions we have. You know, the Son of Sam convicted of brutal murders had a First Amendment right the Supreme Court said to write a book about it. A First Amendment right to write a book about it. Convicted criminals are not denied the right to speak. So just as a legal matter, before we get to the facts, as a legal matter, let's accept that some of the people who spoke at these conferences

A 26 599 077                888                October 13, 2000

were known or suspected terrorists. Is that a crime? No. Is that protected by the First Amendment? Yes. Does that show a threat to national security? It cannot. Now, let's look at the facts. Sheik Omar Abdel Rachman, he spoke at a couple of conferences, one or two, I'm not sure that they established whether it was one or two. He was convicted not of bombing the World Trade Center as the Government has frequently stated and Mr. West has stated. But of conspiracy to blow up the tunnels around New York City. He was convicted of that and he's serving multiple life sentences for that. But he was convicted of those crimes long after he appeared at these conferences. And prior to his, prior to his conviction, he was a public figure in the United States. He spoke all over the United States at all kinds of events, at all kinds of conferences. Has a single person ever been charged with having invited Sheik Omar Abdel Rachman to speak? No. Has Sheik Omar Abdel Rachman ever been charged with, with a crime for having, for saying something in public? No. It is not a crime. And when he was invited to speak or when he spoke, I don't know if he was actually invited, but when he spoke at these events, he had not been convicted of a crime. Sheik Abdel Al-Zes Odi. It's been conceded that he was publicly identified as a spiritual leader of the Palestine Islamic Jihad. As a spiritual leader of the Palestine Islamic Jihad, yes, he spoke at some ICP conferences. It's true that he spoke at these conferences, it's true that he's been identified as a spiritual

A 26 599 077                    889                    October 13, 2000

leader of the Palestine Islamic Jihad. But the question you have to ask yourself is what does that show? What does that prove? Being a spiritual leader of the Palestine Islamic Jihad was not a ground for exclusion from the country when he made his speeches. Indeed, it's not a ground for exclusion at this time. Being a spiritual leader of the Palestine Islamic Jihad was not a crime. Being a spiritual leader of the Palestine Islamic Jihad was not a ground for deportation. The United States granted Mr. Odi a visa and he entered legally on that visa repeatedly. The Government never took any action against Mr. Odi. The Government never sought to exclude him. Why? Because there's no evidence and there's no charge that he actually ever engaged in or supported any illegal activity. A spiritual leader is one thing. A person who has, and you can't be convicted for being a spiritual leader. What you could be convicted for is encouraging, inciting violence. Sheik Omar Abdel Rachman was in a sense a spiritual leader, but he wasn't convicted for being a spiritual leader. He was convicted for very specific acts. And those acts were conspiring with others to do specific, horrendous crimes. That is a crime, that is a threat to national security. But being a spiritual leader in and of itself is not. And the Government has simply offered no evidence whatsoever to suggest that Mr. Odi actually furthered any kind of illegal activity, much less that he furthered any illegal activity after this conference. Let's suppose, I think they did testify that Sheik Abdel Al-Zes Odi

A 26 599 077                          890                          October 13, 2000

might have been convicted in 1984 for something in Israel.  Well, if the Israelis feel that he was and it wasn't, he was no longer detained by the Israelis, so that apparently was not the reason that he needed to be detained.  And suppose he was convicted?  Does he lose his right to speak in the United States because he was convicted?  No.  Does Mazen Al-Najjar lose the right to invite him to speak?  No.  Third person that they have repeatedly referred to as a known or suspected terrorist is Rashid Ghanoushi.  And finally quite remarkable that the Government has continued to focus on Mr. Ghanoushi, once the facts from the Government's own documents have come out.  Mr. Ghanoushi spoke at conferences in either 1988 or 1989 for the ICP.  And the Government says he's a terrorist because he was convicted of attempting to assassinate the President of Tunisia.  It's true that he was convicted.  But he was convicted in 1992.  He's not convicted in 1988 or 1989.  He was not charged in 1988 or 1989.  And the activity, the alleged attempt to assassinate the president had not taken place in 1988 or 1989.  Moreover, the conviction itself has been called into serious question, has ben essentially rejected by the State Department and for good reason.  It was a show trial.  As the State Department's records indicates, 279 people were tried in a single proceeding, in a military court for allegedly attempting to assassinate the President of Tunisia.  Of those 279 people, 265 were convicted and as the State Department found it was based upon tortured

