

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 99-3458-CIV-LENARD
02-20261

MAZEN AL NAJJAR,

      Petitioner,

vs.

JOHN ASHCROFT, Attorney General, United
States Department of Justice, *et al.*,

      Respondents.

_____/

# EXHIBIT 2: OCTOBER 27, 2000, IJ OPINION

TO

SUPPLEMENTAL COMPLAINT AND RENEWED PETITION FOR HABEAS CORPUS

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
UNITED STATES IMMIGRATION COURT
BRADENTON, FLORIDA

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| AL NAJJAR, Mazen, | ) | IN CUSTODY REDETERMINATION |
| | ) | PROCEEDINGS |
| A# 26-599-077, | ) | |
| | ) | |
| Respondent. | ) | Date:  October 27, 2000 |
| | ) | |

On Behalf of Respondent:
David Cole, Esq.
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, D.C. 20001

On Behalf of the Service:
Daniel Vara, Jr., Esq.
District Counsel, INS
7880 Biscayne Boulevard
Miami, Florida 33138

DECISION AND ORDER OF THE IMMIGRATION JUDGE

I.   Procedural History

Respondent is a forty-three-year-old male, native of Gaza and holder of an expired Palestinian refugee travel document issued by the Egyptian government. On December 8, 1984, he entered the United States as a nonimmigrant graduate student. Subsequently, the Immigration and Naturalization Service (Service) issued an Order to Show Cause (OSC) charging Respondent as deportable pursuant to section 241(a)(9) of the Immigration and Nationality Act (Act), for failure to maintain and comply with the nonimmigrant status under which he was admitted.

On May 13, 1997, an Immigration Judge in Orlando, Florida found Respondent deportable as charged, pretermitted Respondent's application for suspension of deportation and denied his applications for asylum and withholding of deportation. Respondent was ordered deported to the

United Arabs Emirates. Respondent appealed the Immigration Judge's decision and order.

On May 19, 1997, pending the appeal, the Service placed Respondent into custody without bond. Respondent thereupon requested a redetermination of his custody status, and a bond redetermination hearing was held on May 29, 1997, in Bradenton, Florida. On June 23, 1997, this Court issued an Order (June 1997 IJ Order) denying Respondent's request for release on bond. Based on classified information presented to the Court by the Service, in camera and ex parte, the Court concluded that Respondent posed a threat to national security. Respondent appealed this decision to the Board of Immigration Appeals (BIA), which dismissed the appeal on September 15, 1998 (BIA Order).

Respondent thereafter filed a Petition for Writ of Habeas Corpus with the United States District Court for the Southern District of Florida, arguing that the bond redetermination proceeding violated his rights to procedural due process because of the manner in which the Service presented the classified information, and the standard used by the Immigration Judge in finding that Respondent was a threat to national security because of his "association" with a terrorist organization. On May 31, 2000, Judge Joan Lenard granted, in part, Respondent's petition, vacating both the June 1997 IJ Order and the BIA Order and remanding the case for further administrative proceedings consistent with her Opinion and Order. See Al-Najjar v. Reno, 97 F.Supp.2d 1329 (S.D. Fla. May 31, 2000).

On June 12, 2000, Respondent filed with Judge Lenard a "Motion for Reconsideration and Clarification and Memorandum in Support," requesting that the District Court clarify its decision and specify that: (1) the matter is remanded to the Immigration Judge, not to the Service, and (2) the Immigration Judge must determine on remand whether Respondent actually "engaged in terrorist

activity" in order to find that he is a threat to national security sufficient to detain him. On June 26, 2000, the Service filed its Reply, asserting that: (1) only the Service, not the Immigration Court, now has jurisdiction over Respondent's custody status, and (2) Respondent's suggested standard for assessing a national security risk is improperly narrow. On July 17, 2000, Respondent submitted his Reply, restating his position and additionally requesting that the District Court order the Immigration Judge to complete his remand reconsideration within thirty days.

On June 23, 2000, Respondent filed with this Court a "Motion for Expedited Redetermination of Custody Status." Notwithstanding his concurrent motion for reconsideration and clarification with the United States District Court, Respondent asserted that "immediate reconsideration by [the Immigration] Court is appropriate." (Respondent's Motion, June 23, 2000, at 1 n.1.) The Service filed its Reply on June 29, 2000, arguing that "any further consideration of [R]espondent's bond request by this [C]ourt should be held in abeyance until the District Court rules on [R]espondent's motion." (Service's Reply, June 29, 2000, at ¶ 4.)

On July 25, 2000, the District Court clarified and ordered that the matter is remanded "to the Immigration Judge for further proceedings consistent with the [District] Court's prior Order dated May 31, 2000." Al-Najjar v. Reno, — F.Supp.2d — (S.D. Fla. July 25, 2000). The District Court declined, however, to reconsider or clarify its prior Order with respect to the standard for determining whether to detain Respondent as a threat to national security. Id. at 2.

On July 27, 2000, this Court issued its Decision and Preliminary Order (July 2000 IJ Order) in which it addressed the District Court's "rulings and suggested guidelines for redressing Respondent's deprivation of due process." July 2000 IJ Order at 3. This Court ordered the implementation of the District Court's rulings, holding that it will bifurcate the proceedings into

"Phase One: Determination Based Solely on Public Record" and "Phase Two: Procedures for Use of Classified Information." Id. at 4.

On July 28, 2000, the Service filed with the District Court a "Motion for a Stay of Order Granting in Part Petition for Writ of Habeas Corpus Pending Appeal" requesting that the Court issue a stay pending the appeal of the Court's May 31, 2000 Order, as modified by its July 25, 2000 Order. Subsequently, Respondent filed a Response in opposition to the Motion, and the Service filed a Reply in further support of the Motion. On August 14, 2000, the District Court denied the Service's Motion for a Stay. See Al-Najjar v. Reno, — F.Supp.2d — (S.D. Fla. August 14, 2000).

Also on July 28, 2000, Respondent filed with this Court a "Motion to Extend the Hearing Date, for Order Requiring Service to Produce a Proffer and/or Summary in Advance of Hearing, and Schedule Pre-Hearing Telephonic Conference." On August 4, 2000, the Service filed a "Motion to Pretermit and Reply to Respondent's Motion to Extend Hearing Date, for Order Requiring Service to Produce A Proffer and/or Summary in Advance of Hearing and to Schedule a Pre-Hearing Telephonic Conference." On August 7, 2000, this Court granted Respondent's Motion to Extend the Hearing Date, and ordered that the parties be prepared for a pre-hearing telephonic conference on August 14, 2000, should it become necessary to resolve any issues that may arise.

This Court held a pre-hearing telephonic conference on August 14, 2000. Proceedings were reset for August 29, 2000. Additionally, the Court denied the Service's Motion to Pretermit.

On August 23, 2000, Respondent filed with this Court a "Motion for Court to Order Service to Produce Unclassified Summary of Any Proposed In Camera Submission[1], Request to Allow

---

[1]The Motion was addressed at the hearing on August 29, 2000. See Transcript at 60 - 71. The Service acknowledged that it would provide Respondent with an unclassified summary of the classified evidence it intended to present to the Court, should the proceedings advance to

Telephonic Appearance of Basheer Nafi[2], and Motion for the Court to Provide Arabic Interpreter for

One of Respondent's Witnesses." Subsequently, on August 24, 2000, Respondent filed a "Motion

for Disclosure of Exculpatory Evidence."[3]   On August 29, 2000, the Service filed a "Motion and

Memorandum of Law in Support of the Admission of Video Recording and Transcript Evidence."

The remand bond redetermination proceedings commenced on August 29, 2000, and were stayed

at Respondent's request on August 31, 2000.

Thereupon, on September 5, 2000, Respondent filed an "Emergency Motion to Compel

Compliance with May 31, 2000 Order" with the District Court requesting that the Court: (1)

"Prohibit the [Service] from presenting classified evidence unless it first satisfies [the] Court that

its presentation will preserve [Respondent's] rights to notice, an opportunity to confront the

evidence, and a fundamentally fair proceeding, as required by [the] Court's May 31 Order"; (2)

"Order the [Immigration Judge] not to consider classified evidence until he makes an initial custody

determination based solely on the public record evidence, as required by [the] Court's May 31

Order"; and (3) "Provide any and all such further relief, including [Respondent's] release and

attorney's fees, that the Court deems appropriate." (Respondent's Motion , September 5, 2000, at

14.)

On the following day, September 6, 2000, the Service filed with this Court a "Motion to

Recalendar Bond Proceedings to Complete Unclassified Portion of Hearing" requesting that the

---

Phase Two. Id.

[2]The Court granted Respondent's request at the hearing on August 29, 2000. See
Transcript at 78 - 79.

[3]The Motion was addressed at the hearing on August 29, 2000. See Transcript at 59.

Court recalendar the remand bond proceedings "so that the Court will receive the public record evidence presented by both sides, and issue a decision on this evidence, before the Service is required to present any classified information." (Service's Motion, September 6, 2000, at 1.) Additionally, the Service "clearly state[d] for the record...that [it] possesses relevant classified information that it would present to the Court." (Id. at 2 and 3 n. 1.)

On September 8, 2000, the Service filed its "Opposition to Emergency Motion to Compel Compliance With May 31, 2000, Order" with the District Court, asserting that Respondent's Motion was "both premature and unnecessary." (Service's Opposition, September 8, 2000, at 4.) Subsequently, on September 10, 2000, Respondent filed a "Reply In Support of Emergency Motion to Compel Compliance" restating his position and arguing that the Motion to Compel was ripe for decision.

The District Court granted Respondent's "Emergency Motion to Compel Compliance with May 31, 2000 Order" on September 12, 2000, ordering this Court to "first determine whether [Respondent] is a threat to national security, based solely upon the public record evidence submitted by both parties at the bond redetermination proceedings, as ordered." Al-Najjar v. Reno, — F.Supp.2d —, 5 (S.D. Fla. September 12, 2000).

## II.   Evidence Presented

### A.   Documentary Evidence Considered

Exhibit No.

1.    I-140 Petition on behalf of Respondent.
1A    Photograph of the 1988 First Annual Islamic Committee for Palestine (ICP) Conference.
2A    Photograph. (Date of photograph uncertain.)
3A    Photograph of the 1991 ICP Conference.
4A    Photograph of the 1991 ICP Conference.

5A   Photograph of the 1991 ICP Conference.
6A   Photograph of the 1991 ICP Conference.
7A   Photograph of the 1992 ICP Conference.
8A   Photograph.
2.   Letter from Sami Al-Arian.
3.   "Pact of Brotherhood."
4.   Letter.
5.   Speech by Sami Al-Arian.
6.   Packet of documents.
7.   The Court interpreter certificate concerning Respondent's ability to translate Arabic into English.
8.   Second Composite Tape and Transcript.
9.   Certification concerning the sources of the seized videotapes used to create the composite tape, signed by Agent West.
10.  First Composite Tape. (*Marked for Identification Only.*)
11.  "Internal Manifest."
12.  Excerpt from Middle East In Sight Magazine, "Political Digest," Volume XII, Number 4-5 (1996).
13.  Certificate by Agent West.
14.  Search Warrant Affidavit by Agent West.
15.  Federal Broadcast Information System document that relates to an official translation of an Arabic interview with Ramadan Shallah.
16.  18 U.S.C. §2339 (a)-(b).
17.  Compilation of Agent West's sources.
18.  Agent West's Notes on the roundtable discussions.
19.  Affidavit of Respondent.
20.  Declaration of John Esposito, University Professor at Georgetown University and a Professor of Religion and International Affairs and of Islamic Studies. Attached Curriculum Vitae. *(In lieu of testimony.)*
21.  Affidavit of Malea Kiblan, Esquire, who represented Basheer Musa Nafi in deportation proceedings conducted in Arlington, Virginia on July 1, 1996. *(In lieu of testimony.)*
22.  Declaration of Ziad Abu-Amr, Professor of Political Science at Birzeit University in the West Bank. Attached Curriculum Vitae. *(In lieu of testimony.)*
23.  Declaration of Tarik Hamdi, former Executive Director of the ICP. *(In lieu of testimony.)*
24.  Curriculum Vitae of Arthur L. Lowrie, Adjunct Professor of International Studies and Vice Chair for the Committee for Middle Eastern Studies, University of South Florida (USF).
25.  List of six events co-sponsored by the Committee for Middle Eastern Studies with the World and Islamic Studies Enterprises, Inc. (WISE) between December 1991 and April 1995.
26.  "A Timely and Exciting Lecture on: The Israeli - P.L.O. Accords and the

Clinton Administration," by Dr. Naseer Aruri, October 18, 1993. Organized and Sponsored by the USF Committee for Middle Eastern Studies, WISE, in collaboration with the University Lecture Series and the International Studies Organization.