A 26 599 077                        891                    October 13, 2000

confessions and proceedings that lacked all due process.  Mr. Ghanoushi was granted asylum, political asylum in the U.K.  Mr. Ghanoushi is not a terrorist, has never been a terrorist.  In fact, Mr. Pelletreau of the State Department identified him as a moderate and specifically said, he has never been engaged in any kind of terrorist activity.  And yet the Government continues to label him as a terrorist.  Ramadan Shallah, he spoke at some of these conferences.  But he spoke at a time when nobody knew he was a member of the Palestine Islamic Jihad.  If he was a member of the Palestine Islamic Jihad.  What is undisputed is that he became the leader of the Palestine Islamic Jihad in 1995 after he had left the United States.  He spoke at conferences in maybe 1989 and 1990 and five years later he became the leader of the Palestine Islamic Jihad, but no evidence has been offered that at the time he spoke, he was engaged in any illegal activity or was a member of the Palestine Islamic Jihad.  Basheer Nafi, the last person who they've identified as speaking at the ICP conferences.  There is no credible evidence that Basheer Nafi is a member of the Palestine Islamic Jihad.  He came at his own initiation to this proceeding and denied all charges under oath.  He explained who he is, he explained that he has never had anything to do with the Palestine Islamic Jihad.  In fact, he opposed its formation.  He has testified that he has written hundreds of articles in all kinds of journals and newspapers and never, in a single issue, has advocated support for the Palestine Islamic Jihad in any way

A 26 599 077                    892                October 13, 2000

shape or form.  And he addressed the errors and misunderstandings made in the two documents, the two books that made assertions that were in the USF library and the thesis that made assertions about him.  I think if you look at those actual assertions, for the most part, as Mr. Smith says, they do not say that Basheer Nafi was committed to or engaged in terrorist activities.  In addition, what they do say is much of what they say is identifiably false and denied under oath in direct testimony.  Direct testimony outweighs any kind of hearsay.  It's true.  Mazen Al-Najjar admitted that Basheer Nafi was invited to come to the United States, he was aware of some of these accounts  Well, the reason he nonetheless invited him was because he didn't believe them.  He believed that they were false.  And I think Basheer Nafi showed us that they had every reason to believe that he, that they were false.  And it's interesting, the Government has claimed Basheer Nafi as a terrorist and associated with the Palestine Islamic Jihad for this entire course of this proceeding, from its first submission to Your Honor in connection with this redetermination hearing.  They have made that assertion.  Yet when Basheer Nafi was on the stand and Mr. Vara was given the opportunity to examine him, did he ask him a single question about alleged associations with Palestine Islamic Jihad?  No.  Did he ask him, did he put forward any evidence to contradict his denial?  No.  What he asked him about was whether he worked for IIIT or whether he worked for WISE and whether he