27. Round Table II with Khursid Ahmad, May 15, 1993, List of Participants.

28. "Islam, Democracy, the State and the West, A Round Table with Dr. Hasan Turabi," May 10, 1992. Sponsored by WISE and the USF Committee for Middle Eastern Studies.

29. Country Reports on Human Rights Practices for 1992, Tunisia, U.S. Department of State.

30. "Report to President Betty Castor, University of South Florida in re USF / WISE Relationship and Related Matters," Wm. Reece Smith, Jr.; May, 1996.

31. Curriculum Vitae for Jamil E. Jreisat, Professor of Public Administration and Political Science, Department of Government and International Affairs, USF.

32. Journal of Political Readings, Volume 1, Number 1 (Winter 1991), sponsored and published quarterly by WISE.

33. Curriculum Vitae of Basheer M. Nafi, Senior Lecturer and the Reader in Islamic History, the Muslim College, London, and Birbeck College, University of London.

34. Correction regarding "Al-'Urdun'" Newspaper, September 28, 1996.

35. "H-1B Nonimmigrant Visa Petition and Extension of Stay Request by the International Institute of Islamic Thought on Behalf of Dr. Basheer Musa Nafi, and Extension of H-4 Visa Status by Imelda J. Ryan, Tariq B. Nafi, Iman Nafi, and Ahmad B. Nafi," by Maggio and Kattar, P.C., dated January 31, 1996.

36. Letter by Timothy M. Spridgeon regarding Basheer Nafi's employment status with WISE, dated April 4, 1996.

37. Petition for H-1B visa by WISE on behalf of Basheer M. Nafi, by Fotopulos, Spridgeon and Perez, P.A., dated December 21, 1992.

38. Form I-140, filed by WISE on behalf of Basheer M. Nafi.

39. Curriculum Vitae of Naseer H. Aruri, Chancellor Professor, Department of Political Science, University of Massachusetts, Dartmouth.

40. "ICP Fifth Annual Conference: Islam & the new world order, A call for national agenda in America," Inquiry, March/April 1993, by Ahmed Fellaj.

41. "Orphan Sponsorship Project in Palestine."

42. "In The Name of God, the Compassionate, the Merciful. The Project of Sponsored Orphaned And Needy Children in Palestine Concerning with Muslim Women's Society in the USA," questionnaire by the ICP.

43. "In the Name of God, the Compassionate, the Merciful. The Project of Family Sponsorship," by the Arab Orphans House Society.

44. "Orphan Sponsorship Project in Palestine," Muslim Women's Society.

45. ICP Orphan Sponsorship Project in Palestine, form containing information concerning the child.

46. Names of sponsored children from the Arab Orphans House Society for the

months of April - June of 1992.

47. The Orphans House Society, Tul Karm 671191, Thank You letter by Susan Awad, dated June 9, 1993.

48. Form 1040, Income Tax Return for 1993, by Sami and Nahla Al-Arian.

49. Declaration of Fawaz Damra that he is a United States naturalized citizen.

50. Declaration of Abdelaziz Abdelrahman Aouda that he resides in Gaza - Palestine Authority.

51. Diagram of the WISE Office at the time of the FBI Search in November 1995.

52. Questions for Respondent, faxed May 27, 1997.

53. Letter by Jan Fairbetter, Respondent's former wife.

54. Letter on behalf of Ramadan Shallah, by the Islamic Community of Tampa Bay, Masjid al-Qassam, dated September 10, 1994.

55. Supplemental evidence submitted by the Service consisting of photocopies of four checks.

56. Application for Alien Employment Certification by Respondent.

57. INS Form by Respondent.

58. Letter by Respondent to the British Consulate-General on WISE letterhead dated October 23, 1995.

59. Biography of Sheikh Abdel Aziz Odeh. (*Marked for Identification Only.*)

60. Executive Order12947, Prohibiting Transactions with Terrorists Who Threaten to Disrupt the Middle East Peace Process, January 23, 1995.

61. Immigration and Naturalization Service Memorandum of Investigation regarding Basheer Musa Nafi, dated June 27, 1996.

62. Report of Receipt and Disbursements (FEC Form 3X).

63. Declaration of Supervisory Special Agent William D. West.

64. Declassified documents, including financial information concerning Respondent.

Tab     1 - 5: Respondent's Post-Hearing Submission.

B. Testimonial Evidence Considered[4]

1. Sami Al-Arian

At the hearing conducted on August 29, 2000, Sami Al-Arian testified to the following facts[5]:

---

[4]The Court does not provide Transcript cites for those individuals who testified on October 10 through October 13, 2000, because the transcript of those specific days of the proceedings was not available at the time this decision was drafted.

[5]Mr. Al-Arian was subpoenaed before the Court. On August 29, 2000, Mr. Al-Arian appeared with counsel, Robert Cannella. Mr. Al-Arian asserted his Fifth Amendment privilege over one-hundred times with respect to any questions relating to the Islamic Committee for

Sami Al-Arian went to high-school with Respondent. Mr. Al-Arian is also Respondent's brother-in-law.

Mr. Al-Arian supports the Constitution of the United States and would bear arms on behalf of the United States. He does not support the freedom of Islam through violence. He did not call Jews "the sons of monkeys and pigs." (Transcript at 115.)

> 2. **Immigration and Naturalization Service Supervisory Special Agent William D. West**

At the hearings conducted on August 29, August 30, October 12, and October 13, 2000, Immigration and Naturalization Service Supervisory Special Agent William D. West (Agent West) testified to the following facts:.

Agent West is a Supervisory Special Agent with the Service and works out of the Miami District Office. He has served as the Chief of the Special Investigations Division for the Service in Miami for approximately ten years. In this capacity, he supervises and oversees a unit which provides for the Service's investigative participation in a variety of multi-agency investigations that include organized crime, gangs and national security cases, such as counter-terrorism and espionage.

Agent West was involved in the investigation of the World and Islamic Studies Enterprises (WISE) and the Islamic Committee for Palestine (ICP). In the course of his investigation, Agent West obtained evidence that indicates that the two organizations provide support to the Palestinian Islamic Jihad (PIJ), a terrorist organization, designated as such by the Secretary of State, which engages in terrorist activities within the Middle East.

WISE employed Mr. Al-Arian, Ramadan Shallah, Basheer Nafi and Respondent. Mr. Al-

---

Palestine, the World and Islamic Studies Enterprises and the Palestinian Islamic Jihad.

Arian was the head of WISE as the founder and chairman. Respondent was associated with WISE in a management capacity, as a subordinate to Sami Al-Arian. A visa petition was filed on behalf of Respondent as the Director of Research for WISE.

In November of 1995, Agent West wrote a search warrant affidavit for a federal criminal search warrant. The search warrant included three locations: (1) the offices of WISE, (2) the residence of Mr. Al-Arian, and (3) the University of South Florida Office (USF) of Mr. Al-Arian. Agent West specifically named Mr. Al-Arian , Mr. Shallah and Mr. Nafi in the search warrant affidavit. However, the search warrant affidavit did not name or include Respondent.

### a. Evidence Obtained From the WISE Offices

During the execution of the search warrant, numerous pieces of evidence were obtained from the offices of WISE. First, the agents seized a document which was identified to be a pact between the Hamas and the PIJ. Second, the agents found a letter on WISE letterhead by Mr. Shallah, former employee of WISE and the current leader of the PIJ. The letter was addressed to Sheik Rasheed Al-Ghannoushi, a leader of a radical Islamic group based in Tunisia. The letter explained to Mr. Al-Ghannoushi that efforts were being made to obtain a visa on his behalf in order for him to attend a seminar in the United States sponsored by WISE. Mr. Al-Ghannoushi currently resides in England as a fugitive of Tunisia because of his conviction for the attempted murder of the former president of Tunisia.

Third, the agents seized a written speech entitled "Islam, Palestine and the West," authored by Mr. Al-Arian that was to be given at an ICP conference.

Fourth, numerous photographs that were taken at various ICP conferences were seized from the WISE office: (1) a photograph of the first ICP Conference in 1988; (2) a photograph taken

between 1990 and 1992 which depicts Hussam Abujbarra, whom Agent West arrested for violating his immigration status in the United States, Al-Awani, who is in a leadership position with the Islamic Institute for Intellectual Thought (IIIT), an Islamic think tank in Northern Virginia, Mr. Nafi, who is one of the founding members and a leading member of the PIJ, and Mr. Al-Ghannoushi; (3) a photograph at the 1991 ICP Conference which depicts Mr. Al-Arian, Sheik Omar Abdel Rahman, also known as the Blind Sheik, who was convicted in the World Trade Center bombing investigation and is serving a life term in federal prison, and Sheik Abdel Aziz Odeh, one of the founding members of the PIJ; (4) a second photograph at the 1991 ICP Conference which depicts Mr. Rahman and Mr. Odeh; (5) a third photograph at the 1991 ICP Conference which depicts Mr. Shallah and Mr. Al-Arian; (6) a fourth photograph at the 1991 ICP Conference which depicts Respondent; (7) a photograph at the 1992 ICP Conference in Chicago which depicts Mr. Al-Arian and Mr. Shallah, the current leader of the PIJ; and, (8) a photograph which depicts Respondent and a poster that is demonstrative of the PIJ.

Fifth, the agents seized a handwritten document identified to be the Internal Manifesto of the PIJ. The document was probably found at the WISE office. (Transcript at 357.)

Sixth, over five-hundred videotapes were seized. Agent West reviewed a "good many" of the videotapes personally. (Transcript at 203.) The videotapes relate to the ICP Conferences held between 1988 and 1992 and other seminars. The individuals who orchestrated the conferences made the videotapes that were seized. Many of the tapes seized were obtained from the WISE offices. Virtually all ten of the tapes that were used to make the composite tape were seized from the WISE office. (Transcript at 342.) The composite tape includes the following events: (1) the First Annual ICP Conference held in St. Louis on December 22, 1988 (depicts a poster of the Islamic Movement

for Palestine; Mr. Al-Arian stated "Death to Israel, "Victory to Islam," "Revolution, Revolution," "Rolling, rolling towards Jerusalem" (Transcript at 310)); (2) the second annual ICP Conference held in Chicago in December of 1989 (Mr. Al-Arian introduced Respondent as the "Director of the program who will talk to you and brief you about the conference and the parts of the conference and the program and the speakers" (Transcript at 313)); (3) a roundtable event in Cleveland, Ohio in April of 1991 (Agent West stated that Respondent attended this event, although he acknowledged that there is no open source evidence that demonstrates that fact (Transcript at 447); Fawaz Damra stated that the ICP "is the active arm of the Islamic Jihad Movement....[W]e like to call it the [ICP] here for security reasons....[D]onate to the Islamic Jihad....If you write a check, write it for the [ ] ICP" (Transcript at 320, 322 - 23); Mr. Al-Arian stated "Let us continue to protest. Let us damn America, let us damn Israel, let us damn their allies until death" (Transcript at 322)); (4) the fourth annual ICP Conference in December of 1991 in Chicago; (5) the fifth annual ICP Conference in Chicago in December of 1992 (Mr. Shallah stated "[T]he first solution is to topple the regimes when we call for toppling the regimes.... I say toppling the rulers and rubbing their noses in the dirt in Jihad against them is not terrorism" (Transcript at 326)); (6) an event commemorating the fifth anniversary of a battle between the PIJ and the Israeli Defense Forces (Agent West stated that Respondent attended this event, although he acknowledged that there is no open source evidence that demonstrates his assertion (Transcript at 447); Agent West was unsure of the location and date of the event; (Transcript at 328); the video depicts several posters, one of which bears a symbol of the PIJ Movement; Mr. Al-Arian stated "[God] cursed those who are the sons of Israel, through David and Jesus, the son of Mary....Those people, God made monkeys and pigs. They kicked you out of your homes....And who did this other than the colonialists, arrogant Americans, Europeans and

NATO....[The] Koran is our constitution, Jihad is our path.   Victory to Islam, death to Israel, revolution, revolution until victory" (Transcript at 339)).