A 26 599 077                    893                 October 13, 2000

worked in Virginia or whether he worked in Tampa. Finally, with respect to these conferences, at which Basheer Nafi spoke twice, Ramadan Shallah may have spoken twice, Omar Abdel Rachman might, may have spoken twice. Abdel Al-Zes Odi may have spoken twice. What was said? What was said? Did any of these speakers in what they said engage in any kind of activity that undermined or threatened the United States? Did they advocate support for the Palestine Islamic Jihad? The Government reviewed, as I said, 500 tapes but they couldn't cite a single sentence from all five annual ICP conferences advocating support for the Palestine Islamic Jihad. It's kind of curious that you've got, that you have five annual conferences lasting three days each with hundreds and hundreds of people which are supposed to be in the Government's view supporting the Palestine Islamic Jihad and yet there is not a single statement in their, in their videotapes that they offered which supports the Palestine Islamic Jihad. They did identify, as I said before, some offensive speech, some heated rhetoric, some, some statements that I certainly wouldn't make. Mr. Vara certainly wouldn't make. And Mr. Al Najjar would not make and criticized. But none of those statements were by Mazen Al-Najjar and all of them were criticized by Mazen Al-Najjar. So that's the ICP conference. The last Government, the last read that the Government has in its claim that somehow Mazen Al-Najjar threatens national security and has to be locked up otherwise the national security will be undermined, is that he

A 26 599 077                    894                    October 13, 2000

helped to bring, he helped petition to bring two terrorists into the United States.  Basheer Nafi and Ramadan Shallah.  And the deportation proceedings, Mr. West testified that their primary purpose, referring to Basheer Nafi and Ramadan Shallah, their primary purpose of coming into the United States is to further the fundraising activities of Palestine Islamic Jihad and Hamas. That's in the deportation transcript at 224 to 225.  And the Government also offered that to Judge Leonard in its answer to the habeas corpus petition at page five.  That's testimony is from Mr. West.

MR. VARA TO JUDGE

Your Honor, we have to object at this point.  He can't refer to evidence not in this proceeding.  It's either in evidence here or it isn't.

JUDGE TO MR. COLE

Yeah, I must admit, I don't have the transcripts of the Judge Leonard hearing and I'm not too sure, I don't believe that I have the transcripts of the --

MR. COLE TO JUDGE

Yeah, it's a public document, Your Honor.  We'd be happy to provide you with the Government's brief in the habeas proceeding. It's not a, it wasn't a hearing, it was a brief in which the Government submitted and we'd be happy to provide that.  In any event if I could continue?

JUDGE TO MR. COLE

A 26 599 077                    895                    October 13, 2000

Okay, go ahead and continue.

MR. COLE TO JUDGE

All right, this is not evidence, this is the closing.  So, but that seems to be theory, that that Ramadan Shallah and Basheer Nafi were brought to the United States under the guise of working for WISE in order to fundraise for the Palestine Islamic Jihad and Hamas.  What's the evidence show?  There's no evidence that either Basheer Nafi or Ramadan Shallah did any fundraising, did any fundraising for the Palestine Islamic Jihad or Hamas.  I don't know where he got the Hamas but where or Hamas while they were here.  There's uncontradicted evidence that while they were here, what they did was work full-time on editing a legitimate and substantial academic journal.  So the purpose of getting them into the country was so that they could fundraise for the Palestine Islamic Jihad, then you would assume that there would be some evidence or some showing that, in fact, they were fundraising.  In fact what they were doing was working on a research institute that was losing money.  The only fundraising that was involved was fundraising to try to pay for the legitimate research of WISE.  The Government, nonetheless, contends that the visa petitions were fraudulent.  But as the Court has noted, Mazen Al-Najjar didn't file any of the visa petitions.  Sami Al-Arian filed the visa petitions.  At most, the Government shows only that Mazen Al-Najjar filed a single affidavit regarding the financial means of WISE in connection