Although not included in the composite tape submitted to the Court, from Agent West's review of the videotapes, he specifically recalled that at the April 1991 roundtable event in Cleveland, Mr. Damra introduced Mr. Al-Arian as the head of the ICP in America. (Transcript at 230.) Further, Mr. Damra stated that it was the duty of Muslims to give one percent of their earnings to the Islamic cause, for the armed struggle against the enemy, Israel. (Transcript at 231 and 530.) He exhorted the crowd to give money, while praising violent acts. (Transcript at 233 - 34.) Many people came to the stage and contributed funds in checks and cash. (Transcript at 234.) There were two stated purposes for the fundraising: (1) to support the orphans, and (2) to support the Islamic Jihad. (Transcript at 524.) The FBI translator totaled the amount for the Islamic Jihad around $6000. (Transcript at 524.)

### b.   Evidence Obtained From Mr. Al-Arian's Residence

Also pursuant to the search warrant, the agents seized personal computer equipment, videotapes, audio tapes, various letters and photographs from Mr. Al-Arian's residence. From the computer and disks, the agents obtained documents which related to the ICP, WISE and other organizations. The agents also obtained a letter written by Mr. Al-Arian in which he solicited funds for the ICP. Additionally, a handwritten document that purports to be a charter for the Center for Studies, Intelligence and Information was found. It describes setting up an organization which would have various functions within a particular country or location, including gathering information and intelligence and providing security for the organization.

c.      Agent West's Conclusions

The open source evidence that Respondent advocated support for the PIJ, must be examined in "the totality of the circumstances in [the] investigation." (Transcript at 448.) "Bringing...known leaders of the PIJ into the United States to attend these conferences and to that process, being part of that entire oversight and management and, the organizational process .... establishes his support for the PIJ." (Transcript at 448.)

Agent West believes that Respondent was aware of Mr. Shallah's connections to the PIJ while he worked at WISE. This conclusion is established by the evidence that demonstrates the relationship between Respondent and Mr. Shallah through WISE and the ICP, the "fact that [Respondent] is a highly educated and intelligent individual who has purported himself ... as someone knowledgeable of Middle Eastern affairs," and the "generally accepted ... historic acknowledgment ... that [Mr.] Shallah has been connected to the PIJ for a long time." (Transcript at 444.) Through academic resource documents, as far as open source publications, Mr. "Shallah has been identified as someone who has been a member of the Islamic Jihad movement for a long period of time, prior to his coming to the United States." (Transcript at 445.) There is evidence, including a book purchased by Agent West, that indicates that Mr. Shallah became associated with the PIJ in the early 1980's. (Transcript at 556.) There is, however, no direct or indirect evidence that Respondent read any of those academic resource documents.

Additionally, Respondent executed the support documents with the visa petitions for Mr. Nafi, one of the founding members of the PIJ. (Transcript at 572 - 73.) Mr. Nafi's visa petition states that he was employed for various times at WISE when, in fact, he was not. (Transcript at

436.)[6]

Regarding fundraising activities, Agent West believes the tapes reflect fundraising at all of the conferences to some extent. (Transcript at 247.) There is no question in Agent West's mind that Mr. Al-Arian engaged in a conspiracy to raise funds for the PIJ. (Transcript at 506.) Moreover, based on Mr. Damra's speech at the April 1991 roundtable event regarding the role of the ICP in America and Respondent's role in the ICP, there is "[n]o question in [Agent West's] mind" that Respondent was involved in fundraising for the PIJ. (Transcript at 524.) However, there is no open source evidence that Respondent ever sent money to a terrorist organization or that he ever advocated terrorism. (Transcript at 447.) Additionally, there is no open source evidence that WISE raised money for any other organization. (Transcript at 471.)

In addition, regarding declassified evidence presented to the Court, the only information that was previously classified that was later declassified was a national security letter used in the investigation to obtain Respondent's financial information. However, the financial information had already been provided by Respondent.

Agent West believes that Respondent is a threat to national security.

3.      Professor Arthur Lowrie

At the hearing conducted on October 10, 2000, Professor Arthur Lowrie testified to the following facts:

Professor Lowrie has known Respondent for nine years. Professor Lowrie was an Adjunct

---

[6]Agent West also testified that at the time of Mr. Nafi's arrest, he was in possession of pay stubs from Reston Investments. Agent West does not have independent knowledge that Mr. Nafi worked at Reston Investments. However, other Service agents concluded that he worked there. There was no follow-up investigation after Mr. Nafi left the country.

Professor at USF from 1987 through 1996. He is a founding member and the current Chair of the Committee for Middle Eastern Studies (CMES). He has been involved in Middle Eastern affairs for almost thirty years through his service for the Department of State and positions in embassies in the Middle East. He lived in the Middle East for eighteen years.

WISE was a small "think tank" devoted to Middle Eastern and Islamic affairs. Its purpose was to promote understanding of the Islamic point of view. WISE was a scholarly and academic organization.

There was a cooperative arrangement between USF and WISE; WISE members could use the USF library, and the students, in turn, could use WISE publications. USF also assisted WISE with conferences and bringing lecturers to the events. They invited numerous highly-regarded lecturers, including Mr. Esposito, a leading academic and head of the Islamic Studies for Georgetown, and Mr. Al-Ghannoushi, a leading intellectual for Islamic studies.

It was true that the CMES was concerned about the activities of devout Muslims, as well as Mr. Al-Arian's involvement in WISE. Therefore, the CMES addressed their concerns to WISE. However, Khalil Shaqaqi of WISE made clear that WISE was not involved in any of the activities that would cause concern and that it would not engage in any fundraising activities.

Respondent was the "workhorse" of WISE, as he is the highest quality academic and scholar. His role at WISE was to complete the majority of the translations and editing. However, Professor Lowrie has no knowledge of Respondent's financial involvement in WISE. Professor Lowrie "would be shocked if Respondent would be involved with the PIJ."

Mr. Shallah also worked for WISE. He left WISE in May of 1995 because it was the end of the semester, his father was ill and he was looking for a job. On October 31, 1995, Professor Lowrie

saw Mr. Shallah on the television and heard that he was the leader of PIJ. Professor Lowrie was "totally shocked" because "nothing indicated that he was willing to take that big step."

WISE was not a front to a terrorist organization as it had so little money. However, Professor Lowrie would be personally embarrassed if WISE was a part of the PIJ.

4.     Dr. Jamil E. Jreisat

At the hearing conducted on October 10, 2000, Dr. Jamil E. Jreisat testified to the following facts:

Dr. Jreisat is a tenured professor of Public Administration and Political Science at USF. He has served USF for thirty years.

WISE was an institute operating in Tampa that was a research-oriented "think tank." The CMES cosponsored six events with WISE between December 1991 and April 1995. Dr. Jreisat attended most of the events and was once invited to speak. The events were legitimate academic events with high caliber academics and participants. There were discussions about political events and the public was allowed to ask questions.

Dr. Jreisat had a professional relationship with Respondent. Dr. Jreisat had few contacts with Mr. Shallah. He "thought there was a mistake" when he saw that he was the leader of the PIJ because it "did not sound like the person they knew."

5.     Basheer Nafi

At the hearing conducted on October 11, 2000, Basheer Nafi testified telephonically to the following facts:

Basheer Nafi currently resides in England and is an Adjunct Professor of Islamic Studies and Senior Lecturer in Islamic History at the Muslim College and Birkbeck College, University of

London. He has authored twenty-four academic articles and hundreds of essays and commentaries.

Mr. Nafi was one of the founders of WISE. The purpose of WISE was to make research available to others. Mr. Nafi worked with Respondent during the existence of WISE. At WISE, Mr. Nafi edited and reviewed books, but was not paid much for his work. Although WISE wanted him to reside in Tampa, Mr. Nafi lived in Virginia.

The WISE library consisted of journals, leaflets, magazines, reports, books and newspaper clippings. WISE's journal, "Political Readings," did not express any political position. The Internal Manifest of the PIJ was available for research. Excerpts from it have been published in the past, one very recently. The Pact of the Brotherhood Cooperation that was found in the WISE office is the type of material they searched for and collected.

Mr. Nafi attended the ICP Conferences in 1988 and 1989. The Conferences were not dedicated solely to Palestine. There was fundraising at both conferences, intended for conference funding and the needy children in Gaza.

Mr. Nafi was employed by the International Institute of Islamic Thought (IIIT), a legal research center located in Virginia, in late 1995. The IIIT did not advocate support for the PIJ. His employment at IIIT involved the same type of work that he engaged in while at WISE. He did not work for Reston Investments and did not have pay stubs on his person at the time of his arrest. Mr. Nafi was deported from the United States for working for an employer who was not responsible for his visa.

Mr. Nafi is not a member of the PIJ and has not advocated for the PIJ. It is not true that he was giving orders to the PIJ as stated in the Smith Report because during the Intifada, he was living abroad. Additionally, the one claim that identified him as a member of the PIJ was retracted. It is

true that he was friends with Mr. K. Shaqaqi, the first Director of WISE, and his brother, Mr. R. Shaqaqi, who later became the PIJ leader. However, he does not support the PIJ or its creation. Mr. Nafi does not denounce the PIJ, but rather the things that both sides did against innocent people.

### 6.   Naseer Aruri

On October 11, 2000, Naseer Aruri testified to the following facts:

Naseer Aruri is a retired professor from the University of Massachusetts, where he was employed for thirty-three years. Mr. Aruri has published around seventy to eighty articles and eight books on the Palestinian-Israeli conflict. Mr. Aruri was qualified as an expert in the Palestinian-Islamic Conflict.[7]

Mr. Aruri provided the Court with a historical account of the Intifada. He explained that there were charitable organizations associated with all parties to address the social needs of the society. Further, much of the rhetoric that was heard at some of the conferences, such as "Death to Israel," were simply an expression of frustration.

Mr. Aruri knew Mr. Shallah through his associations with WISE. He was "absolutely shocked" when he heard that Mr. Shallah was the leader of the PIJ.

Mr. Aruri does not know if the PIJ is a terrorist group. In addition, he does not know if Mr. Shallah is a terrorist. The only terrorist group that Mr. Aruri is able to identify is the Jewish Defense League.

---

[7]Mr. Aruri was qualified as an expert in the Palestinian-Islamic Conflict. However, the Court finds that his testimony was severely undermined by the fact that he was so biased to the Palestinian cause.

7.     Nahla Al-Arian

On October 11, 2000, Nahla Al-Arian testified to the following facts[8]:

Nahla Al-Arian is Respondent's sister and Mr. Al-Arian's wife. Mrs. Al-Arian came to the United States in 1979. She became a lawful permanent resident in 1989 and a United States citizen in 1994. She has five children.

Mrs. Al-Arian is very close to Respondent and she finds it impossible for him to be a member of the PIJ. Respondent has never advocated violence.