A 26 599 077                    896                    October 13, 2000

with one application, pending application apparently for Basheer Nafi.  It appears that an application was made, there was a question about whether WISE had enough money to pay him.  Mazen Al-Najjar submitted an affidavit.  It talks about the financial means of WISE.  No statement in that document is false.  The Government has not challenged Mr. Al-Najjar with making a single, false statement, the only document that he signed in connection with these two pending visa petition.  So even if they were fraudulent, where's the connection to Mazen Al-Najjar?  Moreover, there's no evidence that the WISE application filed by Sami Al-Arian were fraudulent.  And I think the Government's own actions indicate that because if they were fraudulent, the Government would no doubt have charged Sami Al-Arian who they contend is the real culprit here with that fraud.  That's a deportable offense, they coudl get him out of the country, they could lock him up but they have never even brought that charge.  Why?  Because there isn't any fraud.  With respect to Ramadan Shallah, no, no evidence or even claims about fraud have been put forward.  No claims that any statement made in any petition on behalf of, filed on behalf of Ramadan Shallah was false.  With respect to Mr. Basheer Nafi, the only claim of fraud regards the fact that Basheer Nafi, when he came to the United States worked in Virginia for WISE rather than working in Tampa for WISE.  He testified, his testimony was corroborated and uncontradicted that he worked full-time for WISE during that time.  He didn't work in

Tampa because of his, the work that he was doing on his dissertation required him to be near Georgetown.  But the evidence showed that when the petition was filed, WISE wanted him to come to Tampa.  WISE was seeking to get him to come to Tampa, they wanted him in Tampa.  He stayed in London first, he resisted those efforts.  I mean, he was open to them but he resisted them and stayed in London because he was needed original source documents.  And then when he no longer needed original source documents, he could rely on secondary source documents, he agreed to come but to come to Virginia.  So he ended up in Virginia, essentially as a compromise, after the petitions were filed.  Now if it's, if that's a violation of Immigration law, it is a highly technical violation of Immigration law.  Nothing in the petition said, made a false statement.   At the time that they were filed, they intended that he would be working in Tampa.  He didn't end up working in Tampa.  Maybe Sami Al-Arian should have notified the INS that he was working in Virginia.  But it, it couldn't be fraudulent because it's not material.  Even if it were a misrepresentation not to have corrected the record after the fact, it's not material.  It doesn't matter whether he's working in Virginia or Tampa.  The Government doesn't, if the Government would have denied the petition if they knew he was working for WISE in Virginia rather than in Tampa.  So it's not under any theory of the law, it would not be fraud.  But most importantly, most importantly, this has absolutely no relevance to the issue

A 26 599 077                        898                    October 13, 2000

of whether Mazen Al-Najjar is a threat to national security. Let's suppose that it is a technical violation, it is a fraudulent filing by Sami Al-Arian to have failed to correct the record after Basheer Nafi came here.  Does that reflect on whether Mazen Al-Najjar is a threat to national security?  Where there has bee no evidence to question Basheer Nafi's bonafide use as an academic, as a researcher, as a person who worked for WISE? And as a person, who according to the Government's own evidence, that (indiscernible) no fundraising for any terrorist organization.  So what are we left with?  Ramadan Shallah became the head of the Palestine Islamic Jihad six months after leaving WISE, admittedly that raises as the Government says, suspicion. Who is this person?  How did he become the head of the Palestine Islamic Jihad?  But when more than five years later, after the entire contents of the offices have been seized, the Government cannot offer a single piece of evidence to tie WISE, ICP or Mazen Al-Najjar to any terrorist activities or to any support for any terrorist activity.  That suspicion is simply not enough.  It's certainly not enough, it would not be enough to justify a criminal charge, it's not enough to justify a detention.  It is a suspicion and it's a suspicion that led the Government to a significant investigation.  But the important factor is what did they come up with in that investigation and the answer is nothing.  It's also uncontradicted both in this hearing and the prior hearing that Ramadan Shallah, when Ramadan Shallah became