The ICP was established to educate the Muslim community in the United States. The ICP established conferences for five years supporting "the uprising." In addition, the ICP published a journal or magazine. The ICP agenda was very clear, that it advocated for the Palestinian cause.

Mrs. Al-Arian attended all five of the ICP conferences from 1988 through 1992. The ICP conferences consisted of a wide range of topics. The ICP, however, did not endorse the points of view expressed at the conferences. All of the conferences were taped. Various representatives attended the ICP conferences, including Jewish representatives.

As a member of the ICP, Mrs. Al-Arian was in charge of fundraising for the Orphan Sponsorship. The ICP raised money for the orphans at each conference. The duration of the sponsorship project was from 1990 through 1994. The applications for the sponsors did not include a section for religion as a criteria. The sponsors sent money to Mrs. Al-Arian and she would send the money abroad every three months. In addition, she sent a fax with the names of the sponsored children, indicating how much money to give each child.

---

[8]Mrs. Al-Arian appeared with counsel, Robert Cannella, in order to address any issues that arose concerning her spousal privileges.

Mrs. Al-Arian never attended an ICP conference that supported the PIJ. The ICP did not send money to the PIJ. The ICP could not have raised money for the orphans of suicide bombers, as some claim, because the first suicide bomber incident was in 1994 and the conferences ended in 1992.

### 8. Respondent

On October 12, 2000, Respondent testified to the following facts:

Respondent was born on June 4, 1957. From 1971 through 1974, Respondent attended high school in Egypt. From 1974 through 1979 he attended Cairo University. He studied in the United States from 1982 through 1994, when he completed his Ph.D.

Respondent's wife is currently in deportation proceedings. Together they have three United States citizen daughters. The letter that his former wife authored claiming that he fraudulently entered into that marriage is false.

### a. The Mosque and School

Respondent was the cofounder and president of the committee of his mosque. In his capacity as president, he received money for the needy primarily twice a year. Respondent was a signatory of two accounts of the mosque.

The ICP supported the mosque and the school, providing from $15,000 to approximately $100,000. WISE never supported the mosque or the school.

### b. WISE

Respondent was the cofounder of WISE, a research institute. Respondent's title at WISE was "Volunteer Executive Director"; he did not get paid for his work. In his application for employment certification, signed by Mr. Al-Arian, however, it states that as "Executive Director of WISE" he

would earn thirty-two thousand dollars per year. At WISE, Respondent assisted in an administrative and academic capacity.

WISE's inception was in 1991. The purpose of WISE was to educate the public, conduct research and publish materials. WISE published a quarterly research journal titled "Political Reading" or "Policy Review" (Journal) from 1991 through 1995. The Journal was originally printed in Tampa but quickly received support from abroad, and was thereafter also printed in the West Bank and Beirut. The intended market for the Journal was for academicians, researchers and young thinkers. The Journal covered a wide spectrum of issues, including Islamic knowledge as a social science, and, sometimes, religion as theology. Authors "from all walks of life" contributed to the Journal. A disclaimer was printed near the table of contents of the Journal stating that the opinions and views expressed in the Journal represent those of the authors, not of WISE. WISE did not promote any particular religious or political view.

Respondent's financial responsibilities at WISE included paying bills, renewing subscriptions to other journals, raising funds and donations, and obtaining subscriptions to the WISE Journal. The two signatories of the WISE accounts were Respondent and Mr. Al-Arian. However, Mr. Al-Arian did not write checks. In late 1992, Mr. Shallah was added as a signatory. The yearly budget for WISE was on average, $60,000 or $70,000. The best yearly budget totaled approximately $100,000. Individuals were approached to contribute financial support through brochures, in English and Arabic, that delineated WISE's objectives and means.

WISE hosted two roundtables at USF in May of 1992 and 1993, which cost approximately $10,000 to $15,000. The purpose of the roundtables was to serve academicians and allow ideas to be discussed and "exposed under the full sun."

Mr. Shallah worked for WISE in Tampa since late 1992 or early 1993, through May of 1995. He became a signatory of the WISE account and paid his own checks. Respondent's relationship with Mr. Shallah was "mostly a professional association." Respondent and Mr. Shallah worked in the same office building, but Respondent entered Mr. Shallah's office on very few occasions. There was some personal interaction between Respondent and Mr. Shallah, but it was difficult as Mr. Shallah was "self-centered." Respondent "avoided him for a couple of months." However, Mr. Shallah visited Respondent's home at least once, a common practice when individuals "came into town."

WISE considered Mr. Shallah's departure as a "leave of absence" and they wanted for him to return. After Mr. Shallah left the United States in May of 1995, he only communicated with Respondent near the end of October when he sent travel documents to Respondent requesting a visa application and a letter. Thereafter, WISE wrote a letter on Mr. Shallah's behalf because they were interested in his return. This was around the same time that Mr. Shallah became the leader of the PIJ. However, Respondent never knew if Mr. Shallah was a member of the PIJ or if he had any ties to the PIJ while he knew him. When Respondent heard that Mr. Shallah was the head of the PIJ, he was "very sad," "very disappointed," and he found it "very troubling" because Mr. Shallah "destroyed his academic life." Mr. Shallah "did a lot of good work for WISE."

Mr. Nafi, an exemplary scholar, worked for WISE from Virginia, under a visa sponsored by WISE. Respondent petitioned for Mr. Nafi even though there were reports that he was associated with the PIJ in the late 1980's. WISE wanted Mr. Nafi to work in Tampa, but he was working on his second Ph.D. in Virginia. Mr. Nafi worked full-time for WISE from Virginia. Mr. Nafi was "very instrumental in crystalizing the ideas of WISE." He wrote research articles and designed the

themes of each issue of the Journal. Respondent sent checks to Mr. Nafi in Virginia, amounting to $4,000. Mr. Nafi wrote a check from his account to Respondent for $4,000 "for a computer." Respondent discussed the articles that claimed Mr. Nafi was associated with the PIJ with Mr. Nafi himself. Respondent understands how the connection may be viewed due to Mr. Nafi's relations with others; however, it was a misunderstanding.

WISE did not support the PIJ, any terrorist organization or any terrorist activities. WISE never sent to or received money from the PIJ or any terrorist organization. WISE was not a front for the PIJ or any terrorist organization.

When the ICP became defunct in 1994, it stored its materials in the WISE office building. Respondent did not go into the storage to get ICP materials.

On November 20, 1995, Respondent was alone in the WISE office when he heard a loud knock on the door. Respondent was greeted by ten to fifteen FBI agents. Respondent spent hours with them there on the first day. They were in the WISE office for three days. Respondent had never seen several pieces of evidence that the agents obtained from the WISE office. (1) Respondent never saw the Internal Manifest of the PIJ; however, there were similar documents in the library because they were important to understand the theories of the organizations. (2) Respondent never saw the Charter for the Center for Studies of Intelligence Information; he had never heard of this group. (3) Respondent did not see the speech by Mr. Al-Arian. (4) Respondent was not aware of the letter from Mr. Shallah to Mr. Al-Ghannoushi dated May of 1994. Even though Mr. Al-Ghannoushi was convicted in 1992, Respondent still supported his invitation to the United States in 1994 because Mr. Al-Ghannoushi was convicted in a Third World tribunal, which is always tainted. Therefore, Respondent did not give Mr. Al-Ghannoushi's conviction much weight. (5)

Respondent never saw the Communique of PIJ Pact; however, it was common for WISE to see communiques "from many places" because a research center must depend on primary sources and cannot rely on secondary sources. The fact that WISE had these materials does not mean that WISE supported it. (6) Finally, Respondent never saw the letter by Mr. Al-Arian.

WISE no longer exists and has been defunct since 1995. In late 1995, the bank accounts were frozen due to the search warrant.

### (1)     Financial Transactions in Question

#### (i)     $96,000 Wire Transfer

In 1993, Respondent received a wire transfer of $96,000 from his sister-in-law. Part of the money belonged to WISE and part of the money belonged to him. Specifically, $34,000 was for his family. Respondent deposited the money that belonged to him in his federal credit union account. Respondent did not deposit the money allotted for WISE in the WISE account because it would have been spent. Therefore, he deposited the $72,000 in his Barnett account, to guarantee that WISE would be able to pay its overseas costs. Respondent wrote a $24,000 check to Mr. Shallah to run the oversees operation for WISE. Twelve-thousand dollars was left over, which Respondent kept in his account.

#### (ii)     $102,000 Check

On September 15, 1992, Respondent received a personal money wire for $100,000 from his brother-in-law. His brother-in-law intended to relocate and he wanted Respondent to keep the money for him. Respondent's brother-in-law was a businessman involved in the food and rug industries. Respondent divided the money into two accounts, depositing $50,000 in each account. Thereafter, Respondent began "shifting [the] money around, looking for a better rate." On

September 29, 1992, he deposited $98,000 into a Barnett security account. On May 13, 1993, he transferred $50,000 from the Barnett security account to the Barnett general account. On August 23, 1993, Respondent transferred $52,000 from the Barnett securities account to the general Barnett account. In early 1994, Respondent sent a check for $102,000 to his brother-in-law in Beirut in the Middle East. That amount included the money Respondent's brother-in-law sent him, plus interest.

(iii)     **$10,000 Check from WISE**

In 1994 or 1995, Respondent obtained a loan from WISE in the amount of $10,000. He only paid some of it back.

(iv)     **$100,000 deposit**

On November 30, 1992, there was a $100,000 deposit into the WISE account. A donation for that amount is possible.

c.     **The ICP**

The ICP was formed in late 1988 by a group of local Muslims and Palestinians in Tampa. The ICP project was inspired by the idea of having a conference to debate issues. The intended audience was the general public, especially Arabs and Muslims.

The ICP published a magazine titled "Inquiry." It also hosted five annual conferences from 1988 through 1992. The annual conferences were usually held in December. Around three-hundred people attended them. However, one-thousand people attended the last conference. The ICP conferences were always advertised and open to the public. The ICP advertised the conferences through mosques, communities, shops and by mail. About eighty percent of the conference was in the Arabic language; therefore, the ICP provided translations at each conference. The conferences

lasted a full three days, with around six to seven functions daily. All sessions at the conferences were videotapes and recorded.

Fundraising occurred at each ICP conference. The fundraising sessions were held on Saturday or Sunday night, and lasted about forty-five minutes. Since Respondent was working at the conferences, he only attended one or two fundraising sessions. There were two purposes for the fundraising: (1) to raise money to pay for the conferences, which usually cost about $20,000 to $30,000, and (2) to find sponsors for the Palestinian orphans and the needy children. The PIJ was not mentioned during the annual conference fundraising appeals.

Respondent's work for the ICP was seasonal, mainly at the end of the year. He did, however, assist with the initial mailing list and helped volunteers use the database. Respondent assisted with the preparations for all of the conferences. Specifically, for the first conference that was held in Saint Louis, Missouri, he was "in charge of the food." Respondent only spoke at the conferences as a moderator, introducing a certain subject and/or speaker.

Respondent invited speakers to the ICP conferences. He knew that Mr. Odeh was the spiritual leader of the PIJ when he invited him to the ICP conference. He also invited Mr. Al-Ghannoushi, even though he was convicted of violence in Tunisia in 1992, because he was a "highly regarded academic."

However, the ICP was not a front for the PIJ. The ICP did not support or receive money from the PIJ or any terrorist organization.

The ICP is now defunct.

### d.    Events Respondent Did Not Attend·

The Cleveland event in April of 1991 depicted in the composite video was not an ICP event. Respondent did not attend this event and was not aware that it was to take place. Further, Respondent was not aware that Mr. Al-Arian was to speak at that event. Mr. Damra was not a member of the ICP. When he spoke at this event, it was not on behalf of the ICP. His statement that the "ICP is an active arm of the PIJ" is incorrect. Respondent was "outraged" by the "ignorance," "mischaracterization," and "misrepresentation" of Mr. Damra's statement.