A 26 599 077                     899                October 13, 2000

the head of the Palestine Islamic Jihad, it was a total shock to everybody including to Mazen Al-Najjar.  The last set of concerns the Government has raised regard Mr. Al Najjar's marriage fraud, alleged marriage fraud in 1983 and his personal finances.  With respect to the marriage fraud, the marriage fraud is '84.  With respect to the marriage fraud, what has been offered is a single declaration.  What has been heard from Your Honor is direct under cross-examination denials of the statements made in the declaration.  That's all there is.  You have a direct denial versus a hearsay declaration.  The answer ought to be clear.  Again, no charges filed against Mazen Al-Najjar for marriage fraud, no charges filed against him.  In addition, no substantive questions on cross with respect to marriage fraud.  And at the time that this alleged marriage fraud took place in 1982 to 1984, the Palestine Islamic Jihad didn't even exist.  So the notion that the Palestine Islamic Jihad somehow directed Mazen Al-Najjar to come here and marry Jan Fairbetter in order to stay is ludicrous given the uncontradicted evidence that the, from the only expert in this on the Palestine Islamic Jihad, that it was created in the mid 1980s.  Personal finances.  Mazen Al-Najjar is not a rich person, but he did some time, occasionally get large amounts of money from his family.  There were two transactions the Government has raised concerns about.  One, and we offered testimony about them, that fully explains them.  One was a $96,000 transfer in 1993.  He testified 24, it came from his

A 26 599 077                     900                  October 13, 2000

sister, $24,000 of it was from his family for personal support of his family.  $72,000 was a donation raised in the United Arab Emirates for WISE or if he deemed appropriately for the mosque and the school.  He testified that he provided that $72,000 to WISE.  The Government has not offered any evidence to (indiscernible). The second is this $100,000 which we heard about yesterday in Mazen Al-Najjar's testimony in which we heard more about this morning.  But nothing we heard or saw this morning contradicts what Mazen Al-Najjar has said about it.  His brother-in-law, a wealthy businessman in the United Arab Emirates, at a time when there was a great deal of uncertainty after the Gulf War, in the United Arab Emirates when many Palestinians were being expelled from all kinds of Arabs country as a result of post-Gulf War tensions, a time of uncertainty, he sent $100,000 to Mazen Al-Najjar.  Mazen Al-Najjar kept it for a year and a bit and then his brother-in-law asked him to transfer it back and he sent it all back with interest.  That's why it's about $100,000 when it came, $102,000 when it was sent back.  He didn't use it. And in the end there's no evidence that this money was used for any nefarious purpose by anyone.  The Government did testify three years and four months ago that it was investigating Mazen Al-Najjar for bank fraud and currency violations.

(TAPE A-30)

JUDGE TO MR. COLE

Okay, go ahead.

A 26 599 077                    901                    October 13, 2000

MR. COLE TO JUDGE

And we have to assume that they were. But here we are three years and four months later, no charge of bank fraud has been made, no charge of currency violation has been made. And even if such charges were made, they don't establish a threat to national security. So I want to come to a conclusion with the words of the Government's own witness, Special Agent West and the Government's own lawyer, Mr. Dan Vara. In the transcript of this proceeding at page 447, Mr. West, Special Agent West admitted that there is no open source evidence and this is an open source proceeding that Mazan Al-Najjar received funds from a terrorist organization. There is no open source evidence that Mazan Al-Najjar sent any funds to a terrorist organization. And there is no open source evidence that Mazan Al-Najjar has ever even advocated terrorism. Those are admissions from the Government's own witness. Now, Mr. Vara. Mr. Vara, the transcript at page 111, Sami Al-Arian was the one person who was in control of the daily activities of WISE and ICP in relation to everything they did but certainly in relation to what they did in support of the Palestine Islamic Jihad. Sami Al-Arian, according to Mr. Vara, sought to raise funds for the Palestine Islamic Jihad, not Mazan Al-Najjar. Sami Al-Arian, according to Mr. Vara, engaged in inflammatory and offensive rhetoric, not Mazan Al-Najjar. Sami Al-Arian, according to Mr. Vara failed, filed the visa petition that he alleges is fraudulent with respect to Mr. Nafi, not Mazan