Additionally, Respondent did not attend the event in Chicago. He only heard of it sometime after it took place. This was not an ICP event. It was planned by the "Chicago ICP." The two organizations "were just friends" and did not control each other's activities.

### e. ·    Terrorist Organizations

The PIJ engages in terrorist acts. Respondent is not a member of the PIJ. He has never associated with the PIJ and has never supported or advocated for the PIJ. Respondent does not support terrorism, terrorist acts, or the use of force or violence against civilians. Respondent has never sent money to or received money from the PIJ or any terrorist organization.

Respondent denounces the PIJ and threats by Mr. Shallah. He also denounces the Hizballah and Hamas, two other terrorist organizations. Respondent does not denounce Mr. Al-Arian or his statement, "Death to Israel." Respondent does not denounce anyone for saying anything because "this is a free country." Respondent may disagree with certain words, "but they do not necessarily mean violence." Respondent does not denounce anyone for attending a conference where there was fundraising for the PIJ.

### 9.      Brian M. Vrynjolfsson

On October 13, 2000, Brian M. Vrynjolfsson testified to the following facts:

Mr. Vrynjolfsson is a Financial Analyst for the FBI. He works out of the Tampa office. He received information that pertains to this case on Friday, October 6, 2000. He received declassified information in this case on October 12, 2000. Mr. Vrynjolfsson described evidence submitted to the Court consisting of a flowchart of Respondent's funds and other documents relating to numerous financial transactions of Respondent's bank accounts.

Specifically regarding three outgoing international money transfers on May 27, August 9 and August 16, 1993 in the amounts of $2,500, $1,000, and $5,770, respectively, Mr. Vrynjolfsson does not know "where the money went abroad."

### III.    Analysis

#### A.      Immigration Court's Jurisdiction to Conduct New Bond Redetermination Proceeding

The Court retains jurisdiction to redetermine Respondent's custody status, even though his deportation order has since become administratively final. See Al-Najjar, 97 F.Supp.2d at 1341, 1362; see also Al-Najjar, — F.Supp.2d — at 2 (S.D. Fla. July 25, 2000); July 2000 IJ Order. Section 236.1(d)(1) of Title 8 of the Code of Federal Regulations provides that an Immigration Judge loses jurisdiction to conduct a bond redetermination hearing once a deportation order becomes final. See 8 C.F.R. § 236.1 (d)(1). Nevertheless, in the case at hand, U.S. District Court Judge Lenard found that the Executive Office for Immigration Review, both the Immigration Judge and the Board of Immigration Appeals, violated Respondent's Fifth Amendment right to due process. See Al-Najjar, 97 F.Supp.2d at 1354. To remedy this constitutional defect, Judge Lenard ordered this Court to redetermine Respondent's custody status. Id. at 1362; see Al-Najjar, — F.Supp.2d — at 2 (S.D. Fla.

July 25, 2000). Her order supercedes the general jurisdictional rule set out in section 236.1(d)(1) of Title 8 of the Code of Federal Regulations.

B.    Bond

Bond proceedings differ greatly from other immigration proceedings. Matter of Valles-Perez, 21 I&N Dec. 769 (BIA 1997). Bond proceedings are informal hearings that are separate and apart from deportation hearings. Matter of Chirinos, 16 I&N Dec. 276 (BIA 1977). The primary consideration in a bond determination is affording the parties an opportunity to present evidence before an impartial arbiter as promptly as possible. Id. at 277. Bond proceedings accordingly are designed to be "less formal" and "more expeditious" than full-fledged deportation or removal hearings. Id. In a bond proceeding, the record may contain any information which is helpful to an Immigration Judge in determining the bond. Id. An alien should be detained or required to post a bond if he poses a threat to national security or he is a flight risk. Matter of Andrade, 19 I&N Dec. 488, 489 (BIA 1987); Matter of Patel, 15 I&N Dec. 666 (BIA 1976).

Pursuant to section 236.1(c)(8) of Title 8 of the Code of Federal Regulations, an alien is presumed ineligible for bond unless he can demonstrate by a preponderance of the evidence that his release from custody "would not pose a danger to property or persons, and that [he] is likely to appear for any future proceedings." 8 C.F.R. § 236.1(c)(8). The alien may also be held in the custody of the Service without bond based upon a proper finding that his release would pose a threat to the national security of the United States. See Matter of Patel, supra, (citing Carlson v. Landon, 342 U.S. 524 (1952)); see also Doherty v. Thornburgh, 943 F.2d 204, 209 - 11 (2nd Cir. 1991), cert. denied, 419 U.S. 873 (1974).

**C.    Phase One: Determination Based Solely on Public Record**

Judge Lenard prescribed a two-phase process for conducting Respondent's bond redetermination proceeding on remand. See Al-Najjar, 97 F.Supp.2d at 1357 - 58. In Phase One, this Court must determine

> whether, based solely on the evidence presented at the public portions of the bond redetermination proceedings held on May 29, 1997 and June 6, 1997, there are facially legitimate and bona fide reasons to conclude that [Respondent] is a threat to national security. The [Immigration Judge] is in the best position to make such factual determination. The [District] Court finds that the [Immigration Judge] may in fact be able to make this determination, in conformity with procedural due process, based on the complete record of the public portions of [Respondent's] prior bond redetermination hearings, without further hearing.

Id. (emphasis added) (internal citation and footnotes omitted).

However, this Court conducted remand bond redetermination proceedings on August 29, 30, and 31, 2000, thereby granting each party an opportunity to present their case to the Court. The proceedings were stayed at Respondent's request on August 31, 2000. Subsequently, on September 12, 2000, the District Court ordered this Court to "first determine whether Respondent is a threat to national security, based solely upon the public record evidence submitted by both parties at the bond redetermination proceedings, as ordered." Al-Najjar, — F.Supp.2d — at 5 (S.D. Fla. September 12, 2000). Thereafter, this Court continued the remand bond redetermination proceedings on October 10, 11, 12, and 13, 2000.

**1.    Threat to National Security**

Pursuant to section 219 of the Act, the Secretary of State has designated the "Palestine Islamic Jihad-Shaqaqi Faction" (PIJ) a "foreign terrorist organization." See Designation of Foreign Terrorist Organizations, 62 Fed. Reg. 52, 650 (1997); see also 75 Interpreter Releases, No. 8, Mar.

28, 1998, at 294 - 300 (reprinting State Department Cable No. 97-State-191813 (Oct. 9, 1997)).[9] The designation of the PIJ as a foreign terrorist organization became effective on October 8, 1997.[10] Id. Therefore, the PIJ, as a "terrorist organization," "engages in terrorist activity" that "threatens the security of United States nationals or the national security of the United States." See INA § 219(a)(1). "National security" is defined as "the national defense, foreign relations, or economic interests of the United States." INA § 219(c)(2).

The Act, "as interpreted by the Supreme Court, requires that the evidence supporting [the] decision [that an alien is a threat to national security] show more than 'unexplained membership' and show a 'degree of participation' in the activities of the organization that poses a threat to national security." Al-Najjar, 97 F.Supp.2d at 1361-62. Therefore, on remand, this Court is required to determine whether the evidence demonstrates more than mere "membership" or "association." Id. at 1362. Rather, the Court must determine if Respondent has a "'meaningful association' or a 'degree of participation' in activities posing a threat to national security." Id.

Insofar as the District Court found guidance to be lacking in order to determine "meaningful association" in the context of bond redeterminations, it examined the Supreme Court's interpretation of the concept of "meaningful association" under the Act in the deportation context. The Supreme Court has addressed the extent of "association" that must be shown in order to prove deportability based on an alien's membership in or affiliation with the Communist Party pursuant to section 22

---

[9]The Secretary of State specified that the Palestinian Islamic Jihad-Shaqaqi Faction is "also known as": PIJ-Shaqaqi Faction, PIJ, Islamic Jihad in Palestine, Islamic Jihad of Palestine, and Abu Ghunaym Squad of the Hizballah Bayt Al-Maqdis. See 62 Fed. Reg. 52, 650 (1997); see also 64 Fed. Reg. 55, 112 (1999).

[10]The PIJ was redesignated as a foreign terrorist organization pursuant to section 219 of the Act on October 8, 1999. See 64 Fed. Reg. 55, 112 (1999).

of the Internal Security Act of 1950, and section 241(a)(6)(c) of the Act. Id. at 1360. The Supreme

Court's interpretation of "membership" recognizes that

> "there is a great practical and legal difference between those who firmly attach
> themselves' to the beliefs of an organization 'being aware of all of the aims and
> purposes attributed to it,' and those who temporarily join an organization unaware
> 'of its international relationship and believing it to be a group solely trying to remedy
> unsatisfactory social or economic conditions, carry out trade-union objectives,
> eliminate racial discrimination, combat unemployment, or alleviate distress and
> poverty.'"

Id. at 1360 (quoting Gastelum-Quinones v. Kennedy, 374 U.S. 469, 472 - 73 (1963)).

The Supreme Court has found that in order to determine deportability under the Act based

on "membership" or "affiliation" with the Communist Party, the evidence must show more than the

mere voluntary listing of a person's name on the Party rolls. See Scales v. U.S., 367 U.S. 203, 222

(1961). Deportability must be established by evidence that demonstrates the alien's "meaningful

association" with and awareness of the "distinct and active political nature" of the Party. See

Gastelum-Quinones 374 U.S. at 473. Moreover, to determine whether "intermittent or repeated...act

or acts [tend] to prove 'affiliation' [the acts] must be of that quality which indicates an adherence

to or a furtherance of the purposes or objectives of the proscribed organization as distinguished from

mere co-operation with it in lawful activities." Bridges v. Wixon, 326 U.S. 135, 143 - 44 (1945).

"[C]lose cooperation is not sufficient to establish an 'affiliation' within the meaning of the [Act]."

Id. at 146.

Therefore, "[i]nstructed by the Supreme Court's interpretation of the concept of 'meaningful

association' under the [Act], [the District Court found] that mere 'association' with a known terrorist

organization such as the PIJ does not constitute a reasonable foundation under the [Act] for the

conclusion that [Respondent] was a threat to national security and therefore would not be released

from [the Service's] custody on bond." Al-Najjar, 97 F.Supp.2d at 1361.

This Court will, as did the District Court, juxtapose the evidence presented in the leading Supreme Court cases to provide "further definition to the concept of 'association' as used in the Internal Security Act and the [Act]." Id. at 1361 - 62.

The evidence presented by the Service in Galvan v. Press, 347 U.S. 522 (1954), to prove the alien's membership in the Communist Party consisted of the alien's own testimony during the two interrogations by the Service, and the testimony of a woman who was present when the alien was elected as an officer of a club that was an alleged unit of the Communist Party. Id. at 524. During the prior interrogations, the alien testified to the time and place he joined the Communist Party and "talked freely about his membership in the Party." Id. Further, the alien explained that he did not apply for United States citizenship because he feared that his Party membership would become known to the authorities. Id. However, during his deportation hearing, the alien denied that he had admitted joining the Party. Id. The alien also denied the statements made by the woman relating to his active participation in the Communist Party. Id. In his defense, the alien argued that he did not join the Communist Party, and that if he did, he was unaware of the true purposes and program of the Party. Id. at 528. The Supreme Court found that there was a reasonable foundation for finding that the alien was a member of the Communist Party, and that even if the alien was unaware of the Party's advocacy of violence, the evidence "[did] not show a relationship to the Party so nominal as not to make him a 'member' within the terms of the Act." Id. at 529. The Court concluded that "support, even demonstrated knowledge, of the Communist Party's advocacy of violence was not intended to be a prerequisite to deportation. It is enough that the alien joined the Party, aware that he was joining an organization known as the Communist Party which operates a distinct and active political organization, and that he did so of his own free will." Id. at 528.