A 26 599 077                           902                    October 13, 2000

Al-Najjar.  Yet, as I've said before, Sami Al-Arian has been permitted by the INS to walk the streets of Tampa freely for the last three years and four months without any harm to national security.  They have, if they believe that he is engaged in fundraising for a terrorist group, if they believe that he has engaged in fraudulent visa activity, they could put him in deportation, they could put lock him up as a threat to national security, but they've chosen not to.  And that single choice, I think, has to weigh very heavily in Your Honor's consideration. If the Government doesn't have any national security problem with Sami Al-Arian, the person they finger as the real boss here, they have no problem with him walking the streets freely, his presence in Tampa and in Washington and in California and wherever he wants to go is of no concern to the national security.  Then why is it that Mazan Al-Najjar, against whom the Government has not been able to put forward any direct evidence of even offensive speech, much less fundraising for any organization.  And the Government, their own witness has admitted it, why has Mazan Al-Najjar locked up?  Mazan Al-Najjar has never hurt anyone.  He is, as this Court found in a prior decision, a well-respected man, socially, religiously, and professionally, with strong community and family ties.  He is, by all accounts, a gentle man, an intellectual, a man committed to open dialogue and academic pursuit of the truth.  He's also the father of three young girls, who have already irreplaceably lost three years of their youth

A 26 599 077                    903                    October 13, 2000

growing up with their father.  So we return to the question posed by Judge Leonard's remand.  Has the Government shown that Mazan Al-Najjar has participated in activities of the Palestine Islamic Jihad posing a threat to the national security?  The answer, we respectfully suggest, is no.  The Government hasn't shown any participation in activities of the Palestine Islamic Jihad much less activities that would threaten the national security.  And so we're left to talk about the fact that Mazan Al-Najjar was friends with other people who the Government contends were bad people and he was a relative of Sami Al-Arian, whom the Government contends is a bad person.  But there's no evidence that Mazan Al-Najjar was a bad person.  And so we have, we hear the claim that all of this evidence that we've put forward, unrebutted, uncontradicted evidence of legitimate activities on behalf of Mazan Al-Najjar, Your Honor should disregard that because that's just in Mr. Vara's words, the veil of legitimacy. Well, it's easy to claim that legitimate activities are a veil. But when five years after you've had all the evidence and three years after you've locked a person up, you can't come forward with any evidence to show that there's anything under the veil. It's time to release Mr. Mazan Al-Najjar.

JUDGE TO MR. VARA

Mr. Vara.

MR. VARA TO JUDGE

Very short rebuttal, Your Honor.

A 26 599 077                         904                    October 13, 2000

JUDGE TO MR. VARA

Yes.

MR. VARA TO JUDGE

Your Honor, let's talk first about Special Agent West's testimony that has been brought up in rebuttal to our closing argument. At the time it was made and as has been established today, there was no open source evidence that there were transactions relating to money sent to the Middle East, to PIJ or to the ICP or WISE. But what you've seen today in the Exhibit that the Government has produced, Exhibit 64, a document that was declassified on October 12th, the year 2000, there was significant activity in the account handled or the accounts handled by Mazan Al-Najjar. And contrary to the representations of Mr. Cole, there were not two transaction. There wasn't a $96,000 transaction and a separate $99,900 transaction. And how do we know that? Because we have unrebutted evidence in the form of Exhibit 64. If you look at the very front of that Exhibit and you see what the FBI and in their national security letter was asking for, it says provide the, all records, now I won't describe them here, for purposes of, of efficiency but it says for the period from inception of account to present. And the materials provided by this bank and by the credit union have to be presumed to be in compliance with a directive of a Federal law enforcement agency conducting a national security investigation. And what do you see? You can look through all that financial