The evidence presented by the Service in <u>Gastelum-Quinones v. Kennedy</u>, 374 U.S. 469 (1963), consisted solely of the testimony of two Government witnesses, which established that the alien was a "dues-paying member of a club of the Communist Party" for approximately one year, that "he attended about [fifteen] meetings of his Party club, one executive meeting of the group, and one area Party convention." <u>Id.</u> at 471, 474. The alien chose not to introduce any evidence. <u>Id.</u> at 471. The Supreme Court found that the evidence was "extremely insubstantial" to demonstrate the "'meaningful' character of [the alien's] association with the Party, either directly, by showing that he was, during the time of his membership, sensible to the Party's nature as a political organization, or indirectly, by showing that he engaged in Party activities to a degree substantially supporting an inference of his awareness of the Party's political aspect." <u>Id.</u> at 476 - 77.

The evidence presented in <u>Rowoldt v. Perfetto</u>, 355 U.S. 115 (1957), consisted solely of the alien's own testimony before an immigration inspector four years prior to his deportation hearing. <u>Id.</u> at 116, 119. The alien testified that he had previously been a member of the Communist Party, but that his membership lasted for less than one year. <u>Id.</u> at 116. His stated purpose for joining the Communist Party was to "fight...to get something to eat for the people." <u>Id.</u> at 117. While a member, however, he paid dues, attended meetings and worked in an official bookstore for Communist literature. <u>Id.</u> at 116 - 18. The Supreme Court stated, "we cannot say that the unchallenged account given by [the alien] of his relations to the Communist Party establishes the kind of meaningful association required by [the Act]." <u>Id.</u> at 120. The Court found that "the dominating impulse to his 'affiliation' with the Communist Party may well have been wholly devoid of any 'political' implications." <u>Id.</u> Therefore, the Court held that the record was "too insubstantial" to support the deportation order. <u>Id.</u> at 121.

2.      Application

The Service alleges that Respondent is a threat to national security because he supported the PIJ through his affiliations with two domestic organizations, the ICP and WISE, by fundraising for the PIJ, and by inviting members of the PIJ to come to the United States. Moreover, the Service contends that Respondent "is a terrorist" who "engaged in terrorist activities."

a.      Allegation of Fundraising for the PIJ

(1)      The ICP

The Service contends that the ICP was created to "allow [Respondent] to do what [he was] sent here to do, that is to raise money for the PIJ." In order to prove its allegation, the Service presented two specific pieces of evidence to the Court. First, the Service introduced a letter written by Mr. Al-Arian in which he solicited funds for the ICP. See Exhibit 2. The letter was seized from Mr. Al-Arian's residence during the execution of the search warrant. However, Respondent testified that he never saw the letter and was not aware of its existence.

Second, the Service presented a short videotaped excerpt from a roundtable event in Cleveland, Ohio, in April of 1991. See Exhibit 8. The excerpt depicts Mr. Damra soliciting donations from the audience. Id.; see Transcript at 322 - 23. Further, although not shown in the excerpt, Agent West testified that Mr. Damra stated that "it was the duty of Muslims to give one percent of their earnings to the Islamic cause, for the armed struggle against the enemy, Israel." Transcript at 231 and 530. According to Agent West, there were two stated purposes for the fundraising that transpired: (1) to support the orphans, and (2) to support the Islamic Jihad. Transcript at 524.

It is undisputed that the April 1991 roundtable event was not an ICP event. However, in the

excerpt, Mr. Damra stated that the ICP, "is the active arm of the Islamic Jihad Movement," and that it was called the ICP "for security reasons." Transcript at 320. Aside from the statement by Mr. Damra connecting the ICP and the PIJ, the Service did not present any evidence that the money raised at that event was provided to the PIJ. Moreover, Respondent testified that Mr. Damra was not a member of the ICP and was not speaking on its behalf. The Service offered no evidence to rebut Respondent's testimony.

Additionally, Respondent testified that he was not aware that the event was to take place. Furthermore, there is no open source evidence that Respondent attended the event. See Transcript at 447. Nonetheless, the Service contends that the fact that Respondent did not attend the event where the fundraising took place, does not mean that he was not involved in the activities that occurred there. However, the Service has failed to provide any evidence connecting Respondent to this event, apart from his relationship with two individuals who spoke at the event. Based on the evidence presented to the Court, he was not a member of the organization that hosted the event, he did not attend the event, and he did not even know it was to take place.

Notably, Respondent's counsel stipulated, and Respondent admitted, that fundraising occurred at each ICP conference. Respondent explained that there were two purposes for the fundraising: (1) to raise money to pay for the conferences, and (2) to raise funds for needy children. Respondent testified that the PIJ was not mentioned during the fundraising appeals. The Service offered no evidence to contradict Respondent's testimony.

The Service's lead witness, Agent West,[11] believes the videotapes reflect fundraising at all

---

[11]The Court notes that there were numerous discrepancies in Agent West's testimony. However, the Court recognizes that Agent West often testified from memory, and most of the discrepancies were addressed, either through cross-examination, or through the presentation of .

of the conferences to some extent. See Transcript at 247. However, Agent West admitted that there is no open source evidence that Respondent ever sent money to a terrorist organization or that he ever advocated terrorism. See Transcript at 447.

The Court finds it remarkable that out of over five-hundred videotapes that were seized, from which a thirteen-minute composite tape was created, not one excerpt of the composite depicted Respondent engaging in fundraising for the ICP, the PIJ, or any terrorist organization. There is no evidence that Respondent engaged in fundraising for any organization.

The Court also finds the current status of the only two individuals whom the evidence indicates engaged in fundraising activities quite noteworthy: Mr. Al-Arian remains a free man, and Mr. Damra is a naturalized United States citizen "who has never been questioned by any U.S. government agency regarding his association with [Mr.] Al-Arian, [Respondent], WISE or the ICP." See Exhibit 49.

Even if the Court found that the evidence demonstrated that the ICP raised money for the PIJ at this event, it was not illegal to do so until 1997. See 62 Fed. Reg. 52, 650 (1997). Furthermore, even if the Court found that the evidence demonstrated that the ICP raised money for the PIJ and that Respondent was involved, it is possible, although not probable, that those associations with the PIJ at that time may have been "wholly devoid of any political implications." See Bridges, 326 U.S. at 145; see also Rowoldt, 355 U.S. at 120. However, in this case, there is still no evidence that Respondent raised funds for the PIJ or sent funds to the PIJ.

In conclusion, the Court finds that the evidence does not demonstrate that Respondent engaged in fundraising for the PIJ through the ICP. In fact, the Court would be remiss in finding that

---

documentary evidence. The Court does not question Agent West's credibility.

Respondent engaged in fundraising based on the "extremely insubstantial" evidence presented. Cf. Gastelum-Quinones, 374 U.S. at 474, 476 - 77 (finding that the evidence that established that the alien was a dues-paying member of the Communist Party, that he attended fifteen meetings of his Party club, one executive meeting of the group, and one area Party convention was "extremely insubstantial" to demonstrate the "meaningful" character of the alien's association with the Party).

### (2) WISE

The Service alleges that Respondent engaged in fundraising for PIJ through WISE. Respondent testified that as Executive Director, he had numerous financial responsibilities, including raising funds and donations for WISE. WISE solicited financial contributions through the distribution of brochures which delineated WISE's objectives and means. Respondent and Mr. Al-Arian were the original signatories to the WISE bank account. Mr. Shallah was added as a signatory in late 1992.

In order to prove its allegations of fundraising by Respondent for the PIJ through WISE, the Service first calls into question Respondent's financial history, specifically, transactions that link his personal bank accounts and the WISE bank account. Respondent testified that he received two wire transfers from the Middle East.[12] On September 15, 1992, he received a wire transfer in the amount of $100,000 from his brother-in-law, intended for safekeeping. Then in 1993, he received a wire transfer in the amount of $96,000 from his sister-in-law, with $34,000 of it designated for his family, and the remainder for WISE.

In its closing statement, the Service clarified that its allegation is that only one wire transfer

---

[12]Respondent subsequently submitted additional records corroborating his claim. See Tab 4.

from the Middle East occurred, rather than two.

However, regardless of how many wire transfers transpired, the record is devoid of any evidence linking any of Respondent's financial transactions to the PIJ. Furthermore, the FBI Financial Analyst, Mr. Vrynjolfsson, did not have any knowledge of "where the money went abroad."

Although the Court finds that Respondent's numerous discrepancies regarding his financial history reflects that he was less than forthright in addressing the issue, there is no evidence that indicates that Respondent engaged in fundraising for the PIJ through WISE. Notably, Agent West acknowledged that there is no open source evidence that WISE raised money for any other organization. See Transcript at 471.

### (3)   Conclusion on the Fundraising Claim

The Court finds that the Service's claim that Respondent engaged in fundraising activities for the PIJ, through either the ICP or WISE, is unsupported by the evidence of record.

### b.   Inviting the "Who's Who" of Terrorist Organizations

The Service contends that the ICP was "in the business" of inviting "the 'Who's Who' of terrorist organizations around the U.S." to the ICP conferences. One of Respondent's duties at the ICP included inviting speakers to the ICP conferences.

### (1)   Mr. Al-Arian[13]

The Service extensively elaborated on Mr. Al-Arian's activities in the ICP, WISE and at other events. It maintains that there is a "direct connection" between Mr. Al-Arian's activities and

---

[13]The Court does not give any weight to Mr. Al-Arian's testimony. Of the few responses he provided, his answer to one question of whether he made a specific statement, was contradicted by the evidence presented. See Transcript at 155, 339.

Respondent's activities.[14]

However, this Court finds that the fact that Mr. Al-Arian , the actual focus of the Service's case in this matter, and the primary focus of Agent West's search warrant affidavit, has remained a free man, severely undermines the claim that he is a threat to our national security, much less that Respondent's association with him thereby renders Respondent a threat to our national security.

### (2)   Mr. Shallah

Agent West believes that Respondent was aware of Mr. Shallah's connections to the PIJ while he worked at WISE. According to Agent West, the validity of his conclusion is established by the evidence that demonstrates the relationship between Respondent and Mr. Shallah through WISE and the ICP, the "fact that [Respondent] is a highly educated and intelligent individual who has purported himself...as someone knowledgeable of Middle Eastern affairs," and the "generally accepted...historic acknowledgment...that [Mr.] Shallah has been connected to the PIJ for a long time." Transcript at 444. Through academic resource documents, as far as open source publications, Mr. "Shallah has been identified as someone who has been a member of the Islamic Jihad movement for a long period of time, prior to his coming to the United States." Transcript at 445, 556. Cf. Exhibit 2 (stating that there is no evidence to suggest that Mr. Shallah was involved in the PIJ while in the United States).

Respondent testified that Mr. Shallah "did a lot of good work for WISE" and therefore, Respondent wrote a letter on WISE letterhead on his behalf dated October 23, 1995. See Exhibit 58. Further, he stated that he was very sad and disappointed when he learned that Mr. Shallah was

[14]There were allegations of Mr. Al-Arian's connections to the Islamic Jihad as early as 1994. See Exhibit 30 at 25.

the head of the PIJ.

As acknowledged by Agent West, there is no direct evidence that Respondent read any of the academic resource documents indicating Mr. Shallah's connection to the PIJ. Additionally, it is recognized that Mr. Shallah's emergence as a leader of the PIJ "apparently caught many by surprise." See Exhibit 30 at 34 - 35. However, the Court finds it suspect that WISE, an organization engaged in advanced studies of Middle Eastern affairs, was not, at the least, aware of Mr. Shallah's alleged involvement with the PIJ. Furthermore, the Court's suspicions are deepened by the fact that Respondent was a Director at WISE and a close working associate of Mr. Shallah. Nonetheless, mere suspicions do not support a finding of a "meaningful association" with the PIJ. See Al-Najjar, 97 F.Supp.2d at 1362.