A 26 599 077                    905                    October 13, 2000

information and you only see one large transaction. A $99,900 transaction and of course, the $102,000 as it goes back out to the Middle East. And how do we know that it's a questionable transaction if we can't say that at the other end it went to buying guns or bombs? Well, we know because Mazan Al-Najjar chose to lie about it in the merits hearing and this is in evidence. He tried to characterize that transaction and he tried to do it again in this proceeding as a transaction involving a $96,000 in friends and money that went to him and money that might have been for WISE but money that was his and long story short, he tried to, of course, obviscate the fact. And he tried to do it, why did he do it at the merits hearing and why didn't he try to do that in this case? Why did he, in this proceeding choose to say that there were two transactions as opposed to admitting that there was only one, as his own financial records establish? Well, because he knew he had the information and he knew that because we revealed the clue to that the day before he testified by asking Nahala Al-Arian about a $100,000 transaction. And clearly with that clue, he could have come into this court and told the truth to the best of his ability, but he can't do that obviously because he's already lied to another an Immigration Judge about this transaction. So again, the statements of Special Agent West were correctly made and I think that very clearly and contrary to what counsel for the respondent is arguing, there weren't, there weren't two transactions. It

A 26 599 077                    906                    October 13, 2000

was only one. Now, counsel is correct that being a spiritual leader in the United States doesn't allow anybody and shouldn't allow anybody to arrest you until you commit a crime. But it's the same thing for being a scholar and a researcher, until you either commit a crime or if you're an alien scholar and researching, you become a deportable alien for violating the Immigration and Nationality Act. And that's why in this case we have Mazan Al-Najjar in custody. Now, he's correct that there may be others that we might also want to have in custody and there is maybe others around the country that might be violating the laws of the United States. But that's not the question for this Court. The question for this Court is do we have somebody here who has violated the laws of the Immigration, of the United States of America and the Immigration and Nationality Act. And the answer is yes, we have based on the person who has received his fair share and more of due process, a deportable alien who because of his additional activities, beyond those that make him a deportable alien, the ones that we chose to charge him with is a person who poses a threat to national security. Now, you heard from counsel that there was unrebutted testimony that WISE was a research center. And you heard him pose the question, why would respected scholars come to their, to the ICP conferences or WISE conferences if these folks were fronts for, for terrorist activities. Well, there's really two answers that you can take from the, from the evidence of record in this case. And the

A 26 599 077                      907                    October 13, 2000

first one is they either didn't care, because as you heard from some of the witnesses, they wouldn't condemn the Palestine Islamic Jihad.  They can't tell you even that the Palestine Islamic Jihad is a terrorist organization.  In fact, when you ask somebody who claims to be an impartial witness in this proceeding, to name, when you, yourself, asked that person to name a terrorist organization in the Middle East, the only one he can name is the Jewish Defense League and not the PLO, not PIJ, not Hamas, not Hezballah.  Of course, we all know why he can't do that and that's simply because he does not sympathize with the Jewish Defense League and he does with the others.  The other possibility is that they didn't know.  And that plays right into the theory that the Government has in this case.  Mazan Al-Najjar along with the other people that he was involved in was very good at concealing his activities as a terrorist in the United States. He continues to be very good and that's we don't have a mound of evidence that we can present to this court that says that he's a terrorist.  Certainly not in an open court setting, because the one thing that these people know is that again, you must operate covertly or the U.S. Government will send its forces against you since you're doing things that are doing inimical to the best interest of this country.  And the other is that in conducting our investigations, we have to use sources and methods that have to be protected against disclosure based on national security interest and that therefore, it will be very difficult for the

A 26 599 077                      908                 October 13, 2000

U.S. Government to come after you and present the case unless you happen to be somebody who just happens to fall within the class that Mazan Al-Najjar falls into and that's he becomes another wise deportable alien. And that's why he is here before this Court. And the fact that they held conferences in which reputable scholars attended means nothing. Because all it means it that they were good at their veil of legitimacy. Your Honor, you keep on hearing here that there was no evidence whatsoever that there was any activity relating to fundraising in the ICP conferences and that there was no evidence whatsoever that the ICP conferences were conducted on behalf of PIJ, the Palestinian Islamic Jihad terrorist organization and most importantly, that there is no evidence that Mazan Al-Najjar would have had a role or had any knowledge or participation in any fundraising for the PIJ. I just believe that you need to be left with two last images. And the first is from Exhibit 57 and that's Mazan Al-Najjar's own submission to the Department of Labor in which he lists himself as the project management and research official for the Islamic Concern Project, that he now, of course, now when he knows that we know this, he admits is the same as Islamic Committee for Palestine and he lists among his duties organizing and managing fundraising projects. He was the manager for fundraising for the Islamic Committee for Palestine. And Your Honor, we refer you to one other Exhibit and that's Exhibit 8A. And now, and only now, even though they resisted it, at the very