### (3)   Mr. Al-Ghannoushi

Mr. Al-Ghannoushi was convicted in 1992 of attempting to assassinate the former Tunisian president. Respondent testified that he still supported Mr. Al-Ghannoushi's invitation to the United States in 1994 because he was convicted in a Third World tribunal, "which is always tainted." Therefore, Respondent did not give Mr. Al-Ghannoushi's conviction "much weight." He also invited Mr. Al-Ghannoushi to the United States, in spite of his conviction, because he was a "highly regarded academic." The Country Reports for Tunisia corroborate Respondent's claim. See Exhibit 29.

### (4)   Mr. Odeh

Mr. Odeh is a spiritual leader of the PIJ. Respondent admitted that he was aware of Mr. Odeh's position in the PIJ when he invited him to the ICP conference.

(5)     Mr. Nafi[15]

The Service argues that Respondent assisted in obtaining a visa for Mr. Nafi, whom Respondent knew was connected with the PIJ. Respondent testified that he discussed with Mr. Nafi, the articles that he had read that claimed Mr. Nafi was associated with the PIJ. Respondent concluded that the claims were a misunderstanding of Mr. Nafi's relations with others.

The Court recognizes that there is contradicting evidence regarding whether Mr. Nafi was a founder of the PIJ or if he has been associated with the organization. See Exhibits 22, 30, 34. However, even if Mr. Nafi was the founder of the PIJ, the PIJ was not a designated terrorist organization at the time Respondent petitioned on his behalf. See 62 Fed. Reg. 52, 650 (1997). Morever, the Service granted the visa petition, thus authorizing Mr. Nafi's entry into the United States.

(6)     Conclusion On the Who's Who Claim

According to Agent West, the open source evidence that alleges that Respondent advocated support for the PIJ, must be examined in "the totality of the circumstances in [the] investigation." Transcript at 448. Agent West asserts that "[b]ringing...known leaders of the PIJ into the United States to attend these conferences and to that process, being part of that entire oversight and management and, the organizational process....establishes his support for the PIJ." Transcript at 448.

However, while recognizing that this Court is in no position to determine if the

---

[15]The Court finds Mr. Nafi's testimony questionable. It has been tainted by his bias to the Palestinian cause and his relationship with Respondent.

Furthermore, Mr. Nafi's testimony was vague and contradicting. For example, although Respondent submitted evidence explaining why Mr. Nafi had pay stubs from Reston Investments on his person when he was arrested by Service agents, during his testimony, Mr. Nafi denied that he had such pay stubs on his person. See Tab 2; see also Exhibit 61.

aforementioned individuals were or are members of the PIJ, Respondent's association with known or suspected members of the PIJ does not even establish an "unexplained membership" in the PIJ. See Al-Najjar, 97 F.Supp.2d at 1361 - 62; see also Bridges, 326 U.S. at 146 (finding that close cooperation is not sufficient to establish "affiliation" within the meaning of the Act). Therefore, the evidence presented in support of the Service's claim that Respondent is a threat to our national security because of his support for the PIJ by inviting the so-called "Who's Who" of terrorist organizations does not establish a "meaningful association" or a "degree of participation" in activities that pose a threat to national security. See Al-Najjar, 97 F.Supp.2d at 1361 - 62. Moreover, the Court finds notable that, even assuming Respondent invited terrorists into the United States, it is the Government that authorized the entry of these individuals into the United States.

3.    Conclusion[16]

Contrary to Respondent's assertion that the standard directed by the District Court requires direct evidence to prove a "meaningful association" with the PIJ, the Court notes that evidence establishing a "meaningful association" may consist of indirect evidence that demonstrates that Respondent engaged in PIJ activities "to a degree substantially supporting an inference of his awareness" of the political aspects of the PIJ. See e.g. Transcript at 521; see also Gastelum-Quinones, 374 U.S. at 476 - 77.

However, the record before the Court is devoid of any direct or indirect evidence to support

---

[16] The Court notes that the Service was not authorized to reveal whether or not a grand jury investigation currently exists targeting Respondent. Transcript at 591. At the first bond hearing, Agent West confirmed that there was an ongoing grand jury investigation. Transcript at 592. Therefore, Respondent requested that the Court make an adverse inference from the Service's decision not to reveal the information at the remand bond redetermination hearing. Service's Transcript at 595.

the conclusion that Respondent was meaningfully associated, as required by the Act, with the PIJ.[17] See Gastelum-Quinones, 374 U.S. at 476 - 77 (finding that the evidence was "extremely insubstantial" to demonstrate the "meaningful" character of the alien's association with the Communist Party, either directly, by showing that he was, during the time of his membership, sensible to the Party's nature as a political organization, or indirectly, by showing that he engaged in Party activities to a degree substantially supporting an inference of his awareness of the Party's political aspect). In sharp contrast to the aliens in Galvan and Rowoldt, Respondent never admitted that he was a member of the PIJ. See Galvan, 347 U.S. at 524; see also Rowoldt, 355 U.S. at 116. To the contrary, Respondent denied any connection whatsoever to the PIJ or its activities. Furthermore, the evidence presented to the Court failed to rebut Respondent's testimony and did not establish that Respondent was a member of the PIJ. Cf. Gastelum-Quinones, 374 U.S. at 476 - 77 (finding that, despite the fact that the evidence demonstrated the alien's active membership in the Communist Party for one year, it was insufficient to prove, directly or indirectly, the meaningful character of the alien's association with the Party).

It is uncontested that the photographs obtained from the WISE offices depict Mr. Shallah, Mr. Nafi, Mr. Al-Ghannoushi, Mr. Al-Arian, Mr. Rahman and Mr. Odeh. See Exhibits 1A - 8A. However, as previously stated, the evidence before this Court does not demonstrate that Respondent's association with these individuals amounts to "meaningful association" or a degree of participation in activities posing a threat to national security. See Al-Najjar, 97 F.Supp.2d at 1361

---

[17]The Court finds it noteworthy that most of the evidence submitted by the Service was obtained through a search warrant written by Agent West, in which he specifically named Mr. Al-Arian, Mr. Shallah, and Mr. Nafi. However, the search warrant affidavit did not name or include Respondent.

- 62.

The Court certainly recognizes that it raises suspicion that one of the photographs depicts Respondent at an ICP Conference where a poster with a symbol demonstrative of the PIJ appears on the stage. See Exhibit 8A. However, using this as the link by which Respondent is tied to a terrorist organization or terrorist activities, is tenuous, at best. See Bridges, 326 U.S. at 145.

It is also undisputed that the ICP hosted five annual conferences that were advertised, open to the public, videotaped, transcribed and attended by hundreds of people. See Exhibit 23. Furthermore, as claimed by the Service, acknowledged by Respondent, and stipulated by Respondent's counsel, fundraising undoubtedly occurred at each conference. See Transcript at 280 - 81, 285. Respondent admitted and his counsel stipulated that Respondent attended each ICP conference. See Transcript at 284. Nevertheless, there is no evidence in the record to even suggest that the purpose of the fundraising that occurred at the ICP conferences was not to cover the costs of the conference, or to raise money for the Orphan Sponsorship Program.[18] See Exhibit 23.

In support of its allegation that Respondent engaged in fundraising in support of the PIJ, the Service presented a thirteen-minute composite tape compiled from five-hundred videotapes that were seized pursuant to the federal search warrant.[19] See Exhibit 8. However, Respondent was not

---

[18]The Court recognizes that the use of the funds raised at the ICP conferences "is a matter of controversy." See Exhibit 30 at 23. However, based on the record, there is insufficient evidence to conclude that Respondent engaged in fundraising for the PIJ through the ICP.

[19]In regards to the composite tape, the Service contends four major points: (1) that Respondent "attended [the] conferences"; (2) "that other people that the U.S. Government knows or suspects to be terrorists attended the...conferences"; (3) "that there...was a variety of speeches and a lot of rhetoric at [the] conferences that were indicative of people who support violence, support the violent overthrow of governments and other terrorist threats and assertions"; and (4) that "there was fundraising for the [PIJ] as depicted in the videotape." Transcript at 280 - 81.

depicted fundraising at any point, in any excerpt. Id. In fact, the only fundraising appeal that was shown involved Mr. Damra at an event in Cleveland which Respondent did not attend and was not a member of the organization hosting the event. Further, the Service has not presented any evidence that any money raised during that event even went to the PIJ. Additionally, and most notably, subsequent to this event, Mr. Damra, the only individual depicted engaging in fundraising in the composite tape, subsequently became a naturalized United States citizen. See Exhibit 49. That fact alone undermines the Service's claim that the type of fundraising that occurred constitutes 'terrorist activity.'

Although there are allegations that "the ICP and WISE were 'fronts' for 'Palestinian political causes,'" there is no evidence before the Court that demonstrates that either organization was a front for the PIJ.[20] See Exhibit 30 at 25. To the contrary, there is evidence in the record to support the conclusion that WISE was a reputable and scholarly research center and the ICP was highly regarded. See Exhibits 20, 30 at 39 and 57.

The Court rejects the Service's claim that Respondent's alleged attempt to commit fraud through his first marriage leads to a "theme" of his activities in WISE and the ICP. See Exhibit 53. The Service's reliance on a letter from Respondent's former wife to convince the Court of an alleged theme of fraud is circumstantial, at best. It does not corroborate the Service's claim that Respondent is a threat to our national security. Additionally, the Service did not provide any evidence to support its allegation that Respondent was "concealing his identity" by virtue of entering the United States,

---

[20]There have been reports that WISE and the ICP were connected through Mr. "Al-Arian as an incorporator of each entity,...that the entities shared key officers, the same post office box and office facilities." Exhibit 30 at 87. However, the evidence of record does not connect either the ICP or WISE to the PIJ.

joining the mosque, and working at USF and WISE, in order to "create a public person."

Based on the evidence presented to this Court, it appears that Respondent's involvement with WISE and the ICP amounted to cooperation with the organizations in lawful activities. See Bridges, 326 U.S. at 145.

Although the Court finds that all of the witnesses presented by Respondent were affected by their bias to Respondent and/or the Palestinian cause,[21] the fact remains that the Court has not been presented with any evidence linking Respondent to the PIJ.

"[S]uspicion is inevitable regarding the motives of certain individuals and the purposes of the ICP and WISE. But neither the allegations nor the information publicly known is conclusive of terrorist relationship or activity." Exhibit 30 at 39. As clearly stated by Agent West, there is no open source evidence that Respondent ever sent money to a terrorist organization or that he ever advocated terrorism. Transcript at 447. Therefore, the Court finds, based on the evidence presented at the public portions of the remand bond redetermination proceedings, that there are no "facially legitimate and bona fide reasons to conclude that [Respondent] is a threat to national security." See Al-Najjar, 97 F.Supp.2d at 1357.

D.     Phase Two: Procedures for Use of Classified Information

Inasmuch as the Court finds that the public record is insufficient to conclude that Respondent must be detained as a national security threat, if the Service so moves the Court, it will proceed to Phase Two of the bond redetermination proceedings. The Court presumes that the Service will do so as it "clearly state[d] for the record...that [it] possesses relevant classified information that it

---

[21]Many of the witnesses presented by Respondent were borderline hostile witnesses. This also includes Respondent who had to be instructed numerous times by the Immigration Judge to provide the Court with responsive answers.

would present to the Court." (Service's Motion, September 6, 2000, at 2 and 3 n.1.) Therefore, in order to avoid further delay, the Court will hereafter articulate its procedures for Phase Two.