A 26 599 077                    909                    October 13, 2000

end of the presentation and the testimony of Mazan Al-Najjar, does he admit that number one, he is here sitting at an ICP conference.  And what we had was a poster of the martyr that the Palestinian Islamic Jihad and other terrorist organizations find as their inspiration and of course, the self-acknowledged symbol of the Palestine Islamic Jihad.  They're correct, we don't have direct evidence of anything because these people are good at what they do.  But we do have enough evidence to show that a deportable alien, Mazan Al-Najjar, was involved in terrorist activity as defined under the Immigration and Nationality Act and he therefore does pose a threat to national security and he must be held in detention.  Thank you.

JUDGE TO MR. COLE AND MR. VARA

Anything by either side?

MR. COLE TO JUDGE

I would only say, Your Honor, that sitting near a poster that has a PIJ symbol on it is not a crime, does not make one a threat to national security.  And that being involved with ICP fundraising is not a crime and does not make one a threat to national security, where has been shown here, all of the money that the ICP raised went for legitimate activities, its own activities, putting on the conferences and charitable causes in the Middle East.  We're not trying to hide anything.  We're trying to put the truth on and the truth at the end, that I think the image that you should leave with the is the absence, the

A 26 599 077                      910                    October 13, 2000

absence of any evidence that Mazan Al-Najjar ever advocated
support for terrorism, ever raised money for terrorism or ever
received any money from a terrorist organization.  Thank you.

JUDGE TO MR. COLE

     Okay.

JUDGE TO MR. COLE AND MR. VARA

     Now, of course, what I'm going to do is come out with my
written findings on the open portion of the hearing.  And then
depending on what that is, then both sides will be given it and
then if possible, we'll go to the next phase or whatever.

MR. COLE TO JUDGE

     Right.

JUDGE TO MR. COLE AND MR. VARA

     Okay.

                         (OFF THE RECORD)

                         (ON THE RECORD)

MR. VARA TO JUDGE

     Your Honor, it doesn't have to go on the record.  It's just
a correction of my name, it doesn't have to corrected on the
prior transcript but for purposes of our record, it was
misspelled.

JUDGE TO MR. VARA

     How was it?

MR. VARA TO JUDGE

     It's V, it shows up as V E R A, it's V A R A.

A 26 599 077                    911                October 13, 2000

JUDGE TO MR. VARA

    Okay.

MR. VARA TO JUDGE

    Thank you.

<u>HEARING CLOSED</u>

CERTIFICATE PAGE

I hereby certify that the attached proceeding before JUDGE R. KEVIN MCHUGH in the matter of:

MAZAN AL-NAJJAR

A 26 599 077

Bradenton, Florida

is an accurate, verbatim transcript of the cassette tape as provided by the Executive Office for Immigration Review and that this is the original transcript thereof for the file of the Executive Office for Immigration Review.

Susan Aiello, Transcriber

Free State Reporting, Inc.
1324 Cape St. Claire Road
Annapolis, Maryland   21401
(301) 261-1902

October 26, 2000
(completion date)

By submission of this CERTIFICATE PAGE, the Contractor certifies that a Sony BEC/T-147, 4-channel transcriber or equivalent, as described in Section C, paragraph C.3.3.2 of the contract, was used to transcribe the Record of Proceeding shown in the above paragraph.