The District Court found that the manner in which this Court conducted Respondent's prior bond redetermination proceedings deprived him of his due process rights. Id. at 1357. Specifically, the District Court found that the one-line unclassified summary of the classified information provided to Respondent by this Court was insufficient to afford him notice of the information underlying this Court's determination that he was a threat to national security. Id. at 1355. Further, "the failure to maintain any record of the ex parte in camera presentation of classified evidence compounded the deprivation of a fair hearing by insulating the [Immigration Judge's] decision from meaningful review by the Board of Immigration Appeals and the [District] Court." Id. at 1354. The appropriate remedy, as stated by the District Court, is "to afford [Respondent] the opportunity for his application to be considered by the [Immigration Judge] in a fundamentally fair manner on remand." Id. at 1357. However, the District Court concluded that the introduction of and reliance upon classified information in Respondent's bond redetermination proceedings was within the implied statutory authority granted by section 242(a) of the Act and section 3.19 of Title 8 of the Code of Federal Regulations[22]. See Al-Najjar, 97 F.Supp.2d at 1348; see also Operating Policy and Procedures Memorandum OPPM 98-10: Classified Information in Immigration Court Proceedings, U.S. Dept. of Justice, EOIR, Office of the Chief Immigration Judge, at 11 (December 28, 1998) (OPPM 98-10) (stating that pursuant to 8 C.F.R. § 3.19(d), the Immigration Judge may consider "classified information that the [ ] Service offers for consideration").

---

[22]The determination of the Immigration Judge as to custody status or bond may be based upon any information that is available to the Immigration Judge or that is presented to him by Respondent or the Service. See 8 C.F.R. § 3.19(d).

As stated in this Court's July 27, 2000 IJ Order, it will implement the procedural safeguards suggested by the District Court, to the extent possible under the law, during Phase Two of these proceedings. See July 27, 2000 IJ Order. First, the Court will record, on cassette tape, all future proceedings, including ex parte and in camera proceedings. Id. at 5. Second, the fact that the Immigration Judge does not have the authority to order the Service to produce an unclassified summary[23], is a non-issue as the Service has explicitly stated that Respondent "will, if the case proceeds to its classified phase, receive an enhanced summary of that evidence."[24] See Service's Opposition, September 8, 2000, at 4; see Transcript at 60 - 61.

Applying the Mathews[25] analysis to identify the extent of procedural due process required in the instant case, the District Court enumerated the interests involved. Id. at 1352. Respondent's

---

[23]The Court may "encourage[], but cannot require, that the Service offer Respondent a summary or stipulation." July 27, 2000 IJ Order, at 7. "Only the classifying agency - not the Immigration Court - may provide an unclassified summary of the information for release to the alien, whenever it determines it can do so consistently with safeguarding both the classified nature of the information and its sources." See July 27, 2000 IJ Order; see also 8 C.F.R. § 240.49(c)(4)(iv) (emphasis added) (regulating use of classified information in connection with applications for asylum or withholding of deportation in deportation proceedings); 8 C.F.R. § 240.11(c)(3)(iv) (same rule in removal proceedings); 8 C.F.R. § 240.33(c)(4) (same rule in exclusion proceedings).

[24]Following the guidance of the Classified Information Procedures Act or the Alien Terrorist Removal Court, as suggested by the District Court, does not require the Service to disclose the classified information to Respondent. See CIA v. Sims, 471 U.S. 159, 180 (1985) (holding that courts may not themselves order declassification and disclosure of classified national security information).

[25]The Mathews analysis requires identifying: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedural requirements would entail. Mathews v. Eldridge, 424 U.S. 319 (1976).

interests are: (1) the right to petition the government and have that petition fairly adjudged at a meaningful time and in a meaningful manner, (2) notice of the grounds on which the Service continues to detain him, and (3) an opportunity to present evidence in opposition to the Service's asserted reasons for his detention. Id. at 1353 - 54. The Service's interests include: (1) the efficient administration of the immigration laws, (2) protecting national security, and (3) an interest in the integrity and accuracy of administrative proceedings in which those interests are furthered. Id. at 1356.

The District Court found that if this Court should find that there is insufficient public evidence to support the conclusion that Respondent is a threat to national security, "only then should the Government present, if it wishes, classified information in support of its argument for continued detention." Al-Najjar, 97 F.Supp.2d at 1358 (emphasis added). However, the District Court declined to outline procedural safeguards for the presentation of classified information, as subsequently requested by Respondent, stating that "it has manifestly addressed [the] issue within its May 31st Order." Al-Najjar, — F.Supp.2d — at 5 (S.D. Fla. September 12, 2000). Specifically, in its May 31, 2000 Order, the District Court stated that if the Service chooses to introduce classified information, it must do so "in a manner that affords [Respondent] access to the decisive evidence to the fullest extent possible, without jeopardizing legitimately raised national security interests." See Al-Najjar, 97 F.Supp.2d at 1358 (internal punctuation omitted); see also Al-Najjar, — F.Supp.2d — at 5 (S.D. Fla. September 12, 2000). Further, the District Court instructs this Court:

> In conducting a proceeding involving the presentation of classified information, the [Immigration Judge] must [ ] 'properly balance [Respondent's] procedural due process rights and the government's interests in national security and the fair and efficient administration of the immigration laws.

Al-Najjar, — F.Supp.2d — at 6 (September 12, 2000) (citing Al-Najjar, 97 F.Supp.2d at 1358 - 59).

Page 52 of 56

However, the District Court gave no explicit instructions on how this Court must proceed in striking the proper balance. See July 27, 2000 IJ Order; at 4.

This Court, therefore, looks for guidance from persuasive, albeit limited, case law on the issue. In Kiareldeen v. Reno, 71 F.Supp.2d 402 (D.N.J. 1999)[26], the Service presented classified evidence ex parte and in camera to the Immigration Judge which allegedly demonstrated that the alien was a suspected member of a terrorist organization and a threat to national security. Id. at 404. The Immigration Judge apparently reviewed the classified evidence and "determined that [a]n evaluation of the evidence by a person of ordinary prudence and caution cannot sustain a finding that [the alien] has engaged in terrorist activity' and ordered his release from custody ." Id. at 404. Moreover, the District Court considered the Service's unclassified summary evidence "lacking in either detail or attribution to reliable sources which would sore up its credibility." Id. at 414. Therefore, in determining whether due process concerns were satisfied, the Court found that the Service's "reliance on evidence that could not be tested for reliability denied the [alien] the independent adjudication to which he is entitled." Id. at 419.

The Court finds further directive from the applicable policies and procedures of the Executive Office for Immigration Review. See 8 C.F.R. § 3.9(a).[27] Pursuant to OPPM 98-10, the Service may

---

[26]The Court notes that the facts of Kiareldeen are distinguishable from the case at bar. In Kiareldeen, the Service submitted virtually all of its substantive evidence in camera and under seal to the Immigration Judge. See Kiareldeen v. Reno, 71 F.Supp.2d 402, 416 (D.N.J. 1999). Throughout the proceedings, the Service failed to produce original source material or live witnesses to support its allegations of terrorism. Id. at 417 - 18. Clearly, Respondent in the present matter has been afforded the opportunity to rebut many of the allegations made by the Service.

[27]"The Chief Immigration Judge shall be responsible for the general supervision, direction, and scheduling of the Immigration Judges in the conduct of the various programs assigned to them....[The Chief Immigration Judge's duties] include, but are not limited to,

request that the Court conduct an in camera hearing to make determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the hearing. Id. at 11. While Respondent must be notified that classified evidence will be presented to the Immigration Judge, Respondent "should not be advised of the identity(ies) of the agency(ies) or witness(es) providing the classified info, nor of the date(s) and time(s) of such presentations." Id. at 12.

Therefore, in order to determine whether the quality of the evidence offered by the Service as the basis for Respondent's continued detention attains that level of reliability sufficient to satisfy the constitutional standard of fundamental fairness, this Court concludes, in compliance with the Orders of the District Court and the applicable EOIR policies and procedures, Phase Two will proceed as follows:

1.    Upon a request by the Service, the Court will conduct an in camera and ex parte hearing. See OPPM 98-10 at 11 (specifying that the "Service may request that the Court conduct an in camera hearing to make determinations concerning the use, relevance, or admissibility of classified information that would otherwise be made during the hearing or pre-hearing proceedings.")

2.    The Court will notify Respondent that classified evidence will be presented to the Court. Id. at 12 (stating that "notice should be given [to the alien] prior to and following any presentation of classified evidence.")

3.    The Court will not advise Respondent of the identity of the agency or witness providing classified information, nor the date and time of such presentation. Id.

4.    The Court will record all proceedings. See Al-Najjar, 97 F.Supp.2d at 1359; see also July 27, 2000 IJ Order; OPPM 98-10 at 10 (instructing that "a custody or bond proceeding in which the [Service] intends to present classified information must be recorded" and the "tapes of the proceedings must be labeled to indicate the appropriate security classification level.")

---

establishment of operational policies." 8 C.F.R. § 3.9(a).

5.  The Court will review the classified evidence. See Al-Najjar, 97 F.Supp.2d at 1348, 1358 - 59; see also July 27, 2000 IJ Order; OPPM 98-10 at 11.

6.  The classified materials will be placed in the record according to the appropriate procedures. See OPPM 98-10 at 11 (directing that "[i]f classified materials are placed in the record, the Immigration Judge must ensure that appropriate procedures are followed to ensure that the classified information is not viewed by those who do not have security clearance.")

7.  The Court will determine the reliability, relevance, and admissibility of the classified information. See OPPM 98-10 at 11; see also Kiareldeen, 71 F.Supp.2d at 414, 416.

8.  The Court will review the unclassified summary of the classified information. See Al-Najjar, 97 F.Supp.2d at 1359; see also Kiareldeen, 71 F.Supp.2d at 404.

9.  The Court will balance the interests of each party, as enumerated by the District Court. See Al-Najjar, 97 F.Supp.2d at 1358 - 59; see also Al-Najjar, --- F.Supp.2d --- at 6 (S.D. Fla. September 12, 2000).

10. The Court will provide notice to Respondent following the presentation of classified evidence. See OPPM 98-10 at 12 (explaining that "notice should be given [to the alien] prior to and following any presentation of classified evidence.")

11. If the Court concludes that:

    a.  the classified information is reliable, relevant, and admissible, (see OPPM 98-10 at 11; see also Al-Najjar, 97 F.Supp.2d at 1358 (finding that the unclassified summary provided to Respondent in the prior bond redetermination hearing was "lack[ing] in detail to bolster the credibility of its content and the necessity of its use against [Respondent]"); Kiareldeen, 71 F.Supp.2d at 414); AND

    b.  the unclassified summary affords Respondent "access to the decisive evidence to the fullest extent possible, without jeopardizing legitimately raised national security interests," (see Al-Najjar, 97 F.Supp.2d at 1358 - 59; see also Al-Najjar, — F.Supp.2d — at 6 (S.D. Fla. September 12, 2000)),

        then, the classified summary shall be made available to Respondent, and he will have the opportunity to rebut the allegations. See OPPM 98-10 at 13 (stating that "[p]rior to and following any in camera hearing, the alien and his representative(s) should be allowed to present any opposing evidence.")

12. If the Court concludes that:

a. the classified information is not reliable, relevant, and admissible, (see OPPM 98-10 at 11; see also Kiareldeen, 71 F.Supp.2d at 414); AND/OR

b. the unclassified summary does not afford Respondent "access to the decisive evidence to the fullest extent possible, without jeopardizing legitimately raised national security interests," (see Al-Najjar, 97 F.Supp.2d at 1358 - 59; see also Al-Najjar, --- F.Supp.2d --- at 6 (S.D. Fla. September 12, 2000)),

then, the case will be terminated, and Respondent shall be released from custody.

Accordingly, the following Orders shall enter:

## ORDERS

IT IS HEREBY ORDERED that the Service shall have fourteen (14) days from the date of this Order to request an in camera and ex parte hearing.

IT IS HEREBY FURTHER ORDERED that upon such request, the matter will proceed to PHASE TWO, in accordance with the procedures outlined above.

IT IS HEREBY FURTHER ORDERED that if the Service does not request to proceed to Phase Two within the required period, this case shall be TERMINATED and Respondent shall be RELEASED FROM CUSTODY.

Dated this 27th day of October, 2000.

Honorable R. Kevin McHugh
UNITED STATES IMMIGRATION JUDGE

RKM/ad